# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PHYSIOTHERAPY HOLDINGS, INC., *et al.*,<br><br>                    Debtors. | Chapter 11 Case<br>Case No. 13-12965 (KG)<br>(Jointly Administered) |
| PAH LITIGATION TRUST,<br><br>                    Plaintiff,<br><br>   v.<br><br>WATER STREET HEALTHCARE PARTNERS, L.P. *et al.*,<br><br>                    Defendants. | Adversary Proceeding<br>Case No. 15-51238 (KG) |
| PAH LITIGATION TRUST,<br><br>                    Plaintiff,<br><br>   v.<br><br>WATER STREET HEALTHCARE PARTNERS, L.P. *et al.*,<br><br>                    Defendants. | Case No. 18-01734 (LPS)<br><br><br>PUBLIC VERSION FILED<br>APRIL 30, 2019 |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS
## MOTION TO EXCLUDE EXPERT OPINIONS UNDER FRE 702

OF COUNSEL:
Richard I. Werder, Jr.
Susheel Kirpalani
Benjamin Finestone
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

R. Brian Timmons
Johanna Y. Ong
B. Dylan Proctor
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3112

DATED:  April 23, 2019

Michael A. Barlow (#3928)
April M. Kirby (#6152)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
barlow@abramsbayliss.com
akirby@abramsbayliss.com

*Attorneys for Plaintiff*
*PAH Litigation Trust*

# **TABLE OF CONTENTS**

**Page**

NATURE AND STAGE OF PROCEEDINGS ...................................................................1

SUMMARY OF ARGUMENT ...................................................................................1

STATEMENT OF FACTS ...............................................................................................3

     A.     Factual And Procedural History.............................................................3

     B.     Defendants' Expert Reports..................................................................6

          1.     Timothy Renjilian ......................................................................6

          2.     Daniel Fischel ............................................................................7

          3.     Rajiv Gokhale ............................................................................7

          4.     Richard Puntillo ........................................................................8

ARGUMENT..................................................................................................................10

I.     Defendants' Proposed Expert Testimony Regarding Damages Is Inconsistent With The Court's Rulings...................................................11

II.     Fischel's Opinions Regarding Pre-Transaction Solvency Are Irrelevant And Likely To Mislead The Jury...........................................13

III.     Puntillo's Proposed Testimony Regarding The Auction Sale Process And Due Diligence Is Irrelevant, Unreliable And Misleading ......................................16

     A.     Puntillo's Opinions That The Auction Sale Process Was Actually Customary And Transparent Are Unreliable .............................................16

     B.     Puntillo's Opinions That The Auction Sale Process Merely Appeared Customary And Transparent Are Irrelevant And Misleading.................................................17

     C.     Puntillo's Opinions Regarding Auction Sale And Due Diligence Customs And Practices Are Irrelevant And Likely To Mislead...............18

CONCLUSION................................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>CASES</u>

*Am. Exp. Travel Related Servs. Co. v. D & A Corp.,*
    2007 WL 3217565 (E.D. Cal. Oct. 29, 2007) ................................................ 19-20

*Benjamin v. Peter's Farm Condo. Owners Ass'n,*
    820 F.2d 640 (3d Cir. 1987) ................................................................................ 18

*Cappuccio v. Prime Capital Funding, LLC,*
    No. CIVA07-4627, 2008 WL 7700925 (E.D. Pa. Sept. 16, 2008) ..................... 20

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ........................................................................ 1, 10, 11, 16

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) .................................................................................... 10, 17

*Halperin v. Moreno,*
    2015 WL 5146161 (Bankr. D. Del. Aug. 31, 2015) ........................................... 19

*Henry v. Rizzolo,*
    2010 WL 3385448 (D. Nev. Aug. 24, 2010) ...................................................... 19

*Hodell-Natco Indus., Inc. v. SAP Am., Inc.,*
    2015 WL 350360 (N.D. Ohio Jan. 26, 2015) ..................................................... 20

*In re Armstrong World Indus., Inc.,*
    285 B.R. 864 (Bankr. D. Del. 2002) .................................................................. 11

*In re Baby Food Antitrust Litig.,*
    166 F.3d 112 (3d Cir. 1999) ................................................................................ 17

*In re DVI, Inc. Sec. Litig.,*
    2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ...................................................... 12

*In re Paoli R.R. Yard PCB Litig.,*
    35 F.3d 717 (3d Cir. 1994) .................................................................................. 18

*In re Physiotherapy Holdings, Inc., et al.,*
    No. 13-12965-KG (Bankr. D. Del.) ...................................................................... 4

*Jetport, Inc. v. Landmark Aviation Miami, LLC,*
    2017 WL 7734095 (S.D. Fla. July 19, 2017) ..................................................... 13

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.,*
    2015 WL 6750899 (E.D. Pa. Nov. 5, 2015) ...................................................... 12

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ........................................................................................... 13

*L & M Beverage Co., v. Guinness Imp. Co.*,
 1996 WL 368327 (E.D. Pa. June 24, 1996) ........................................................ 12

*LaSalle Bank Nat. Ass'n v. CIBC Inc.*,
 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ...................................................... 13

*Level 3 Commc'ns, LLC v. Floyd*,
 2011 WL 1100078 (M.D. Tenn. Mar. 22, 2011) ................................................ 12

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
 306 Fed. Appx. 781 (3d Cir. 2009) .................................................................... 15

*Oddi v. Ford Motor Co.*,
 234 F.3d 136 (3d Cir. 2000) ................................................................................ 10

*Peltz v. Hatten*,
 279 B.R. 710 (D. Del. 2002) ................................................................................ 14

*PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*,
 2013 WL 12143965 (D. Del. Apr. 10, 2013) ...................................................... 15

*Pipitone v. Biomatrix, Inc.*,
 288 F.3d 239 (5th Cir. 2002) .............................................................................. 12

*Saldana v. Kmart Corp.*,
 260 F.3d 228 (3d Cir. 2011) ................................................................................ 16

*Seals v. Mitchell*,
 2011 WL 1399245 (N.D. Cal. Apr. 13, 2011) .................................................... 15

*United States v. Martin*,
 2019 WL 422353 (M.D. Fla. Jan. 9, 2019) ........................................................ 20

*Zemaitatis v. Innovasive Devices, Inc.*,
 90 F. Supp. 2d 631 (E.D. Pa. 2000) .................................................................... 18

## RULES/STATUTES

11 U.S.C. § 548(a)(1)(A) ................................................................................................ 19

11 U.S.C. § 548(a)(1)(B) ................................................................................................ 14

12 Pa. C.S.A. § 5104(a)(2) ............................................................................................. 14

Fed. R. Evid. 402 ..................................................................................... 10, 12, 15, 18, 20

Fed. R. Evid. 403 ..................................................................................... 11, 12, 18, 20

Fed. R. Evid. 702 ........................................................................... 1, 10, 12, 15, 17, 18, 20

## NATURE AND STAGE OF PROCEEDINGS

This is a bankruptcy adversary proceeding in which Plaintiff PAH Litigation Trust (the "Trust") seeks to avoid certain transfers made to Defendants Water Street Healthcare Partners, L.P., Water Street Healthcare Management, L.P., WS Associate Co-Invest Partners, LLC (collectively, "Water Street"), Wind Point Partners IV, L.P., Wind Point IV Executive Advisor Partners, L.P., and Wind Point Investors IV, L.P. (collectively, "Wind Point," and with Water Street, the "Defendants") that caused the bankruptcy of debtor Physiotherapy Holdings, Inc. and certain affiliates. Plaintiff submits this Opening Brief in support of its motion pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), to exclude certain of Defendants' expert opinions.

## SUMMARY OF ARGUMENT

The Trust respectfully moves to exclude three categories of expert opinion that Defendants intend to offer at trial. These opinions are irrelevant to the issues the jury will decide, highly misleading and prejudicial to the Trust, and in some cases directly contrary to the Court's rulings.

1. <u>Remedies</u>. As the Court may recall, the Bankruptcy Court adopted a creative procedure in this case: at the parties' request, it resolved disputed issues relating to the Trust's available remedies on summary judgment, prior to any determination of liability. In doing so, the Bankruptcy Court ruled as a matter of law that (i) the Trust may recover the full amount of the fraudulent transfers to Defendants ($248.6 million) if it prevails on a claim under the Bankruptcy Code; (ii) the Trust may recover the amount necessary to satisfy outstanding creditor claims ($228.7 million) if it prevails on a claim under state law; (iii) the profits made by creditors from selling the reorganized Debtor years after the bankruptcy are irrelevant; and (iv) the Bankruptcy Plan's contemporaneous valuation of the creditors' interest in the reorganized Debtor is binding. Defendants asked this Court to review each of these rulings. The Court denied review.

Defendants' experts now act as though these rulings never issued. Without addressing the summary judgment ruling, Defendants' accounting expert (Timothy Renjilian) and damages expert (Rajiv Gokhale) propose to testify that the Trust's recovery should be no more than $23 million because the creditors' gains from the sale of Physiotherapy in 2016 act as an offset. Defendants' valuation expert (Daniel Fischel) and Gokhale opine that the Bankruptcy Plan's valuation of the creditors' interest in the reorganized Debtor cannot be verified. And Gokhale opines that the Trust would obtain a windfall if Defendants were required to return their ill-gotten gains. These opinions contradict the Court's legal rulings, and are inadmissible.

2.  <u>Pre-Transaction Solvency</u>. This case involves a fraudulent sale that rendered the Debtor insolvent. The Trust has stipulated that, prior to this transaction (and the transfer to Defendants that was part of it), the Debtor was solvent. Nevertheless, Defendants' valuation expert, Fischel, proposes to testify regarding Physiotherapy's pre-transaction solvency. That opinion is not relevant to any claim or disputed issue, and would confuse the jury about the correct standard for avoiding fraudulent transfers.

3.  <u>Private Equity Industry Customs</u>. Defendants' private equity industry customs and practices expert, Richard Puntillo, opines that the process for selling Physiotherapy in 2012, which led to the $248 million transfer to Defendants, was "customary" and "transparent," and it allowed for "adequate" due diligence by the buyer and debt investors before the deal closed. But Puntillo admitted at deposition that he did not consider whether material information was withheld from the buyer or investors, or whether the transaction was fraudulent, and thus cannot say whether the transaction was *actually* customary. The most that he can say is that the process *appeared* customary, in the sense that customary steps (like the retention of third-party advisors) were taken. But that opinion is irrelevant, and highly likely to mislead the jury into thinking, wrongly, that

Puntillo studied and is vouching for the *actual* "transparency" of the sale process. These misleading, unreliable opinions should not be admitted.

## STATEMENT OF FACTS

### A. Factual And Procedural History

The Debtor is a physical therapy provider called Physiotherapy Associates Holdings ("Physiotherapy," "PTA" or the "Company"). The Defendants are two private equity firms that owned Physiotherapy and then fraudulently sold it in 2012. As part of the transaction, Physiotherapy transferred $248.6 million to Defendants. By this action, the Trust—an entity formed by the Bankruptcy Court to prosecute claims for the benefit of the bankruptcy estate— seeks the return of those fraudulently-transferred funds.

As the Court will learn at trial, the process of accounting for revenues in the health care industry raises unique complexities, and Physiotherapy used those complexities as a vehicle to inflate its financial statements without detection. Nearly all payments for physical therapy services come from third parties, such as health insurers, long after the services are provided. But physical therapy companies record their revenue at the time of service, and thus must estimate how much money they will later receive. After Defendants decided to sell the Company, the Company adopted a new method for estimating revenues that significantly overstated its income. These inflated estimates led to internal bookkeeping discrepancies, which Physiotherapy's senior management concealed from the Company's auditors. Defendants and Physiotherapy's management then touted the overstated financials in offering the Company for sale, and hid the internal accounting discrepancies from bidders.

The fraud worked, and in April 2012 a private equity firm, Court Square Capital Partners, L.P. ("Court Square"), agreed to purchase Physiotherapy in a leveraged buyout at a valuation of $510 million—more than double its true value. Court Square provided more than $213 million in

equity, and the Company took on $310 million in new debt, including $210 million in principal (and more than $470 million with interest) on new Senior Notes. Defendants siphoned $248.6 million from the Company in the transaction, leaving it insolvent. The Company defaulted on the Senior Notes within a year.

On November 12, 2013, Physiotherapy filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *In re Physiotherapy Holdings, Inc., et al.*, No. 13-12965-KG (Bankr. D. Del.). Because Physiotherapy could not pay the $470 million due under the Senior Notes, the Plan reflected a compromise: (1) the Senior Notes Claims would be allowed in the "principal amount of $210,000,000," Bankr. D.I. 18 at 21; (2) the Allowed Senior Notes Claims would be discharged, and Physiotherapy's obligations to the Noteholders would be released, *id.*; and (3) in exchange, the Noteholders would receive *pro rata* shares of (i) new common stock issued by the reorganized Debtor (the "Equity Interest"), and (ii) 50% of Trust recoveries (the "Litigation Interest"), *id.* at 32. Court Square, whose equity in Physiotherapy was wiped out in the bankruptcy, would receive the other 50% interest in Trust recoveries. *Id.* Based on a contemporaneous valuation by Rothschild, Inc. ("Rothschild"), the Plan valued the Noteholders' Equity Interest at $84.63 million. Bankr. D.I. 19 at 326.

The Trust filed this adversary proceeding in September 2015. Adv. D.I. 1. Its Complaint details Physiotherapy's fraud and alleges claims of actual and constructive fraudulent transfer under the Bankruptcy Code and Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"). *Id.* On June 20, 2016, the Bankruptcy Court denied Defendants' motion to dismiss, allowing all of the Trust's claims to proceed. Adv. D.I. 250, 251.[1] This Court rejected Defendants' request for

---

[1] The Bankruptcy Court initially dismissed the Trust's claims for constructive fraudulent transfer under federal law, Adv. D.I. 250, 251, but reinstated those claims following an intervening U.S. Supreme Court decision, Adv. D.I. 851.

interlocutory review, finding that Defendants presented no substantial grounds for disagreement with any of the Bankruptcy Court's rulings. Case No. 16-00201-LPS, D.I. 22. Defendants subsequently waived their right to seek summary judgment on liability. Adv. D.I. 884-2.

While this lawsuit was pending, in March 2016, a third party called Select Medical Corporation ("Select Medical") acquired the reorganized Debtor, which was primarily owned by certain Noteholders. Adv. D.I. 566-14. The Noteholders who sold their equity to Select Medical received approximately $242 million from the sale. Adv. D.I. 566-16 at 4. Because Defendants claimed the proceeds of this sale should offset the Trust's fraudulent transfer recovery, the parties filed cross-motions for partial summary judgment on remedies. Adv. D.I. 557, 562. On November 1, 2017, the Bankruptcy Court granted the Trust's motion and denied Defendants' motion, deciding four key issues regarding damages. Adv. D.I. 624, 625 (Exs. 1 and 2 to the Declaration of April M. Kirby).

*First*, the Court held that if the Trust prevails on a claim under federal law, it may avoid the *full* amount of the transfers to Defendants ($248.6 million) without any cap or offset based on the amount of creditor claims. Adv. D.I. 624 at 16-20. As the Court explained, "[a] trustee may thus avoid a transfer beyond the extent necessary to satisfy a creditor's claim. The Trustee may avoid the entire transfer for the 'benefit of the estate.'" *Id.* at 17. Thus, the amount of harm to creditors is irrelevant under federal law. *Id.*

*Second*, the Court held that although the Trust's remedy under state law is limited to the outstanding amount of creditor claims, "the appreciation of equity from the Select Medical sale is irrelevant" in determining that amount. *Id.* at 19. The Trust will not receive a "windfall" from a recovery in this case, despite the Noteholders' sale of their Equity Interest to Select Medical, because "[t]he Court does not determine whether a party which received stock received too much

5

or too little value when weighed against a claim." *Id.* Moreover, "[h]ad there been no bankruptcy, the Noteholders would have received with interest $470,332,509 at maturity," which is more than they will receive if the transfers to Defendants are returned. *Id.*

*Third,* the Court held that the Plan's valuation of the Noteholders' Equity Interest at $84.63 million, based on a contemporaneous valuation of the reorganized Debtor by Rothschild, is "binding" in this case. *Id.* at 19-20 & n.7.

*Finally*, considering these rulings and the Plan's terms governing the distribution of Trust recoveries, the Court held that a recovery of $228.7 million would be necessary to satisfy outstanding creditor claims. *Id.* at 20 & n.7. Thus, this is the amount that the Trust is entitled to recover under its *state law creditor* claims if it prevails on liability. *Id.*

Defendants requested interlocutory review of these rulings by this Court. Case No. 17-00319-LPS, D.I. 1. On March 3, 2018, this Court denied review. *Id.*, D.I. 20.

## B.  Defendants' Expert Reports

Defendants have proffered four expert witnesses. The Trust seeks to exclude portions of the proposed testimony of each.

### 1.  <u>Timothy Renjilian</u>

Renjilian primarily addresses the appropriateness of Physiotherapy's accounting practices prior to its sale in 2012. Kirby Decl. Exs. 4 (opening report), 5 (rebuttal report). In the sixth opinion in his opening and rebuttal reports, he addresses a different issue—the amount of Noteholder losses. *Id.*, Ex. 4 at § V.F; Ex. 5 at § IV.F. According to Renjilian, once proceeds from the sale to Select Medical are deducted, most Noteholders "did not incur a loss on their investment" (Ex. 4 at ¶ 282) and "the maximum losses incurred by holders of the Senior Notes are no more than $23,070,146" (*id.* ¶ 284). Renjilian ignores the Bankruptcy Court's ruling that the Select Medical sale is irrelevant.

### 2. **Daniel Fischel**

Fischel opines on valuation, finding that Physiotherapy was solvent before and after the disputed transaction. Kirby Decl. Ex. 6 at, *e.g.*, ¶¶ 15, 16, 50, 53, 65-68, 75, 93 (pre-transaction valuation); ¶¶ 15, 17, 70, 83, 94 (post-transaction valuation). Following the issuance of his report, however, the parties stipulated that the Debtor was solvent before the transaction, eliminating that as a disputed issue for trial. *See* Adv. D.I. 884-2 at 3 (Kirby Decl. Ex. 3).

Fischel also addresses the valuation of Physiotherapy that was adopted under the Plan in 2013, by Rothschild, and states that he was "unable to reach an opinion" as to whether this valuation "could be verified or otherwise evaluated for reasonableness" because the Plan's "Disclosure Statement does not provide sufficient information or describe Rothschild's methodology and/or inputs in greater detail." Kirby Decl. Ex. 6 at § IX, ¶¶ 99-100. Fischel "note[s]" that "certain documents" provided by Defendants may "imply" a higher valuation, but states that he is not "in any way expressing any opinion on whether these documents are representative of the valuation of [Physiotherapy]" in 2013. *Id.* at 35, ¶ 101 (mislabeled as ¶ 3). Fischel disregards the Bankruptcy Court's ruling that the Rothschild valuation is "binding" in this proceeding. Adv. D.I. 624 at 20.

### 3. **Rajiv Gokhale**

Gokhale offers opinions in response to Dr. Sanjay Unni, the Trust's expert regarding remedies under the Court's rulings.[2] Kirby Decl. Ex. 7 at 1. Unlike Unni, however, Gokhale does

---

[2] Because the remedy for fraudulent transfer claims is avoidance and the dollar amount of the transfers is undisputed, traditional damages expert testimony is unnecessary in this case. Still, out of an abundance of caution, the Trust designated an expert who tabulated the amounts subject to avoidance under the Bankruptcy Court's rulings for each claim, on a defendant-by-defendant basis. Kirby Decl. Ex. 9 at 11-14, 22-27 (Unni Report). The primary purpose for designating Dr. Unni was to provide guidance to the Court on the subject of prejudgment interest, should it become necessary and appropriate to address that subject post-trial. *Id.* at 14-22.

not follow the Court's rulings, and instead "assume[s]" that Defendants' "position" on damages is correct. *Id.* at ¶¶ 20-22. Based on that understanding, he opines in Section IV of his report that the Trust's damages are "at most $23.07 million," once proceeds from the sale to Select Medical are deducted. *Id.* at ¶ 28.

Similarly, in Section VI of his report, Gokhale opines that requiring Defendants to return the transfers will give the Trust a "windfall." Gokhale explains that sums received from the Select Medical sale must be considered (*e.g.*, ¶¶ 54, 60); the terms of the Plan governing Trust distributions are "arbitrary" and not controlling (¶¶ 55-57, 59); the Noteholders may not have received the $470 million they were due under the Notes even "absent the alleged fraud" (¶ 53); and the return of the fraudulent transfers would seize value from the Defendants because Physiotherapy was solvent prior to the transaction (¶¶ 49-52). Gokhale does not address the Bankruptcy Court's ruling that requiring Defendants to return the fraudulent transfers will "not be a windfall." Adv. D.I. 624 at 21.

### 4. <u>Richard Puntillo</u>

Puntillo is Defendants' expert in private equity auction sale and due diligence customs and practices. Kirby Decl. Ex. 8. He offers four opinions in his opening report (*see id.* at 3-4):

*First,* that it "is customary for a private equity firm engaging in an acquisition to perform rigorous and independent due diligence, including reasonably investigating material information provided by the seller and the seller's agents and performing its own independent valuation analysis." *Id.* § III.

*Second,* that Physiotherapy "and its owners followed a customary auction sale process that involved, among other things, retaining third-party consultants and advisors to assist with the auction sale process, providing underlying accounting, financial and business data to potential purchasers, including [Court Square], and making key personnel from PTA and its third-party

consultants and advisors available to potential purchasers, including [Court Square], to answer questions." *Id.* § IV.

*Third,* that the "material risks PTA disclosed during the PTA Sale Process regarding its business were consistent with the types of disclosures customarily provided in M&A transactions and, therefore, provided [Court Square] and other potential purchasers with an adequate basis to conduct buyer-side due diligence to evaluate the risks before purchasing PTA." *Id.* § V.

*Fourth,* that the "information disclosed in the 2012 Notes OM and other materials provided to prospective investors was consistent with the types of disclosures customarily provided in debt-financed transactions, including with respect to material risks associated with the Senior Notes and PTA's business, and therefore provided prospective investors an adequate basis to conduct due diligence to evaluate the risks before investing in the Senior Notes." *Id.* § VI.

Puntillo concludes that "the customary process PTA followed was open and transparent and allowed potential purchasers to make their own judgments based on the underlying data provided to them." *Id.* at 24. At deposition, however, Puntillo admitted that he did not analyze whether the sale process was *in fact* open and transparent, or merely appeared that way. He did not consider whether the financial statements that Physiotherapy disclosed "were materially misstated," Kirby Decl. Ex. 11 (Puntillo Dep. Tr.) at 96:16-19, or "whether PTA management, the board, or the sellers knew that PTA's financial statements were materially misstated," *id.* at 98:14-18. Nor did he analyze the "accuracy and completeness of [the] information" that was provided. *Id.* at 97:20-25. Puntillo therefore cannot say "whether any material information was withheld from Court Square or the other buyers," because he "didn't look at enough to be able to even make such a judgment." *Id.* at 98:1-6. He does not know "whether PTA or the defendants engaged in fraud." *Id.* at 20:18-21.

# ARGUMENT

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The requirement that expert testimony must "assist the trier of fact" goes "primarily to relevance" because expert testimony that is not relevant to a disputed issue for trial will not be helpful to the jury. *Daubert,* 509 U.S. at 591; *see Fed. R. Evid.* 402. The remaining considerations in Rule 702 require "the trial judge [to] ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589. "*Daubert* . . . require[s] more than the haphazard, intuitive inquiry," *Oddi v. Ford Motor Co.,* 234 F.3d 136, 156 (3d Cir. 2000), and a district court should thus exclude proposed testimony "that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In addition, expert testimony that is misleading, confusing or unduly prejudicial is not admissible. *Fed. R. Evid.* 403; *Daubert,* 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (quotation omitted).

Defendants bear the burden of demonstrating that their proposed testimony is admissible under these standards. *In re Armstrong World Indus., Inc.,* 285 B.R. 864, 870 (Bankr. D. Del. 2002).

# I. **Defendants' Proposed Expert Testimony Regarding Damages Is Inconsistent With The Court's Rulings**

Defendants seek to use expert testimony to circumvent the Bankruptcy Court's summary judgment ruling. They should not be permitted to do so.

Following extensive briefing and a half-day hearing, the Bankruptcy Court ruled as a matter of law that the Trust may recover the full amount of the fraudulent transfers, regardless of the amount of creditor losses, if it prevails on a claim under the Bankruptcy Code. Adv. D.I. 624 at 16-19. The Court further ruled, as to the Trust's state law claims, that (i) the valuation of the Noteholder's Equity Interest when Physiotherapy was sold to Select Medical in 2016 is irrelevant, while (ii) the valuation of the Equity Interest under the Plan based on an analysis by Rothschild is binding. *Id*. at 19-20. The Bankruptcy Court concluded that the Trust may recover $248.6 million on its federal claims or $228.7 million on its state law claims. *Id*. at 3, 16, 20. These recoveries will not produce a windfall because the Noteholders were entitled to receive much more under the Notes ($470 million), and Court Square has never received any compensation for its losses. *Id*. at 21.

Defendants' experts plan to contradict *all* of these rulings. According to Renjilian, the Select Medical sale shows that the Noteholders suffered only minor losses—at most $23 million—and the Trust's recovery is limited to that amount. Kirby Decl. Ex. 4 at 143-44 (§ V.F), Ex. 4 at 104 (§ IV.F). According to Fischel, the "reasonableness" of the valuation performed by Rothschild cannot be "verified," and certain documents "imply" a higher valuation. *Id.* Ex. 6 at 34-35 (§ IX). According to Gokhale, the Trust's damages cannot exceed $23 million, and it would be a windfall for the Trust to recover a greater amount. *Id*. Ex. 7 at 10-12, 21-28 (§§ IV, VI).

None of these opinions is proper, for experts cannot offer testimony that contradicts the Court's rulings. *See, e.g., In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *9-12 (E.D. Pa. Sept.

3, 2010) (excluding opinion of damages expert as "unfit" and "irrelevant" where it conflicted with court's rulings); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.,* 2015 WL 6750899, at *10 (E.D. Pa. Nov. 5, 2015) (precluding expert from testifying as to legal standard rejected by the court); *Level 3 Commc'ns, LLC v. Floyd*, 2011 WL 1100078, at *5 (M.D. Tenn. Mar. 22, 2011) (excluding damages testimony as inconsistent with rulings); *L & M Beverage Co. v. Guinness Imp. Co.*, 1996 WL 368327, at *3-4 (E.D. Pa. June 24, 1996) (same). The issues that Defendants' experts plan to address have already been decided. Their proposed testimony is therefore irrelevant and unhelpful, and would confuse the jury and prejudice the Trust by suggesting that the jury should reevaluate decided issues. Such testimony is inadmissible. *Fed. R. Evid.* 402, 403, 702.

In addition, Defendants' expert opinions regarding the Rothschild valuation are inadmissible for another reason: they are not expert opinions at all. Fischel states that he was "*unable to reach an opinion*" regarding the reasonableness of the Rothschild valuation because he lacked the requisite information. Kirby Decl. Ex. 6 at 34 (emphasis added). And Gokhale admits that he did not "perform any analysis to evaluate the fairness or reasonableness of the Rothschild valuation." *Id.* Ex. 10 at 30:19-25. Experts are not permitted to testify about matters as to which they were unable to formulate an opinion. *See Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 245 (5th Cir. 2002) ("A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence."); *Jetport, Inc. v. Landmark Aviation Miami, LLC*, 2017 WL 7734095, at *4 (S.D. Fla. July 19, 2017) (testimony excluded as "obviously unreliable and not useful" where expert conceded that "it is impossible for him to render an expert opinion"). Nor may they offer opinions that are merely their *ipse dixit.* *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 157 (1999).

Finally, Gokhale's expert opinions regarding the "windfall" that a fraudulent transfer recovery would supposedly yield (Kirby Decl. Ex. 7 at 21-28, § VI) are inadmissible for another, independent reason: the Trust does not intend to offer the opinion by Dr. Unni that Gokhale purports to rebut. Out of an abundance of caution, Dr. Unni prepared an opinion that avoidance of the fraudulent transfers would not result in a windfall under principles of economics. Kirby Decl. Ex. 9 at 27-33. The Trust does not intend to introduce this opinion at trial, however, and Gokhale's associated rebuttal opinion is therefore inadmissible. *See, e.g., LaSalle Bank Nat'l Ass'n v. CIBC Inc.,* 2012 WL 466785, at *19 (S.D.N.Y. Feb. 14, 2012) (where an opinion will not be offered at trial, "rebuttal opinions are necessarily irrelevant").

The Bankruptcy Court went to great lengths to resolve disputed issues of damages prior to trial, as a matter of law. Defendants' proposed testimony seeking to have the jury reevaluate those decided issues should be excluded.

## II.     Fischel's Opinions Regarding Pre-Transaction Solvency Are Irrelevant And Likely To Mislead The Jury

The Court should also exclude Fischel's testimony that, prior to its sale to Court Square, Physiotherapy was well capitalized and solvent. This testimony is not relevant to any issue to be tried and would likely mislead the jury regarding its task, which is to determine (as relevant here) whether the transaction *rendered* Physiotherapy undercapitalized or insolvent. Because Fischel's proposed testimony on *pre-transaction* solvency is irrelevant and likely to mislead, it is not admissible.

The Bankruptcy Code and UFTA give plaintiffs an option in pursuing claims of constructive fraudulent transfer: They can allege that the debtor was insolvent prior to a transfer, or that the debtor became insolvent as a result of a transfer, or both. The Code provides that a transfer is constructively fraudulent if the debtor "received less than a reasonably equivalent value

in exchange" for it, and either "(I) was insolvent on the date that such transfer was made or such obligation was incurred, *or became insolvent as a result of such transfer or obligation*; (II) was engaged in business or a transaction, *or was about to engage in business or a transaction*, for which any property remaining with the debtor was an unreasonably small capital; [or] (III) intended to incur, or *believed that the debtor would incur*, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(i) & (ii) (emphasis added). The terms of the UFTA are similar. 12 Pa. C.S.A. § 5104(a)(2). With both sets of claims, a plaintiff can prevail by showing insolvency either prior to *or* as a result of a transaction, at the plaintiff's election. *See, e.g., Peltz v. Hatten*, 279 B.R. 710, 742 (D. Del. 2002).

In this case, the Trust alleges only the latter—that the transaction rendered the Debtor insolvent, undercapitalized, and unable to pay its debts, not that the Debtor was insolvent prior to and without considering the transaction. The Trust's Complaint alleges that the transaction "rendered the company insolvent the moment the transaction closed." Adv. D.I. 1 (complaint) ¶ 1; *see also id.* at ¶¶ 2, 96 (similar). Moreover, the Trust has stipulated "that PTA was balance sheet solvent immediately before, and without considering the effects of, the April 30, 2012 merger transaction in which Court Square Capital Partners became the owner of PTA," and "is not basing any claim on the assertion that PTA was inadequately capitalized or unable to pay its debts as they came due immediately before, and without considering the effects of, the April 30, 2012 merger transaction . . . ." Adv. D.I. 884-2 at 3 (Kirby Decl. Ex. 3).

Accordingly, there is no disputed issue to which Fischel's proposed testimony could be relevant. Fischel opines at length that Physiotherapy was well-capitalized and able to pay its debts prior to the transaction, without considering the effects of the transaction. Kirby Decl. Ex. 6 at ¶¶ 13, 16, 49-51, 53, 65-68, 74-75, 77, 79, 83-85, 90-91, 93, Exs. K, L, O, S, T, W, Y, Z. But it is

simply immaterial that, if the $248 million in transfers to Defendants were never made, and if the $310 million in new debt that Physiotherapy took on under the transaction did not exist, the Company would be solvent. The Company *did* take on $310 million in new debt, and it *did* transfer $248 million to Defendants. The jury's task is to decide whether those events left the Company insolvent, not whether the Company was solvent before those events occurred.

For these reasons, Fischel's proposed testimony regarding pre-transaction solvency and capitalization is irrelevant, will not help the jury, and does not fit the facts of the case. Such testimony is not admissible. *See Fed. R. Evid.* 402, 702; *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 Fed. Appx. 781, 790 (3d Cir. 2009) (expert testimony is admissible only if there is a "clear 'fit' connecting the issue in the case with the expert's opinion" such that the opinion "will aid the jury in determining an issue in the case"); *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 2013 WL 12143965, at *2 (D. Del. Apr. 10, 2013) (excluding expert opinion on matters not in dispute as unhelpful to jury); *Seals v. Mitchell*, 2011 WL 1399245, at *9 (N.D. Cal. Apr. 13, 2011) (excluding expert opinion on issue that was undisputed in light of stipulation).

Moreover, Fischel's pre-transaction solvency opinions are likely to confuse and mislead the jury, and unduly prejudice the Trust. Defendants will use Fischel's testimony that Physiotherapy had value prior to the transaction to argue that it would be "unfair" to require Defendants to return the transfers they received. Defendants' expert Gokhale, for example, opines that "if PTA was solvent immediately prior to the Sale Transaction, then the [equity interest redeemed in exchange for the] $248.6 million that Water Street and Wind Point received from the Sale Transaction was not worthless, and if Water Street and Wind Point were required to return the cash they received . . ., that would result in a windfall to the Trust . . . ." Kirby Decl. Ex. 7 at ¶ 51. None of this is relevant to the issues that the jury must decide, and any argument or evidence

along these lines would confuse and mislead the jury. Fischel's proposed testimony on pre-transaction solvency should be excluded to prevent such prejudice and confusion. *Daubert*, 509 U.S. at 594-95 (courts have broad discretion to exclude expert testimony that is prejudicial or misleading); *Saldana v. Kmart Corp.*, 260 F.3d 228, 233 (3d Cir. 2001) (same).

### III. Puntillo's Proposed Testimony Regarding The Auction Sale Process And Due Diligence Is Irrelevant, Unreliable And Misleading

In his opening report, Puntillo proposes to testify that Physiotherapy's auction sale process "was a customary sale process in every sense of the word," Kirby Decl. Ex. 8 at 37: it was "open" and "transparent" (*id.* at 24), Physiotherapy provided "customary disclosures" and "thoroughly discussed and disclosed accounting, financial and business risks" (*id.*), the "negotiation process" was "customary" (*id.* at 60), and potential buyers and debt investors were afforded an "adequate basis . . . to evaluate the risks" and "make their own judgments" (*id.* at 24, 36, 60, 61, 63, 70). But this testimony is unreliable because Puntillo did not perform the analysis needed to reach such conclusions, and his fallback opinion that the sale process merely *appeared* customary is irrelevant and likely to mislead the jury. Accordingly, the testimony in Puntillo's opening report should be excluded.

#### A. Puntillo's Opinions That The Auction Sale Process Was Actually Customary And Transparent Are Unreliable

Puntillo opines that Physiotherapy and the sellers conducted a "customary," "open," "transparent" and "adequate" sale process that allowed bidders and investors to make their own judgments. As Puntillo acknowledges, however, it is *not* "customary in the auction sale process for the sellers to make material misrepresentations to the buyers," *id.,* Ex. 11 at 136:14-19, or "for management to present data as reliable when management, in fact, believes that it's unreliable," *id.* at 157:24-158:11. In proposing to testify that the process here was customary, Puntillo thus

presumably would have examined whether the transaction was infected by fraud—because there is nothing "customary" about fraud.

But Puntillo did not consider that question at all. He does not know "whether any material information was withheld from Court Square or the other buyers" because he "didn't look at enough [information] to be able to even make such a judgment." *Id.* at 98:1-6. Puntillo cannot speak to the "accuracy and completeness of [the] information" that was disclosed, *id.* at 97:20-25, or "whether PTA management, the board, or the sellers knew that PTA's financial statements were materially misstated," *id.* at 98:14-18, or "whether any material information was withheld from Court Square or the other buyers," *id.* at 98:1-6. He did not consider "whether PTA or the defendants engaged in fraud." *Id.* at 20:18-21.

Puntillo's failure to consider such questions undermines the reliability of his conclusions. Puntillo concedes that a fraudulent sale process is not customary, yet opines that the process here was customary without considering whether it was fraudulent. Such unreliable, *ipse dixit* expert testimony is not admissible. *Fed. R. Evid.* 702; *Joiner*, 522 U.S. at 146; *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134–35 (3d Cir. 1999) (excluding testimony where expert "never analyzed the pricing conduct of any of the defendants" and instead formed opinion based on "superficial information"); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (expert opinion cannot be based on "speculation"); *Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640, 643 (3d Cir. 1987) (expert opinion not grounded in facts of case is a "castle made of sand").

### B.     Puntillo's Opinions That The Auction Sale Process Merely Appeared Customary And Transparent Are Irrelevant And Misleading

Because Puntillo did no analysis to support conclusions that the sale process was *actually* customary or transparent, he explained at deposition that he really means to offer only a "process-oriented" opinion that the "customary element[s]" of an auction sale were present. Kirby Decl.

Ex. 11 at 126:3-5, 130:13-16, 136:7-8. That is, the *process* was "customary" in the sense that "consultants and advisers" were retained, information was put in a "data room," and bidders could talk to "management and advisers." *Id.* at 125:10-126:5; *see id.* at 130:7-16 (Puntillo was "speaking to the process"). To Puntillo, it did not matter whether there was rampant fraud because the process *appeared* typical. *Id.* at 135:25-136:13; 131:2-4 ("[M]y opinion is really process-oriented -- fraud, I don't know it changes the process. Maybe it does. I just haven't thought about it.").

These explanations only highlight the need to exclude Puntillo's testimony. It is simply not relevant that the sale process included typical features like a data room. The jury must decide whether the transaction *actually* rendered the Debtor insolvent and whether the Debtor *actually* made transfers with fraudulent intent—not whether the process superficially *looked* typical. And the jury will surely be misled by Puntillo's proposed testimony that the process was customary, open and transparent into believing, wrongly, that he examined and is vouching for Physiotherapy's disclosures, which he did not do. Puntillo's testimony is thus not only irrelevant, but also highly likely to mislead and confuse the jury, and inadmissible on that basis. *Fed. R. Evid.* 402, 403, 702; *see, e.g., Zemaitatis v. Innovasive Devices, Inc.*, 90 F. Supp. 2d 631, 633-34 (E.D. Pa. 2000) (precluding testimony regarding product's approval by FDA as "likely to lead the jury to believe the FDA conducted substantial testing" of the product, when it had not, thus giving "the product an unearned stamp of approval").

### C. Puntillo's Opinions Regarding Auction Sale And Due Diligence Customs And Practices Are Irrelevant And Likely To Mislead

Finally, Puntillo's remaining opinions describing private equity auction sale and due diligence customs and practices are also inadmissible, for they too are irrelevant and likely to mislead the jury. Puntillo opines that "[i]t is customary for a private equity firm engaging in an

acquisition to perform rigorous and independent due diligence," Kirby Decl. Ex. 8 at 8, "[r]easonable buyer due diligence must be performed in accordance with the custom and practice," *id*. at 13, and a buyer cannot "rely[] on financial projections made by the target company," *id.* at 14, while it is "appropriate and customary for the seller to rely on the work of [third-party] consultants and advisors in the selling process," *id.* at 25. The implication of this testimony is that it was Court Square's fault if it and the Noteholders were deceived, while Defendants were entitled to rely on their advisors.

But whether Court Square could (or could not) have discovered the fraud, and whether or not Defendants consulted with advisors during the sale process, are not the issues for trial. This is a fraudulent transfer case, and the elements of a common-law fraud claim do not apply. *See, e.g., Henry v. Rizzolo*, 2010 WL 3385448, at *4 & n.1 (D. Nev. Aug. 24, 2010) ("Unlike a claim for common law fraud, the UFTA does not require proof that the defendant made a knowingly false statement upon which the plaintiff relied."). The relevant question is whether the Debtor acted with the "'intent to hinder, delay, or defraud' a past or future creditor," *In re Green Field Energy Servs., Inc. (Halperin v. Moreno),* 2015 WL 5146161, at *6 (Bankr. D. Del. Aug. 31, 2015); *see* 11 U.S.C. 548(a)(1)(A), not whether Court Square could have discovered such misconduct and prevented it from occurring, *see Am. Express Travel Related Servs. Co. v. D & A Corp.,* 2007 WL 3217565, at *38 (E.D. Cal. Oct. 29, 2007) ("defenses of comparative fault, apportionment of fault and assumption of the risk do not provide a defense to . . . claims of fraudulent transfer"). It is thus no defense that outside advisors were involved in the sale process, or that Court Square supposedly could have discovered the fraud. Moreover, as Puntillo concedes, "detect[ing] fraud" is *not* the purpose of due diligence in the first place. Kirby Decl. Ex. 11 at 92:6-8.

Accordingly, because the jury will not be asked to determine whether the buyer, sellers or lenders satisfied any purported industry standard or custom, Puntillo's proposed testimony is irrelevant. This proposed testimony is also highly likely to mislead the jury, which may incorrectly believe that it must decide whether the sellers lived up to the industry custom of retaining "advisers" and whether Court Square satisfied its "responsibility" to perform "rigorous" due diligence, rather than answer the very different questions that will be posed by the Court's jury instructions. Puntillo's irrelevant, misleading testimony is not admissible. *See Fed. R. Evid.* 402, 403, 702; *United States v. Martin*, 2019 WL 422353, at *1-2 (M.D. Fla. Jan. 9, 2019) (testimony that defendant's conduct was consistent with "industry wide practices of sales representatives" excluded as irrelevant and likely to "confuse the issues and mislead the jury" in considering whether defendant's conduct was lawful); *Cappuccio v. Prime Capital Funding, LLC*, No. CIVA07-4627, 2008 WL 7700925, at *1 & n.1 (E.D. Pa. Sept. 16, 2008) (excluding expert testimony regarding standard loan closing practices because "Defendants' compliance with the law—not with industry practices—is relevant to this case"); *Hodell-Natco Indus., Inc. v. SAP Am., Inc.*, 2015 WL 350360, at *3 (N.D. Ohio Jan. 26, 2015) (similarly excluding industry standard of care expert in fraud case, on grounds that "jury will not be required to gauge the parties actions against any standard of care").

## CONCLUSION

For these reasons, the Trust respectfully requests that the Court grant this motion.

OF COUNSEL:                                  _/s/ Michael A. Barlow_____
Richard I. Werder, Jr.                       Michael A. Barlow (#3928)
Susheel Kirpalani                            April M. Kirby (#6152)
Benjamin Finestone                           ABRAMS & BAYLISS LLP
QUINN EMANUEL URQUHART & SULLIVAN, LLP       20 Montchanin Road, Suite 200
51 Madison Avenue, 22nd Floor                Wilmington, Delaware 19807
New York, New York 10010                     (302) 778-1000
(212) 849-7000                               barlow@abramsbayliss.com
                                             akirby@abramsbayliss.com

R. Brian Timmons
Johanna Y. Ong                               *Attorneys for Plaintiff PAH*
B. Dylan Proctor                             *Litigation Trust*
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3112

DATED:  April 23, 2019