# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PHYSIOTHERAPY HOLDINGS, INC., *et al.,*<br><br>Debtors. | Chapter 11 Case<br>Case No. 13-12965 (KG)<br>(Jointly Administered) |
| PAH LITIGATION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>WATER STREET HEALTHCARE PARTNERS, L.P. *et al.,*<br><br>Defendants. | Adversary Proceeding<br>Case No. 15-51238 (KG) |
| PAH LITIGATION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>WATER STREET HEALTHCARE PARTNERS, L.P. *et al.,*<br><br>Defendants. | Case No. 18-01734 (LPS) |

## JOINT PROPOSED FINAL JURY INSTRUCTIONS[1]

---

[1] The parties are continuing to meet and confer, and many of the substantive issues discussed below have been presented to the Court in the pending motions and pretrial disputes. A further discussion of the parties' general objections is on the last page of these instructions.

## TABLE OF CONTENTS

**Page**

1.  General Instructions ............................................................................................1

    1.1.  Introduction ...........................................................................................1

    1.2.  Jurors' Duties .........................................................................................2

    1.3.  Burden of Proof [DISPUTED]................................................................3

    1.4.  Evidence Defined....................................................................................6

    1.5.  Direct and Circumstantial Evidence .......................................................8

    1.6.  Consideration of Evidence ......................................................................9

    1.7.  Statements of Counsel...........................................................................10

    1.8.  Credibility of Witnesses........................................................................11

    1.9.  Number of Witnesses ............................................................................13

    1.10. Expert Witnesses...................................................................................14

    1.11. Deposition Testimony ...........................................................................15

    1.12. Demonstrative Exhibits.........................................................................16

    1.13. Use of Notes .........................................................................................17

    1.14. Stipulations of Fact [DISPUTED] ........................................................18

2.  The Parties and Their Contentions [DISPUTED]................................................19

3.  Fraudulent Transfer—Federal Claims [DISPUTED] ..........................................21

    3.1.  Existence of a Transfer [DISPUTED] ...................................................21

    3.2.  Actual Fraudulent Transfer—Elements [DISPUTED] ...........................39

    3.3.  Actual Fraudulent Transfer—Badges of Fraud [DISPUTED]................53

    3.4.  Actual Fraudulent Transfer—Defendants' Intent Sufficient But Not
          Necessary [DISPUTED] .......................................................................67

    3.5.  Actual Fraudulent Transfer—Other Matters Not Relevant [DISPUTED] ...........75

    3.6.  Constructive Fraudulent Transfer—Elements [DISPUTED] .................80

    3.7.  Constructive Fraudulent Transfer—Leveraged Buyout Structure
          [DISPUTED]........................................................................................101

    3.8.  Constructive Fraudulent Transfer—Relevant Time Period [DISPUTED] .........113

    3.9.  Constructive Fraudulent Transfer—Ongoing Operations [DISPUTED]............122

    3.10. Ratification/Estoppel Defense [DISPUTED] .......................................126

    3.11. Safe Harbor Defense [DISPUTED]......................................................134

i

3.12.   Release Defense [DISPUTED] ........................................................................154

3.13.   Damages [DISPUTED] ................................................................................158

3.14.   Good Faith For Value Defense [DISPUTED] ...................................................167

3.15.   Equitable Adjustment [DISPUTED] ..............................................................174

4.   Fraudulent Transfer – State Law Claims [DISPUTED] ...................................................182

4.1.   Actual Fraudulent Transfer [DISPUTED] ......................................................183

4.2.   Constructive Fraudulent Transfer [DISPUTED] ..............................................185

4.3.   Damages  [DISPUTED] ............................................................................187

5.   Deliberations and Verdict ................................................................................192

5.1.   Introduction ............................................................................................192

5.2.   Unanimous Verdict ..................................................................................193

5.3.   Duty to Deliberate ...................................................................................195

5.4.   Social Media ..........................................................................................196

5.5.   Court Has No Opinion ..............................................................................197

## 1.   <u>General Instructions</u>

### 1.1.   **Introduction**

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.  Each of you has been provided a copy of these instructions.  You will be able to take your copies with you into your deliberations and refer to them at that time, if necessary.

I will start by explaining your duties and the general rules that apply in every civil case.  Then I will explain some rules that you must follow in evaluating particular testimony and evidence.  Then I will explain the positions of the parties and the law you will apply in this case.  Finally, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen carefully to everything I say.

You will have your written copy of these instructions with you in the jury room for your reference during your deliberations.  You will also have a verdict form, which will list the questions that you must answer to decide the case.

### <u>AUTHORITY</u>

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.), Jury Instruction No. 1.1 (as modified).

### 1.2.    Jurors' Duties

You have two main duties as jurors.  The first is to decide what the facts are from the evidence that you saw and heard in Court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.  You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and decide under the appropriate burden of proof which party should prevail on any given issue.  It is my job to instruct you about the law, and you are bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly.  Do not guess or speculate, and do not let any bias, sympathy, or prejudice you may feel toward one side or the other influence your decision in any way.

### **AUTHORITY**

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 1.2; Third Circuit Model Civil Jury Instruction 1.1 (as modified).

### 1.3.    Burden of Proof [DISPUTED]

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof."  In this case, the plaintiff, PAH Litigation Trust (or the "Trust"), must prove the elements of its claims by a "preponderance of the evidence."  That means that the Trust must produce evidence that, when considered in light of all of the facts, leads you to believe that what that party claims is more likely true than not true.  To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting the Trust's claims must make the scales tip somewhat toward the Trust's side.

[**Defendants' Proposal**:  On certain issues, called affirmative defenses, Defendants have the burden of proving the elements of the defense by a preponderance of the evidence.  I will instruct you on the facts that will be necessary for you to find on each affirmative defense.  An affirmative defense is proven if you find, after considering all evidence in the case, that Defendants have succeeded in proving that the required facts are more likely so than not so.]

Some of you may have heard the phrase "proof beyond a reasonable doubt."  That burden of proof applies only in criminal cases and has nothing to do with a civil case like this one.  You should therefore not consider it in this case.

### AUTHORITY

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 1.3 (as modified); Third Circuit Model Civil Jury Instruction 1.10 (as modified); *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir. 2006) ("The party 'bringing the fraudulent conveyance action' bears the burden of proving each of these elements by a preponderance of the evidence."); *In re Green Field Energy Servs., Inc.*, 594 B.R. 239, 289 (Bankr. D. Del. 2018) (same); *In re Zambrano Corp.*, 478 B.R. 670, 690 (Bankr. W.D. Pa. 2012)

3

("A trustee must show a constructive fraudulent transfer by a preponderance of the evidence."); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 335 n.45, 365-69 (S.D. Tex. 2008) (holding that preponderance-of-the-evidence standard applies to Delaware UFTA claims).

## PLAINTIFF'S OBJECTION TO DEFENDANTS' INSERT

Plaintiff objects that Defendants' proposed language is not necessary because it has no legally viable affirmative defenses. To the extent the Court concludes that any of Defendants' affirmative defenses are viable, Plaintiff believes that its proposed language is more appropriate. Plaintiff's proposed language describes the burden, which is the same for Plaintiff's claims and Defendants' affirmative defenses, in the same language to avoid juror confusion that the burdens are different because the descriptions of the burdens are different. If the Court decides that an instruction on Defendants' affirmative defenses is necessary, then without waiving the Trust's objections, the Trust proposes the following alternative instruction:

## PLAINTIFF'S COUNTERPROPOSAL FOR INSERT

Defendants have asserted affirmative defenses. On affirmative defenses, Defendants have the same burden of proof as the Trust has on its claims. Defendants must prove its defenses by a preponderance of the evidence. Defendants must produce evidence that, when considered in light of all of the facts, leads you to believe that the evidence required to prove its defenses are more likely true than not true. To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting Defendants' affirmative defenses must make the scales tip somewhat toward the Defendants' side.

## AUTHORITY

*Moon Express, Inc. v. Intuitive Machines, LLC*, C.A. No. 16-344-LPS (Stark, J.) Preliminary Jury Instructions at 14 (as modified); Third Circuit Model Civil Jury Instruction 1.10

(as modified).

## **DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTION**

Defendants have asserted several affirmative defenses in their Answers, all of which remain in the case, and which Defendants are therefore entitled to pursue at trial. *See Drippe v. Gototweski*, 434 F. App'x 79, 81 (3d Cir. 2011) (holding that where defendant "raised [an] affirmative defense in his responsive pleading . . he was, therefore, entitled to pursue th[e] defense at trial."). The jury should therefore be instructed on Defendants' defenses.

### 1.4.    Evidence Defined

You must make your decision based only on the evidence that you saw and heard here in Court.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside of Court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath (including deposition transcript or previous trial transcript testimony that has been played or read to you), the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and the facts that I have judicially noticed.  Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts.  Their questions and objections are not evidence.  My legal rulings are not evidence.  Any of my comments and questions are not evidence.

During the trial, I may have ruled that you could not hear the answers to some of the questions that the lawyers asked or that you could not see some of the exhibits that the lawyers wanted you to see.  You must completely ignore all of these things.  And, sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record.

Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

You may have heard evidence that was received for particular limited purposes.  This evidence can be considered by you as evidence for those limited purposes, as I previously explained them.  It may not be used for any other purpose.

You must not conduct any independent research, investigation, or experiments about the

case or its subject matter.  Make your decision based only on the evidence, as I have defined it here, and nothing else.

## **<u>AUTHORITY</u>**

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 1.4 (as modified); Third Circuit Model Civil Jury Instructions 1.5 & 2.10 (as modified).

### 1.5.    Direct and Circumstantial Evidence

During the preliminary instructions, I told you about "direct evidence" and "circumstantial evidence."  I will now remind you what each means.

Direct evidence is simply evidence like the testimony of an eyewitness that, if you believe the testimony, directly proves a fact.  For example, if a witness testified that he or she saw it raining outside, and you believed the witness, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of facts and circumstances that indirectly proves a fact.  For example, if someone walked into the Courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight you should give to either one, nor does it say that one is any better evidence than the other.  You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

### **<u>AUTHORITY</u>**

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 1.5; Third Circuit Model Civil Jury Instruction 1.6 (as modified).

**1.6.    Consideration of Evidence**

You should use your common sense in weighing the evidence.  Consider the evidence in light of your everyday experience with people and events and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

<u>**AUTHORITY**</u>

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 1.6; Third Circuit Model Civil Jury Instruction 1.5 (as modified).

### 1.7.    Statements of Counsel

A further word about statements and arguments of counsel.  The attorneys' statements and arguments are not evidence.  Instead, their statements and arguments are intended to help you review the evidence presented.  If you remember the evidence differently from the attorneys, you should rely on your own recollection.

### AUTHORITY

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 1.7; Third Circuit Model Civil Jury Instruction 1.12 (as modified).

### 1.8.    Credibility of Witnesses

You are the sole judges of each witness' credibility.  You may believe everything a witness says, part of it, or none of it.  You should consider each witness' means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness' biases, prejudices, or interests; the witness' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave during trial.  You have the right to distrust such a witness' testimony, and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth.  People may tend to forget some things or remember other things inaccurately.  If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend on whether it concerns an important fact or an unimportant detail.

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.

## **AUTHORITY**

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark,

J.) Jury Instruction No. 1.8 (as modified); Third Circuit Model Civil Jury Instruction 1.7 (as modified).

### 1.9.    Number of Witnesses

One more point about witnesses.  Sometimes jurors wonder if the number of witnesses who testified makes any difference.  Proof of a fact does not necessarily depend on the number of witnesses who testify about it.  Unless I instruct you otherwise, the testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after all of the other evidence you believe that single witness.

Do not make any decisions based solely on the number of witnesses who testified.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.  Concentrate on that, not the numbers.

### <u>AUTHORITY</u>

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 1.9; Third Circuit Model Civil Jury Instruction 3.2 (as modified).

### 1.10.   Expert Witnesses

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business.  This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.  When knowledge of technical subject matter may be helpful to the jury, an expert is permitted to state an opinion on those technical matters.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the facts I have previously mentioned for weighing the testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all of the other evidence in the case.  You are free to accept or reject the testimony of experts, just as with any other witness.

### <u>AUTHORITY</u>

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 1.10.

**1.11.   Deposition Testimony**

During the trial, certain testimony was presented to you by the reading of a deposition transcript or the playing of video excerpts from a deposition.  The deposition testimony may have been edited or cut to exclude irrelevant testimony, as the parties have only a limited amount of time to present you with the evidence.  You should not attribute any significance to the fact that the deposition videos or readings may appear to have been edited.  Deposition testimony is out of Court testimony given under oath and is entitled to the same consideration you would give if the witness had appeared personally in Court.

<u>**AUTHORITY**</u>

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 1.11; Third Circuit Model Civil Jury Instruction 2.5 (as modified).

### 1.12.   Demonstrative Exhibits

During the course of the trial, you have seen many exhibits.  Many of these exhibits were admitted into evidence.  You will have these admitted exhibits in the jury room for your deliberations.  The remainder of the exhibits (including charts and animations) were offered to help illustrate the testimony of various witnesses.  Unless I have specifically admitted them into evidence, these illustrative exhibits, called "demonstrative exhibits," have not been admitted, are not evidence, and should not be considered as evidence.  Rather, it is the underlying testimony of the witnesses that you heard when you saw the demonstrative exhibits that is the evidence in this case.

### <u>AUTHORITY</u>

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 1.12.

16

### 1.13.   Use of Notes

You may use notes taken during trial to assist your memory.  However, as I instructed you at the beginning of the case, you should use caution in consulting your notes.  There is always a tendency to attach undue importance to matters that you have written down.  Some testimony that is considered unimportant at the time presented, and thus not written down, takes on greater importance later on in the trial in light of all the evidence presented.  Therefore, you are instructed that your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence.  Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of trial.

Above all, your memory should be your greatest asset when it comes time to deliberate and render a decision in this case.

### <u>AUTHORITY</u>

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 1.13; Third Circuit Model Civil Jury Instruction 1.9 (as modified).

### 1.14.   Stipulations of Fact [DISPUTED]

The parties have stipulated that certain facts are true, and those stipulations were read to you during this trial.  You must therefore treat these facts as having been proved for the purposes of this case.

## AUTHORITY

Third Circuit Model Civil Jury Instruction 2.4 (as modified).

## DEFENDANTS' OBJECTION

Stipulated facts are already discussed in the preliminary instruction regarding Evidence in the Case.  That instruction more helpfully explains what a stipulation means and specifically calls on jurors to treat stipulated facts like any other facts admitted at trial.  Repeating it here as a separate instruction gives outsized importance to stipulations of fact.

## PLAINTIFF'S RESPONSE

Plaintiff believes this instruction, a model Third Circuit Instruction, is necessary for jurors to understand the significance of stipulated facts and understand that they have the same weight as other facts admitted during trial.  Plaintiff does not believe a partial sentence reference to stipulated facts in Preliminary Instruction 6.0 is sufficient, especially given that it does not explain that all types of evidence listed should be given the same weight.

2.      **The Parties and Their Contentions [DISPUTED]**

I will now review for you the parties in this action and the positions of the parties that

you will have to consider in reaching your verdict.

### PLAINTIFF'S PROPOSAL

As I explained in my preliminary instructions, the Plaintiff in this case is the PAH

Litigation Trust (the "Trust"), a special entity that was created by the federal bankruptcy court

here in Delaware in connection with the bankruptcy of Physiotherapy.  The Defendants are

investment funds managed by two private equity firms:  Water Street and Wind Point.  The

Defendants were controlling shareholders of Physiotherapy until the Transaction that closed on

April 30, 2012.

The Trust claims that the transfers of $248.6 million to Water Street and Wind Point in

connection with the sale of Physiotherapy were (1) actually fraudulent and (2) constructively

fraudulent.  The Defendants do not dispute that they received $248.6 million in connection with

the sale of Physiotherapy, but deny that those transfers were either actually or constructively

fraudulent.  It is for you to decide whether the transfers to Water Street and Wind Point were

actually or constructively fraudulent pursuant to the instructions that follow.  You should

evaluate each of the Trust's claims separately and independently.[2]

As I previously explained, the Bankruptcy Court has already determined the amount of

damages.  Therefore, you are only deciding whether Defendants are liable to the Trust on its

claims.

### DEFENDANTS' PROPOSAL

As I explained in my preliminary instructions, Defendants, as you have heard, were

---

[2]   Plaintiff reserves the right to modify this instruction to address affirmative defenses in the event the Court permits any of Defendants' affirmative defenses to go to the jury.

shareholders and indirect investors in Physiotherapy Associates Holdings, Inc., which is referred to as "Physiotherapy" or "PTA."  Physiotherapy was bought by a company called Court Square. A subsidiary of Court Square, referred to as "Buyer," transferred $248.6 million to Wells Fargo, which then distributed that money to Defendants when they gave up their shares in Physiotherapy.  Court Square borrowed $210 million from a group known as the Noteholders to help purchase Physiotherapy.

Plaintiff claims that the $248.6 million Defendants received for their shares in Physiotherapy was a "fraudulent transfer."  Defendants deny Plaintiff's claims and assert several defenses.  As I mentioned before, Court Square is not a plaintiff in this case; indeed, Court Square has previously released any claims that it may have had.  Instead, the Plaintiff Litigation Trust is asserting the claims of the Noteholders.

3.      **Fraudulent Transfer—Federal Claims [DISPUTED]**

   3.1.    **Existence of a Transfer [DISPUTED]**

## DEFENDANTS' PROPOSAL

Plaintiff asserts two types of claims under federal law: one for "actual fraudulent transfer," and the other for "constructive fraudulent transfer."  Before I instruct you on the individual elements of those two types of claims, I will instruct you on one issue that all of Plaintiff's claims have in common.

All of Plaintiff's claims require that Physiotherapy transferred its own property to Defendants.  The parties dispute whether this occurred. Plaintiff contends that it did, whereas Defendants contend that the transfer did not come from Physiotherapy, but rather from Wells Fargo, and before that from a subsidiary of Court Square called "Buyer."  In order to find that Physiotherapy transferred its own property, you must find that Physiotherapy acquired rights to the $248.6 million before the transfer and that Physiotherapy transferred the money to Defendants.

If you find that Plaintiff proved by a preponderance of the evidence that Physiotherapy transferred $248.6 million of its own property to Defendants, then you must go on to consider the remaining elements of Plaintiff's legal claims. By contrast, if you find that Plaintiff did not prove that Physiotherapy made the transfer of its own money—if, for example, you find that Wells Fargo made the transfer, or that Court Square's "Buyer" subsidiary did—then Plaintiff has failed to carry its burden of proof on any of its claims and you must find for the Defendants on all of Plaintiff's claims.

## AUTHORITY

11 U.S.C. § 548(a)(1)(A); *see also* 3B Fed. Jury Prac. & Instr. § 164:220 (6th ed.).

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 894 (2018) ("[T]he trustee is not free to define the transfer that it seeks to avoid in any way it chooses.  Instead, that transfer is necessarily defined by the carefully set out criteria in the Code. . . .  Accordingly, after a trustee files an avoidance action identifying the transfer it seeks to set aside, a defendant in that action is free to argue that the trustee failed to properly identify an avoidable transfer under the Code, including any available arguments concerning the role of component parts of the transfer."); *Crystallex Int'l Corp. v. Petroleos de Venezuela, S.A.*, 213 F. Supp. 3d 683, 693 (D. Del. 2016) ("*Crystallex I*") (Stark, J.) ("a transfer is not made until the debtor has acquired rights in the asset transferred") (quoting 6 Del. C. § 1306(4)), *rev'd on other grounds that strengthen Defs' position*, 879 F.3d 79, 81 (3d Cir. 2018) ("*Crystallex II*") ("a transfer by a non-debtor cannot be a 'fraudulent transfer'"); *In re Plassein Int'l Corp.*, 366 B.R. 318, 326 (Bankr. D. Del. 2007) ("Since no Debtor made a transfer, there is no legal basis for any fraudulent conveyance claim."); *In re Robert L. Dawson Farms, LLC*, No. 18-00127-5-DMW, 2019 Bankr. LEXIS 1567, *16 (Bankr. E.D.N.C. May 20, 2019) ("logic and equity dictate that a debtor should not be able to claim a retroactive interest in property transferred by a non-debtor").

### PLAINTIFF'S OBJECTION

This misleading proposed instruction, on a new theory that Defendants advanced in the Pretrial Order for the first time, should not be given for numerous reasons.  Defendants' theory is both legally invalid and waived.  Moreover, it presents an issue of law for the Court, and even if the question were for the jury, Defendants' biased instruction would not be proper.

1. <u>Legally Erroneous.</u>  Defendants' new theory of the case elevates form over substance and has been rejected by numerous courts and commentators.  There is no dispute that the Transaction encumbered Physiotherapy with $310 million in new debt from creditors

(including the Noteholders), and Defendants acknowledge the debt was used to pay Defendants. Adv. D.I. 107 at 33 ("The Offering Memorandum provided to prospective Noteholders made clear that the proceeds of the Senior Notes would be used to purchase PTA stock from the shareholders, including Water Street and Wind Point.").  Defendants now ask the Court to instruct the jury that it may find that there was no transfer by the Debtor to Defendants if the funds were  sent by the Debtor's intermediaries "Wells Fargo" or "Court Square's 'Buyer' subsidiary."  But such facts do not make a legal difference or raise a jury issue.

The Bankruptcy Code defines a transfer to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . property or . . . an interest in property."  11 U.S.C. § 101(54); *see* 6 Del. C. §1301(12) (same under DUFTA). In light of this broad language, "a transfer does not have to be made directly by a debtor in order to fall within the ambit of the [fraudulent transfer] statute."  *In re Arbogast*, 466 B.R. 287, 310–11 (Bankr. W.D. Pa.), *aff'd*, 533 F. App'x 150 (3d Cir. 2013) (internal citation omitted).

This is a classic LBO transaction, which has been subject to fraudulent transfer laws for decades.  *See, e.g., United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1297 (3d Cir. 1986).  Under the collapsing doctrine, courts have long recognized the risk that LBO sponsors may try to structure transactions with intermediaries in order to immunize themselves from fraudulent transfer liability.  *See*, e.g., *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) (Posner, J.) (the "fraudulent conveyance doctrine … is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights"); *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("Where a transfer is only a step in a general plan, the plan 'must be viewed as a whole with all its composite implications.'"); *In re Jevic Holding Corp.*,  2011 WL 4345204, at

*4 (Bankr. D. Del. Sept. 15, 2011) ("An LBO is the classic context in which courts have collapsed multiple transactions for the purpose of assessing and finding fraudulent transfer liability" where "these transactions are part of 'an overall scheme to defraud . . . creditors . . . . Neither time nor transactional formalities can shield a party involved in such a series of transactions."); *In re Pinto*, 89 B.R. 486, 497 (Bankr. E.D. Pa. 1988) (rejecting argument seeking "to irrationally break down the present transaction into minute detail to support . . . contention that no transfer occurred").  Here, the $248 million transfer to the Defendants—whether sent in the end by Wells Fargo or Merger Sub—was made with money borrowed by the Debtor, at the behest of the Debtor, based on the credit of the Debtor, and for the benefit of the Debtor.  It was the final step in a series of interdependent steps in a single LBO transaction, whereby the Defendants sold their stock in the Debtor in exchange for a payment from the Debtor for $248 million—a payment that was financed on the basis of the Debtor's assets and income. Defendants' proposed instruction ignores the economic substance of the transaction and runs counter to the collapsing doctrine.

Courts routinely hold that a transfer may be avoided even if the debtor itself did not formally transfer the property.  *See, e.g.*, *In re Wettach*, 811 F.3d 99, 115 (3d Cir. 2016) (transfer that debtor caused to be paid *by* a third party *to* another third party was avoidable because "[a] person may not do by indirection what he is forbidden to do directly"); *In re Marshall*, 550 F.3d 1251, 1256 (10th Cir. 2008) (where debtors directed lender to pay loan proceeds to a third party, reversing ruling that transfer could not be avoided); *In re Craig*, 144 F.3d 587, 592 (8th Cir. 1998) (debtor could not evade avoidance of a transfer by signing a note for funds which were disbursed to the seller to pay for property conveyed to his wife); *In re Scheffler*, 471 B.R. 464, 485 (Bankr. E.D. Pa. 2012) (debtor who guaranteed mortgages had property interest in

transferred house even though he lacked title); *In re Khan*, 2014 WL 10474969, at *12 (E.D.N.Y. Dec. 24, 2014) (debtor that owned 25% of real property had property interest in proceeds of mortgage paid to third party); *In re FBN Food Servs., Inc.*, 185 B.R. 265, 272–73 (N.D. Ill. 1995) (the "fact that [the debtor] did not actually cut the check … does not undermine the bankruptcy court's conclusion that the debtor actually had an interest in the property").

Other courts have criticized the kind of arguments Defendants are advancing here. In *In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289 (D. Del. 2012), for example, the defendants argued there was no transfer by the debtor because the "the Lenders wired funds directly to [Defendants]" and the debtor "never took possession of the funds." *Id.* at 298. This Court rejected that assertion, explaining that "although Defendants received the dividend directly from the Lenders," it "truly defies logic" and "would be paradoxical to allow the Parties to offer Debtors' property as collateral, abscond with the proceeds of the loan in the form of a dividend, and yet declare that the Debtors had no interest in property." *Id.* at 299. Similarly, the court in *Lyondell* rejected as "puzzling" an argument that plaintiff could not avoid transfers that "came from the LBO lenders through their paying agent to Lyondell stockholders" because the debtor's "pre-existing assets were pledged as collateral for the LBO Lenders' loans." *In re Lyondell Chem. Co.,* 503 B.R. 348, 381 (Bankr. S.D.N.Y. 2014), abrogated on other grounds by *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016); *see also Stores, Inc. v. Schottenstein*, 94 B.R. 488, 503 (N.D. Ill. 1988) (transfer of funds to selling shareholders in an LBO transaction, paid through a shell company created by the buyer, was a transfer of interest of the debtor in property because buyer entity was a "conduit" for the transaction).

Here, the Debtor took on $310 million in debt in order to fund the transfers to Defendants. Although a shell entity was the initial issuer of the debt, that shell entity had no

assets, no income, and no ability to borrow without the backing of the Debtor.  The relevant contracts "provided that immediately following the Acquisition and the Merger, the [Debtor] shall become the borrower."  PTX 906 (WATERST000177 at 396, 417) (Debt Commitment Letter).  Before the Transaction closed, the Debtor agreed to assume the $310 million in debt "at Closing."  PTX 870, 841 (Joinder and Assumption Agreement for Senior Notes, Assumption Agreement for Term Loan).  *Physiotherapy* then instructed the intermediary that held the funds (Wells Fargo) to make the transfers of $248.6 million to Defendants.  PTX 837 (WATERST089881) (Instructions to Paying Agent).  Upon the closing, the shell entity that initially issued the Notes ceased to exist, *see* 8 Del. C. 259 ("When any merger . . .  shall have become effective . . . the separate existence of all the constituent corporations . . . except the one into which the other . . . . ha[s] been merged . . .  shall cease."), leaving Physiotherapy as the sole borrower at the time the transfers were made to Defendants.  The Debtor was thus the ultimate entity that (1) borrowed the money and (2) instructed the paying agent to pay it to Defendants.

Defendants' authorities do not support a different conclusion.  *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 894 (2018), stands for the uncontroversial proposition that a party "is not free to define the transfer that it seeks to avoid in any way it chooses," which says nothing about whether the $248.6 million that was transferred here was the Debtor's property.

Defendants also cite *Crystallex Int'l Corp. v. Petroleos de Venezuela, S.A.*, 213 F. Supp. 3d 683, 693 (D. Del. 2016), for the proposition that "a transfer is not made until the debtor has acquired rights in the asset transferred," and *Crystallex II,* 879 F.3d 79, 81 (3d Cir. 2018), for the proposition that "a transfer by a non-debtor cannot be a 'fraudulent transfer.'"  But *Crystallex* involved a very different set of facts.  In that case, a creditor with a money judgment against Venezuela sued an alleged corporate alter ego of Venezuela and its subsidiaries in the United

States, seeking to avoid dividends issued by those subsidiaries up the corporate chain and out of the country to Venezuela.  As this Court explained, the only debtor was Venezuela, the only transferors were its subsidiaries, and Venezuela did not have a property interest in its subsidiaries' assets before they were transferred.  *Id.* at 686, 690-693.  The debtor was a foreign *transferee* that *received* a transfer from the defendants, not a transferor that made a transfer to the Defendants as in this case, and the parties did not use the debtor's assets to borrow funds in order to make the transfers.  *Id.* at 690-691.  The distinctions between *Crystallex* and this case are stark.  Nothing in that case suggests that where, as here, a Debtor takes out loans in order to pay dividends to its owners, the fraudulent transfer laws do not apply so long as an intermediary is involved.

Finally, Defendants' remaining citations do not support their defense either, as their fact patterns are dissimilar to the facts here.  In *In re Plassein Int'l Corp.,* 366 B.R. 318 (Bankr. D. Del. 2007), a subsidiary took on debt to acquire companies from third parties.  *Id.* at 320.  The parent and acquired companies later filed for bankruptcy, and the trustee brought an adversary proceeding to avoid the cash payments made by the subsidiary to the third-party sellers.  *Id.* at 322.  But the trustee did not allege that the debtor-parent or acquired subsidiaries made any transfers of its own property, the debtor-parent did not take on any debt when the subsidiary acquired the companies, the acquired companies were never merged into the parent, and there were no allegations that the debt later assumed by the acquired companies was part of a fraudulent scheme known to the selling third parties.  *Id.* at 321.  The unavailability of a fraudulent transfer claim under these facts is not instructive.  Defendants' final citation, *In re Robert L. Dawson Farms, LLC*, 2019 WL 2366418 (Bankr. E.D.N.C. May 20, 2019), is similarly inapposite.  It involved a "unique question of whether a debtor which is the surviving entity to a

pre-petition corporate merger may avoid as preferential a transfer [of collateral] made by a merged company [more than a year] prior to the merger." *Id.* Unlike here, where Physiotherapy had a property interest in the cash transfers to Defendants because it incurred $310 million in debt to fund the transfers as part of the merger, in *Dawson,* the merger transaction did not retroactively make collateral transferred by the merged company a year earlier property of the surviving entity. *Id.* This, again, is not pertinent to the facts here.

Accordingly, Defendants' new theory is legally invalid, and should not be sent to the jury.

2.    <u>Waived.</u>   Defendants new theory is also waived.   After four years of litigation, Defendants cannot seek to present at trial a new theory raised for the first time in the Pretrial Order.   This is prejudicial and improper.   Early in this case, the Trust asked Defendants to "[s]tate all bases for [their] contention that the transfer of funds to [Defendants] in connection with the Transaction was not a fraudulent conveyance."   Trust's Interrogatories (Set 2), No. 6.   In their response, Defendants did not (1) disclose their theory that the Debtor did not make a transfer, or (2) assert, as they do now, that the Debtor lacked "property rights in the $248.6 million" transferred to Defendants.

To the contrary, Defendants repeatedly acknowledged that the transfer *was* made by the Debtor.   For example, the Trust asked Defendants to "[d]escribe the flow of funds received by You in connection with the Transaction."   Trust's Interrogatories (Set 1) No. 3.   Water Street responded by referring to a chart that identified the "TRANSFERS FROM PHYSIOTHERAPY ASSOCIATES HOLDINGS, INC"—that is, *from the Debtor*—to Defendants.   PTX 895 (Water Street's Resp. to Trust's Interrogatories (Set 1), No. 3: "Water Street refers the Litigation Trust to documents previously produced by Water Street bearing bates numbers WATERST003085-

28

88."), PTX 547 (WATERST003085).

At the pleading stage as well, Defendants affirmatively asserted that "the relevant intent in this case is that of … [the Debtor's] Board of Directors," Adv. D.I. 107 at 68, thus conceding that the Debtor was the transferor—because the intent of the transferor is what must be proven. *See, e.g., In re Direct Response Media, Inc*., 466 B.R. 626, 653 (Bankr. D. Del. 2012) ("A plaintiff charging a violation under Section 548(a)(1) must prove that the transferor made the transfer with the 'actual intent to hinder, delay or defraud creditors.'").  And on summary judgment, the Bankruptcy Court stated based on undisputed facts that, "[a]s a result of the LBO, *Physiotherapy* transferred $248.6 million of the proceeds to Defendants."  Adv. D.I. 624 at 3 (emphasis added).

During the past four years of litigation, not once did Defendants claim that the Debtor did not transfer the $248.6 million that they received.  It is far too late to raise this waived theory. *Fed. R. Civ. P.* 37(c)(1) ("If a party fails to provide information … as required by Rule 26(a) or (e), the party is not allowed to use that information … at a trial, unless the failure was substantially justified or is harmless."); *see, e.g.*, *CPC Int'l, Inc. v. Archer Daniels Midland Co*., 831 F. Supp. 1091, 1102-03 (D. Del. 1993) (defendant waived theory not disclosed in interrogatory response); *AstraZeneca AB v. Mut. Pharm. Co*., 278 F. Supp. 2d 491, 508 (E.D. Pa. Aug. 21, 2003) (same); *EJAS Casing Ltd. v. IPSCO Tubulars, Inc.*, 2011 WL 13120162, at *2 (S.D. Tex. Dec. 19, 2011) (same); *Boardwalk Apartments, L.C. v. State Auto Prop. & Cas. Ins*. Co., 2015 WL 197308, at *5 (D. Kan. Jan. 14, 2015) (same).

Allowing Defendants to advance their new theory now, just weeks before trial, would be prejudicial.  Had Defendants disclosed their new theory in a timely manner, the Trust could have easily sought documents from Defendants and deposition testimony from witnesses that would

have further laid bare Defendants' attempt to elevate form over substance.  The Trust would have also moved for summary judgment on Defendants' spurious theory.  Having been deprived of these opportunities, the Trust should not be required to tackle this theory for the first time at trial. *See  ING Bank, FSB v. Am. Reporting Co., LLC*, 859 F. Supp. 2d 700, 704 (D. Del. 2012) (plaintiff could not "alter its theory of the case" shortly before trial, as doing so would "unduly prejudice the defendant by forcing it to prepare to defend against a new theory of the case"); *Swendsen v. Corey*, 2012 WL 465722, at *2 (D. Idaho Feb. 13, 2012) (plaintiff "would be prejudiced . . . by being required to investigate these new defenses instead of preparing for trial in the few weeks left before trial"); *Rigsbee v. City & Cty. of Honolulu*,  2019 WL 984276, at *6 (D. Haw. Feb. 28, 2019) (Defendant's request to amend answer to add defense "five weeks before trial" would "prejudice plaintiff"); *Keim v. United Heritage Life Ins. Co.*, 2008 WL 3289608, at *2 (D. Idaho Aug. 8, 2008) (plaintiff would be "prejudiced by being forced to respond to this new defense just three months before trial").

      3.    <u>Not A Jury Issue.</u>  Even if Defendants' new theory were valid and not waived, it would not be an issue for the jury.  The ultimate question is whether Physiotherapy had a *property interest* in the money it borrowed, which it used to fund the transfers to Defendants.  11 U.S.C. §§ 548(a)(1) ("The trustee may avoid any transfer . . . . of an interest of the debtor in property. . . "), 101(54) (defining "transfer" as encompassing direct and indirect transfers of property or interests in property).  That is a question of law for this Court to decide, not a question of fact for the jury.  *See Mauke v. Town of Dune Acres*, 835 F. Supp. 468, 473 (N.D. Ind. 1993) ("The question of the existence of a property right is a question of law to be decided by this Court, not a question of fact to be resolved by a jury, particularly where the existence of a property right turns on the construction of a statute."); *Driggins v. City of Oklahoma City, Okl.*,

954 F.2d 1511, 1513 (10th Cir. 1992) ("[I]n this case the judge erred in allowing the jury to resolve the disputed legal issue of whether [plaintiff] could have a property interest in her employment"); *In re Cascade Ag Servs., Inc.*, 2017 WL 5017405, at *7 (B.A.P. 9th Cir. Nov. 2, 2017) ("[W]hich entity owned the [property] is a legal conclusion for the court to determine"); *Tarabishi v. McAlester Reg'l Hosp.*, 827 F.2d 648, 652 (10th Cir. 1987) ("Whether the facts establish a property interest is a question of law."); *Marine One, Inc. v. Manatee Cty.*, 877 F.2d 892, 894 (11th Cir. 1989) ("[W]hether state law has created a property interest is a legal question for the court to decide"); *City of Wilmington v. Parcel of Land Known as Tax Parcel No. 26.067.00.004*, 607 A.2d 1163, 1168 (Del. 1992) ("[T]he existence and scope of common law property rights are questions of law").

## DEFENDANTS' RESPONSE

Plaintiff mischaracterizes an essential element of its own claims—an avoidable transfer—as a "defense"; falsely contends that Defendants somehow "waived" the requirement that Plaintiff must prove this essential element of its claims; and asks this Court to "collapse" the transaction at issue in this case as a matter of law when both the law and the facts refute Plaintiff's theory. Plaintiff's belated briefing on this issue is procedurally improper and substantively incorrect.

1. <u>Plaintiff's "Collapsing" Argument is Legally and Factually Erroneous</u>. As this Court held in *Crystallex I*, the "collapsing doctrine does not cleanly fit" and should not be applied where, as here, there is a dispute as to "whether and when 'property of a debtor' was 'transferred' and, if so, who the parties to that transfer were. The Court has not encountered any case applying the collapsing doctrine in such a circumstance." 213 F. Supp. 3d at 693 (Stark, J.). As in *Crystallex I*, Plaintiff's argument here impermissibly implies that Physiotherapy held

31

property rights in the $248.6 million when the transfer occurred, prior to the consummation of the merger.  *Cf. id*.  But the transfer came from Court Square's "Buyer" subsidiary, which was (like Court Square and its other subsidiary "Merger Sub") on the opposite side of the Transaction from Physiotherapy at the time of the transfer.  And even after the transfer, Physiotherapy had no rights to the $248.6 million, because those funds were never intended for Physiotherapy, but for its former shareholders.  Moreover, at the time of the transfer, ***Physiotherapy was not a debtor to the Noteholders in this case***.  After the transfer and merger, Court Square Physiotherapy took on Merger Sub's debts to the Noteholders.   But that was the result of ***an entirely different transaction between Court Square and the Noteholders***,[3] which ***Court Square was responsible for***, and Buyer and Merger Sub ***promised would not harm creditors,***[4] ***and even if it did, would not be blamed on Defendants***.[5]

These facts, among others, defeat Plaintiff's misleading effort to leverage the case law involving leveraged buyouts (LBOs).  The Transaction here does not fit the mold of Plaintiff's

---

[3] *See* Merger Agr. § 9B(iv) ("[E]ach of Buyer and Merger Sub affirms that it is not a condition to the Closing or to any of their other obligations under this Agreement that Buyer and/or Merger Sub (or the Surviving Corporation) obtain financing for or related to any of the transactions contemplated by this Agreement (including the Financing).").

[4] *See id.* § 8J ("Solvency. As of the Closing and immediately after giving effect to the transactions contemplated hereby (including the incurrence of the Debt Financing), Buyer and each of its Subsidiaries (including the Surviving Corporation and its Subsidiaries) shall be able to pay their respective debts as they become due and shall own property which has a fair saleable value greater than the amounts required to pay their respective debts when due (including all contingent liabilities). As of the Closing and immediately after giving effect to the transactions contemplated hereby, Buyer and each of its Subsidiaries (including the Surviving Corporation and its Subsidiaries) shall have adequate capital to carry on their respective businesses. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Buyer and its Subsidiaries (including the Surviving Corporation and its Subsidiaries).").

[5] *See id.* § 11B (agreeing to indemnify Defendants and hold them harmless for any failure of the foregoing representation and warranty as to solvency).

cases for many reasons, starting with the fact that **nobody** contends that the allegedly "leveraged" aspect of the Transaction (*i.e.*, the existence of debt financing) was part of an "overall scheme to defraud creditors." *In re Bachrach Clothing, Inc.*, 480 B.R. 820, 855 (Bankr. N.D. Ill. 2012) (citations omitted). On the contrary, Court Square—through its subsidiaries Buyer and Merger Sub—***explicitly represented and warranted that the Transaction was nothing of the kind***. *See* Merger Agr. § 8J. Neither Plaintiff nor the Noteholders can claim otherwise because—as in one of the cases on which Plaintiff relies—the Noteholders here **knew** "that they were lending for the purposes of [a purported] LBO, and that the proceeds of their loans were going to stockholders." *In re Lyondell Chem. Co.*, 503 B.R. 348, 385 (Bankr. S.D.N.Y. 2014), *abrogated on other grounds by In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016); *see also*, *e.g.*, *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 479 B.R. 405, 411 (N.D. Tex. 2012) (creditors who knew money would be used to pay transferee could not avoid transfer). Court Square's agreement to purchase Physiotherapy "***without any financing contingency***" further refutes Plaintiff's effort to collapse the two independent transactions. *Bachrach*, 480 B.R. at 856 (emphasis in original); *see* Merger Agr. § 9B(iv); *see also In re Tribune Co.*, 464 B.R. 126, 165-67 (Bankr. D. Del. 2011) (no collapsing because "step 2" of multi-step transaction was not contingent on "step 1"). And approximately 42% of the purchase price was financed with ***cash***, not debt, unlike a "typical leveraged buyout," in which "the purchaser usually invests only a modest, if any, amount of its own capital as new equity." *Official Comm. Unsecured Creditors of Grand Eagle Companies, Inc. v. ASEA Brown Boverie, Inc.*, 313 B.R. 219, 230 (N.D. Ohio 2004) (no collapsing where only approximately 25% of the purchase price was financed with cash). Because here, as in *Grand Eagle*, "***a substantial amount of new money [was] infused into the company***," there is "***no reason to collapse the transactions***." *Id.* (emphases added).

Indeed, to the extent this case bears any similarity to *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), on which Plaintiff relies, the similarity is that, like the LBO lender in *Tabor*, the Noteholders here **knew**—as, indeed, they admit above—that the money they lent was used to finance Court Square's acquisition of Physiotherapy. *See id.* at 1295. But in *Tabor*, the LBO lenders (or their assignees) were **defendants** in the fraudulent-transfer action, not plaintiffs. Indeed, Defendants are not aware of any case where lenders who, like the Noteholders here, knowingly participated in an alleged LBO were allowed to assert (or assign) claims casting them as the victims of the alleged LBO. On the contrary, such lenders are typically on the defense side of such cases. As the Third Circuit explained in *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991), LBO lenders are beneficiaries, not victims, of the LBO because they receive "higher interest rates and fees." *Id.* at 646. Here, moreover, the Noteholders seek to obtain an even greater windfall by falsely casting themselves in the role of victims after already recouping their full investment and more, and as discussed below with respect to damages, by seeking to recover far more than the amount of their (already recovered) investment. As in *Crescent Resources Litigation Tr. ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464 (Bankr. W.D. Tex. 2013), the Noteholders, having already "recoup[ed] the bulk of the loan," hope to also "walk away with ownership" of Physiotherapy without paying **anything** for it. *Id.* at 482. "In essence, the lenders will have **stolen**" Physiotherapy, which this Court cannot allow. *Id.* (emphasis added).

None of Plaintiff's cases support its argument. In *In re Appleseed's Intermediate Holdings*, LLC, 470 B.R. 289 (D. Del. 2012), for example, the defendants were the parties that borrowed funds to acquire a company and secured those funds with their target's assets. Here, it was **Court Square** that borrowed money from the Noteholders to finance its acquisition of

Physiotherapy; *Court Square* that promised Defendants that the acquisition was not contingent on Court Square's financing arrangements with the Noteholders; and *Court Square* that promised that Physiotherapy would remain solvent. *Appleseed* is inapposite. And *Lyondell*, as already mentioned, rejected the claims of lenders who knew, as Plaintiff admits the Noteholders knew, "that they were lending for the purposes of an LBO." 503 B.R. at 385. Moreover, although the *Lyondell* court provisionally collapsed the transaction in denying a motion to dismiss, it expressly sated that "this is not to say, of course, that the LBO here necessarily must be collapsed. It is to say merely that the Creditor Trust has plausibly alleged facts under which it might be." *Id.* at 381. Here, the time of "alleged facts" is past; the time for evidentiary proof has come. Plaintiff must prove the elements of its claims—including an avoidable transfer—and cannot evade its burden by merely asserting that the transaction "necessarily must be collapsed." *Id.* The law and facts dictate the opposite conclusion.

2.    <u>No Waiver Except Plaintiff's Own</u>.   Defendants have not waived their theory that the transfer at issue was not made by Physiotherapy—and in fact have advanced this position at several points throughout this litigation.

As the most direct example of Defendants' articulation of this theory, in the very interrogatory response Plaintiff cites in its objection, which asked Defendants to "State all bases for [their] contention that the transfer of funds to [Defendants] in connection with the Transaction was not a fraudulent conveyance," Defendants pointed Plaintiff to several motions that outlined their various positions. Defendants included in their response a reference to Defendants' Answer which Defendants stated would provide "a summary of the factual bases and affirmative defenses that establish (based on the facts known at this time) that any transfer of equity by Water Street to, ***and any transfer of funds to Water Street by Court Square (as PTA***

*was neither the transferor nor the transferee of such funds),* was not a fraudulent transfer." Water Street's 2/13/2017 Resp. to Plaintiff's Interrogatories (Set 2), No. 6.  Defendants thus stated unequivocally that part of their defense that no fraudulent conveyance had occurred was because "PTA was neither the transferor nor the transferee of such funds."  Indeed, that disclosure and Plaintiff's own admission, above, that it would have moved for summary judgment had it paid attention to Defendants' disclosure, lead to the conclusion that it is Plaintiff, not Defendants, that has waived the argument.  It is far too late now, and this is certainly not the right forum, for Plaintiff to move for summary judgment that it satisfied the primary element of its claims—it did not and cannot.

Plaintiff also cites Defendants' response to Interrogatory No. 3, but makes no mention of the supplemental response, provided just two months later that expands upon the earlier response on where the various funds came from.  In their 4/10/17 Response to Plaintiff's Interrogatory No. 3, Defendants' explained: "There is also no mystery as to what was received in exchange. Water Street and Wind Point *exchanged their equity interests in PTA to an affiliate of Court Square in return for the portion of the merger consideration* that remained after PTA's outstanding debts and transaction fees and expenses were paid."  *See* Water Street's Suppl. Resp. to Trust's Interrogatories (Set 1), No. 3.  Thus, Defendants made clear that the exchange occurred between Water Street and Wind Point and Court Square's affiliate, not Physiotherapy.  Moreover, the supplemental response references both the document Plaintiff misleadingly relies on (as discussed below) but also another document, WATERST037778 (DTX 1669).  That document is an excel spreadsheet which details each of the wire transfers involved in the transaction in a chart entitled "Wires *from Court Square to WSHP/WPP* & Other Affiliated PTA Parties." *See id.*

In its objection, Plaintiff misquotes statements from the other document cited in

Defendants' response to Interrogatory 3 to suggest some type of "waiver-by-implication."  But that document (PTX 547) does not concede that the transfer was made by Physiotherapy.  In fact, the chart Plaintiff describes is entitled "Initial Transfer of Proceeds from Sale of Physiotherapy Associates Holdings, Inc."  It then refers to "Initial Transfers from Physiotherapy Associates Holdings Inc." as a short-form reference to the initial transfers from the proceeds of the sale (dropping the language "of proceeds from Sale of.")  Plaintiff misleadingly omits this important context, and omits reference to the word "initial."  In any event, whatever implication Plaintiff now claims that document has, it cannot defeat Defendant's explicit stated responses.  Nor can the Bankruptcy Court's description of the transaction as "Physiotherapy transferred $248.6 million," in the context of an order assuming *Plaintiff's* theory of liability, waive *Defendants' opposing* theory—which, again, was not at issue in that motion.  Finally, at no point in Defendants' motion to dismiss briefing did they characterize Physiotherapy as the transferor. And if Plaintiff believed that any statement by Defendants in that motion in 2015 waived the defense, they could have raised it upon receipt of Defendants' contention interrogatory responses in 2017, but they did not.  Plaintiff has had ample notice of Defendants' theory, and any decision by Plaintiff not take further discovery on that theory was it its own peril.

       3.    <u>Plaintiff Cannot Establish The Essential Transfer Element as a Matter of Law</u>. Finally, Plaintiff cites several inapposite cases about property rights—none of which involved fraudulent-transfer claims—to suggest that the jury cannot decide the "transfer" element of Plaintiff's claims.  Yet Plaintiff itself concedes that this is an essential element of the claim, *see infra*, yet—as discussed above—never sought to establish it as a matter of law through summary judgment or otherwise.  The charging conference is not the forum for deciding this issue, which certainly cannot be decided in Plaintiff's favor as a matter of law, as *Lyondell*, on which Plaintiff

relies, makes clear.  Even if Plaintiff "plausibly alleged facts under which" the transaction "might be" collapsed, that "is not to say, of course, that" it "must be collapsed."  503 B.R. at 381. The Court should either hold, as in *Crystallex I*, that the "collapsing doctrine does not cleanly fit" here and does not apply, 213 F. Supp. 3d at 693, or wait for the evidence to come in and either decide the issue as a matter of law under Rule 50, or let the jury decide whether Plaintiff carried its burden to prove the essential "transfer" element, based on Defendants' proposed instruction above.

### 3.2.    Actual Fraudulent Transfer—Elements [DISPUTED]

#### PLAINTIFF'S PROPOSAL

Plaintiff has two claims under federal law – one for actual fraudulent transfer and the other for constructive fraudulent transfer.  I will now instruct you on each of these claims.

To prove its claim for actual fraudulent transfer, the Trust must show three things by a preponderance of the evidence: (1) Physiotherapy transferred an interest in property, (2) the transfer was made within two years of Physiotherapy's bankruptcy petition, and (3) the transfer was made with the actual intent to hinder, delay or defraud creditors.

The Court has determined that the first two elements are satisfied—Physiotherapy transferred $248.6 million to the Defendants in April 2012, within two years of Physiotherapy's bankruptcy petition in November 2013.  On this claim, the only question for you to consider is whether the Trust has proven the third element—actual intent by Physiotherapy to hinder, delay, or defraud creditors—by a preponderance of the evidence.

In general, to act with intent to hinder or delay creditors is to act improperly to make it more difficult for a creditor to collect a debt.  If Physiotherapy overstated its earnings or its receivables in seeking financing, or concealed material facts, that may be evidence of an intent to hinder, delay or defraud creditors.

In considering whether Physiotherapy acted with the necessary intent, you should consider the actions taken by its officers, directors and agents.  Because entities act through individuals, an officer's or director's knowledge of wrongdoing is charged to Physiotherapy, so long as the officer or director was acting within the scope of his or her authority.

You should also consider the natural consequences of the actions taken by Physiotherapy's officers, directors and agents.  The law presumes that Physiotherapy intended

the natural consequences of those actions.  If the natural consequence of Physiotherapy's actions was to hinder, delay or defraud creditors, you may infer that the transfers were fraudulent.

If you find that Physiotherapy made the transfers to Defendants with the actual intent to hinder, delay or defraud creditors, you must find for Plaintiff on its actual fraudulent transfer claim.

## AUTHORITY

1.      The first paragraph sets forth the undisputed elements of the Trust's claim.

2.      Regarding the second paragraph, there is no dispute that the transfer to Defendant in April 2012 was made within two years of the Debtor's bankruptcy in November 2013.  In addition, as shown in the Trust's objections to Defendants' Proposed Instruction No. 3.1, Defendants cannot argue for the first time that Physiotherapy did not make the transfer that they received.  Accordingly, the first two elements of this claim are satisfied as a matter of law.  As to third element, the Trust need only show that Physiotherapy intended to hinder, delay, *or* defraud creditors.  *See* 11 U.S.C. §§ 548(a)(1)(A) & 550; *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932) ("A conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them."); *In re Spearing Tool & Mfg. Co., Inc.*, 171 B.R. 578, 583 (Bankr. E.D. Mich. 1994) ("An intent to delay or hinder creditors, standing alone, is sufficient to constitute a fraudulent conveyance[.]"); *U.S. v. Spencer*, 2012 WL 4577927, at *8 (N.D. Okla. Oct. 2, 2012) (intent element satisfied where defendant sought to delay his creditor in order to buy time to earn sufficient funds to pay the debt).

3.      Regarding the third paragraph, to act with intent to hinder or delay a creditor is to act improperly to make it more difficult for the creditor to collect a debt.  *In re Levi*, 581 B.R. 733, 745 (Bankr. S.D.N.Y. 2017) ("[T]o act with intent to hinder or delay is to act improperly to

make it more difficult for a creditor to collect a debt.") (quotations and citations omitted); *In re Wreyford*, 505 B.R. 47, 59 (Bankr. D.N.M. 2014) ("Fraudulent intent to hinder or delay a creditor means an intent to improperly make it more difficult for creditors to reasonably collect on their debts.") (quotations and citations omitted).  Financial overstatements and concealment are probative of intent to hinder, delay or defraud creditors.  *In re Bayou Grp., LLC*, 439 B.R. 284, 306-07 (S.D.N.Y. 2010) (finding intent to hinder, delay, or defraud where debtor's principals had "disseminated various kinds of documents containing false information about [the debtor's] performance," "'made up numbers' to disguise trading losses and self-dealing," and provided "reports to investors containing 'falsely inflated earnings' that were designed to 'deceitfully induc[e] present investors to retain their accounts and prospective investors to invest").

4.      The fourth paragraph recites the established rule that the intent of Physiotherapy's officers, directors, and agents may be imputed to Physiotherapy if they were acting within the scope of their authority, as the Bankruptcy Court has already determined.  Adv. D.I. 250 at 33 (Bankruptcy Court rejecting the "argu[ment] that the actions of the Debtor's individual directors *and officers* cannot be imputed to Water Street and Wind Point") (emphasis added); *see Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 884 (3d Cir. 1975) ("[T]he fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation."); *In re Personal & Bus. Ins. Agency*, 334 F.3d 239, 242-43 (3d Cir. 2003) (applying *Rochez Bros.* standard to Section 548 claim); *In re James River Coal Co.*, 360 B.R. 139, 161 (Bankr. E.D. Va. 2007) (in Section 548 action, "the intent of the officers and directors may be imputed to the corporation"); *In re Lyondell Chem. Co.*, 554 B.R. 635, 647-50 (S.D.N.Y. 2016) (imputing knowledge of debtor's

41

CEO to debtor under principles of agency); *In re Bernard L. Madoff Inv. Sec. LLC*, 560 B.R. 208, 228 (Bankr. S.D.N.Y. 2016) (stating that "the knowledge of a corporate officer will be imputed to the corporation" in a fraudulent transfer case); *In re Blazo Corp.*, 1994 WL 92405, at *1–2 (Bankr. N.D. Ohio Feb. 25, 1994) ("It is well settled that corporations may be held liable for the actions of their agents who are acting within the scope of their authority, and the scope of authority of the president of a corporation extends to all ordinary and necessary acts which are incident to the office.") (citation omitted); *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *6 (Bankr. D. Del. Feb. 8, 2016) (imputing intent of officers and directors to debtor); Restatement (Third) Of Agency § 5.03 cmt. d (2006) (agent's "knowledge of the falsity is imputed" to principal).

5.      The fifth paragraph recites the established rule that Physiotherapy is presumed to have intended the natural consequences of its actions.   *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1305 (3d Cir. 1986) (party is deemed to have intended the natural consequences of his acts); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1075 (3d Cir. 1992) (same); *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 417 F. Supp. 2d 580, 592 (D. Del. 2006) ("Intent need not be proven by direct evidence; it is most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor."); *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019) ("[I]f the 'natural consequence' of a debtor's action" is to hinder, delay or defraud creditors, a court may infer an intentional fraudulent conveyance") (quotations and citations omitted); *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *6 (Bankr. D. Del. Feb. 8, 2016) ("The Debtors are presumed to intend the natural consequences of their acts."); *In re Am. Bus. Fin. Servs., Inc.*, 384 B.R. 66, 75 (Bankr. D. Del. 2008) (Trustee stated claim for intentional fraudulent transfer where "[t]he

natural consequence of [defendant's] actions was to defraud the Debtor's creditors"); *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 417 F. Supp. 2d 580, 592 (D. Del. 2006) ("Intent need not be proven by direct evidence; it is most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor.") (quotations and citation omitted).

## DEFENDANTS' OBJECTION

There are numerous defects in Plaintiff's proposed construction, as is apparent from comparing the two proposals. Furthermore, Plaintiff improperly added a large amount of briefing to its purported "Authority" section a mere 42 hours before the joint filing deadline, with another round of last-minute briefing provided a mere 16 hours before filing.  Defendants have attempted to respond to Plaintiff's objections and responses to the extent possible within the Court's deadlines, but reserve the right to supplement their submission with additional responses as necessary.

1.      Plaintiff proposes to instruct the jury that it must find that the transfer was made within two years of the bankruptcy petition, only to then instruct the jury that this is undisputed. The jury need not be instructed about what is undisputed—especially not in the prejudicial manner Plaintiff proposes.  Reference to the bankruptcy is also prejudicial for the reasons set forth in the moving and reply papers in support of Defendants' Motion in Limine No. 2.

2.      Plaintiff's contention that Defendants somehow "waived" the necessity for Plaintiff to prove the first element of its own claims is wrong.  *See* Defendants' Response re Instr. 3.1.

3.      Indeed, the waiver at issue in this context is Plaintiff's own waiver of allegations that Physiotherapy intended to "hinder" or "delay" the Noteholders. The gravamen of Plaintiff's claim has always been alleged intent to "defraud," and the cases Plaintiff cites illustrates the

confusion Plaintiff will cause through its last-minute insertion of its new allegations of hindrance and delay.  Plaintiff has never before alleged, for example, that Physiotherapy did not act out of an intent to defraud, but instead out of a "genuine belief that, if suits can be staved off for a season, [it would] weather a financial storm, and pay [its] debts in full," *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932), or that, in contrast to any intent to defraud, Physiotherapy only intended to delay collection proceedings, *In re Spearing Tool & Mfg. Co., Inc.*, 171 B.R. 578, 583 (Bankr. E.D. Mich. 1994); *accord* United States v. Spencer, 2012 WL 4577927, at *8 (N.D. Okla. Oct. 2, 2012).  That would be a different case.  It is far too late for Plaintiff to change its theory now and its proposed instruction about allegations that have never been part of this case can only serve to confuse the jury.

4.      Plaintiff's erroneous imputation theory is refuted in Defendants' briefs on their Motion in Limine No. 3.  Furthermore, Plaintiff's treatment of the intent of Physiotherapy's officer's and agents after the transaction is particularly problematic.  To the extent that the intent and actions of Physiotherapy's officers, board members, and agents are attributable to Defendants prior to the transaction, they are attributable to Court Square after the transaction.  Accordingly, to the extent the Court selects Plaintiff's proposal with respect to intent, Defendants offer Counterproposal No. 2, below.

5.      Defendants' instruction follows the well-established standard for "intent" set forth in the Restatement (Second) of Torts—a standard that both federal and Delaware courts have followed in fraudulent transfer cases.  *See* Defendants' Authority re Instr. 3.2; *see also ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 387 (S.D. Tex. 2008) ("Many fraudulent transfer cases cite to the Restatement (Second) of Torts for the definition of 'intent' under the UFTA…. Even when not specifically referenced, other cases apply the definition found in the Restatement,

i.e., if one acts with knowledge that creditors will be hindered or delayed by a transfer but then intentionally enters the transaction in disregard of this fact, he acts with actual intent to hinder and delay them.") (applying Delaware law).  Plaintiff's attempt to replace this standard definition of intent with an instruction that a transferor "is presumed to intend the natural consequences of his acts" is inappropriate for at least four reasons.

*First*, contrary to Plaintiff's contention, the instruction is not an "established rule" under federal or Delaware law.   The two Third Circuit opinions relied on by Plaintiff apply **Pennsylvania law** (the Pennsylvania Uniform Fraudulent Conveyance Act), not federal law or Delaware's Uniform Fraudulent Transfer Act.  *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1305 (3d Cir. 1986) (applying Penn. UFCA); *Moody v. Security Pac. Bus. Corp.*, 971 F.2d 1056, 1062 n.5, 1075 (3d Cir. 1992) (same).   Further, neither case attempted to define "actual intent," let alone under federal or Delaware law.

*Second*, Delaware law does not recognize Plaintiff's "natural consequences" language. Under Delaware law, a factfinder "***may not merely infer intent from the economic consequences of the transaction***," but rather must find "**knowledge** that the transaction would hinder [creditor] rights."  *Beal Bank, SSB v. Lucks*, 1999 WL 413356, at *9 (Del. Ch. June 11, 1999) (emphasis added).

*Third*, although Plaintiff cites several federal motion to dismiss opinions, these cases uncritically rely on *Tabor*'s interpretation of Pennsylvania law, and their resolutions do not turn on that issue.  In fact, although the *Syntax-Brillian* court referenced the "natural consequences" language, the court did so in the context of applying the "substantial certainty" test used in the Restatement.  *SB Liquidation Tr. v. Preferred Bank (In re Syntax-Brillian Corp.)*, 2016 WL 1165634, at *4 (Bankr. D. Del. Feb. 8, 2016) (complaint adequately pleaded intent because "[t]he

delay of payment to creditors was ***substantially certain to occur***....") (emphasis added).

*Fourth*, Plaintiff's instruction is prejudicial because it improperly risks that the jury will apply a "foreseeability" or "negligence" test to determine intent.  Negligence, foreseeability or recklessness do not rise to the level of "actual intent."  *Tabor Court Realty*, 803 F.2d at 1305 (rejecting district court's reliance on a "foreseeability" test for determining actual intent); *Official Comm. of Unsecured Creditors v. Aust (In re Network Access Sols., Corp.)*, 330 B.R. 67, 77 (Bankr. D. Del. 2005) ("[A] claim for actual fraud requires that there be conscious wrong-doing"); *In re Actrade Fin. Techs., Ltd.*, 337 B.R. at 809 ("[I]ntentional fraudulent conveyance claims [under the Bankruptcy Code and state law] should be relegated to their proper sphere, *i.e.*, where there is a knowing intent on the part of the defendant to damage creditors").

If the Court instructs the jury that it may presume that a transferor intends the natural consequences of its acts, then the Court also should instruct the jury that it may not infer "intent" from a finding that Physiotherapy acted negligently or recklessly, as is set forth in Defendants' proposed jury instruction.  The Court also should clarify that a consequence "naturally" flows from an event if it is "substantially certain" to occur, to minimize the risk that the jury apply a negligence or foreseeability standard instead of a standard of actual intent.

## DEFENDANTS' COUNTERPROPOSAL NO. 1

I will now instruct you on Plaintiff's claim under federal law for "actual fraudulent transfer."

To prevail on its claim for actual fraudulent transfer, Plaintiff must prove that Physiotherapy made that transfer with actual intent to defraud the Noteholders.  Specifically, Plaintiff must prove by a preponderance of the evidence that Physiotherapy made the transfer with wrongful intent.  Physiotherapy had wrongful intent if it either: (a) desired to prevent the

46

Noteholders from collecting on their debts, (b) was substantially certain that the Noteholders would have been prevented from collecting on their debts.   It is not enough that Physiotherapy "should have known" that creditors would be defrauded, or that Physiotherapy acted recklessly. Also, Plaintiff must prove that Physiotherapy intended to defraud the Noteholders, as opposed to Court Square, who was not a creditor.

In considering whether Physiotherapy acted with the necessary intent, you must consider only the intent of the Board of Directors of Physiotherapy.  This means that you may only consider the intent of a majority of the Board of Directors of Physiotherapy, at the time of the transaction, when they were acting in their capacity as Board members.  You may not attribute to the Physiotherapy Board the knowledge or intent of Wind Point or Water Street, as those are legally separate entities.  Additionally, you may not attribute to the Physiotherapy Board the intent of Physiotherapy employees.

If you find that the intent element has not been proven by a preponderance of the evidence, then your verdict must be for Defendants on this claim.  On the other hand, if you find that Plaintiff has proven the necessary intent by a preponderance of the evidence, then you must proceed to consider Defendant's affirmative defenses and, potentially, damages.

## AUTHORITY

11 U.S.C. § 548(a)(1)(A); *see also* 3B Fed. Jury Prac. & Instr. § 164:220 (6th ed.).

RESTATEMENT (SECOND) TORTS § 8A (1965) (The word "intent" … denote[s] that the actor desires to cause consequences of his act, or that he believes the consequences are substantially certain to result from it."); *Weisfelner v. Hofmann (In re Lyondell Chem. Co.)*, 554 B.R. 635, 650–51 (S.D.N.Y. 2016) ("[T]here must be proof in some form of an actual intent, as distinct from the knowledge of the facts from which the consequences of the debtor's act will

arise. That means only this: That although, in general, civil responsibility is imputed to a man for the usual results of his conduct, regardless of whether in the instance under consideration he actually had those consequences in mind, in specific cases like this, the law requires proof of that added element, *his mental apprehension of those consequences*, before it attaches to his conduct the result in question") (citing *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912) (L. Hand, J.)) (emphasis in original); *Kirschner v. Fitzsimmons* (*In re Tribune Co. Fraudulent Conveyance Litig.*), 2017 WL 82391, at \*18 (S.D.N.Y. Jan. 6, 2017) (finding that "allegations regarding what the Special Committee 'should have known' are not particularly relevant to whether they had an actual intent to hinder, delay, or defraud," because this "equate[d] 'actual intent' with 'presumed intent' or a standard based on foreseeability"); *Beal Bank, SSB v. Lucks*, 1999 WL 413356, at \*9 (Del. Ch. June 11, 1999) (DUFTA) ("The 'actual intent' element is a stringent requirement that the Court not merely infer intent from the economic consequences of the transaction, but find by a preponderance of the evidence that the transacting parties acted with (a) knowledge of the creditor's rights and (b) knowledge that the transaction would hinder those rights."); *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016) ("The word 'actual' has a simple meaning in the context of common-law fraud: It denotes any fraud that involves moral turpitude or intentional wrong.  'Actual' fraud stands in contrast to 'implied' fraud or fraud 'in law,' which describe acts of deception that may exist without the imputation of bad faith or immorality.  Thus, anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'") (citations, quotation marks, and brackets omitted); *In re Network Access Sols., Corp.*, 330 B.R. 67, 77 (Bankr. D. Del. 2005) ("In contrast to constructive fraud, which does not require any malevolent intent, a claim for actual fraud requires that there be conscious wrong-doing."); *see also In re Tribune Co. Fraudulent Conveyance Litigation*, 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) at \*6 (permitting

48

imputation of officer intent only when the officer is "in a position to control the disposition of [the transferor's] property, thereby effectuating the underlying offense.") (""[T]his test appropriately accounts for the distinct roles played by directors and officers under corporate law""); *see also* Defendants Motion in Limine No. 3 to Exclude Evidence of Corporate Officers' and Employees' Purported Intent Generally, and Their Actions and Intent After the Sale in Particular. *See also Elway Co., LLP v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 712 (Bankr. D. Del. 2010) (although defendant-officers had high degree of functional control, they did not have "formal, legal control" over decision and therefore their intent would not be imputed); *Burtch v. Masiz (In re Vaso Active Pharm., Inc.)*, 2012 WL 4793241, at *16–17 (Bankr. D. Del. Oct. 9, 2012) (denying summary judgment on imputing intent of officer transferee because genuine issue of fact existed where, despite presence of several badges of fraud, transaction was approved by independent board*)*

## DEFENDANTS' COUNTERPROPOSAL NO. 2

After the date of the transaction, Court Square was responsible for the knowledge and actions of Physiotherapy's officers, directors, and agents while they were acting within the scope of their authority.

## PLAINTIFF'S RESPONSE TO OBJECTIONS AND COUNTERPROPOSALS

As is shown in Plaintiff's authorities above, there are many defects in Defendants' proposed instructions. At the outset, without explanation, neither of Defendants' proposals even instructs the jury that it must determine whether Physiotherapy made the transfers with intent to "hinder, delay, or defraud" creditors, which is what the relevant statute provides. 11 U.S.C. § 548(a)(1)(A).

Imputation. Defendants' Counterproposal No. 1 would instruct the jury that it must

consider only the intent of a majority of the Board, and not the intent of any of Physiotherapy's officers or employees.  However, the law in the Third Circuit has long been that "the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation." *Rochez Bros.*, 527 F.2d at 884.  This standard applies to Section 548 claims.  *See, e.g.*, *Personal*, 334 F.3d at 242-43.  Defendants made their contrary argument—the same argument they make here—in their Motion to Dismiss.  Adv. D.I. 107 at 57-60.  The Bankruptcy Court properly rejected this argument, Adv. D.I. 250 at 33, and its ruling is the law of the case, *In re Continental Airlines, Inc.*, 145 B.R. 404, 408 (D. Del. 1992).  Defendants offer no basis for now seeking reconsideration.  *See N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (reconsideration may be appropriate only if there is "(1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; [or] (3) the need to correct clear error [of law] or prevent manifest injustice.") (quotations and citations omitted; alterations in original).

*In re Tribune Co. Fraudulent Conveyance Litigation*, 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017), on which Defendants rely, is contrary to both controlling Third Circuit law and the prevailing view in the Second Circuit.  For example, the court held in *In re Lyondell Chem. Co.*, 554 B.R. 635 (S.D.N.Y. 2016), that the debtor's CEO's "knowledge and intent in connection with the LBO may be imputed to" the debtor for purposes of a Section 548 claim, consistent with general principles of agency law.  *Id.* at 648.  The court rejected the argument Defendants present here, "that [the CEO's] intent may be imputed to [the debtor] only if the Trustee adequately pleads that [the CEO] was in a position to control the Board's decision to proceed with the LBO," explaining that there was "no basis to infer, based on the fact that the LBO

50

required the approval of the Board, that long established agency law principles should be altered."  *Id.* at 648-49; *see In re Bernard L. Madoff Inv. Sec. LLC*, 560 B.R. 208, 228 (Bankr. S.D.N.Y. 2016) (stating, in Section 548 case, that "the knowledge of a corporate officer will be imputed to the corporation"); *see also* Restatement (Third) Of Agency § 5.03 cmt. d (2006) (agent's "knowledge of the falsity is imputed" to the principal).  No unfairness results from the imputation doctrine, which exists to create "strong incentives for principals to design and implement effective systems through which agents handle and report information."  *Lyondell*, 554 B.R. at 647; Restatement (Third) Of Agency § 5.03 cmt. b (2006) (same).[6]

The other cases Defendants cite on this point, *In re Vaso Active Pharm., Inc.*, 2012 WL 4793241 (Bankr. D. Del. Oc. 9, 2012) and *In re Elrod Holdings Corp.*, 421 B.R. 700 (Bankr. D. Del. 2010), are inapposite.  In both cases, the question was whether to impute the intent of the *transferees*, not the intent of officers of the *transferors*.  *Vaso*, 2012 WL 4793241, at *10 ("in certain circumstances, which Plaintiff alleges arise here, a *transferee's intent* to hinder, delay, or defraud creditors may be imputed to a debtor so as to render a transfer fraudulent") (emphasis added); *Elrod*, 421 B.R. at 709-12 (discussing "transferee intent").  As will be discussed in Instruction No. 3.4, there is a three-part test that must be met in order to impute the intent of a transferee, which is different from the principles of agency that apply to impute to the transferor the intent of its own officers.  Indeed, both *Vaso* and *Elrod* recognize these agency principles. *See Vaso*, 2012 WL 4793241, at *10 ("How does a legal fiction such as a corporation have an intent to do anything?  Of course, corporations act through people and, ultimately, their officers and directors."); *Elrod*, 421 B.R. at 710 (recognizing that entities created by law are "incapable

---

[6] Moreover, *Tribune* is based on an inapplicable fact pattern in which "independent" directors approve a transfer.  As the district court noted in *Lyondell*, the bankruptcy court ruling on which *Tribune* was based (which itself was reversed) was expressly limited to a transfer approved by a "functioning" board with independent directors.  554 B.R. at 649.

of formulating or acting with intent" and therefore the intent of partners may be imputed to a partnership).

      <u>Defendant Intent.</u>  Another defect in Defendants' Counterproposal No. 1 is that it states that the jury may not consider the knowledge or intent of Water Street or Wind Point, but they are transferees whose intent may be imputed to the Debtor if the three-part test set forth in Plaintiff's Proposed Instruction No. 3.4 is met.

      <u>Natural Consequences.</u>  Defendants' Counterproposal No. 1 also fails to recognize that fraudulent intent may be inferred if the natural consequence of Physiotherapy's actions was to hinder, delay or defraud creditors.  Defendants seek to place a much heavier burden on Plaintiff with respect to the definition of intent than the law requires.  As shown in Plaintiff's authorities, the law in the Third Circuit with respect to intent for fraudulent transfers is that "a party is deemed to have intended the natural consequences of his acts."  *E.g.*, *Tabor*, 803 F.2d at 1305.  While it is true, as Defendants state, that actual fraud must be "done with wrongful intent," *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016), these two concepts are not incompatible.  Thus, if the "natural consequence" of the Company's acts is to hinder, delay, or defraud creditors, it must be deemed to have intended that consequence.

      <u>Time Period.</u>  Defendants' Counterproposal No. 2 would confuse the jury about the relevant time period.  Defendants acknowledge that the relevant intent is the intent that exists at the time of the transaction, *see, e.g.*, Defendant's Counterproposal No. 1 to Plaintiff's Proposed Instruction No. 3.4, but then seek to confuse the jury with an instruction regarding intent after the Transaction.  Evidence regarding the conduct of Physiotherapy's agents after the Transaction is relevant to show that Physiotherapy acted with fraudulent intent prior to the Transaction.  For example, there is evidence that the Company's CEO and CFO, who remained with the Company

after the change in ownership, acted to cover up their prior fraud.   However, Defendants'
proposal would lead the jury to assign the blame to Court Square for this cover-up.   An
instruction on post-Transaction imputation of intent is wholly unnecessary, and should not be
given, because the Trust's claim puts at issue the Debtor's intent at the time of the Transaction,
not after it closed.

### DEFENDANTS' RESPONSE

The majority of Plaintiff's improper briefing above addresses issues already briefed in
connection with Defendants' Motion in Limine No. 3 at the time and within the page limits
prescribed by the Court.   Plaintiff should not have arrogated to itself further briefing on that
motion here, almost literally at the last minute.   The Court should decide that motion based on the
briefs as timely filed within the page limits allotted.   To the extent the Court entertains Plaintiff's
improper additional briefing, Defendants reserve their right to respond further.   In any event,
Plaintiff's proposed jury instruction misstates the law, is prejudicial and confusing, and should be
rejected for reasons explained elsewhere herein and in connection with the parties' motions *in
limine*.

### 3.3.    Actual Fraudulent Transfer—Badges of Fraud [DISPUTED]

### PLAINTIFF'S PROPOSAL

Direct evidence of fraudulent intent is seldom available, and is not necessary for
Plaintiff's actual fraudulent transfer claim.   Instead, fraudulent intent may be proven through
circumstantial evidence called the "badges of fraud."   The following are "badges" of fraudulent
intent that you may consider:

1.   Whether the transfer was made to an insider or controller.

2.   Whether the transfers occurred shortly before or shortly after a substantial debt was

incurred.

3.   Whether the value of the consideration that Physiotherapy received from Defendants, if any, was reasonably equivalent to the value of the money that was transferred to Defendants.

4.   Whether Physiotherapy became insolvent shortly after the transfers were made. Physiotherapy was "insolvent" if, after the transfers were made, the amount of its debts exceeded the value of its assets, at a fair market valuation.

5.   How much of Physiotherapy's estate was transferred.

The appearance of multiple badges of fraud in one transaction generally provides conclusive evidence of an actual intent to defraud, which Defendants may rebut by offering significantly clear evidence of a legitimate supervening purpose for the transaction.

This list is not exhaustive, and you may consider any evidence that has been admitted in determining whether Physiotherapy acted with the requisite fraudulent intent, including whether Physiotherapy misrepresented its true financial condition or concealed material facts in connection with its sale.

## **AUTHORITY**

1.     The Trust can prove fraudulent intent based on the badges of fraud.  *In re Charys Holding Co., Inc.,*  2010 WL 2774852, *5 (Bankr. D. Del. July 14, 2010) (badges of fraud in federal actual fraudulent conveyance action include "(i) the relationship between the transferor and transferee; (ii) the consideration for the transfer; (iii) the insolvency of the transferor; and (iv) concealment or secrecy of the transaction"); *In re Covenant Partners, L.P.,* 531 B.R. 84, 91 (Bankr. E.D. Pa. 2015) (identifying and applying common-law and state-law badges of fraud, including whether "the transfer was of substantially all the debtor's assets" and whether "the

transfer occurred shortly before or shortly after a substantial debt was incurred"); *Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A.*, 879 F.3d 79, 86 (3d Cir. 2018) ("The relevant DUFTA and Bankruptcy Code provisions are nearly identical, and Delaware courts have interpreted and applied them uniformly.").

    2.    The presence of multiple badges of fraud in a single transaction "generally provides conclusive evidence of actual intent to defraud." *Merrill Lynch Bus. Fin. Servs., Inc. v. Kupperman*, 441 F. App'x 938, 941 (3d Cir. 2011) (quotations omitted); *see also In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 460 (Bankr. D. Del. 2018) (same); *In re AgFeed USA, LLC*, 56 B.R. 318, 335 (Bankr. D. Del. 2016) (same); *In re Green Field Energy Servs., Inc.*, 2015 WL 5146161, *6 (Bankr. D. Del. Aug. 31, 2015) (same); *In re Glencoe Acquisition, Inc.*, 2015 WL 3777972, *5 (Bankr. D. Del. June 16, 2015) (same); *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 565 (Bankr. D. Del. 2012); *Charys Holding*, 2010 WL 2774852 at *5 (same); *In re Fedders N. Am. Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) (same).

    3.    If multiple badges of fraud are proven in connection with a single transaction, the defendant bears the burden of providing significantly clear evidence of a legitimate supervening purpose. *Kelly v. Armstrong*, 141 F.3d 799, 803 (8th Cir. 1998) (vacating judgment and remanding for new trial due to erroneous instruction that improperly told the jury "that badges of fraud, if found, could be given whatever weight the jury thought they warranted"); *In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994) ("The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent "significantly clear" evidence of a legitimate supervening purpose. Thus, once a trustee establishes indicia of fraud in an action under section 548(a)(1), the burden shifts to the transferee to prove some 'legitimate supervening purpose' for the transfers at issue.") (quotations

and citations omitted); *In re SMTC Mfg. of Tex.*, 421 B.R. 251, 299-300 (Bankr. W.D. Tex. 2009) ("The presence of many badges of fraud will always make out a strong case of fraud.") (internal quotation omitted).

4.     A finding that Physiotherapy misrepresented its true financial condition or concealed material facts would be indicative of fraudulent intent.  *In re Bayou Grp., LLC*, 439 B.R. 284, 305-07 (S.D.N.Y. 2010) (fact that defendants "disseminated various kinds of documents containing false information about Bayou's current performance" in order "to induce new investors to invest in Bayou" served to "confirm the existence of the fraud scheme," which "provides overwhelming evidence of actual fraudulent intent"); *Kipperman v. Onex Corp.*, 411 B.R. 805, 853 (N.D. Ga. 2009) ("A badge of fraud may be defined to be any circumstance which tends to raise justifiable suspicion of fraud. The determination of whether any particular circumstance is a badge of fraud is dependent upon facts, the credibility and weight of which the jury are the exclusive judges.").

## DEFENDANTS' OBJECTION

Plaintiff's proposed instruction is erroneous and prejudicial.  The Court should not list five of Plaintiff's cherry-picked "badges of fraud" and then say that it has already "determined" that the first three are "satisfied."  The Court has not made any such determination, and should not, because intent is for the jury to decide, and the positions Plaintiff asks this Court to take— and take away from the jury—are wrong.  In particular, Plaintiff is wrong to contend that the transaction was a purported LBO in which the money that was borrowed was used to buy out Physiotherapy's former shareholders and that, as a result, Plaintiff need not prove reasonably equivalent value.  That was the situation in *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 644 (3d Cir. 1991) (debtor's guaranty of and security interest collateralizing the loan to

the company that bought the debtor in the LBO which "was used to buy out [the debtor's former] shareholders"). The Third Circuit in *Mellon* held that the plaintiff was required to prove lack of reasonably equivalent value yet failed to do so. *See id.* at 646-48. Indeed, the plaintiff in *Mellon* adopted many of the same erroneous positions as Plaintiff here, which the Third Circuit rejected. *See id.* at 646-50; *see also* Defs.' Obj. to Pl's Instr. No. 3.6.

In any event, there is no reason to instruct the jury about the "badges of fraud" at all in this case. As Plaintiff's proposed instruction implicitly acknowledges, most of the "badges" do not apply—unsurprisingly, because they were never intended to apply to an arm's-length sale of a company in which the **buyer** promised to conduct and rely on its **own** investigation; that its **own** partially-leveraged financing was **not** a condition of the sale; that the company would **remain solvent despite both the transfer and the leveraged financing**; and that "**No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud** either present or future creditors of Buyer and its Subsidiaries (including the Surviving Corporation and its Subsidiaries)." Merger Agr. § 8J (emphasis added); *see also id.* §§ 8D, 9B(iv), 11B. Moreover, contrary to the LBO-line of cases that Plaintiff relies on, this case did not involve an LBO, and it involves complaining creditors who were knowing and willful participants in the decision to increase the debtor's debt load. Instructing the jurors to focus on the "badges" in this case will cause confusion, and instructing them to focus on Plaintiff's cherry-picked "badges" is a recipe for confusion and prejudice.

Moreover, as the court held in *In re Bernier*, 282 B.R. 773 (Bankr. D. Del. 2002):

> In determining if wrongful intent existed at the time of the transfer, courts examine the totality of circumstances surrounding a transaction. Therefore, in addition to the evidence of actions taken by a debtor which are purported by a plaintiff to be indicia of intent to defraud, hinder or delay, the court may also

> consider the implications of the absence of certain badges of fraud or badges of intent to hinder or delay in the circumstances surrounding the transfer and/or evidence of a legitimate purpose for the transfer. Indeed, the absence of several very significant badges of wrongful intent may **disprove** actual intent to hinder, delay or defraud. . . . Evidence of some other convincing explanation other than an intent to hinder, delay or defraud may supercede the implications initially presented by the presence of certain badges of fraud.

*Id.* at 781-82 (emphasis in original) (citations omitted). Another relevant factor is "whether the transaction [was] conducted at arm's length." *Id.* at 781.

Thus, contrary to Plaintiff's proposed instruction, the "badges" are ***not*** "conclusive." Indeed, the "badges" are simply a form of circumstantial evidence, and as stated in the general circumstantial evidence instruction, ***which Plaintiff itself proposed***: the jury should "consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves." It would therefore be contradictory and prejudicial for the Court to thereafter single out particular types of circumstantial evidence as "conclusive." Moreover, the jury must "examine the totality of circumstances surrounding [the] transaction," *id.*, and "should take a holistic view and take into account all evidence that supports or undermines a finding of fraud," *In re Irving Tanning Co.*, 555 B.R. 70, 81 (Bankr. D. Me. 2016). The insolvency and reasonably-equivalent-value badges are certainly not "conclusive," because otherwise all constructively fraudulent transfers would also be actually fraudulent, making the distinct statutory provisions for the two types of claims superfluous. *In re Commercial Loan Corp.*, 396 B.R. 730, 747 (Bankr. N.D. Ill. 2008). And even if several badges of fraud are found, that is not the end of the inquiry: the burden then shifts to the defendant-transferee to prove a legitimate supervening purpose for the transfer. *Bernier*, 282 B.R. at 782; *see also*, *e.g.*, *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 (1994) (defendant may rebut any inference of fraudulent intent based on the "badges"); *In re Harris*, 2003 WL 23096966, at *2 (Bankr. D. Del. Dec. 30, 2003) (same); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 391 (S.D. Tex. 2008) (same);

58

UFTA § 4(b) cmt. 5 ("Proof of the existence of any one or more of the factors . . . may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer or incurred a fraudulent obligation.").

In light of the foregoing, Defendants offer two alternative counterproposals: one that greatly simplifies the instruction by omitting the "badges," and another that lists them but, unlike Plaintiff's proposal, does so fairly.

<u>**DEFENDANTS' COUNTERPROPOSAL NO. 1**</u>

In deciding whether Plaintiff carried its burden to prove that Physiotherapy actually intended to hinder, delay, or defraud the Noteholders, you must consider all of the circumstances surrounding the transaction, taking into account all evidence that supports or undermines a finding of fraud.

<u>**AUTHORITY**</u>

*In re Bernier*, 282 B.R. 773, 781 (Bankr. D. Del. 2002); *In re Irving Tanning Co.*, 555 B.R. 70, 81 (Bankr. D. Me. 2016).

<u>**DEFENDANTS' COUNTERPROPOSAL NO. 2**</u>

In deciding whether Plaintiff carried its burden to prove that Physiotherapy actually intended to hinder, delay, or defraud the Noteholders, you must consider all of the circumstances surrounding the transaction, taking into account all evidence that supports or undermines a finding of fraud.  Factors which you may consider include whether or not:

    (1)    The transfer or obligation was to an insider rather than part of an arm's-length transaction;

    (2)    Physiotherapy retained possession or control of the property transferred after the transfer;

    (3)    The transfer was concealed rather than disclosed;

    (4)    Before the transfer was made or obligation was incurred, Physiotherapy

had been sued or threatened with suit;

(5)      The transfer was of substantially all of Physiotherapy's assets;

(6)      Physiotherapy absconded (*i.e.*, left in a hurry and in secret) after the transfer;

(7)      Physiotherapy removed or concealed assets;

(8)      The value of the consideration received by Physiotherapy was reasonably equivalent to the value of the asset transferred;

(9)      Physiotherapy was insolvent or became insolvent shortly after the transfer;

(10)     The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)     Physiotherapy transferred the essential assets of the business to a lienor who transferred the assets to an insider of Physiotherapy.

None of these factors is conclusive.  For example, even if you find that Physiotherapy was insolvent at the time of the transfer or shortly after, and that it did not receive consideration of reasonably equivalent value, those factors standing alone are insufficient to establish fraudulent intent because those are the elements of Plaintiff's "constructive" fraud claim, as I will explain, and Plaintiff's "actual" fraud claim requires more to prove actual intent.  Also, even if you find that several of these factors were present, you must consider whether Defendants have given a legitimate explanation for the transfer.  And you may consider the overall transaction— in other words, the sale of Physiotherapy to Court Square, whether that transaction was conducted at arm's length, whether Court Square promised that Physiotherapy did not intend to hinder, delay or defraud any creditors, and anything else that either supports or undermines a finding of fraudulent intent.

## **AUTHORITY**

6 Del. C. § 1304(b) (listing the "badges," which are neither referenced nor listed in the Bankruptcy Code); *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 389-90 (5th Cir. 2017)

(rejecting plaintiff's argument that the trial court erred "by listing all eleven badges of fraud in the jury instructions, but not instructing the jury that all eleven need not be found to find fraudulent intent"; it was sufficient that the jury was instructed that "consideration may be given, among other factors, to" the badges of fraud); *In re Bernier*, 282 B.R. 773, 781-82 (Bankr. D. Del. 2002) (fact-finder should consider the totality of the circumstances, including "whether the transaction [was] conducted at arm's length" and "the timing of the transfer relative to the filing of the petition," that the absence of certain badges "may **disprove** actual intent to hinder, delay or defraud," and that "some other convincing explanation . . . may supercede the implications initially presented by the presence of certain badges of fraud") (emphasis in original); *Tanning*, 555 B.R. at 81 (consider "all evidence that supports or undermines a finding of fraud"); *In re Commercial Loan Corp.*, 396 B.R. 730, 747 (Bankr. N.D. Ill. 2008) ("With evidence sufficient to establish only two badges of fraud—lack of reasonably equivalent value and insolvency—the Trust has raised no inference of fraudulent intent.  Indeed, these two badges of fraud standing alone are arguably never enough to establish actual fraud because lack of reasonably equivalent value and insolvency are the elements of constructive fraud.  If the elements of constructive fraud were enough to demonstrate actual fraud, the constructive fraud provisions . . . would be superfluous.  Statutes should not be construed to render portions of them superfluous.").

## PLAINTIFF'S RESPONSE TO OBJECTIONS AND COUNTERPROPOSALS

Need for Instruction.    Defendants cite no authority in support of their first counterproposal, to omit the badges of fraud from the Court's instructions entirely, instead relying solely on an argument about provisions in the Merger Agreement.  As set forth in the Trust's Motion *In Limine* No. 3, those provisions should be excluded altogether, but even if admitted, they do not lessen the need to instruct the jury on well-established badges of fraud.  *In*

*re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019) ("Actual intent to defraud is usually not susceptible to direct evidence; courts therefore may rely on circumstantial evidence to infer such intent.  This circumstantial evidence often takes the form of badges of fraud."); *see In re Sharp Int'l. Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (badges of fraud are "so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent").  In Defendants' authorities, the courts considered the relevant badges of fraud.  *See In re Bernier*, 282 B.R. 773, 781 (Bankr. D. Del. 2002) ("Recognizing the difficulty of proving actual intent to hinder, delay or defraud, courts have identified several 'badges of fraud' or wrongful intent which, if present in the circumstances surrounding the transaction, may establish the requisite actual intent."); *In re Irving Tanning Co.*, 555 B.R. 70, 80-81 (Bankr. D. Me. 2016) ("In determining whether the circumstantial evidence supports an inference of fraudulent intent, courts should look to the existence of certain badges of fraud.").

        <u>Improper to Instruct on Inapplicable Badges.</u>  Defendants' second counterproposal is improper, confusing, and prejudicial.  Defendants propose that the jury be given a laundry list of statutory badges of fraud under Delaware law, most of which have nothing to do with the facts of this case.  However, courts limit the analysis to the badges of fraud that are relevant under the facts, omitting irrelevant badges from consideration.  "The proper inquiry is whether the badges of fraud are present, not whether some factors are absent."  *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 460 (Bankr. D. Del. July 11, 2018); *see, e.g.*, *In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, *10-15 (Bankr. D. Del. Oct. 9, 2012) (evaluating only a subset of the badges set forth in 6 Del. C. § 1304(b), some of which were present and others of which were absent); *In re B.L. Jennings, Inc.*, 373 B.R. 742, 767 (M.D. Fla. 2007) ("the Court turns to analysis of the badges of fraud under CA-UFTA, *discussing only those which are relevant*") (emphasis added).

*In re Bernier* supports Plaintiff's instruction, as that case considered (under a different statute) the absence of a *crucially relevant badge of fraud,* and did not purport to consider badges that were simply inapplicable, or credit the defendant with the absence of such inapplicable badges. *See* 282 B.R. at 783 (where plaintiff alleged fraudulent conveyance designed to defraud, delay or hinder a prior judgment, it was relevant that plaintiff "did not demonstrate that Debtor was aware of the 1994 Judgment or the garnishment" at the time of the accused transfer).   The Trust's proposed instruction lists the badges of fraud that pertain to the facts of this case.   Defendants make no argument as to relevance of any other badges of fraud, and no argument for why the absence of any additional badges would make the Debtor's fraudulent intent more or less likely.

Inaccurate Description of Badges.   In addition to including irrelevant badges of fraud, Defendants' Counterproposal No. 2 alters, without explanation or support, the first badge to add the phrase "rather than part of an arm's-length transaction."   This phrase appears nowhere in the statute that Defendants purport to apply, *see* 6 Del. C. § 1304(b), and sets up a false and confusing distinction between arm's-length transactions and transactions with insiders.   This is particularly inappropriate in this case, where Defendants plainly constitute "insiders" and are thus by Congress's definition and purpose "subject to closer scrutiny than those dealing at arms length with the debtor."   *In re U.S. Med., Inc.*, 531 F.3d 1272, 1277 (10th Cir. 2008) (quoting the legislative history for the definition of "insider" in S. Rep. No. 95-989, at 25 (1978); *see* 11 U.S.C. § 101(31)(B) ("insider" includes directors, officers, and persons in control of a debtor corporation); *In re Direct Response Media, Inc.*, 466 B.R. 626, 657 n.18 (Bankr. D. Del. 2012) (finding insider status for persons in control of debtor).

Defendants' proposal that the Court instruct the jury that certain badges are not sufficient to prove actual fraudulent intent, on the ground that doing so would render the constructive

fraudulent transfer provision superfluous, is a further error.  There is no superfluity issue here because, as Defendants argue elsewhere, the jury is entitled to consider the totality of the circumstances in determining actual fraudulent intent, including Defendants' explanation for the transfers.  In contrast, the constructive fraudulent transfer statute does not invite the jury to consider such explanations in assessing liability in the first instance.  Because a jury evaluating Defendants' intent to hinder, delay, or defraud considers both the badges of fraud *and* the broader totality of circumstances, including at a minimum Defendants' explanations, a determination of actual fraudulent intent always reflects additional and different elements from a determination of constructive fraudulent transfer, no matter which badges the jury deems relevant.

      <u>Biased Language.</u>  Finally, Defendant's counterproposal ends with a request that the Court summarize Defendants' favorite evidence, in Defendants' preferred light, as a description of "the overall transaction."  This would be improper under any circumstances, but particularly here, where Defendants ask the Court to invite the jury to consider whether "Court Square promised that Physiotherapy did not intend to hinder, delay or defraud any creditors," a fact that is utterly irrelevant to actual intent in this case and once again seeks to bind the Trust to a non-party's positions and representations, which has already been ruled impermissible as a matter of law.  *See* PTO Exh. 6 (MIL No. 3).  The Court should reject the invitation to skew the instruction in this way.

## **DEFENDANTS' RESPONSE**

      At every turn, Plaintiff seeks to make this case a one-way street.  Here, it seeks to instruct the jury only on the "badges" Plaintiff wants to focus on, ignoring the badges whose absence undermines any finding of fraud.  Rather than attempt to list everything the jury might consider,

it would be simpler to simply instruct them that they must consider all of the circumstances surrounding the transaction, taking into account all evidence that supports or undermines a finding of fraud.  *See In re Bernier*, 282 B.R. 773, 781 (Bankr. D. Del. 2002); *In re Irving Tanning Co.*, 555 B.R. 70, 81 (Bankr. D. Me. 2016).  But if the Court decides to instruct the jury about the badges of fraud, Plaintiff is wrong to assert that the Court should instruct the jury only on Plaintiff's cherry-picked badges.  In *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377 (5th Cir. 2017)—which Plaintiff conspicuously ignores—the Fifth Circuit rejected the plaintiff's argument "that by listing all eleven badges of fraud in the jury instructions, but not instructing the jury that all eleven need not be found to find fraudulent intent, the jury could have been misled."  *Id.* at 389-90.  And the Delaware Bankruptcy Court held in *Bernier* that the fact-finder "may also consider the implications of the *absence* of certain badges of fraud or badges of intent to hinder or delay in the circumstances surrounding the transfer and/or evidence of a legitimate purpose for the transfer.  Indeed, the *absence* of several very significant badges of wrongful intent may **disprove** actual intent to hinder, delay or defraud."  282 B.R. at 781–82 (italics added; bold in original).  Plaintiff's suggestion that the badges Defendants propose to include are irrelevant is wrong.  It is highly significant, for example, that the alleged transfer was part of an arm's-length transaction that was fully disclosed to the Noteholders.  *See*, *e.g.*, *id.* at 781.  For the same reason, Plaintiff's contention that Defendants are "insiders" is misleading.  Again, the transaction at the heart of this case was Court Square's arm's-length purchase of Physiotherapy.  Plaintiff cannot be allowed to mislead the jury into thinking this case is about an insider transaction.  It is not.  It is about an arm's-length sale, which Plaintiff mischaracterizes as a fraudulent transfer, and seeks to evade the consequences of having "failed to properly identify an avoidable transfer under the Code," *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883,

65

894 (2018), by seeking to obfuscate "the totality of circumstances surrounding [the] transaction,"

*Bernier*, 282 B.R.at 781.

**3.4.     Actual Fraudulent Transfer—Defendants' Intent Sufficient But Not Necessary [DISPUTED]**

<u>**PLAINTIFF'S PROPOSAL**</u>

Proof of Physiotherapy's intent to hinder, delay or defraud a creditor is sufficient for Plaintiff's actual fraudulent transfer claim, and Plaintiff is not required to prove that the Defendants shared that intent.  However, Plaintiff may also prove the necessary intent by showing that:  (1) Defendants intended to hinder, delay, or defraud Physiotherapy's creditors; (2) Defendants were in a position to dominate or control Physiotherapy; and (3) the domination and control related to Physiotherapy's transfer of the $248.6 million to Defendants.  If you find that Plaintiff has established these elements, you must find for Plaintiff on its actual fraudulent transfer claim.

<u>**AUTHORITY**</u>

*In re Syntax-Brillian*, 573 F. App'x 154, 161 (3d Cir. Aug. 11, 2014) (proof of the debtor's intent to hinder, delay or defraud a creditor is sufficient to satisfy the intent element of an actual fraudulent transfer claim); *In re Elrod Holdings Corp.*, 421 B.R. 700, 710 (Bankr. D. Del. 2010) (holding that three requirements must be met to impute a transferee's intent to the Debtor: "First is that the controlling transferee possesses the requisite intent to hinder, delay, or defraud the debtor's creditors.  Second, the transferee must be in a position to dominate or control.  And third, the pertinent domination and control relates to the debtor's disposition of his property.") (quoting *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 443 (S.D.N.Y. 2001)); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 369 (S.D. Tex. 2008) (adopting three-part test and predicting that Delaware would do so).

<u>**DEFENDANTS' OBJECTION**</u>

Plaintiff's proposed instruction misstates and misapplies the law.  As a matter of law, Defendants did not control the transfer of $248.6 million, and imputation of their intent in these circumstances "would be improper."  *In re Elrod Holdings Corp.*, 421 B.R. 700, 712 (Bankr. D. Del. 2010).  In *Elrod*, the defendants sold equity in their company in a leveraged buyout that left the company in debt, and its "financial condition deteriorated quickly."  *Id.* at 705.  The company restructured its debt obligations, but went into bankruptcy nonetheless, after which the trustee alleged that the defendants "defrauded and tricked" the buyer into agreeing to the restructuring.  *Id.* at 707.  The trustee attempted to impute the defendants' alleged fraudulent intent to the debtor, but the Delaware Bankruptcy Court rejected that attempt as a matter of law.  The transfers at issue were approved by individuals aligned with the buyer, on the other side of the transaction from defendants, "and each side was represented by counsel.  These facts are undisputed.  Therefore, as a matter of law, neither [of the defendants] can be said to have controlled [the debtor] with respect to the transfers at issue.  Imputation of their intent to [the debtor] would be improper.  The Trustee's 'actual intent' fraudulent transfer claims fail."  *Id.* at 712; *see also*, *e.g.*, *In re Adler, Coleman Clearing Corporation*, 263 B.R. 406, 449 (S.D.N.Y. 2001) (reversing lower court's decision to impute transferee's intent to debtor where it was "central to the Trustee's theory" that the transferee was guilty of "deceiving" the debtor, and the transferee "could not simultaneously have acted as [the debtor's] principal directing [the debtor] to knowingly defraud itself").

Similarly here, although Plaintiff contends that Court Square was "defrauded and tricked," Plaintiff cannot deny that Court Square approved the transfer at issue and was "represented by counsel."  *Elrod*, 421 B.R. at 707, 712.  Because Court Square (defrauded or not) controlled the transfer at issue in this case, Defendants cannot have exercised the control over the transfer

necessary for imputation, as a matter of law.  *See id.*; *Adler*, 263 B.R. at 439-51.

ASARCO, on which Plaintiff relies, does not suggest otherwise.  There, "the companies involved were affiliated and not independent," and the debtor "was not dealing at arm's length with" the party that purchased it.  396 B.R. at 369.  Here, the underlying transaction—Court Square's purchase of Physiotherapy—was conducted entirely at arm's-length.  Imputation of Defendants' intent to Physiotherapy in these circumstances would be improper as a matter of law.  *See Elrod*, 421 B.R. at 705-12; *Adler*, 263 B.R. at 439-51.

Furthermore, Plaintiff's proposed instruction improperly and counterfactually assumes that Physiotherapy made the transfer at issue, which is very much in dispute, as discussed above.  Plaintiff's proposed instruction also erroneously asserts that if the jury finds the three "elements" listed in the instruction, it "must find for Plaintiff," ignoring the other elements of Plaintiff's claims as well as the defenses.  For all of these reasons, the Court should reject Plaintiff's proposed instruction, and should not give the jury any instruction about imputation.  If, however, the Court offers an instruction on imputation—which, again, it should not—the Court should instruct the jury as follows, in lieu of the second paragraph included in Defendants' proposed instruction on intent (*i.e.*, Instruction No. 3.1.2).

## DEFENDANTS' COUNTERPROPOSAL NO. 1

In considering whether Physiotherapy acted with the necessary intent, you should consider the intent of the Board of Directors of Physiotherapy at the time of the transaction. You may not attribute to the Physiotherapy Board of Directors the intent of Physiotherapy employees.

While the law typically only permits you to consider the intent of Physiotherapy's Board, Plaintiff argues that an exception to that rule should apply.  That exception is a narrow one that only applies if you find that this was an extreme situation in which either Wind Point or Water

Street exercised nearly total control over both Physiotherapy and the transfer.  In order for you to consider Wind Point or Water Street's intent, Plaintiff must first prove (1) that Defendants had nearly total control over Physiotherapy; and (2) that Defendants had nearly total control over the transfer of $248.6 million.  Defendants cannot have had such control if you find that the transfer would not have occurred without the approval of Court Square or its affiliates.

## AUTHORITY

11 U.S.C. § 548(a)(1)(A).

Intent:  *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016) ("The word 'actual' has a simple meaning in the context of common-law fraud: It denotes any fraud that involves moral turpitude or intentional wrong.  'Actual' fraud stands in contrast to 'implied' fraud or fraud 'in law,' which describe acts of deception that may exist without the imputation of bad faith or immorality.  Thus, anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'") (citations, quotation marks, and brackets omitted); *In re Network Access Sols., Corp.*, 330 B.R. 67, 77 (Bankr. D. Del. 2005) ("In contrast to constructive fraud, which does not require any malevolent intent, a claim for actual fraud requires that there be conscious wrong-doing.").

Control:  *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 439-51 (S.D.N.Y. 2001) (explaining the basis and parameters of the narrow exception for imputation of transferee intent to transferor); *In re Elrod Holdings Corp.*, 421 B.R. 700, 710-11 (Bankr. D. Del. 2010) ("*Adler* clarifies that domination or control is but one part of a three-part test for intent imputation:  First is that the controlling transferee possesses the requisite intent to hinder, delay, or defraud the debtor's creditors.  Second, the transferee must be in a position to dominate or control.  And third, the pertinent domination and control relates to the debtor's disposition of his property.  A moving party must satisfy all three of these elements to qualify for the transferee intent exception and

avoid application of the default rule, which is that the debtor's intent controls.  The Court adopts the Adler test for intent imputation. . . .  A moving party must satisfy all three of these elements to qualify for the transferee intent exception and avoid application of the default rule, which is that the debtor's intent controls. . . .  [T]he cases are careful to point out that vicarious intent is an extreme situation that is dependent upon nearly total control of a debtor by a transferee. . . .  The Elrods and JKE were counterparties in these transactions, and each side was represented by counsel.  These facts are undisputed.  Therefore, as a matter of law, neither the Elrods nor Elway can be said to have controlled JKE with respect to the transfers at issue.  Imputation of their intent to JKE would be improper.  The Trustee's actual intent fraudulent transfer claims fail.") (citations and internal quotation marks omitted).

### PLAINTIFF'S RESPONSE TO OBJECTION AND COUNTERPROPOSAL NO. 1

The Trust's proposed instruction accurately states the law.  Defendants' Counterproposal No. 1 does not.

1.     Defendants' proposed instruction states that the intent of Physiotherapy's employees may not be considered.  As explained in connection with Plaintiff's Proposed Instruction 3.2, that is incorrect.

2.     Defendants err in arguing that imputation of transferee intent is improper in this case as a matter of law.  As *Adler* explains, imputation of a transferee's intent is proper where three elements are satisfied:  "First is that the controlling *transferee* possesses the requisite intent to hinder, delay or defraud the debtor's creditors.  Second, the transferee must be in a position to dominate or control.  And third, the pertinent domination and control relates to the debtor's disposition of his property."  263 B.R. at 443 (quotations and citations omitted).  The evidence supports each of these elements:  there is ample evidence of Defendants' intent to defraud

creditors; Defendants' ownership of nearly 90% of the shares in the Debtor gave them control; and their ownership interest gave them control over the transfer in particular.  As the Bankruptcy Court noted, Defendants' controlling ownership interest meant that, "by definition, they controlled the Board of Directors who had the power to appoint management."  Adv. D.I. 250 at 33.

Defendants cite *Elrod* for the proposition that transferee intent cannot be imputed whenever a buyer is involved with a transfer in an arms-length transaction, but *Elrod*'s holding is not that broad, and the facts of that case were materially different than here.  In *Elrod*, the challenged transfers related to a restructuring that occurred more than a year *after* the buyer purchased a 75% stake in the company.  421 B.R. at 704-06, 710.  The Trustee argued that the intent of the 25%-owners should be imputed based on their involvement in management and the "force of [their] personalities."  *Id.* at 712.  The court held that this was not enough because the transactions were approved by the buyer-appointed treasurer and buyer-appointed directors, which constituted a majority of the board, and the 25% owners were counterparties in the transaction.  *Id.*  Here, in stark contrast, Defendants were controlling shareholders and appointed all of the board members who signed off on the transfers to Defendants.  Court Square had no ownership interest in Physiotherapy when the Company decided to approve the transfers to Defendants.  Nor does *Adler* support Defendants' position.  In the case, there was no domination and control because the transferor and transferee were completely "independent, unaffiliated companies."  263 B.R. at 448-49.  Here, on the other hand, the Defendants were controlling shareholders of Physiotherapy.  There is thus no basis for Defendants' argument that their intent cannot be imputed as a matter of law.

      3.      Defendants' proposed instruction misstates the three-part test for transferee intent

quoted above.  Instead, Defendants offer only a two-part test, which misstates the law by changing the language of the three-part test identified in those cases, and inserting loaded, ambiguous terms such as their proposed instruction that this exception applies only in "extreme situations."  The Court should give the established three-part test, which governs the "situations" in which imputation is proper.

4.      In addition, Defendants' argument that it was Court Square, not the Defendants, who authorized the transfer, ignores the general principle of the collapsing doctrine, which instructs that LBO transactions are to be viewed as a whole for purposes of fraudulent transfer law.  *See*, e.g., *In re Jevic Holding Corp.*,  2011 WL 4345204, at *4 (Bankr. D. Del. Sept. 15, 2011) ("An LBO is the classic context in which courts have collapsed multiple transactions for the purpose of assessing and finding fraudulent transfer liability," citing cases where "[t]he Third Circuit has recognized the propriety of collapsing multiple transactions and treating them as one integrated transaction.").

### DEFENDANTS' RESPONSE

1.      *See* Defendants' Response re Instr. 3.2.

2.      Plaintiff's attempt to distinguish *Elrod* and *Adler* by pretending that Court Square had no control over the transaction fails.  The transaction, and hence the alleged transfer, would not have happened if Court Square had not agreed to it.  As *Elrod* and *Adler* demonstrate, moreover, Plaintiff's allegation that Court Square was defrauded does not support Plaintiff's contention that Defendants controlled the transaction.  *See Elrod*, 421 B.R. at 707, 712; *Adler*, 263 B.R. at 448–49.  In other words, fraudulent *inducement* is fundamentally distinct from fraudulent *transfer*.

3.      As the court made clear in *Elrod*, imputation is a "narrow exception" to the

"default rule, which is that the debtor's intent controls"—an exception that should only apply in "an extreme situation" of control over both the debtor and the transfer. *Elrod*, 421 B.R. at 708, 710-12.  Plaintiff's proposed instruction improperly seeks to give the jury the misimpression that this "narrow exception" is the rule.  It is not. *See id.* 4.    The so-called "collapsing doctrine" does not apply here as explained in Defendants' response to Plaintiff's erroneous objections to Defendants' Proposed Instruction 3.1, above.

### 3.5.    Actual Fraudulent Transfer—Other Matters Not Relevant [DISPUTED]

#### PLAINTIFF'S PROPOSAL

Pursuant to the instructions that I just gave you, the key question for Plaintiff's actual fraudulent transfer claim is whether Physiotherapy acted with intent to hinder, delay or defraud creditors.  Other matters are not relevant, including (1) whether Court Square or creditors relied on any statements made by Physiotherapy; (2) whether Court Square or creditors could or should have discovered the fraud; and (3) whether Court Square or creditors engaged in adequate due diligence.

#### AUTHORITY

*In re Teleservices Grp., Inc.*, 469 B.R. 713, 732 n.58 (Bankr. W.D. Mich. 2012) (holding creditors' due diligence was irrelevant in fraudulent transfer action); *Am. Express Travel Related Servs. Co. v. D & A Corp.,* 2007 WL 3217565, at *38 (E.D. Cal. Oct. 29, 2007) ("defenses of comparative fault, apportionment of fault and assumption of the risk do not provide a defense to . . . claims of fraudulent transfer"); *Henry v. Rizzolo*, 2010 WL 3385448, at *4 & n.1 (D. Nev. Aug. 24, 2010) ("Unlike a claim for common law fraud, the UFTA does not require proof that the defendant made a knowingly false statement upon which the plaintiff relied."); *In re Shirley*, 2011 WL 4963192, at *3 (Bankr. E.D. Tenn. Oct. 19, 2011) (individual creditors' "opinion whether the Debtors were a good risk" at the time of investment not relevant to fraudulent transfer liability); *In re Bay Plastics, Inc.*, 187 B.R. 315, 332 (Bankr. C.D. Cal. 1995) (extent of creditor's "opportunity to investigate the nature of the LBO transaction . . . is irrelevant to the cause of action for a fraudulent transfer that renders a debtor insolvent.").

#### DEFENDANTS' OBJECTION

Plaintiff's proposed instruction is erroneous and the cases Plaintiff cites do not support it.

As discussed above with respect to the "badges of fraud" instruction, the law is clear that the intent inquiry considers the "totality of the circumstances." It would therefore be erroneous to instruct the jury ***not to consider*** those circumstances that the Plaintiff deems harmful to its case. The logical fallacy in Plaintiff's argument is clear: just because the intent inquiry does not ***require*** the Plaintiff to prove a certain fact does not render that fact irrelevant. For instance, under Plaintiff's logic, because the law does not require the Plaintiff to prove the existence of any particular badge of fraud, the Court should instruct the jury not to consider any of them. At its core, Plaintiff's proposed instruction is inconsistent with the "totality of the circumstances" test.

Indeed, *Henry v. Rizzolo*, 2010 WL 3385448 (D. Nev. Aug. 24, 2010), ***undermines*** Plaintiff's proposed instruction. The court in *Henry* held that defendants who sought to prove that they acted in good faith—as Defendants will prove here—were "***entitled to conduct discovery regarding the facts and circumstances that led to the execution of*** " the agreement at issue, "***including Plaintiffs' knowledge about Defendants' assets and/or transfers of assets prior to execution of*** " that agreement. *Id.* at *4 (emphasis added). Similarly, the jury must be allowed to consider such matters without being told, wrongly, that they are "not relevant."

As for Plaintiff's other cases, *In re Teleservices Grp., Inc.*, 469 B.R. 713 (Bankr. W.D. Mich. 2012), involved proceedings ***after*** "a twelve-day trial" in which it was "***already decided***" that the transfers at issue were actually fraudulent and not received for value or in good faith. *Id.* at 719-20 (emphasis added). Given that those issues had already been decided, the bankruptcy court refused to consider the argument that the proven victim of the proven fraud did not act with due diligence, *see id.* at 732-33 & n.58, but that has no bearing whatsoever here, where nothing has been decided yet. In *American Express Travel Related Services*, 2007 WL 3217565 (E.D.

76

Cal. Oct. 29, 2007), the court held that a debtor who exceeds a credit-card limit cannot assert a comparative-fault defense based on the allegation that "American Express was negligent in erroneously permitting [the debtor] to exceed its credit limits." *Id.* at \*37. *American Express* bears no resemblance to this case. Contrary to Plaintiff's misrepresentation of it, *In re Shirley*, 2011 WL 4963192 (Bankr. E.D. Tenn. Oct. 19, 2011), did not address what is "relevant to fraudulent transfer liability," but merely held that a creditor's positive opinion about the debtor "for the purposes of making a loan does not equate to solvency under the Bankruptcy Code." *Id.* at \*3. Again, that has no bearing on this case. Finally, *In re Bay Plastics, Inc.*, 187 B.R. 315, 333 (Bankr. C.D. Cal. 1995), involved a "secret transaction." There was nothing secret about the transaction here.

Plaintiff's improper instruction, if given, would have the jury ignore the fact that, to take just one example, Court Square not only agreed to investigate and take responsibility for Physiotherapy's financial condition, but, having done so, explicitly promised that "***No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Buyer and its Subsidiaries (including the Surviving Corporation and its Subsidiaries)***." Merger Agr. § 8J (emphasis added). The jury is entitled to consider that and other such facts about the transaction—indeed, the "totality of circumstances surrounding" it, *In re Bernier*, 282 B.R. 773, 781 (Bankr. D. Del. 2002), in order to "take a holistic view and take into account all evidence that supports or undermines a finding of fraud," *In re Irving Tanning Co.*, 555 B.R. 70, 81 (Bankr. D. Me. 2016). The Court, therefore, should reject Plaintiff's erroneous and improper "Other Matters Not Relevant" instruction.

## PLAINTIFF'S RESPONSE

It does not follow, from the general proposition that the jury should consider the "totality of the circumstances," that the jury should consider irrelevant matters.  It should not do so, and Plaintiff's proposed instruction properly so informs the jury.  Defendants' objection underscores the necessity of this proposed instruction, making clear that they intend to make arguments about matters that are not relevant to Physiotherapy's or Defendants' fraudulent intent.

Defendants extensively quote from *Henry*, 2010 WL 3385448, but the portions they quote discuss evidence relevant to claims of *common-law fraud and conspiracy*, not fraudulent transfer.  *See id.* at *4.  Defendants cannot and do not dispute that reasonable reliance—an element of the fraud claim at issue in *Henry*—is *not* required in fraudulent transfer cases.  *See id.* at *4 n.1 ("Unlike a claim for common law fraud, the UFTA does not require proof that the defendant made a knowingly false statement upon which the plaintiff relied.").  As the court in *Teleservices Group* similarly explained, a purported lack of investor due diligence "has no relevance" to a fraudulent transfer claim.  469 B.R. at 732 n.58.  Defendants note that this decision was rendered after trial, but that fact had no bearing on the principle the court recognized and applied—that a purported lack of investor due diligence is irrelevant as a matter of law.  *Id.*

Nor can Defendants distinguish Plaintiff's other authorities, which likewise recognize that a potential investor's due diligence or reliance, or the lack thereof, does not bear on the question whether a transferor acted with fraudulent intent.  The court in *Shirley* determined that "what the Plaintiff believed—in its capacity as a creditor—is, for the purposes of this fraudulent conveyance action, irrelevant," and thus disregarded the "Plaintiff's internal records" valuing the transferred asset.  2011 WL 4963192, *3.  The *Bay Plastics* court likewise ruled that creditors' "opportunity to investigate the nature of the LBO transaction" was "irrelevant to the cause of

78

action for a fraudulent transfer," recognizing that this has no bearing on the transferor's intent. 187 B.R. at 332-33 (noting that, as in this case, no pre-transaction notice ever informed creditors "that the transaction would render the debtor insolvent").   And Defendants' attempt to distinguish *American Express* solely by referencing the factual differences between the cases fails because, like the defendants in that case, Defendants "do not respond specifically to the *legal* authority" set forth in that decision or offer any substantive dispute with the holding that "the affirmative defenses of comparative fault, apportionment of fault and assumption of the risk do not provide a defense to … claims of fraudulent transfer."   2007 WL 3217565 at *38 (emphasis added).

Finally, Defendants argue that this proposed instruction would improperly have the jury ignore the representations Court Square made in the Merger Agreement.   But they *should* be ignored.   The Trust does not bring any claims on behalf of Court Square, and instead brings claims based on the bankruptcy estate and its creditors.   Defendants' planned argument that the jury should find no intent based on contractual representations made by an entity that is not the Plaintiff, and in whose shoes the Plaintiff does *not* stand, highlights the need for this instruction. *See also* PTO Exh. 6 (MIL No. 3).

## DEFENDANTS' RESPONSE

Plaintiff's argument is refuted in Defendants' Opposition to Plaintiff's Motion in Limine No. 3, to which Defendants respectfully refer the Court.   Moreover, contrary to Plaintiff's mischaracterization of *Henry*, 2010 WL 3385448, the plaintiff there did **not** allege reliance. *See id.* at *4 ("Plaintiffs' Second Amended Complaint does not allege any specifically false statements made by Defendant[s] . . . upon which the Plaintiffs relied to their detriment."). Instead, the plaintiff alleged a "violation of the covenant of good faith and fair dealing." *Id.* The

79

court held that "Plaintiffs' knowledge about Defendants' assets and/or transfers of assets" was relevant to that claim. *Id.* Similarly here, Plaintiff's claims put Defendants' good faith at issue. *See*, *e.g.*, *Peltz v. Hatten*, 279 B.R. 710, 736–37 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003) ("In employing the totality of the circumstances test, courts consider a host of factors, including the good faith of the parties, the difference between the amount paid and the fair market value, and whether the transaction was at arms length."). Moreover, as this District made clear in *Peltz*, and the Third Circuit affirmed, the due diligence of a buyer such as Court Square is plainly relevant. *See id.* at 736-42. Indeed, where— as here—"sophisticated parties make reasoned judgments about the value of assets," based on their own due diligence, "it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight." *Id.* at 738. Plaintiff's proposed instruction says the opposite and thus is directly contrary to established law. *See id.*

### 3.6. Constructive Fraudulent Transfer—Elements [DISPUTED]

#### PLAINTIFF'S PROPOSAL

Plaintiff also asserts a claim for constructive fraudulent transfer under federal law. The word "constructive" means that, unlike with its claim for "actual" fraudulent transfer, Plaintiff can prove its "constructive" claim without proving that Physiotherapy actually intended to hinder, delay, or defraud the Noteholders. To prove this claim, the Trust must show by a preponderance of the evidence that (1) Physiotherapy received less than reasonably equivalent value in exchange for its transfers to Defendants, and (2) any one of the following factors is true:

- Physiotherapy became insolvent as a result of the transfers. This factor is satisfied if, following the transfers, the amount of Physiotherapy's debts was greater than the value of its assets, at a fair market valuation. Or,

- Physiotherapy was left with an unreasonably small amount of capital following the transfers.  This factor is satisfied if Physiotherapy did not generate enough cash flow to sustain its operations, even if it was solvent following the transfers.  Or,

- Physiotherapy intended to, or believed that it would, incur debts beyond its ability to pay as they became due following the transfers.  This factor is satisfied if Physiotherapy made the transfers with an intent or belief that creditors likely would not be repaid.  You may infer that Physiotherapy made the transfers with this intent or belief if the facts and circumstances surrounding the transaction show that it could not reasonably have believed that it would be able to pay its debts as they matured.

The Trust need not prove that all three of the foregoing factors occurred – it only needs to prove that one of them is true.

The Court has already determined that Physiotherapy received less than reasonably equivalent value in exchange for its transfers to Defendants because a transfer made based on an ownership interest is not an exchange for reasonably equivalent value.  You are therefore instructed that the first element of this claim is satisfied.  It is for you to decide whether the second element is satisfied.

If you find that the Trust has met the second element in one of the three ways above (i.e., that the transfers either rendered Physiotherapy insolvent, left it with an unreasonably small amount of capital, or that Physiotherapy intended to or believed that it would incur debts beyond its ability to pay), you must find for Plaintiff on its claim for constructive fraudulent transfer.

In Instruction Nos. 3.7-3.9 that follow, I will give you further information about how to determine whether a transfer was constructively fraudulent.

**AUTHORITY**

81

1.     Elements of Constructive Fraudulent Transfer.   11 U.S.C. §§ 548(a)(1)(B) & 550.

2.     Insolvency.   11 U.S.C. § 101(32) (defining insolvency); *In re Fatoorehci*, 546 B.R. 786, 796 (Bankr. N.D. Ill. 2016) ("In order to determine solvency on a balance-sheet basis, a snapshot must be taken of a debtor's financial situation at the time of the transfer or shortly after the transfer[.]"); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 10 (3d Cir. 1992) (unreasonably small capital "refer[s] to the inability to generate sufficient profits to sustain operations. Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable solvency."); *In re EBC I, Inc.*, 380 B.R. 348, 359 (Bankr. D. Del. 2008) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured.") (quoting *In re WRT Energy Corp.,* 282 B.R. 343, 415 (Bankr. W.D. La. 2001)); *In re Corbett*, 80 B.R. 32, 37-38 (Bankr. E.D. Pa. 1987) (debtor was insolvent as a result of the challenged transfer under § 548 where it was rendered insolvent "immediately after" the sale); *In re WRT Energy Corp.,* 282 B.R. at 415 ("[T]he courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured.").

3.   <u>Reasonably Equivalent Value</u>.  *Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 252 (3d Cir. 2000) ("there is ordinarily no value to the corporation in such an exchange" of cash for stock); *In re SemCrude L.P.*, 648 F. App'x 205, 209 (3d Cir. 2016) ("The Bankruptcy Court found, and it is undisputed, that the Trustee satisfied [the requirement of proving that the debtor received less than a reasonably equivalent value] because 'no reasonably equivalent value was provided' for the equity distributions."); *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 796 (7th Cir. 2009) (stockholder distributions were not an exchange for value because they "were made, not in return for some exchange of property or services, or the payment of an antecedent debt, but solely on account of their status as shareholders"); *In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 540 (9th Cir. 1990) (similar); *Primex Plastics Corp. v. Zamec*, 675 F. App'x 629, 631 (7th Cir. 2017) ("[C]hanging a firm's ownership structure is not a source of value to the firm itself.  A payment to repurchase membership interests is in the nature of a dividend, which distributes profits to investors (and changes proportional ownership interests) but does not add to the firm's financial health."); *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002) ("stock redemptions are treated as dividends to shareholders which return no value to the company"); *In re Fid. Bond & Mortg. Co.*, 340 B.R. 266, 286-87 (Bankr. E.D. Pa. 2006) (same); *Feinberg v. RM Acq., LLC*, 629 F.3d 671, 674 (7th Cir. 2011) ("[A] dividend is not an exchange of reasonably equivalent value."); Rutter Practice Guide on Bankruptcy, ¶ 21:1095.1 ("When the 'debt' paid is actually equity, the

transfer is not for reasonably equivalent value and may be avoided as constructively fraudulent[.]") (citing *Matter of Fitness Holdings, Int'l Inc.*, 714 F.3d 1141, 1147 (9th Cir. 2013)); 5 Collier on Bankruptcy ¶ 548.05[2][a] (16th ed. 2012) (reasonably equivalent value is determined by a two-part analysis:  first, whether the debtor received any value, and second, whether such value was "reasonably equivalent" to what the debtor transferred).

### DEFENDANTS' OBJECTION

Plaintiff's proposed instruction is erroneous and improper, especially the assertion that this Court "has already determined that Physiotherapy received less than reasonably equivalent value."  The Court has not made that determination, and should not because it is for the jury to decide.  Plaintiff would have this Court decide as a matter of law, and instruct the jury, that there was no reasonably equivalent value because this was purportedly an LBO in which funds were used to buy out the former shareholders.   But even accepting *arguendo* Plaintiff's characterization of this transaction as an LBO—which is incorrect, as discussed below—the Third Circuit in *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991), addressed an LBO in which the debtor guaranteed the loan to the company that bought the debtor in the LBO, which "was used to buy out [the debtor's former] shareholders." *Id.* at 644.  The plaintiff was required to prove lack of reasonably equivalent value yet failed to do so. *See id.* at 646-48.

The cases on which Plaintiff relies for its attempt to avoid its burden to prove lack of reasonably equivalent value involved stock redemptions, but it is "clear that under the Delaware General Corporation Law, a conversion of shares to cash that is carried out in order to accomplish a merger is legally distinct from a redemption of shares by a corporation." *Rauch v.*

*RCA Corp.*, 861 F.2d 29, 30 (2d Cir. 1988).   This follows from "Delaware's doctrine of independent legal significance," under which "the various provisions of the Delaware General Corporation Law are of equal dignity, and a corporation may resort to one section thereof without having to answer for the consequences that would have arisen from invocation of a different section."   *Id.* at 31 (citing, *e.g.*, *Rothschild Int'l Corp. v. Liggett Grp.*, 474 A.2d 133, 136 (Del. 1984); and *Hariton v. Arco Elecs., Inc.*, 188 A.2d 123, 125 (Del. 1963)).   "Plaintiff's contention that the transaction was essentially a redemption rather than a merger must therefore fail."   *Id.*; *see also*, *e.g.*, *In re Appraisal of Metromedia Int'l Grp., Inc.*, 971 A.2d 893, 906 (Del. Ch. 2009) ("[T]he merger did not operate as an effective redemption of the preferred shares"); R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corporations & Business Organizations, § 9.4 (3d ed. 2017) ("Under the 'doctrine of independent legal significance,' the Delaware courts have held that . . . a conversion of shares to cash through a merger does not constitute a redemption.   The doctrine has become a keystone of Delaware corporate law. . . ."). Plaintiff's mischaracterization of the transaction as a stock redemption also fails for the independent reason that—as explained in Defendants' pretrial conference statement—Physiotherapy did not make the transfer Plaintiff seeks to avoid.

Also, the statement that, if the jury finds the elements of the claim, it "must find for Plaintiff on its claim for constructive fraudulent transfer," is incorrect because it ignores Defendants' affirmative defenses.

Another defect in Plaintiff's instruction is that it does not specify the timeframe at which the three insolvency tests should be evaluated—and instead relegates that issue to a subsequent instruction.   This invites the possibility that the jury erroneously evaluates the insolvency tests using the improper timeframe.

## DEFENDANTS' COUNTERPROPOSAL

Plaintiff's other claim under federal law is for what is called "constructive" fraudulent transfer. The word "constructive" means that, unlike with its claim for "actual" fraudulent transfer, Plaintiff can prove its "constructive" claim without proving that Physiotherapy actually intended to hinder, delay, or defraud the Noteholders.

To prevail on its claim for constructive fraudulent transfer, Plaintiff must prove (1) that Physiotherapy received less than a reasonably equivalent value in exchange for that transfer; and (2) that either (a) Physiotherapy became insolvent as a result of the transfer; (b) Physiotherapy was left with unreasonably small capital for its business; or (c) Physiotherapy intended to or believed that it would incur debts beyond its ability to pay as such debts matured.

The parties disagree about all of these elements, which Plaintiff must prove by a preponderance of the evidence.

### 1.    Reasonably Equivalent Value

An essential element of a constructive fraudulent transfer claim is that the company did not receive "reasonably equivalent value" in the transaction. To determine whether Physiotherapy received "reasonably equivalent value" in the transaction, you must look at the transaction's overall impact on Physiotherapy. You must decide whether Physiotherapy's total value after the transaction was equal to or exceeded its total value before the transaction. If so, it received "reasonably equivalent value."

You may consider all relevant circumstances in making this determination, including any benefits or synergies Physiotherapy expected as a result of its association with Court Square and/or the Noteholders. You may also consider whether the transaction was at arm's-length and whether the Defendants acted in good faith. In addition, you may consider the knowledge and

sophistication of the parties to the transaction, as well as whether they were advised by financial or legal professionals.  You must not reevaluate the transaction using hindsight.  Physiotherapy received "reasonably equivalent value" if you find that Court Square was a sophisticated party that relied on its own investigation and judgment in deciding what to pay for Physiotherapy in an arm's-length transaction. There is no mathematical formula to determine "reasonably equivalent value," and there need not be a "dollar for dollar" equivalence.  Instead, you may consider all the surrounding circumstances to determine whether the transaction is fair.

## 2.   **Insolvency**

As I mentioned earlier, Plaintiff must prove that Physiotherapy either (a) became insolvent as a result of the transaction; (b) was left with unreasonably small capital for its business; or (c) intended to or believed that it would incur debts beyond its ability to pay as such debts matured.

Physiotherapy was "insolvent" if the sum of its debts was greater than the value of all of its property, at fair valuation.  You must determine solvency at the time of the transfer, based on information known or knowable as of that date, without the benefit of hindsight.  For instance, the fact that Physiotherapy may have had financial problems after the transaction is legally irrelevant and should not be considered when evaluating solvency.

Physiotherapy had "unreasonably small capital" if it was left with insufficient cash to sustain operations, whether from the company's cash flow, or from the company's ability to borrow funds or sell assets.  You must determine whether, at the time of the transaction, it was reasonably foreseeable that the transaction would lead to Physiotherapy's inability to generate sufficient profits to sustain operations.  But a company need not have perfect capitalization, in other words, capital to withstand any and all setbacks.  A company with "unreasonably small

capital" is a company that is doomed to fail.  You must determine whether Physiotherapy had unreasonably small capital at the time of the transfer, based on information known or knowable as of that date, without the benefit of hindsight.

You must determine whether Physiotherapy intended to incur, or believed that it would incur, debts beyond its ability to repay, based on information known or knowable as of that date, without the benefit of hindsight

## AUTHORITY

11 U.S.C. § 548(a)(1)(B).

<u>Transfer</u>: *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 894 (2018) ("[T]he trustee is not free to define the transfer that it seeks to avoid in any way it chooses. Instead, that transfer is necessarily defined by the carefully set out criteria in the Code. . . . Accordingly, after a trustee files an avoidance action identifying the transfer it seeks to set aside, a defendant in that action is free to argue that the trustee failed to properly identify an avoidable transfer under the Code, including any available arguments concerning the role of component parts of the transfer."); *Crystallex Int'l Corp. v. Petroleos de Venezuela, S.A.*, 213 F. Supp. 3d 683, 693 (D. Del. 2016) ("*Crystallex I*") (Stark, J.) ("a transfer is not made until the debtor has acquired rights in the asset transferred") (quoting 6 Del. C. § 1306(4)), *rev'd on other grounds that strengthen Defs' position*, 879 F.3d 79, 81 (3d Cir. 2018) ("*Crystallex II*") ("a transfer by a non-debtor cannot be a 'fraudulent transfer'"); *In re Plassein Int'l Corp.*, 366 B.R. 318, 326 (Bankr. D. Del. 2007) ("Since no Debtor made a transfer, there is no legal basis for any fraudulent conveyance claim."); *In re Robert L. Dawson Farms, LLC*, No. 18-00127-5-DMW, 2019 Bankr. LEXIS 1567, *16 (Bankr. E.D.N.C. May 20, 2019) ("logic and equity dictate that a debtor should not be able to claim a retroactive interest in property transferred by a non-debtor").

88

Reasonably Equivalent Value:  *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647-48 (3d Cir. 1991) ("The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred. Thus, when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received. . . . In valuing the cost of Metro's guaranty, the right of contribution from co-guarantors needs to be balanced against the amount of debt for which Metro is liable."). *VFB LLC v. Campbell Soup Co.*, 2005 WL 2234606, at *21 (D. Del. Sept. 13, 2005) ("The factors that are often considered in a 'totality of circumstances' analysis are such things as the fair market value of the transferred assets, the relationship of the parties to one another, and the good faith of the parties.  The aim is to discover 'whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred.'), aff'd, 482 F.3d 624 (3d Cir. 2007); *Peltz v. Hatten*, 279 B.R. 710, 736–37 (D. Del. 2002) ("The term 'reasonably equivalent value' is not expressly defined or explained by the Code.  Rather, Congress left to the courts the task of setting forth the scope and meaning of this term.  In so doing, courts have rejected the application of any fixed mathematical formula to determine reasonable equivalence.  Instead, governing case law dictates that in determining whether the Liquidating Trustee has met its burden in proving that [the debtor] did [not] receive 'reasonably equivalent value,' the court should examine the 'totality of circumstances' . . . .In employing the totality of the circumstances test, courts consider a host of factors, including the good faith of the parties, the difference between the amount paid and the fair market value, and whether the transaction was at arms length."); *Litig. Tr. of MDIP Inc. v. De La Rue Cash Systems Inc. (In re MDIP Inc.)*, 332 B.R. 129, 133 (Bankr. D. Del. 2005) ("The

applicable statutes do not define 'reasonably equivalent.' Rather, courts have defined the scope and meaning of the term.  In doing so, courts consider the totality of the circumstances.  This is not strictly a mathematical formula.  Courts have generally considered three factors: (1) whether the transaction was at arm's-length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the assets transferred and the price paid.  Certainly, the fact that a transaction occurred at arm's-length is one considerable factor in the determination."). *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002), aff'd sub nom. *In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003) ("When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight"); *In re USN Commc'ns, Inc.*, 60 F. App'x 401, 402 (3d Cir. 2003) ("It was well within the District Court's prerogative as finder of fact to choose not to rely on the speculative testimony of appellant's experts as colored by hindsight and the interests of litigation, especially when the $68 million price paid for CT Tel was the product of arm's-length negotiations between knowledgeable, sophisticated parties, advised by reputable financial and legal professionals."). *Dayton Title Agency, Inc. v. The White Family Cos. Inc. (In re Dayton Title Agency, Inc.)*, 262 B.R. 719, 731 (Bankr. S.D. Ohio 2001) ("It is not necessary for there to be 'mathematical precision' or a 'penny-for-penny' exchange in order to establish reasonably equivalent value."); *Silagy v. Gagnon (In re Gabor)*, 280 B.R. 149, 158 (Bankr. N.D.Ohio 2002) ("In determining the existence of fair consideration or equivalent value, courts require review of 'all the surrounding circumstances to determine whether the transaction is fair.'")

Solvency:  11 U.S.C. § 101(32); 6 Del. C. § 1302; *Mellon Bank, N.A. v. Metro Commc'ns,*

90

*Inc.*, 945 F.2d 635, 649 (3d Cir. 1991) ("The bankruptcy court reasoned that the LBO rendered Metro insolvent because it assumed that the 1.85 million paid to the former shareholders of Metro reflected the fair market value of Metro and that Metro's pledge of its stock and assets in equal amount necessarily rendered it insolvent. . . .  Not only is the bankruptcy court surprisingly cavalier in fashioning what amounts to a *per se* rule that LBO loans collateralized with the target's assets are fraudulent, the court's analysis is flawed by several fundamental errors.  First, even assuming that Metro's fair market value was 1.85 million dollars, the guaranties of TCS and MCM should have been counted as reducing Metro's liability to something below 1.85 million dollars. Second, the court erred in stating that Metro "pledged its stock *and* all of its remaining unencumbered assets." Metro, of course, cannot, and did not, pledge its own stock as the corporation's stock was held by another entity-TCI. The bankruptcy court thus, in essence, double counted when it stated that Metro pledged stock as well as assets."); *In re SemCrude L.P.*, 648 F. App'x 205, 210 (3d Cir. 2016) (hindsight should not be used to answer the question of unreasonably small capital). *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 154 (3d Cir. 1996) ("For purposes of § 548, solvency is measured at the time the debtor transferred value, not at some later or earlier time."); *id.* at 155 ("The use of hindsight to evaluate a debtor's financial condition for purposes of the Code's 'insolvency' element has been criticized by courts and commentators alike."); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992) (unreasonably small capital is the "inability to generate sufficient profits to sustain operations."); *id.* at 1072 ("[B]usinesses fail for all sorts of reasons, and … fraudulent [conveyance] laws are not a panacea for all such failures. Therefore, we hold that the test for unreasonably small capital is reasonable foreseeability. Under this analysis, it was proper for the district court to consider availability of credit in

determining whether Jeannette was left with an unreasonably small capital"); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (a company with unreasonably small capital is "doomed to fail"; "While a company must be adequately capitalized, it does not need resources sufficient 'to withstand any and all setbacks"); Boyer v. Crown Stock Distribution, Inc., 587 F.3d 787, 794-95 (7th Cir. 2009) ("[O]ne has to be careful with a term like "unreasonably small."  It is fuzzy, and in danger of being interpreted under the influence of hindsight bias.  One is tempted to suppose that because a firm failed it must have been inadequately capitalized.  The temptation must be resisted"); *Credit Mgrs. Ass'n v. Federal Co.*, 629 F.Supp. 175, 187 (C.D. Cal. 1986) ("But the law does not require that companies be sufficiently well capitalized to withstand any and all setbacks to their business. The requirement is only that they not be left with 'unreasonably small capital' at the time of the conveyance alleged as fraudulent.").

### PLAINTIFF'S OBJECTION AND RESPONSE TO COUNTERPROPOSAL

Defendants' lengthy counterproposal on the elements of a claim for constructive fraudulent transfer is biased and inaccurate.  It should not be given.  The Trust's proposal is proper.

1.     <u>Transfer By Debtor.</u>  For the reasons discussed in connection with Instruction No. 3.1, the jury should be instructed that the $248.6 million transferred to Defendants was the Debtor's property.

2.     <u>Reasonably Equivalent Value—No Jury Issue.</u>  Defendants can argue that reasonably equivalent value is a disputed issue of fact for the jury only by confusing the issues. A plethora of authorities recognize that, by definition, a payment to a shareholder on account of its equity ownership is not an exchange for reasonably equivalent value.  In *Buncher Co. v.*

*Official Committee of Unsecured Creditors of GenFarm Ltd. P'ship IV*, the Third Circuit held that defendants' equity interests did not provide reasonably equivalent value to the debtor because "a transaction in which the corporation receives nothing but outstanding stock amounts simply to a reduction in capitalization," and "[f]rom the perspective of the creditors, there is ordinarily no value to the corporation in such an exchange."  229 F.3d 245, 252 (3d Cir. 2000). In *Primex Plastics Corp. v. Zamec,* the Seventh Circuit held that a debtor did not receive reasonably equivalent value in exchange for funds paid to its owners in a buyout because "changing a firm's ownership structure is not a source of value to the firm itself," and a "payment to repurchase membership interests" does "not add to the firm's financial health."  675 F. App'x 629, 630 (7th Cir. 2017).  In *Boyer v. Crown Stock Distrib., Inc.*, Judge Posner agreed that there is no exchange of value where shareholders receive distributions "solely on account of their status as shareholders of the company" rather than "in return for some exchange of property or services, or the payment of an antecedent debt[.]"  587 F.3d 787, 796 (7th Cir. 2009).  And in *In re SemCrude, L.P.*, the Bankruptcy Court confirmed that "no value is conferred in equity distributions" which are made, pursuant to a buyout, "on account of Defendants' equity interests."  2013 WL 2490179, at *5 (Bankr. D. Del. June 10, 2013), *aff'd*, 526 B.R. 556 (D. Del. 2014), *aff'd*, 648 F. App'x 205 (3d Cir. 2016).  Numerous other authorities recognize the same principle.  *See, e.g.*, *In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 540 (9th Cir. 1990); *Feinberg v. RM Acq., LLC*, 629 F.3d 671, 674 (7th Cir. 2011); *In re Joy Recovery Tech Corp.*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002); *In re Fid. Bond & Mortg. Co.*, 340 B.R. 266, 286-87 (Bankr. E.D. Pa. 2006); Rutter Practice Guide on Bankruptcy, ¶ 21:1095.1.  These authorities recognize that there is *no* value to the debtor when it pays cash in exchange for the stock of its owners, let alone "reasonably equivalent value."

Defendants argue that this well-established rule does not apply because "a conversion of shares to cash" is "legally distinct" as a matter of Delaware corporations law "from a redemption of shares by a corporation."  But the question here is not whether Defendant's stock was "redeemed" or "converted to cash" and then cancelled—it is whether Defendants gave the Debtor reasonably equivalent value in exchange for the $248.6 that the Debtor paid them.[7] Defendants' distinction is irrelevant in this context, because whether their shares were redeemed or cancelled, they received payment from the Debtor *on account of their ownership interest*, and *gave no value to the Debtor in return*.  It follows that there was no exchange for reasonably equivalent value.  *E.g.*, *Boyer*, 587 F.3d at 793, 796 (no reasonably equivalent value where debtor "distributed the money it received in the sale forthwith to its shareholders" on "account of their status as shareholders of the company"); *see Buncher*, 229 F.3d at 252 (whether there was reasonably equivalent value should be analyzed "[f]rom the perspective of the creditors").

Most of the authorities on which Defendants rely relate to inapposite issues of shareholder rights, not reasonably equivalent value.  These authorities merely hold that, as a matter of Delaware corporations law, mergers do not require the redemption of stock.  *See Rauch v. RCA Corp.*, 861 F.2d 29, 30-31 (2d Cir. 1988) (company "chose to convert its stock to cash to accomplish the desired merger, and in the process chose not to redeem the Preferred Stock"); *In re Appraisal of Metromedia Int'l Grp., Inc.*, 971 A.2d 893, 905-06 (Del. Ch. 2009) (merger "did not operate as an effective redemption of the preferred shares").  This is not relevant to the issues here.

Defendants also cite *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir.

---

[7]   Defendants previously asserted that their stock *was* redeemed in the sale.  *See, e.g.*, Adv. D.I. 163 at 16 (Defendants:  "the transfer of Merger Consideration to 'redeem' the Certificates involved a 'security'"); *id.* at 37 (Defendants:  the Noteholders "made loans the proceeds of which were required to be used to redeem the shares of the selling shareholders").

1991), but that case likewise recognizes that when "selling shareholders" are "cashed out," the company "receives no direct benefit to offset the greater risk of now operating as a highly leveraged corporation[.]"  *Id.* at 646.  In *Mellon*, however, the transfer at issue was not a transfer of cash from the debtor to selling shareholders; it was the debtor's guarantee of a loan to an entity of the buyer.  *Id.* at 638, 644.  There was substantial evidence that the debtor received "indirect benefits" from this guarantee, including that the LBO gave the debtor "the ability to borrow working capital through a line of credit," allowed it to establish a "permanent relationship" with a complementary business with highly sophisticated equipment and experienced staff, and gave it a "right of contribution" from co-guarantors of the loan.  *Id.* at 646-48.  The Defendants here have identified no such indirect benefits to Physiotherapy. Defendants do not argue that Physiotherapy received any additional ability to borrow money as part of the transaction, or that Physiotherapy's relationship with Court Square provided it with benefits that its existing owners (Water Street and Wind Point) could not provide, or that the presence of co-guarantors added value to the Debtor.

The Transaction here was simply a change in ownership.  Because the law is clear that "changing a firm's ownership structure is not a source of value to the firm itself," *Primex Plastics*, 675 F. App'x at 631, Defendants did not give the Debtor any value—let alone value that was reasonably equivalent to the $248.6 million they received.  The Court should accordingly instruct the jury that there was no exchange for reasonably equivalent value.

3.    Reasonably Equivalent Value—Improper Counterproposal.  Even if reasonably equivalent value were an issue for the jury, Defendants' proposed instruction is incorrect, for numerous reasons.

*First*, Defendants' proposal fails to instruct the jury that the first question it must answer

is whether Defendants gave value to the Debtor. *See In re R.M.L., Inc.,* 92 F.3d 139, 149 (3d Cir. 1996) ("[B]efore determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court must make an express factual determination as to whether the debtor received any value at all."); 5 Collier on Bankruptcy ¶ 548.05[2][a] (16th ed. 2012) (reasonably equivalent value is determined by a two-part analysis: first, whether the debtor received any value, and second, whether such value was "reasonably equivalent" to what the debtor transferred). Defendants' omission of this requirement is improper.

*Second*, Defendants' proposal fails to properly instruct the jury on the "totality of the circumstances" test for determining whether the Debtor received reasonably equivalent value. That test requires consideration of (1) the fair market value of the benefit received; (2) whether the relationship between transferor and transferee was arms-length, and (3) the transferee's good faith. *In re Nat. Pool Constr., Inc.*, 598 F. App'x 841, 844 (3d Cir. 2015) (citing *In re Fruehauf Trailer Corp.,* 444 F.3d 203, 212-13 (3d Cir. 2006)). Regarding the second factor, Defendants' proposal erroneously states that "Physiotherapy received 'reasonably equivalent value' *if you find that Court Square was a sophisticated party that relied on its own investigation and judgment in deciding what to pay for Physiotherapy in an arm's-length transaction*." But the question whether "the relationship" was arms-length refers to the relationship *between the Debtor and transferee*, not between the Debtor and buyer. As the Company's controlling shareholders, Defendants plainly did not have an arms-length relationship with the Debtor, and Defendants cannot change the applicable test to replace the focus of the relationship test to one between the Debtor and the buyer.

*Third*, Defendants' proposal states that reasonably equivalent value should be found if the parties were "sophisticated" and "advised by financial or legal professionals." That is again

96

wrong.  The "reasonably equivalent value" question is not whether the parties to the overall Transaction (i.e., Court Square and the Defendants) were sophisticated or acted at arms-length, but whether *Defendants' shares* provided the equivalent of $248.6 million in value *to Physiotherapy*.  Whether the parties were sophisticated, or received advice from professionals about the Transaction as a whole, has nothing to do with that issue.  In *In re USN Commc'ns, Inc.*, on which Defendants rely, the alleged fraudulent transfer was the debtor's acquisition of a company, so the question was whether that company's value was reasonably equivalent to the price paid, and the court found it relevant that the debtor had received advice in determining how much to offer the sellers in an arms-length transaction.  60 F. App'x 401, 402 (3d Cir. 2003).  Here, on the other hand, Physiotherapy transferred cash to its own shareholders.  No amount of professional "advice" could create $248.6 million in value for a stock cancellation that, as numerous authorities recognize, provides *no* value to the Debtor at all.

    4.    <u>Solvency.</u>    Defendants' Counterproposal is also erroneous with respect to solvency.

    *First*, as explained in connection with Instruction No. 3.8, Defendants' proposed instruction that solvency must be determined "at the time of the transfer" is erroneous in this case, where the Trust claims that the transfer *rendered* the Debtor insolvent.

    *Second*, Defendants' proposal improperly fails to instruct the jury that a company need not be insolvent to have unreasonably small capital.  *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 10 (3d Cir. 1992) ("[U]nreasonably small capital would seem to encompass financial difficulties short of equitable solvency."); *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009) ("The difference between insolvency and 'unreasonably small' assets in the LBO context is the difference between being bankrupt on the day the LBO is

consummated and having at that moment such meager assets that bankruptcy is a consequence both likely and foreseeable.").

*Third*, Defendants' statement that "the fact that Physiotherapy may have had financial problems after the transaction is legally irrelevant and should not be considered when evaluating solvency" is legally erroneous.  That is, in fact, highly relevant, because the fact that a Debtor proved unable to pay its debts following a major Transaction tends to show that the Transaction left the Debtor undercapitalized.  In *Boyer*, for example, Judge Posner considered the debtor's poor financial performance and ultimate bankruptcy even though it occurred *three-and-a-half years* after the transfers, recognizing that "[a]n inadequately capitalized company may be able to stagger along for quite some time," and the debtor was bound to eventually collapse "as a result of the terms of the LBO[.]"  *Id.* at 793, 795; *see also, e.g.*, *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 398 (S.D. Tex. 2008) ("[T]he length of time a corporation survives after the challenged transfer is . . . one factor to consider in the unreasonably small assets analysis."); *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 670 (N.D. Tex. 2011) (similar).  No authority supports Defendants' suggestion that the Debtor's post-Transaction financial difficulties are irrelevant.

*Fourth*, Defendants' Counterproposal erroneously fails to inform the jury that it may infer that Physiotherapy intended to, or believed that it would, incur debts beyond its ability to pay as they became due following the transfers if the facts and circumstances surrounding the transaction show that it could not reasonably have believed that it would be able to pay its debts as they matured.  *See In re WRT Energy Corp.,* 282 B.R. at 415 ("[T]he courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as

they matured.").

**DEFENDANTS' RESPONSE**

Plaintiff's eleventh-hour brief on constructive fraudulent transfer is procedurally improper and substantively incorrect. Given that Plaintiff provided what amounts to a belated summary-judgment motion a matter of hours before this document was due to be filed, Defendants object and reserve the right to brief these issues more fully if necessary.

1.    Transfer By Debtor.  *See* discussion re Instruction No. 3.1, above.

2.    Reasonably Equivalent Value.  Here, again, Plaintiff attempts to avoid its burden to prove the elements of its own claims by asserting that one of those elements is satisfied as a matter of law, even though Plaintiff never moved for summary judgment on this issue. The time for such motions is long gone and Plaintiff must prove its claims to the jury. In any event, Plaintiff is wrong about the law. As the Third Circuit held in *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991), "when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received." *Id.* at 647. The evidence in this case will show that Physiotherapy received reasonably equivalent value under that definition and in light of the totality of the circumstances. Indeed, Plaintiff's contention that a debtor never receives value when its former shareholders are paid in an acquisition would bring mergers and acquisitions to a halt and is directly contradicted by *Peltz v. Hatten*, 279 B.R. 710, 735-36 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003), which Plaintiff ignores. There, as here, "***[t]he 'value' transferred by the [shareholders] at Closing was all issued and outstanding stock***." *Id.* at 736 (emphasis added).

3.    Defendants' Proposed Instruction Is Well Founded.  Rather than attempt to reach

99

a compromise or propose its own instruction on reasonably equivalent value, Plaintiff nit-picks Defendants' proposal without offering any viable alternative.  That is improper, and in any case, Plaintiff's criticisms have no merit.  Defendants' proposal follows from the authorities cited and accurately states the governing legal principles.

        4.    <u>Solvency</u>.    Again, Plaintiff failed to provide its erroneous cavils about Defendants' solvency instruction until a matter of hours before the filing.  Although Plaintiff's related contentions about Instructions 3.8 and 3.9 were similarly belated, they were at least provided a few hours before Plaintiff's last-minute objections to this proposed instruction, so Defendants respectfully refer the Court to the discussion of those instructions below, and reserve all rights to provide further briefing and argument as necessary.

### 3.7.    Constructive Fraudulent Transfer—Leveraged Buyout Structure

### [DISPUTED]

#### <u>PLAINTIFF'S PROPOSAL</u>

The sale of Physiotherapy was structured as a "leveraged buyout."  A leveraged buyout is a transaction in which someone buys a company using  debt secured by that company's assets and future earnings.  In a leveraged buyout, the entire transaction (including the purchase, the financing, and the payment to the sellers) is viewed as one single transaction.  The test for insolvency is whether the transaction as a whole rendered the company insolvent.

In every leveraged buyout, the buyer participates in securing financing for the purchase. As a matter of law, the buyer's role in securing or arranging for financing is not relevant. Accordingly, you should not consider whether the buyer, Court Square Capital Partners, played a role in obtaining the financing used for the leveraged buyout transaction.

#### <u>AUTHORITY</u>

1.    A leveraged buy-out ("LBO") is a type of business transaction where a company is acquired by taking on debt that is used to purchase its then-shareholders equity interests.  *See In re Insilco Techs., Inc.*, 480 F.3d 212, 214 (3d Cir. 2007) ("In an LBO, the buyers use the target corporation's own money to pay the previous owners.  Typically, the transaction requires the target corporation to incur secured debt to acquire the cash to pay to the sellers.  Problems occur when the target corporation incurs more debt than it can service, thus rendering it insolvent.").

2.    Fraudulent transfers made through complex transaction structures like LBOs are avoidable, regardless of how they are labeled or structured.  *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1297 (3d Cir. 1986) (fraudulent transfer law "does not justify exclusion of

a particular transaction such as a leveraged buy-out simply because it is innovative or complicated."); *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) ("[W]hether one calls [a transaction] an LBO or not is not critical. . . . [The] fraudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights.").

3.      The Transaction at issue in this case was a leveraged-buyout. The $510 million purchase price for Physiotherapy was funded 60% by debt ($310 million) that Physiotherapy assumed as part of the Transaction, as discussed in connection with Instruction No. 3.1.  The Trust contends that the leveraged structure of the Transaction was part of the fraudulent scheme. Adv. D.I. 1 ¶¶ 87, 89.

4.      For purposes of assessing whether a transfer made in the course of an LBO transaction was fraudulent, the "collapsing" doctrine emphasizes the economic substance of the transaction over the form, and construes each of the interdependent steps as part of a single transaction.  *See In re OODC, LLC*, 321 B.R. 128, 137 (Bankr. D. Del. 2005) ("In appropriate circumstances courts may view a series of transactions (such as those involved in a leveraged buyout) as one integrated transaction."); *In re Lyondell Chem. Co.*, 503 B.R. 348, 379 (Bankr. S.D.N.Y. 2014), *as corrected* (Jan. 16, 2014) ("Courts analyzing the effect of LBOs have routinely analyzed them by reference to their economic substance, 'collapsing' them, in many cases, to consider the overall effect of multi-step transactions."), *abrogated on other grounds by In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016); *In re Syntax-Brillian Corp.*, 573 F. App'x 154, 160 (3d Cir. 2014) (collapsing doctrine is an "equitable tool by which a court may 'collapse' multiple apparently innocuous transactions for purposes of a

fraudulent transfer analysis and consider the economic reality of the integrated whole"); *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("[A]n allegedly fraudulent conveyance must be evaluated in context," such that "[w]here a transfer is only a step in a general plan, the plan 'must be viewed as a whole with all its composite implications'"); *In re Sunbeam Corp.*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) (collapsing doctrine allows the factfinder to consider "the knowledge and intent of the parties involved in the transaction" where "it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme").

5.     The test for insolvency in a collapsed transaction is whether the transaction as a whole rendered the company insolvent.   *In re Tribune Co.*, 464 B.R. 126, 167 (Bankr. D. Del. 2011) (explaining that if the court were to collapse two steps of a transaction, solvency would be assessed based on the effect of the transaction as a whole).

## <u>DEFENDANTS' OBJECTION</u>

Plaintiff's proposed instruction about leveraged buyouts (LBOs) and "collapsing" misstates and misapplies the law and is improper.  As this Court held in *Crystallex I*, the "collapsing doctrine"—which Plaintiff seeks to invoke here—"does not cleanly fit" and should not be applied where, as here, there is a dispute as to "whether and when 'property of a debtor' was 'transferred' and, if so, who the parties to that transfer were.  The Court has not encountered any case applying the collapsing doctrine in such a circumstance." 213 F. Supp. 3d at 693 (Stark, J.).  Like the plaintiff in *Crys0tallex I*, Plaintiff's argument here impermissibly implies that Physiotherapy held property rights in the $248.6 million when the transfer occurred, prior to the consummation of the merger.  *Cf. id.*  But the transfer came from Court Square's "Buyer" subsidiary, which was (like Court Square and its other subsidiary "Merger Sub") on the opposite

side of the Transaction from Physiotherapy at the time of the transfer.  And even after the transfer,

Physiotherapy had no rights to the $248.6 million, because those funds were never intended for

Physiotherapy, but for its former shareholders.    Moreover, at the time of the transfer,

***Physiotherapy was not a debtor to the Noteholders in this case***.  After the transfer and merger,

Court Square Physiotherapy took on Merger Sub's debts to the Noteholders.  But that was the

result of ***an entirely different transaction between Court Square and the Noteholders***,[8] which

***Court Square was responsible for***, and Buyer and Merger Sub ***promised would not harm***

***creditors,***[9] ***and even if it did, would not be blamed on Defendants***.[10]

Furthermore, Plaintiff does not and cannot contend that the allegedly "leveraged" aspect

of the Transaction (*i.e.*, the existence of debt financing) was part of an "overall scheme to defraud

creditors."  *In re Bachrach Clothing, Inc.*, 480 B.R. 820, 855 (Bankr. N.D. Ill. 2012) (citations

omitted).   On the contrary, Court Square—through its subsidiaries Buyer and Merger Sub—

***explicitly represented and warranted that the Transaction was nothing of the kind***.  *See* Merger

---

[8] *See* Merger Agr. § 9B(iv) ("[E]ach of Buyer and Merger Sub affirms that it is not a condition to the Closing or to any of their other obligations under this Agreement that Buyer and/or Merger Sub (or the Surviving Corporation) obtain financing for or related to any of the transactions contemplated by this Agreement (including the Financing).").

[9] *See id.* § 8J ("Solvency. As of the Closing and immediately after giving effect to the transactions contemplated hereby (including the incurrence of the Debt Financing), Buyer and each of its Subsidiaries (including the Surviving Corporation and its Subsidiaries) shall be able to pay their respective debts as they become due and shall own property which has a fair saleable value greater than the amounts required to pay their respective debts when due (including all contingent liabilities). As of the Closing and immediately after giving effect to the transactions contemplated hereby, Buyer and each of its Subsidiaries (including the Surviving Corporation and its Subsidiaries) shall have adequate capital to carry on their respective businesses. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Buyer and its Subsidiaries (including the Surviving Corporation and its Subsidiaries).").

[10] *See id.* § 11B (agreeing to indemnify Defendants and hold them harmless for any failure of the foregoing representation and warranty as to solvency).

Agr. § 8J.  Neither Plaintiff nor the Noteholders can claim otherwise because—as in one of the cases on which Plaintiff relies—the Noteholders here *knew* "that they were lending for the purposes of [a purported] LBO, and that the proceeds of their loans were going to stockholders." *In re Lyondell Chem. Co.*, 503 B.R. 348, 385 (Bankr. S.D.N.Y. 2014), *abrogated on other grounds by In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016); *see also*, *e.g.*, *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 479 B.R. 405, 411 (N.D. Tex. 2012) (creditors who knew money would be used to pay transferee could not avoid transfer).  Court Square's agreement to purchase Physiotherapy "*without any financing contingency*" further refutes Plaintiff's effort to collapse the two independent transactions.  *Bachrach*, 480 B.R. at 856 (emphasis in original); *see* Merger Agr. § 9B(iv); *see also In re Tribune Co.*, 464 B.R. 126, 165-67 (Bankr. D. Del. 2011) (no collapsing because "step 2" of multi-step transaction was not contingent on "step 1").  And approximately 42% of the purchase price was financed with *cash*, not debt, unlike a "typical leveraged buyout," in which "the purchaser usually invests only a modest, if any, amount of its own capital as new equity."  *Official Comm. Unsecured Creditors of Grand Eagle Companies, Inc. v. ASEA Brown Boverie, Inc.*, 313 B.R. 219, 230 (N.D. Ohio 2004) (no collapsing where only approximately 25% of the purchase price was financed with cash).  Because here, as in *Grand Eagle*, "a substantial amount of new money [was] infused into the company," there is "no reason to collapse the transactions."  *Id.*

Furthermore, even in the prototypical LBO context, the role of the buyer with regard to financing is undoubtedly relevant.  In *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, (3d Cir. 1991), for example, the Third Circuit held that the bankruptcy court erred in failing to realize that "one of the indirect benefits that Metro received as a result of the LBO was the ability to borrow working capital," and that the bankruptcy court also erred in failing to "account for the

value created by the LBO itself." *Id.* at 647.  One such value was the debtor's "ability to obtain substantial credit due to its new association with the [buyer] and the synergy expected to result from the combination of these corporations." *Id.*

For all of these reasons, Plaintiff's proposed instruction is erroneous and improper.  The cases Plaintiff cites, moreover, do not support its proposed instruction.  *In re OODC, LLC*, 321 B.R. 128 (Bankr. D. Del. 2005), for example, held that in "deciding whether to 'collapse' a series of transactions into one integrated transaction, the issue is . . . whether there was an overall scheme to defraud the estate and its creditors by depleting all the assets through the use of a leveraged buyout." *Id.* at 138.  Accordingly, the court looked to who "orchestrated" the LBO.  *Id.* Here, the purported LBO was "orchestrated" by Court Square and the Noteholders.  That fact is certainly relevant, and Plaintiff's assertion otherwise in its proposed instruction is wrong as a matter of law.  Indeed, in *Lyondell*, on which Plaintiff relies, the court held that "LBO lenders," like the Noteholders here, "who are participants in an alleged fraudulent transfer, or who have ratified it, cannot then seek to have that transfer avoided."  503 B.R. at 383.  Thus, Plaintiff is wrong to mischaracterize as "not relevant" the totality of the circumstances of the transaction, including Court Square's orchestration of, and contractual responsibility for, the "leveraging," and the Noteholders' knowledge of, participation in, and benefits from that "leveraging."

### **PLAINTIFF'S RESPONSE TO OBJECTIONS**

Defendants' objection to this instruction highlights the need for it.  The collapsing doctrine prevents LBO sellers and sponsors from structuring transactions to avoid fraudulent transfer liability to creditors.  This instruction will help the jury understand that it is *not* appropriate to consider each step of the transaction in isolation, and that the jury should instead focus on the substance and overall effects of the transaction.  Defendants cite no authority to the

contrary.  Nor do they cite authority suggesting that a buyer's participation in an LBO is a defense.

1.  <u>Collapsing.</u>  The structure of the Transaction—a reverse merger with four contracting parties, several non-contracting parties, a shell corporation that existed solely as a temporary merger vehicle, a paying agent, multiple lenders, and debt assumption agreements— will be new to virtually all jurors.  Defendants intend to use the complexities of the Transaction to confuse the jury.  It is therefore critical that the jury be instructed to evaluate the Transaction as a whole—which, it is undisputed, left Physiotherapy with $310 million in debt, and Defendants with $246.8 million in their bank accounts.

That is the very purpose of the collapsing doctrine.  That doctrine is an "equitable tool by which a court may 'collapse' multiple apparently innocuous transactions for purposes of a fraudulent transfer analysis and consider the economic reality of the integrated whole."  *In re Syntax-Brillian Corp.*, 573 F. App'x 154, 160 (3d Cir. 2014).  Fraudulent transfer law "does not justify exclusion of a particular transaction such as a leveraged buy-out simply because it is innovative or complicated," and where a series of transactions are all "part of one integrated transaction," the "aggregate transaction" should be considered.  *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1301-03 & n.8 (3d Cir.1986); *see also In re Jevic Holding Corp.*, 2011 WL 4345204, at *4 (Bankr. D. Del. Sept. 15, 2011) ("[I]n the LBO context, courts will frequently collapse a series of transactions upon a showing that these transactions are part of 'an overall scheme to defraud . . . creditors . . . .  Neither time nor transactional formalities can shield a party involved in such a series of transactions").  "[A]n allegedly fraudulent conveyance must be evaluated in context," and "[w]here a transfer is only a step in a general plan, the plan 'must be viewed as a whole with all its composite implications.'"  *Orr v. Kinderhill Corp.*, 991 F.2d

31, 35 (2d Cir. 1993).

Courts apply the collapsing doctrine where the defendant had knowledge of the overall transaction and its structure.  *See Tabor*, 803 F.2d at 1302–03 (party to first step in transaction had knowledge of the financial consequences of the subsequent steps); *In re Mervyn's Holdings, LLC*, 426 B.R. 487-98 (Bankr. D. Del. 2010) (collapsing doctrine applied where defendant had knowledge of each of the transactions, including the subsequent parts of the transaction which left the debtor stripped of assets and overburdened with debt); *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 546 (D. Del. 2005) (defendants had knowledge of subsequent steps in transaction sufficient for the collapsing doctrine to apply), *aff'd sub nom. In re Hechinger Inv. Co. of Delaware, Inc.*, 278 F. App'x 125 (3d Cir. 2008); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635-36 (2d Cir. 1995) ("[T]he courts have looked frequently to the knowledge of the defendants of the structure of the entire transaction and to whether its components were part of a single scheme").

Here, Defendants argue that their receipt of $248.6 million was an "entirely different transaction" from the Debtor's agreement—that same day—to repay loans of $310 million. Based on that strained claim, Defendants argue that this transaction was not an LBO at all.  But as Judge Posner has explained, "[w]hether one calls [a transaction] an LBO or not is not critical. . . . [The] fraudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights."  *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 793 (7th Cir. 2009).  Here, the Debtor took on $310 million in debt for the purpose of making transfers to its owners as part of a change in ownership.  Defendants do not deny that they were fully aware that the Debtor was doing so.  Whether Defendants want to call the overall Transaction an LBO or

not, it had the effect of impairing creditor rights—and the jury should be instructed to consider the Transaction's overall effects.

Defendants also argue that the collapsing doctrine does not apply because "Plaintiff does not and cannot contend that the allegedly 'leveraged' aspect of the Transaction . . . was part of an 'overall scheme to defraud creditors.'"  That argument is odd, because Plaintiff always has made that contention. *See, e.g.*, Complaint, Adv. D.I. 1 ¶ 87 ("The overall intent of the LBO, and of its component steps, was to enable, facilitate, and effectuate the leveraging and attendant sale of Water Street and Wind Point's interests in Physiotherapy."), ¶ 89 ("The sum of all of the foregoing was that Physiotherapy incurred a massive amount of new debt—predicated on false financials—the proceeds of which were transferred out to Physiotherapy's former owners.").

Defendants also rely on contractual provisions in which a "Buyer" shell corporation agreed that the sale was not contingent on financing.  Such contractual terms are not relevant. They do not bind the Trust, as explained in connection with Instruction No. 3.12, and even if they did, they do not alter the *reality* that the sale was financed with debt incurred by the Debtor.  In fact, other portions of the contract itself made clear that Court Square agreed to commit at most $225 million in equity, PTX 906 (WATERST000177 at 350), and the remainder of the $510 million purchase price would have to come from debt assumed by Physiotherapy, *id.* at 373.  The "no financing contingency" clause meant only that Court Square would have to pay a termination fee if the deal did not close, PTX 906 (WATERST000177 at 222 (Merger Agreement § 9B(ii)—not that the deal could actually close without financing.  If Defendants were correct that talismanic, counterfactual language in a contract denying the need for financing were sufficient to avoid the application of fraudulent transfer laws, the Third Circuit's longstanding rule that such laws fully apply to LBOs would be a dead letter.

109

Finally, Defendants' authorities do not support their position.  In *In re Tribune Co*., 464 B.R. 126, 139-140 (Bankr. D. Del.), unlike here, there were two wholly separate transactions: first, a stock repurchase by the debtor (Tribune) and by a new entity ("ESOP"), and second, more than six months later, a merger between the debtor and ESOP.  Collapsing of these two transactions was not appropriate because "Step 1" only "required the parties to use their best efforts to close the Step Two transactions, [and] the parties structured the documents so that Step One could stand alone if necessary."  *Id.* at 165-166.  Here, the Transaction could not close without $510 million in cash, and that cash was not available without Physiotherapy's assumption of $310 million in debt.  The Debtor incurred that debt the moment this single, overall Transaction closed.  Defendants cite no authority supporting their position that this single, integrated Transaction can be disaggregated.

Defendants' reliance on this Court's prior ruling in *Crystallex* is also misplaced.  That case—which did not involve a transaction in which the Debtor incurred debt to finance transfers to its owners—provides that the collapsing doctrine cannot be used to fundamentally re-characterize the events, *i.e.*, transform a non-debtor into a debtor or grant a debtor property rights it never had.  *Crystallex Int'l Corp. v. Petroleos de Venezuela, S.A.*, 213 F. Supp. 3d 683, 693 (D. Del. 2016).  Here, however, the Trust's proposed instruction merely instructs the jury to evaluate the substance of the overall Transaction, as the Third Circuit has repeatedly approved.  Defendants cite no authority disapproving of collapsing where a Debtor took on debt to finance transfers to its owners.  Nor are Defendants' references in their objections to their ratification arguments availing.  Those arguments are wrong for the reasons discussed in connection with Instruction No. 3.10, and in any event do not support Defendants' effort to focus the jury on isolated segments of the Transaction rather than the Transaction as a whole.

For these reasons, Defendants' objection to this Instruction's explanation that the entire Transaction should be viewed as "one single transaction," and the "test for insolvency is whether the transaction as a whole rendered the company insolvent," is unavailing.

2.     Buyer Involvement In Financing Not Relevant.   Nor do Defendants cite any authority suggesting that Court Square's role in helping to procure financing for the LBO is relevant.   It is not.   By definition, an LBO is a transaction where "the buyers use the target corporation's own money to pay the previous owners," requiring the target to incur debt "to acquire the cash to pay to the sellers."  *See In re Insilco Techs., Inc.*, 480 F.3d 212, 214 (3d Cir. 2007).   A buyer's participation is an inherent part of an LBO, which nevertheless *is* subject to fraudulent transfer laws.  *See, e.g.*, *Tabor Court Realty*, 803 F.2d at 1292-97 (LBO transactions are subject to avoidance).   Court Square's participation in the financing process is thus not legally meaningful, and not a valid defense.   Defendants cite no contrary authority.   The jury should be so instructed.

## DEFENDANTS' RESPONSE

Nowhere in Plaintiff's lengthy argument—which, again, it provided mere hours before filing this document—does it address *In re Bachrach Clothing, Inc.*, 480 B.R. 820, 855 (Bankr. N.D. Ill. 2012), or *Official Comm. Unsecured Creditors of Grand Eagle Companies, Inc. v. ASEA Brown Boverie, Inc.*, 313 B.R. 219, 230 (N.D. Ohio 2004).   As discussed in Defendants' initial objection above, and unrefuted in Plaintiff's response, *Bachrach* demonstrates that the underlying transaction—Court Square's purchase of Physiotherapy—must not be "collapsed" with Court Square's separate financing transactions with the Noteholders because Court Square expressly agreed to purchase Physiotherapy "*without any financing contingency*."   480 B.R. at 856 (emphasis added).   And *Grand Eagle* establishes that where, as here, "*a substantial amount of*

***new money [was] infused into the company***," there is "***no reason to collapse the transactions***." 313 B.R. at 30 (emphases added).  As discussed above, Plaintiff must prove its claims, and cannot evade its burden by merely asserting that the transaction "necessarily must be collapsed."  *Lyondell*, 503 B.R. at 381.  Again, the law and facts dictate the opposite conclusion.

### 3.8.    Constructive Fraudulent Transfer—Relevant Time Period [DISPUTED]

#### PLAINTIFF'S PROPOSAL

In considering whether the transfers to Defendants rendered Physiotherapy insolvent or left it with an unreasonably small amount of capital, you should focus on the period of time that immediately followed the transfers to Defendants. Whether Physiotherapy was solvent or insolvent prior to the transfers to Defendants is not relevant.

#### AUTHORITY

A constructive fraudulent transfer claim may be proven on the basis that the debtor was already insolvent at the time of the transfer, *or* rendered insolvent at the time of the transfer, or both. See 11 U.S.C. § 548(a)(1)(B)(ii)(I) (a fraudulent transfer claim may be based on insolvency either "on the date that [a] transfer was made" or "as a result of [a] transfer."); *In re Corbett*, 80 B.R. 32, 37-38 (Bankr. E.D. Pa. 1987) (debtor was insolvent as a result of the challenged transfer under § 548 where it was rendered insolvent "immediately after" the sale); *In re Fatoorehci*, 546 B.R. 786, 796 (Bankr. N.D. Ill. 2016) ("In order to determine solvency on a balance-sheet basis, a snapshot must be taken of a debtor's financial situation at the time of the transfer or shortly after the transfer[.]").  Plaintiff has elected to pursue a theory of solvency on the basis that Physiotherapy was rendered insolvent as a result of the transfers to Defendants, not that it was already insolvent prior to the transfers to Defendants on April 30, 2012.  *See* Adv. D.I. 1 ¶ 1; Adv. D.I. 884-2 at 3.

#### DEFENDANTS' OBJECTION

This instruction is unnecessary if the Court adopts Defendants' Proposed Instruction No. 3.6 ("Constructive Fraudulent Transfer – Elements"), which already addresses the appropriate timing for the inquiry.

But most importantly, this instruction is inaccurate.  As Plaintiff's own authority makes clear, the jury should focus on "*the time of the transfer* or shortly after the transfer," *Fatoorehci*, 546 B.R. at 796 (emphasis added), yet Plaintiff omits the time of the transfer—the most relevant time period.  The Court should instruct the jury consistent with the case law, not Plaintiff's misquotation of it.  Moreover, whether Physiotherapy was solvent prior to the transfer is certainly relevant because it has at least a "tendency" to make it more "probable" that Physiotherapy was solvent at the time of the transfer—particularly if the jury wishes to evaluate solvency with reference to how the transaction changed the value of the company from its pre-transaction state to its post-transaction state.  Fed. R. Evid. 401.  So the last sentence of Plaintiff's proposed instruction is incorrect.  *See id.*; *see also* D.I. 63 at 15-17 (refuting Plaintiff's effort to exclude expert testimony about pre-sale solvency).  If the Court adopts Plaintiff's Proposed Instruction No. 3.6, it should incorporate the correct timing principles into that instruction. To the extent that the Court finds that timing must be addressed as a separate instruction, Defendants provide a proposal below.

## DEFENDANTS' COUNTERPROPOSAL

In considering whether the transfers to Defendants rendered Physiotherapy insolvent or left it with an unreasonably small amount of capital, you should focus on Physiotherapy's financial situation at the time of the transfer or shortly after the transfer.  You should not consider subsequent events that occurred after the transaction and that were not known or knowable at the time of the transaction.

## AUTHORITY

*In re Fatoorehci*, 546 B.R. 786, 796 (Bankr. N.D. Ill. 2016) ("In order to determine solvency on a balance-sheet basis, a snapshot must be taken of a debtor's financial situation at

the time of the transfer or shortly after the transfer[.]") (citation omitted). *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 154 (3d Cir. 1996) ("For purposes of § 548, solvency is measured at the time the debtor transferred value, not at some later or earlier time."); *id.* at 155 ("The use of hindsight to evaluate a debtor's financial condition for purposes of the Code's 'insolvency' element has been criticized by courts and commentators alike.").

### PLAINTIFF'S RESPONSE

1.      Defendants' response underscores the need for Plaintiff's proposed instruction. Under the governing statute, a constructive fraudulent transfer claim may be based on insolvency either "on the date that [a] transfer was made" *or* "as a result of [a] transfer," 11 U.S.C. § 548(a)(1)(B)(ii)(I).   In this case, Plaintiff alleges only the latter—that Physiotherapy *became* insolvent as a result of the transfer to Defendants. *See* Adv. D.I. 1 ¶ 1 (Complaint) (alleging that the transaction "rendered the company insolvent the moment the transaction closed.").   The parties have so stipulated.  Adv. D.I. 884-2 at 3.  Defendants cannot now demand an instruction on a different measure of solvency that is not relevant under Plaintiff's claims.

Plaintiffs often pursue solvency under both statutory tests—"on the date that [a] transfer was made" *and* "as a result of [a] transfer"—such that the "at the time of the transaction" measure is appropriate.  That was true in *In re Fatoorehci*, 546 B.R. 786, 793 (Bankr. N.D. Ill. 2016), where the Court explained that on a constructive fraudulent transfer claim, "the Trustee must prove . . . [the debtor] was insolvent or was rendered insolvent as a result of the transfer," when both were at issue.  That was also true in *In re R.M.L., Inc.*, 92 F.3d 139 (3d Cir. 1996), where the court considered solvency "at the time the transfer was made" because that was relevant under the plaintiff's claims, which *did* allege insolvency prior to the transfer. *Id.* at 157.

115

But nothing in these cases suggests that a debtor's pre-transaction value is relevant where, as here, a plaintiff alleges only post-transaction insolvency.

Defendants argue  that "whether Physiotherapy was solvent prior to the transfer . . . has at least a 'tendency' to make it more 'probable' that Physiotherapy was solvent at the time of the transfer," but that only reinforces the need for a clear jury instruction.  To a lay person, it may seem that pre-transaction solvency is probative of post-transaction solvency—usually, if a business is solvent one day, it will be solvent the next day too.  But here, the Debtor took on $310 million in debt upon the closing of the Transaction.  Defendants should not be permitted to confuse the jury by focusing on the Debtor's solvency before it took on that debt.  Instead, the Court should instruct that solvency is measured immediately *after* the Transaction, after that debt was incurred.   Defendants' vague counterproposal that the jury should be instructed to consider solvency "at the time of the transfer *or* shortly after the transfer" does not specify which time is proper in this case, and thus would not accurately guide the jury.

2.      In addition, Defendants' proposal to instruct the jury that it "should not consider subsequent events that occurred after the transaction and that were not known or knowable at the time of the transaction" is also inappropriate.  *First*, as addressed above, the jury's task is to evaluate whether the Debtor became insolvent as a result of the transfers to Defendants, and so, the limitation to what was "known or knowable" "at the time of the transaction" would be confusing.  Under the legal theory Plaintiff is pursuing, "[i]n order to determine solvency on a balance-sheet basis, a snapshot must be taken of a debtor's financial situation . . . *shortly after the transfer*[.]"  *Fatoorehci*, 546 B.R. at 796 (emphasis added).

*Second*, evidence of Physiotherapy's financial struggles after the Transaction *does* bear on solvency.  As explained in Plaintiff's Opposition to Defendants' MIL No. 2, a constructive

fraudulent transfer may be shown not just based on analysis of Physiotherapy's balance sheet at the moment following the transfers, but also where Physiotherapy was left with "unreasonably small capital" following the transfers, or intended to incur debts "beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(II, III); *see Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 10 (3d Cir. 1992) (Unreasonably small capital "refer[s] to the inability to generate sufficient profits to sustain operations. Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable solvency."). Evidence of Physiotherapy's poor financial performance and inability to pay its debts following the Transaction is *highly* relevant to show that the Transaction *left* the Debtor inadequately capitalized and unable to pay its debts. *See, e.g., Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009) (analyzing debtor's post-transaction financial performance as pertinent to unreasonably small assets analysis); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 398 (S.D. Tex. 2008) (similar); *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 670 (N.D. Tex. 2011) (similar). Indeed, while Defendants moved to exclude the fact of the Debtor's bankruptcy, they have not even argued that the fact of its credit default is irrelevant or inadmissible. Their request for a jury instruction stating that such evidence is irrelevant is unsupported.

*Finally*, Defendants' broad proposed instruction not to "consider subsequent events that occurred after the transaction" is also improper because post-Transaction conduct in this case is relevant to show the cover-up of the fraud. Physiotherapy's former officers actively concealed the fraud and Physiotherapy's deteriorating financial condition during the post-Transaction time period, which delayed discovery of the fraud and the Debtor's insolvency. This evidence is

117

probative of both the Debtor's actual intent to defraud at the time of the Transaction, and it explains why it took time to discover the fraud and the insolvency.  Plaintiff's Oppositions to Defendants' MIL No. 2 at 2 and MIL No. 3 at 2-3.  The jury should not be instructed to disregard this evidence.

## DEFENDANTS' RESPONSE

Under both federal and Delaware law, Plaintiff must prove that Physiotherapy was insolvent on the date of the transfer or was rendered insolvent as a result of the transfer.  11 U.S.C. § 548(a)(1)(B)(2)(I) (plaintiff must show that the debtor "was insolvent on the date that such transfer was made …, or became insolvent as a result of such transfer or obligation"); 6 Del. C. § 1305(a) (plaintiff must show that the "debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation").  Defendants' proposed instruction neutrally adheres to this statutory language on timing, whereas Plaintiff picks the parts of the statute it prefers.

There is no prejudice in instructing the jury as to the exact statutory language on timing of insolvency, because the statutory language makes clear that insolvency can be measured at either time point:  the time of transfer or immediately after the transfer.  The language leaves no room for confusion.  The fact that Plaintiff intends to proceed under one prong of the statute, and cannot satisfy the other, is not a reason to selectively ignore the statutory language that Plaintiff cannot satisfy.

Through its proposed instruction, Plaintiff wants to divert the jury's attention away from the fact that Plaintiff concedes solvency at the time of the transfer.  But focusing the jury *exclusively* on the second part of the test that Plaintiff prefers is improper.  Rather, if the Court provides an instruction on timing at all, it should neutrally reflect the wording of the statute, as in

Defendants' counterproposal.

Further, Physiotherapy's solvency at the time of the transaction *is* relevant.  It is relevant to Defendants' Bankruptcy Code § 548(c)(1) defense, because the value that Defendants' gave in the transaction—Physiotherapy's shares—depends on Physiotherapy's solvency at the time of the transaction.  Likewise, Defendants' Bankruptcy Code § 502(h) defense allows for a reduction to the extent Defendants' shares would have had value had the transaction never occurred— which again depends on the value of Physiotherapy's shares (and hence Physiotherapy's solvency) at the time of the transfer.  Physiotherapy's solvency at the time of the transaction also is relevant to whether Plaintiff can prove reasonably equivalent value, which will depend on a comparison of Physiotherapy's value pre-transaction and post-transaction.  *See Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991) ("[W]hen the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received.").

Plaintiff also objects to the instruction that solvency must be determined using only information known or knowable at the time of the transaction, and not using hindsight.  But this is an uncontroversial principle of solvency law that Plaintiff cannot reasonably dispute.  *See, e.g.*, *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 155 (3d Cir. 1996) ("The use of hindsight to evaluate a debtor's financial condition for purposes of the Code's 'insolvency' element has been criticized by courts and commentators alike."); *Paloian v. LaSalle Bank N.A.*, 619 F.3d 688, 693 (7th Cir. 2010) ("Hindsight bias is to be fought rather than embraced"); *Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs., Inc.)*, 2005 WL 6499290, at \*12 (Bankr. N.D. Okla. Nov. 14, 2005) ("For the purpose of a solvency analysis, however, assets and liabilities must be valued based upon

information *known or knowable* as of the date of the challenged transfer") (emphasis in original); *In re Heritage Org. LLC*, 375 B.R. 230, 284 (Bankr. N.D. Tex. 2007) ("[T]he court values contingent assets and liabilities based on information known or knowable as of the date of the challenged transfer, without the benefit of hindsight."); *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009) ("Courts should consider contemporaneous evidence untainted by hindsight or post-hoc litigation interests when evaluating a company's financial condition."); *Credit Mgrs. Ass'n v. Fed. Co.*, 629 F.Supp. 175, 184 (C.D. Cal. 1986) ("The question the court must decide is *not* whether GECC's projection was correct, for it clearly was not, but whether it was reasonable and prudent at the time it was made.  The court finds that it was.") (emphasis in original); *Fidelity Bond and Mortgage Co. v. Brand (In re Fidelity Bond and Mortgage Co.)*, 371 B.R. 708, 723 (E.D. Pa. 2007) ("A 'court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made.'") (citation omitted).

Plaintiff argues that the jury supposedly will be unable to reconcile the instruction that it must not use improper hindsight with the instruction that it may consider whether the transaction rendered Physiotherapy insolvent.  But these two concepts are easily reconcilable and will not lead to confusion:  the jury may consider the debt that Physiotherapy incurred in the transaction (a known fact), but may not consider facts that were unknown or unknowable at that time.

Plaintiff also argues that the instruction about hindsight is improper because some out-of-circuit opinions have treated the length of time between a transfer and a company's subsequent failure as pertinent evidence under the unreasonably small capital test.  Although courts have split on this legal concept, as discussed in Jury Instruction 3.9, the Court need not resolve that split here for one simple reason:  ***Plaintiff's solvency expert did not rely on this type of***

*information, and instead relied only on information known or knowable as of the transaction date for all three of her solvency tests*.  *See* 5/29/18 Austin Smith Deposition Tr. At 21:25–22:4 ("Q.  And in performing your business valuation and solvency analysis in this case, did you consider information that was not known or reasonably available on your April 30, 2012 valuation date?  A.  My valuation and solvency conclusions are based only on information that was known or knowable as of that date.").  If Plaintiff's solvency expert did not consider the length of time between the transaction and Physiotherapy's bankruptcy as a basis for finding insolvency, then Plaintiff's objection that the jury must do so to determine solvency is not credible.

Finally, Plaintiff objects to the instruction that the jury should consider only information known or knowable as of the transaction date on the ground that subsequent information is relevant to proving a "cover-up" of fraud, which Plaintiff contends is probative of "actual intent to defraud."   Although Defendants dispute this, it does not matter for purposes of this jury instruction, because the instruction here relates to solvency/insolvency, not intent to hinder, delay or defraud.  Proving a "cover-up" is not relevant to Physiotherapy's solvency.

### 3.9.    Constructive Fraudulent Transfer—Ongoing Operations [DISPUTED]

#### PLAINTIFF'S PROPOSAL

In considering whether the transfers to Defendants rendered Physiotherapy insolvent or left it with an unreasonably small amount of capital, you are instructed that a company may be insolvent or have an unreasonably small amount of capital even if the company is able to continue operating for an extended period following the transfers.

#### AUTHORITY

*Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009) (company had unreasonably small amount of capital at the time of the leveraged buyout even though it survived for more than three years after the transfer); *In re Morse Tool, Inc.*, 148 B.R. 97, 133–34 (Bankr. D. Mass. 1992) ("The fact that Morse was able to remain afloat for over two years after the buyout does not establish that the buyout left Morse adequately capitalized to continue in business."); *In re O'Day Corp.*, 126 B.R. 370, 372, 381, 404, 407 (Bankr. D. Mass. 1991) (company was insolvent and had unreasonably small capital following transaction even though it continued to operate for nearly 22 months after leveraged buyout).

#### DEFENDANTS' OBJECTION

This instruction is unnecessary, misleading, and invites error.  The Court's instruction on insolvency is sufficient.    Plaintiff's instruction here invites the jury to consider events that occurred after the transaction—which constitutes improper hindsight analysis. *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 154 (3d Cir. 1996) ("For purposes of § 548, solvency is measured at the time the debtor transferred value, not at some later or earlier time."); id. at 155 ("The use of hindsight to evaluate a debtor's financial condition for purposes of the Code's 'insolvency' element has been criticized by courts

and commentators alike.")

## PLAINTIFF'S RESPONSE

This proposed instruction correctly informs the jury that under the prevailing law a delay between the transaction at issue and a company's eventual collapse does not preclude a finding that the transfers rendered the company insolvent or left it with an unreasonably small amount of capital *at the time they were made*. As explained in connection with Instruction 3.8, post-transaction events, including the filing of bankruptcy, are relevant to determining whether the transaction left Physiotherapy inadequately capitalized. Indeed, Defendants do not seek to exclude a great deal of post-transaction evidence, such as the fact that Physiotherapy defaulted on the notes. The jury may be uncertain, when considering such evidence, about the impact it should have on the Debtor's solvency. This instruction is appropriate to guide the jury on that issue.

The authorities are clear that a company's ability to survive for several years following a transfer does not preclude a finding that it was insolvent at the time of (or immediately after) the transfer. *See, e.g.*, *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 794 (company was bound to collapse following LBO, even though it survived for 3.5 years); *In re Tronox Inc.*, 503 B.R. 239, 298 (Bankr. S.D.N.Y. 2013) (holding that the fact that a debtor "survived for several years after the [transaction], and it maintained an ostensible market capitalization" was insufficient to establish solvency at time of transaction); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 398 (S.D. Tex. 2008) ("The fact that ASARCO did not file bankruptcy until over two years after the transfer is not dispositive."). Consistent with this established law, this instruction will ensure that the jury does not assume incorrectly that the time between the transaction and the Debtor's collapse precludes a finding that it was insolvent immediately

123

following the transaction.

*In re R.M.L., Inc.*, 92 F.3d 139 (3d Cir. 1996), on which Defendants rely, cautions against relying on "developments that could not reasonably have been foreseen at the time of the transfer" to establish insolvency. *Id.* at 155 (quotation omitted). It does not address whether a company's survival following the transfer at issue—even for a few years—precludes a finding of insolvency at the time of the transfer. The jury should be so instructed.

## DEFENDANTS' RESPONSE

Plaintiff's proposed instruction is one-sided. Plaintiff would have the Court instruct the jury that just because a company survives for a period of time, this does not necessarily reflect solvency. But numerous courts have held the opposite: the fact that a company continues to operate for a period of time after the transaction is probative of its *solvency*. *See, e.g.*, *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) ("Courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction."); *Fidelity Bond and Mortgage Co. v. Brand (In re Fidelity Bond and Mortgage Co.)*, 371 B.R. 708, 728 (E.D. Pa. 2007) (14 month period between transaction and bankruptcy was a "factor to consider" in unreasonably small capital analysis); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 920-21, 944 (S.D.N.Y. 1995) ("That the company remained viable so long after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout").

Plaintiff's proposed instruction also is unnecessary. A factfinder should determine solvency using information known or knowable as of the valuation date. *See* Defendants' Response to Jury Instruction 3.8. In addition, the solvency experts in this case do not rely on

information that is not known or knowable as of the transaction date.  There thus is no basis to instruct the jury on how subsequent events that were unknowable at the time of the transaction (such as how long Physiotherapy would continue to operate) should affect solvency.  Neither solvency expert considered that information, and thus it cannot be presented to the jury as a basis for finding insolvency.

If the Court does instruct the jury about "ongoing operations," then it should do so fairly. Because Plaintiffs' proposed instruction is one-sided, any instruction should include the following sentence: "you are also instructed that a company's ability to operate after the transaction may be evidence of its solvency or adequate capitalization."

### 3.10.    Ratification/Estoppel Defense [DISPUTED]

#### DEFENDANTS' PROPOSAL

Defendants have raised an estoppel or ratification defense based on the fact that the Noteholders agreed to finance the transaction.  To prevail on this defense, Defendants must prove by a preponderance of the evidence that the Noteholders had knowledge of the material facts of the transaction.  If you find that the Noteholders had knowledge of the material facts of the transaction, then you must find in favor of Defendants.

#### AUTHORITY

*In re Physiotherapy Holdings, Inc.*, 2017 WL 6524524, at *10 - *11 (D. Del. Dec. 21, 2017) (Stark, J.) ("[T]he Trustee argued that . . . the proper question [for purposes of the ratification defense] is whether these creditors 'had full knowledge of all material facts' surrounding the transaction. . . . [and] the Bankruptcy Court concluded that there is a material dispute as to whether the Secured Noteholders had knowledge of the material facts of the transaction.") (citing Adv. D.I. 135 at 47 & *In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *12 (Bankr. D. Del. June 20, 2016)); *HSBC Bank USA, Nat. Ass'n v. Adelphia Commc'ns Corp.*, 2009 WL 385474, at *6 (W.D.N.Y. Feb. 12, 2009), *aff'd sub nom. In re Adelphia Recovery Tr.*, 634 F.3d 678 (2d Cir. 2011) ("The doctrine of ratification applies to transactions sought to be avoided as fraudulent transfers."); *In re Lyondell Chem. Co.*, 503 B.R. 348, 385 (Bankr. S.D.N.Y. 2014), *abrogated on other grounds by In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016) ("LBO Lenders" could not avoid transfer because they knew "that they were lending for the purposes of an LBO, and that the proceeds of their loans were going to stockholders").

#### PLAINTIFF'S OBJECTION

126

The Court should not instruct the jury regarding Defendants' "ratification" or "estoppel" defense, for several reasons. *First,* the Bankruptcy Court and this Court have already made legal rulings that preclude it. Rejecting this defense at the pleading stage, the Bankruptcy Court ruled that it could apply *only if* Defendants show that the Noteholders had "full knowledge of all material facts" in connection with the Transaction, and "intended to extend credit to an insolvent company." Adv. D.I. 250 at 28; *see id.* at 27 ("Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding.") (citing 57 N.Y. Jur. 2d Estoppel, Ratification, and Waiver § 87.6 at 692). On review, this Court found no "substantial grounds for difference of opinion" with respect to this ruling. Case No. 16-00201-LPS, D.I. 22 at 20. The ruling is, accordingly, the law of the case. *In re Continental Airlines, Inc.*, 145 B.R. 404, 408 (D. Del. 1992) (Bankruptcy Court Order "stands as a final order and as the law of the case").

Defendants now seek to instruct the jury on a new, ambiguous "had knowledge of the material facts of the transaction" standard. But Defendants fail to identify any basis for seeking reconsideration of the Courts' prior rulings. *See N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (reconsideration may be appropriate only if there is "(1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; [or] (3) the need to correct clear error [of law] or prevent manifest injustice.") (quotations and citations omitted; alterations in original). Indeed, the authorities that Defendants now cite are the same authorities the Bankruptcy Court and this Court previously considered and rejected. Adv. D.I. 250 at 27028 (Opinion on Motion to Dismiss addressing Defendants' citations to *Adelphia* and *Lyondell*); Case No. 16-00201-LPS, D.I. 22 at 18-19 (same, in this Court's Order Denying Leave to File Interlocutory Appeal).

127

Under the established legal standard, Defendants do not contend that they have a viable defense.  They do not argue, for example, that the Noteholders were aware of the fraud or intended to extend credit to an insolvent company, and no evidence would support any such argument.  Accordingly, this defense is not viable, and there is no basis for instructing the jury on it.

*Second*, even if this defense were viable, it is equitable and not a defense for the jury. "[R]atification is an equitable defense," *Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 195 (Del. 2011), as is "estoppel," *Schering Corp. v. Amgen Inc.*, 969 F. Supp. 258, 269 (D. Del. 1997).  If this or any other equitable defense *could* apply, it would be for the Court to decide after trial, not for the jury.  *See GlaxoSmithKline LLC v. Glenmark* Pharm. Inc., 2017 WL 8948975, at *7 (D. Del. May 30, 2017) ("equitable defenses . . . are exclusively for the District Court to decide and therefore (absent some further ruling by the District Court) would not be relevant for the jury trial."), report and recommendation adopted, 2017 WL 2536468 (D. Del. June 9, 2017) (Stark, J.); *Schering*, 969 F. Supp. at 269 (same).

*Third*, Defendants' arguments for a different legal standard, even if procedurally proper (which they are not), are erroneous.  The Bankruptcy Court's ruling on Defendants' motion to dismiss is consistent with established law.  *See, e.g., In re Tronox Inc.*, 503 B.R. 239, 276 (Bankr. S.D.N.Y. 2013) (explaining that ratification defense could apply only if "the bondholders knowingly gave sanction to the fraudulent conveyances complained of in this case" because "[i]f the decision to become a creditor of an entity constitutes a ratification sufficient to bar that creditor from filing a fraudulent conveyance complaint . . . few such actions could be brought, even though it is well accepted that they may have claims under the fraudulent conveyance laws."); Case No. 16-00201-LPS, D.I. 13 at 9-13 (collecting authorities).  Moreover,

the Bankruptcy Court itself distinguished the authority on which Defendants now rely, explaining that *In re Lyondell Chem. Co.*, 503 B.R. 348 (Bankr. S.D.N.Y. 2014), is "highly distinguishable because . . . there were no allegations that the *Lyondell* lenders relied on false financial statements," Adv. D.I. 250 at 28, and that *HSBC Bank USA, Nat. Ass'n v. Adelphia Commc'ns Corp.*, 2009 WL 385474, at *6 (W.D.N.Y. Feb. 12, 2009), found ratification only because all "material facts" were in fact known to the ratifying debtor-in-possession there, Adv. D.I. 250 at 27-28.  Moreover, in *In re Adelphia Recovery Tr.*, 634 F.3d 678, 693–94 (2d Cir. 2011), the Second Circuit *reversed* the District Court's finding that the debtor-in-possession had ratified the sale of a loan, holding that "[w]here the allegedly ratifying party's silent acquiescence to a transaction credibly appears to have resulted from the complexity of the situation rather than intent, ratification does not occur."

*Fourth*, if the Court determines that an instruction on this defense is appropriate, Defendants' proposed instruction is improper for numerous reasons.  Defendants' instruction fails to:  (1) state that ratification may only apply if the Noteholders had "full knowledge of all material facts" in connection with the Transaction and "intended to extend credit to an insolvent company," Adv. D.I. 250 at 28; (2) explain that ratification is "the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding," *id.* at 27; (3) specify that "[m]ere negligence is not ratification," *In re Adelphia Recovery Tr.*, 634 F.3d 678, 691–92 (2d Cir. 2011); (4) explain that "[t]he intent required for ratification 'must be clearly established and may not be inferred from doubtful or equivocal acts or language,'" *id.*; or (5) state that Defendants bear the burden of proving that *each* Noteholder ratified the fraudulent transfers, *Spelman v. Bayer Corp.*, 2012 WL 13047524, at *5 (D.S.C. Dec. 17, 2012) (affirmative defenses such as estoppel "require individual inquiries into the facts particular to

each plaintiff").

Moreover, Defendants' instruction also fails to specify that the ratification defense does not apply to the Trust's claims under federal law.  *See In re Teleservices Grp., Inc.,* 444 B.R. 767, 842 (Bankr. W.D. Mich. 2011) (limiting defendant to statutory defenses under Section 548 because "[t]his court is not empowered to create other equitable defenses"); *In re Equip. Acquisition Res., Inc.*, 2012 WL 4754949, at *4 (Bankr. N.D. Ill. Sept. 28, 2012) (same); *Auto. Professionals, Inc.,* 398 B.R. 256, 261 (Bankr. N.D. Ill. 2008) (similar).  Physiotherapy's estate, and the Trust as the assignee of the estate's claims, did not participate in the Transaction, and could not possibly have ratified it.

For these reasons, the Trust objects to giving the jury any instruction on this defense.  Nevertheless, if the Court decides to do so, then without waiving the Trust's objections, the Trust proposes the following alternative instruction:

## PLAINTIFF'S COUNTERPROPOSAL

Defendants assert a defense called ratification.  Ratification is the act of knowingly approving an act that would otherwise be unauthorized.  In this case, to show ratification, Defendants must prove by a preponderance of the evidence that each and every Noteholder intended to extend credit to an insolvent company, and knew at the time of the Transaction that the Debtor intended to make transfers that were fraudulent.  Such intent must be clearly established and may not be inferred from doubtful or equivocal acts or language.  The mere act of making a loan to an insolvent company is not ratification.

Defendants must make this showing as to each Noteholder individually.  This defense only applies to Plaintiff's claims under state law, and does not apply to Plaintiff's claims under federal law.

## DEFENDANTS' RESPONSE

*First*, neither the Bankruptcy Court not this Court have ever ruled that Defendants are precluded from advancing their Ratification/Estoppel defense at trial.  The Bankruptcy Court's prior ruling denying Defendants' motion to dismiss based on the defense, does not mean that Defendants are precluded from developing facts supporting the defense and pursuing it at trial. Indeed, this Court explicitly made clear the import of the rulings as follows: "[T]he Court agrees with the Trustee that ***Bankruptcy Court's ruling was not a final ruling on any defense***— regardless of whether the applicable defense is characterized as ratification or estoppel—***but, rather, a non-final determination that application of the defense was 'inappropriate at this juncture'*** . . . However, again, all the Bankruptcy Court decided was that further factual development is required before applying the defense of ratification or estoppel***."***  *In re Physiotherapy Holdings, Inc.*, No. AP 15-51238-KG, 2017 WL 6524524, at *11 (D. Del. Dec. 21, 2017) *(*quoting *In re Physiotherapy Holdings, Inc.,* No. 13-12965(KG), 2016 WL 3611831, at *12 (Bankr. D. Del. June 20, 2016)).  Accordingly, there is no need for Defendants' to seek reconsideration of any prior ruling, there is no bar to their pursuit of the defense at trial.

*Second*, Plaintiff's argument that Defendants' Ratification/Estoppel defense is an equitable defense and therefore must be decided by the judge not the jury is contradicted by this Court's statement that the defense hinges on "factual issues." *In re Physiotherapy Holdings, Inc.*, 2017 WL 6524524, at *10.  Given the need for factual determinations, Defendants maintain that the jury should decide this defense.

*Third*, Defendants do not understand Plaintiff's position that Defendants have argued for a "different legal standard" but note that Defendants' proposed instruction is based on the very legal standard articulated by the Bankruptcy Court as applying to Ratification/Estoppel

defenses—a standard based on the standard the *Plaintiff* previously advocated before that court. As the Bankruptcy Court explained in denying Defendants' motion to dismiss: "The *Trustee* believes that the appropriate question to ask is whether the bondholders '*had full knowledge of all material facts' surrounding the transaction.*" The Bankruptcy Court then went on to adopt a version of that formulation, concluding that "there is a material dispute as to whether or not the Senior Noteholders *had knowledge of the material facts surrounding the transaction.*" *In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *12.

*Fourth*, Plaintiff's attempt to shoehorn statements from cases from every jurisdiction relating to the term "ratification," regardless of the facts of those cases, into this jury instruction should not be heeded.  For example, there is no evidence here that the Noteholders made only "doubtful or equivocal acts or language" to indicate their ratification/estoppel, so such language is unnecessary.  The purpose of a jury instruction is to guide the jury as to the legal standards applicable in this case, not in different factual circumstances where "ratification" may be at issue.  As for Plaintiff's assertion that this defense does not apply to its "federal claims" because Plaintiff is the assignee of the estate, Plaintiff suggests that the "estate" is something other than Court Square and the Noteholders, but those are the two entities that have agreed to split any recovery in this case 50/50.  Yet Plaintiff cannot be asserting any claims it was assigned by Court Square, because those have been Released.  That leaves the Noteholders, because all the other creditors were paid off.  So if the Noteholders' ratified the transfer, Plaintiff cannot avoid or recover it.  None of Plaintiff's authorities address a situation like this one and federal law should no more countenance an inequitable result than state law would.  *Cf.*, *e.g.*, *In re Teleservices Grp., Inc.*, 469 B.R. 713, 762 (Bankr. W.D. Mich. 2012) ("[T]he discretion given to the court under Section 550(a) to award value offers the same opportunity for adjustment when only a

money judgment is sought.  Indeed, it is likely as not that Congress was attempting to mimic the equitable adjustment provisions of comparable state fraudulent transfer laws when it left awards of value under Section 550(a) to the court's discretion.") (citations omitted).

### 3.11.   Safe Harbor Defense [DISPUTED]

### **DEFENDANTS' PROPOSAL**

Before you consider the Plaintiff's claim for constructive fraudulent transfer under federal law, you must decide whether the Defendants are protected by the safe harbor Congress has provided.  Defendants are protected by the safe harbor—and therefore cannot be liable on the Plaintiff's constructive fraudulent transfer claim—if Defendants prove by a preponderance of the evidence that:

(1) An entity that transferred money to or received money from Wells Fargo Bank was a customer of Wells Fargo Bank;

(2) Wells Fargo Bank acted as an agent or custodian of that entity; and

(3) The money was transferred to Wells Fargo Bank and then to Defendants in connection with a transaction for the purchase or sale of stock, or a transaction that is similar or related to a purchase or sale of stock.

An entity is a "customer" of Wells Fargo Bank if that entity was a buyer or purchaser of the Bank's services, or if the Bank received and held the money for it.

Wells Fargo Bank acted as an "agent" or "custodian" of an entity if Wells Fargo Bank held money on behalf of or at the request of the entity.

### **AUTHORITY**

11 U.S.C. § 546(e) (barring a Trustee from asserting a claim for constructive fraudulent transfer with respect to "a settlement payment . . . made by . . . [a] financial institution," or "a transfer made by . . . [a] financial institution . . . in connection with a securities contract . . . ."); 11 U.S.C. § 101(22)(A) (defining "financial institution" to include "a Federal reserve bank, or an entity that is a commercial or savings bank . . . ***and, when any such*** . . . ***entity is acting as agent***

*or custodian for a customer* . . . *in connection with a securities contract* . . . .")(emphasis

added); *In re Tribune Co. Fraudulent Conveyance Litg.*, 2019 WL 1771786 (S.D.N.Y., April 23,

2019) at *9 (listing elements of defense), *10 (defining "customer"), *11 (defining "agent" and

"securities contract"), and 12 (explaining the purpose of the safe harbor); *see also Merit*

*Management Group LP v. FTI Consulting, Inc.*, 138 S.Ct. 883, 890 n.2 (noting that neither party

had contended that the debtor or petitioner "qualified as a 'financial institution' by virtue of its

status as a 'customer' under  § 101(22)(A) of the Bankruptcy Code," and declining to address

that question).

## PLAINTIFF'S OBJECTION

The Court should not give this improper proposed instruction, which misstates the law,

seeks jury findings on issues of law for the Court, and would mislead the jury even if there were

disputed issues of fact for the jury.

1.    <u>Question Of Law.</u>   Defendants' proposed safe harbor instruction seeks jury

findings on whether Physiotherapy or Defendants are "financial institutions" under Sections

101(22) and 546(e) of the Bankruptcy Code.  That, however, is a *legal* question of statutory

interpretation that falls within the exclusive province of the Court.  *See Marin v. King*, 720 F.

App'x 923, 938 (10th Cir. 2018) (whether an individual meets a statutory definition is "a matter

of statutory interpretation; thus a question of law for a court to decide rather than a question of

fact for a jury to decide"); *Kaufmann v. Siemens Med. Solutions USA, Inc.*, 638 F.3d 840, 846

(8th Cir. 2011) ("A question of statutory interpretation is always a question of law …. Therefore,

while the jury resolved the factual dispute over [the defendant's intent], the jury did not

answer—nor should it have answered—the legal question of whether [the plaintiff's claim]

satisfied [the relevant statute].").  There accordingly is no basis for submitting this question to

the jury.

2.    <u>The Parties To This Case Are Not Financial Institutions.</u>   Moreover, the text, purpose, and legislative history all confirm what is obvious from plain English:   that Physiotherapy, Court Square, and the Defendants are not "financial institutions," such as banks, which are subject to special protection from federal-law liability for constructive fraudulent conveyances.    Under Defendants' proposed interpretation, newspapers, grocery stores, individuals, and anyone else who uses a bank in a securities transaction is a "financial institution" entitled to the same special protection that the Bankruptcy Code affords to national banks.  This interpretation of a statutory provision designed to protect banks in order to prevent systemic disruption of our financial market is vastly overbroad.  If adopted, this "exception" would swallow the rule that ordinary parties *can* be liable for constructive fraudulent transfer under federal law, and would render the Supreme Court's recent decision in *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018), a dead letter.

In *Merit Management*, the Supreme Court limited the scope of the Bankruptcy Code's safe harbor defense.  Prior to that decision, many courts held that the involvement of a bank or other financial institution as an *intermediary* in a transaction was sufficient to trigger the safe harbor.  The Supreme Court rejected that position, holding that the text, structure, and purpose of the safe harbor provide "good reason to believe that Congress was concerned about transfer '*by an industry hub*' specifically," not merely one that involves such a party as an intermediary.  *Id.* at 897.   In placing limits on Section 546(e), *Merit Management* teaches that Congress focused the safe harbor exception on the transferor and transferee, and *not* their intermediary conduits. *Id.* at 892-93 ("Congress signaled that the exception applies to the overarching transfer that the trustee seeks to avoid, not any component part of that transfer.").

136

Under Defendants' view, however, a defendant is entitled to the protection of the safe harbor whenever a party to a transaction hires a bank as an intermediary—because, by doing so, that party *itself* becomes a financial institution that is protected by the safe harbor.  That makes no sense.  Congress should not be presumed to have operated at such cross-purposes, particularly where the text and history of the statute indicate the opposite intention.

The errors in Defendants' proposed statutory interpretation begin with the text.  Section 101(22)(A) defines "financial institution" as

> a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer.

In this statute, Congress identifies a number of financial entities that qualify for treatment as financial institutions ("a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union").  The definition then goes on to clarify that a "receiver, liquidating agent, or conservator for such entity" also qualifies.  Each of these entities is separated by a disjunctive "or" because each of them has "separate meanings": they are each independent alternative forms of a financial institution.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings.").

The final section of the definition, in contrast, is not an independent alternative introduced by another "or," but instead a separate category linked, and subsidiary, to the prior list of institutions: "***and***, when any such [entity] is acting as agent or custodian for a customer … in connection with a securities contract … such customer" (emphasis added).  Canons of statutory

137

construction establish that Congress's word choice in this definition is meaningful; the operating presumption is that "where words differ as they differ here, 'Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).  Moreover, Congress's particular intentional act here, to tie its references to "customers" to the prior list of institutions with the word "and," means that *a customer alone is not a "financial institution."* *See Reese Bros., Inc. v. United States*, 447 F.3d 229, 235-36 (3d Cir. 2006) ("The usual meaning of the word 'and,' however, is conjunctive, and 'unless the context dictates otherwise, the "and" is presumed to be used in its ordinary sense.'") (quoting *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1332 (11th Cir. 2005)); *In re Buena Park Dev. Corp.*, 20 B.R. 215, 218 (C.D. Cal. 1982) (provisions joined by "and" "are not to be construed as alternatives"); Antonin Scalia & Bryan A. Garner, *Reading Law*, 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."); *cf. City of Rome v. United States*, 446 U.S. 156, 172 (1980), *abrogated on other grounds by Shelby Cty., Ala. v. Holder*, 570 U.S. 529 (2013) ("By describing the elements of discriminatory purpose and effect in the conjunctive, Congress plainly intended that a voting practice not be precleared unless *both* discriminatory purpose and effect are absent.").[11]

Thus, the only interpretation that gives effect to the full text of Section 101(22)(A) is one that recognizes that customers may be *included* when the Bankruptcy Code regulates an institution acting on their behalf, but are *not* themselves, standing alone, financial institutions.  A

---

[11] Congress further reinforced that customers alone are *not* financial institutions by limiting the definition to only reach them "*when* any such [entity] *is acting* as agent or custodian for a customer … in connection with a securities contract" (emphasis added).  This construction, in which the listed entity (e.g., a bank) is the subject, is only intelligible if it is the entity, rather than the customer, whose action is governed by the Bankruptcy Code's substantive provisions.

bank does not *lose* its safe-harbor protections merely because it is acting for a customer.  If, for example, a trustee attempts to avoid a settlement payment made to a bank, the trustee cannot avoid the safe harbor by arguing that the bank was acting for a customer.  But a trustee is not barred from setting aside transfers that are *not* made to banks—that are made to ordinary parties—simply because they are customers of banks.  Where a bank is the true counterparty in an "overarching transfer," the safe harbor applies.  *Merit Mgmt.*, 138 S.Ct. at 892-93.  Where it is merely an intermediary, as in *Merit Management* and this case, the safe harbor does not apply.

This interpretation is further bolstered by the structure of the Bankruptcy Code.  The Code vests trustees with broad rights to avoid constructive fraudulent conveyances, and then exempts specific market participants from those claims—not just financial institutions, but commodity brokers, forward contract merchants, stockbrokers, financial participants, and securities clearing agencies.  11 U.S.C. § 546(e).   Under Defendants' theory, Congress then expanded the safe harbor to protect not just the listed entities, but virtually every participant in the modern economy based on a vague reference to "customers" in the definition of a single type of market participant.  "'It is highly unlikely that Congress made a decision of such economic and political significance in so cryptic a fashion.'"  *Port Auth. Trans-Hudson Corp. v. Sec'y, U.S. Dep't of Labor*, 776 F.3d 157, 168 (3d Cir. 2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)) (alterations omitted); *see also Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 792 (2011) ("We are confident that if Congress had intended such a sea change in intellectual property rights it would have said so clearly—not obliquely through an ambiguous definition of 'subject invention' and an idiosyncratic use of the word 'retain.'").  Defendants' position violates the canon of statutory construction that Congress "does not alter the fundamental details of a regulatory scheme in

vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).

Congress is also presumed not to "make 'radical—but entirely implicit—changes' through 'technical and conforming amendments.'" *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1071 (2018) (quoting *Director of Revenue of Mo. v. CoBank ACB*, 531 U.S. 316, 324 (2001)). Yet that is *precisely* how Congress described the alteration to Section 546(e) that Defendants now invoke. *See Omnibus Bankruptcy Improvements Act of 1983: Report of the Committee on the Judiciary, United States Senate*, S. Rep. 98-65, at 81 (Apr. 26, 1983) (addition of "financial institution" to safe harbor provision is a "Conforming amendment"); 129 Cong. Rec. S1047-48 (Feb. 3, 1983) (remarks of Sen. Dole, introducing bill that became PL 98-353, 98 Stat 333) (definition of "financial institution" is one of several "Technical Amendments"). Indeed, Congress continues to describe financial institutions as merely one example of "a financial intermediary," even when amending Section 101, further establishing that it did not intend the term to include non-intermediary customers simply because they have a relationship with a bank. H.R. REP. 109-31(I), 119, 2005 U.S.C.C.A.N. 88, 181 (Apr. 8, 2005).

Defendants' interpretation of "financial institution" is further undermined by the legislative history, which establishes that Congress enacted the safe harbors at issue because "certain protections are necessary to prevent the insolvency of one commodity or securities firm from spreading to other firms and possibly threatening the collapse of the affected market." H.R. Rep. No. 97-240, at 1 (1982). Just last year, the Supreme Court held that the text, structure, and purpose of the safe harbor all provided "good reason to believe that Congress was concerned about transfer 'by an industry hub' specifically." *Merit Management*, 138 S. Ct. at 897 (emphasis omitted); *see also* Adv. D.I. 250 at 18 ("[B]oth the written decisions and legislative

history suggest that sections 546(e) and 546(g) were enacted to further augment the protections against systemic risk codified in the initial safe harbors.").  Here, both the Bankruptcy Court and this Court have already recognized that allowing the Litigation Trust to set aside the transfers would *not* have the destabilizing effect on financial markets that Congress sought to prevent.  *See* Adv. D.I. 250 at 20; 16-mc-00201-LPS D.I. 22 at 15.

In the first 35 years after the predecessor to Section 101(22)(A) was enacted, no court suggested that a customer of a bank may be insulated from a federal fraudulent conveyance claim because the customer was, itself, a "financial institution."  The only authority to take that view is *In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019), but the discussion of the meaning of "financial institution" in that case was *dicta*,[12] and the court made the same error that Defendants now advocate by interpreting each word in the statute individually rather than considering the definition as a whole.[13]  *See Alli v. Decker*, 650 F.3d 1007, 1016 (3d Cir. 2011) ("'Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.'") (quoting *Dolan v. United States Postal Serv.*, 546 U.S. 481, 486 (2006)).  The decision in *In re Tribune* prompted a settlement, depriving the Second Circuit of the opportunity for further review.  This Court should not follow its analysis, which cannot be squared with the text, structure, purpose, or history of Sections 546(e) and 101(22)(A) of the Bankruptcy Code, and which would conflict with *Merit Management*'s focus on the overarching transfer, rather than the fact that an intermediary step in

---

[12]   *See id.* at *6 ("Standing alone, undue prejudice to the Shareholders provides a sufficient basis upon which to deny the Trustee's motion.").

[13]   Neither party raised the structure of Section 101(22)(A) in briefing the proper interpretation of the statute.  *See* 11-md-02296-DLC (S.D.N.Y.) Dkt. 7818 at 25; Dkt. 7831 at 14-23; Dkt. 7867 at 4-9.

the transaction involved a bank.

In addition, even if the Court accepted Defendants' flawed interpretation of the statute, the Transaction here would still fall outside of the safe harbor because Wells Fargo was neither an agent nor a custodian for any party to the Transaction, as a matter of law.  There is no dispute that Wells Fargo does not meet the statutory definition of "custodian."[14]  Nor do these circumstances give rise to an agency relationship.  Under the Restatement (Third) of Agency, "[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  *Id.* § 1.01; *see Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011) (adopting Restatement's test). The undisputed facts of this case and governing legal documents establish that, as a matter of both federal and Delaware law, Wells Fargo was neither party's agent, barring application of the Section 546(e) safe harbor.

In particular, Wells Fargo was not an "agent" for purposes of the Bankruptcy Code because it expressly disclaimed the duty of loyalty that must be present for an agency relationship to exist.  "If the relationship between two persons is one of agency as defined in this section, the agent owes a fiduciary obligation to the principal." *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (quoting Restatement. § 1.01 cmt. e); *see IPSCO Steel (Ala.), Inc. v. Blaine Constr. Corp.*, 371 F.3d 141, 148 (3d Cir. 2004) ("The principal-agency relationship is fiduciary in nature."); *Gentili v. L.O.M. Med. Int'l, Inc.*, 2012 WL 3552685, *2 n.26 (Del. Ch. Aug. 17,

---

[14]   11 U.S.C. § 101(11) ("The term 'custodian' means--(A) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title; (B) assignee under a general assignment for the benefit of the debtor's creditors; or (C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.").

142

2012) ("[T]he relationship between a principal and agent is fiduciary in character.").  Here, in contrast, the Paying Agent[15] Agreement is explicit that Wells Fargo "shall under no circumstance be deemed a fiduciary for any of the parties to this agreement."  Paying Agent Agreement ("PAA") § 9(b) (PTX 906 at WATERST000478).

Wells Fargo was also not an "agent" because the Paying Agent Agreement bars the alleged principals from requiring Wells Fargo to carry out further instructions beyond those delineated in the contract itself.  "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents."  Restatement § 1.01 cmt. f.; *see Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 509 (Del. 2005) ("[T]he right to assert control through interim instructions[ is] a defining hallmark of a legal relationship of agency.") (quotations omitted); *E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*, 2008 WL 2220396, *11 (E.D. Cal. May 27, 2008) ("[T]he term 'interim instructions' as used by the Restatement means instructions that go beyond the scope of instructions of a customer to a provider or a buyer to a seller and that encompass basic and substantial business decisions that would normally be made internally by officers, directors or employees….").  "A relationship is not one of agency within the common-law definition unless … the principal has the right throughout the duration of the relationship to control the agent's acts.  It is for this reason that a mere 'middleman' is not typically an agent."  *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1360 (Fed. Cir. 2016) (quotations and citations omitted).  The Paying Agent Agreement clarifies that Wells Fargo is a middleman, not an agent, by specifically providing no party has the right to give Wells Fargo any further instructions:  "The

---

[15]   The contracting parties' decision to refer to Wells Fargo as the "Paying Agent" in their contract has no bearing on whether an agency relationship exists.  *See* Restatement § 1.02 ("Whether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling.").

Paying Agent shall have only those duties as are specifically provided in this Agreement, which shall be deemed purely ministerial in nature …"  PAA § 9(b) (PTX 906 at WATERST000478). Where a contract does not grant a purported principal the power to give interim instructions to a purported agent, no agency relationship exists as a matter of law.  *See, e.g.*, *Reo v. Caribbean Cruise Line, Inc.*, 2016 WL 1109042, *5 (N.D. Ohio Mar. 18, 2016) (dismissing claim as a matter of law under Rule 12(b)(6) due to failure to allege power to give interim instructions); *Melito v. Am. Eagle Outfitters, Inc.*, 2015 WL 7736547, *7 (S.D.N.Y. Nov. 30, 2015) (same); *Jackson v. Caribbean Cruise Line, Inc.*, 88 F. Supp. 3d 129, 139 (E.D.N.Y. 2015) (same); *Murray v. Choice Energy, LLC*, 2015 WL 4204398, *5 (S.D. Ohio July 10, 2015) (same); *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 278 (2d Cir. 2013) (affirming same)

Wells Fargo was also not an "agent" because no contracting party had the authority to terminate the Paying Agent Agreement that Defendants argue gave rise to an agency relationship.   The requirement that the contract "shall remain in effect until the parties' obligations hereunder have been fulfilled," PAA § 16 (PTX 906 at WATERST000482), is inconsistent and incompatible with the authority of a principal, who in an agency relationship may terminate an agent's actual authority by "a manifestation of revocation."   Restatement § 3.06; *see Haft v. Haft*, 671 A.2d 413, 420 (Del. Ch. 1995) ("Most agency powers are, of course, terminable by the grantor of the power at will.  Irrevocable powers or powers in which the holder has a property right are an exception.").  Wells Fargo owed no fiduciary duty to either of the alleged principals, who in turn had no power to give Wells Fargo interim instructions or terminate Wells Fargo's authority; as a matter of law, no agency relationship was formed.  *See, e.g.*, *Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1342 (11th Cir. 2000) (holding that a bank's "administration of [an] escrow account did not thrust on them the role of agent").  Thus,

144

Defendants' argument fails as a matter of law, for multiple, independent reasons.

3.     <u>Erroneous Instruction.</u>   Finally, if the Court decides to give any version of the proposed instruction—which it should not do because these are questions of law for the Court to decide—the Court should correct the multiple deficiencies in this instruction.  *First*, Defendants misstate the law regarding the test for creation of an agency or custodian relationship.  For the reasons discussed immediately above, holding "money on behalf of or at the request of [an] entity" does not create either an agency or custodian relationship.  A proper statement of the law of agency would inform the jury that Wells Fargo acted as an 'agent' of an entity only if a fiduciary relationship arose when that entity manifested assent for Wells Fargo to act on the entity's behalf and subject to the entity's control, and Wells Fargo manifested assent to do so.  Restatement (Third) of Agency § 1.01 (2006).   The instruction should also specify that whether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling.  *Id.* § 1.02.

*Second*, Defendants' proposed instruction improperly fails to specify that this defense does not apply to the Trust's state-law claims at all.  The Bankruptcy Court and this Court have already reached this conclusion.  Adv. D.I. 250 at 20 ("the safe harbor does not preempt [the Trust's] state law fraudulent transfer claims"); 16-mc-00201-LPS, D.I. 22 at 15 (ruling that no substantial ground for difference of opinion exists).   Defendants provide no basis for reconsideration of this decided issue, which is the law of the case.  *See, e.g.*, *In re Continental Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002) (law of the case doctrine "limits relitigation of an issue once it has been decided"); *In re Continental Airlines, Inc.*, 145 B.R. 404, 408 (D. Del. 1992) (Bankruptcy Court Order "stands as a final order and as the law of the case").

*Third*, the Court should not instruct the jury that it must decide whether the safe harbor

145

applies "before" considering the Trust's constructive fraudulent claim on the merits.  This is an affirmative defense.  It should be treated as such.

## DEFENDANTS' RESPONSE

Plaintiff withheld its twelve-page brief-like response to this proposed jury instruction until approximately 7:00 p.m. (Eastern) on June 27, less than 16 hours before final submission was due.  By waiting until the last minute, Plaintiff has deprived Defendants of a meaningful opportunity to respond.  To the extent that the Court takes any of Plaintiffs' arguments under advisement, Defendants request a fair opportunity to respond.  Any omissions in Defendants' response below are due to a lack of time, and should not be treated as concessions.

Plaintiff's interpretation of the term "financial institution" in Bankruptcy Code § 101(22)(A) flips statutory construction on its head.  When interpreting a statute, a court begins with the plain meaning of the statute's words and, if those words are clear, ends there.  *See Food Mktg. Inst. v. Argus Leader Media*, ___ S. Ct. ___, 2019 WL 2570624, at *5 (June 24, 2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself.  Where, as here, that examination yields a clear answer, judges must stop.") (citation omitted).   Just because a party disagrees with a statute's plain meaning does not create an ambiguity; a statute must have two reasonable readings before it becomes ambiguous.  *MRL Development I, LLC v. Whitecap Inv. Corp.*, 823 F.3d 195, 205 (3d Cir. 2016) ("[J]ust because party opponents may proffer different interpretations of the statutory language does not make the language ambiguous.  It just makes the court's role difficult in deciding which interpretation is persuasive.") (citation and internal quotation marks omitted).

The definition of "financial institution" in Bankruptcy Code § 101(22)(A) is susceptible to one reasonable reading only:  customers of a bank that is acting as their agent in connection with a securities contract fall within the statutory definition.

The statute reads as follows:

> The term "financial institution" means— a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer.

11 U.S.C. § 101(22)(A).  Under the statute's plain words, an entity that itself is not a traditional financial institution still qualifies under the statutory definition if it is (a) a customer of (b) a commercial or savings bank (or other covered entity) that (c) was acting as an agent or custodian for the customer (d) in connection with a securities contract.  *Id.* ("Financial institution" means "an entity that is a commercial or savings bank… ***and***, when any such … entity is acting as agent or custodian for a customer … in connection with a securities contract … ***such customer***.") (emphasis added); *see also In re Tribune Fraudulent Conveyance Litig.*, 2019 WL 1771786, at *9 (S.D.N.Y. Apr. 23, 2019) ("It is undisputed that CTC is both a 'bank' and a 'trust company.' The issues of statutory construction that are presented are thus: (1) was Tribune a 'customer' of CTC? (2) was CTC acting as Tribune's 'agent or custodian'? and (3) was CTC acting 'in connection with a securities contract'?").

All four of § 101(22)(A)'s elements are satisfied here.  First, Buyer and Defendants were "customers" of Wells Fargo.  Under the plain meaning of the term, a "customer" is a buyer or purchaser of goods or services, and encompasses parties that retain a bank like Wells Fargo to provide paying agent services in exchange for a fee.  *Tribune*, 2019 WL 1771786, at *10

147

("Tribune engaged the CTC's services as depository in exchange for a fee…. It was a 'purchaser' of CTC's 'services.'").

Second, Wells Fargo indisputably is a "commercial or savings bank."

Third, Wells Fargo was acting as agent for its customers. "Agent" is not defined in the Bankruptcy Code. Generally, an agent is "[s]omeone who is authorized to act for or in place of another." *Agent*, BLACK'S LAW DICTIONARY (10th ed. 2014); *Agent*, Merriam-Webster Dictionary (same). "At common law, '[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act.'" *Tribune*, 2019 WL 1771786, at *10 (citing Restatement (Third) of Agency § 1.01 (2006)).

Here, Wells Fargo acted for and on behalf of Buyer and Defendants. Wells Fargo received and held the merger consideration for Buyer. It then paid that consideration upon receiving satisfactory letters of transmittal—not for its own account, but on behalf of Buyer as buyer and the Defendants as sellers. When Wells Fargo paid money to Defendants, it did so in Buyer's place. Like in *Tribune*, this was a "paradigmatic principal-agent relationship." *See Tribune*, 2019 WL 1771786, at *11 ("CTC was entrusted with billions of dollars of Tribune cash and was tasked with making payments on Tribune's behalf to Shareholders upon the tender of their stock certificates to CTC. This is the paradigmatic principal-agent relationship.").

Finally, the merger agreement here was a "securities contract." *See In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *11 (Bankr. D. Del. June 20, 2016) (holding that merger agreement in this case was a securities contract).

Buyer and Defendants are "customers" of a "financial institution" acting as their "agent" in connection with a "securities contract," and therefore are "financial institutions" under the plain terms of Bankruptcy Code § 101(22)(A).  The analysis ends there.

Plaintiff's reading of § 101(22)(A) as not including "customers" of a covered entity belies the statute's words.  Section 101(22)(A) has two parts:  first, it lists a series of entities that are themselves "financial institutions" (banks, trust companies, etc…).  Second, it states that customers of these entities also fall within the statutory definition of "financial institution" if the entity acts as the customer's agent in connection with a securities contract.  11 U.S.C. § 101(22)(A) ("The term 'financial institution means … [banks, trust companies, etc.] *and*, when any such … entity is acting as agent or custodian for a customer … in connection with a securities contract (as defined in section 741) *such customer*.") (emphasis added).  These words openly include customers within the statutory definition of "financial institution."

Plaintiff zeroes in on the word "and" that separates the two parts of § 101(22)(A), and suggests that this single word somehow excludes "customers" from the definition.  There is no reasonable reading of the language that supports this conclusion.  The word "and" separates the first part of § 101(22)(A) (dealing with banks and other institutions) from the second part of § 101(22)(A) (dealing with customers).  The term "financial institution" includes both that first category of institutions "*and*" that second category of customers.  Plaintiff's attempt to interpret the word "and" to mean "and not" makes no sense.

Plaintiff also relies on policy or legislative history arguments, for example, the argument that reading § 101(22)(A) according to its plain terms over-expands the § 546(e) safe harbor.  But because the words of the statute are clear, statutory construction ends there.  The Court should not deviate from a statute's clear words for policy reasons.  *See Connecticut Nat'l Bank v.*

*Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (citation omitted).

In any event, Plaintiff's argument that applying the statute according to its terms would create a parade of horribles is overstated. Contrary to Plaintiff's assertion, not "every" transaction in the commercial world would be protected by the safe harbor. The safe harbor applies to covered entities participating in securities transactions. "Newspapers, grocery stores, individuals" and the like typically would not fall into this definition, because they typically do not engage in covered securities transactions. Section 546(e) would not swallow fraudulent transfer law.

Likewise, Plaintiff exaggerates when it argues that applying the statute according to its terms would run counter to *Merit Management*. In *Merit Management*, the Supreme Court specifically declined to address the scope of the definition of "financial institution." *Merit Mgmt. Group, L.P. v. FTI Consulting, Inc.*, 138 S. Ct. 883, 890 n.2 (2018) ("The parties here do not contend that either the debtor or petitioner in this case qualified as a 'financial institution' by virtue of its status as a 'customer' under § 101(22)(A).… We therefore do not address what impact, if any, § 101(22)(A) would have in the application of the § 546(e) safe harbor."). And at oral argument, Justice Breyer posed a question reflecting an understanding consistent with the statute's plain meaning. *See Merit Mgmt.*, No. 16-784, Nov. 6, 2017 Hr'g Tr. at 16, 18-19 ("the definition of financial institution . . . is also the customers of each of those financial institutions in an instance where the bank is acting as agent or custodian for a customer. . . . So why doesn't that cover it?").

Plaintiff next attacks *Tribune*, first on the ground that it is the "only" case in 35 years to suggest that a customer may be a "financial institution." That is not so, as *Merit Management*

150

itself recognized this issue.  *See supra*; *Merit Mgmt. Group, L.P.*, 138 S. Ct. at 890 n.2.  The reason why this issue has arisen for the first time now, after *Merit*, is because under pre-*Merit* law in most circuits (including this one), *all* transfers passing through a financial institution intermediary were protected.  *See, e.g.*, *Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.)*, 590 F.3d 252, 257 (3d Cir. 2009).  There was no reason to go any further and establish that the transferor or transferee was a "customer."

Plaintiff also attacks *Tribune* on the ground that it is *dicta*.  This too is wrong.  *Tribune* denied leave to amend the complaint for two alternative, independent reasons:  (1) prejudice; and (2) amendment would have been futile because the transferor company was a "financial institution" under § 101(22)(A) and therefore was protected by the safe harbor.  *Tribune*, 2019 WL 1771786, at *6, 9–12.  The fact that a court provides two alternative grounds for granting relief does not render either ground *dictum*.  *See, e.g.*, *United States v. Shakir*, 616 F.3d 315, 319 n.1 (3d Cir. 2010) (noting that each alternative basis for a decision is not dictum but rather a valid holding of the court); *Kushner v. Winterthur Swiss Ins. Co.*, 620 F.2d 404, 408 n.4 (3d Cir. 1980) ("When two independent reasons support a decision, neither can be considered obiter dictum; each represents a valid holding of the court.").

Plaintiff next argues that the arrangement between Wells Fargo and the parties was not an "agency" relationship.  But as *Tribune* held, when parties entrust an entity to hold cash on their behalf and to make payments upon receipt of stock certificates, that is a classic common law agency relationship.  *Tribune*, 2019 WL 1771786 at *11 ("CTC was entrusted with billions of dollars of Tribune cash and was tasked with making payments on Tribune's behalf to Shareholders upon the tender of their stock certificates to CTC.  This is the paradigmatic principal-agent relationship.").

The Paying Agent Agreement's disclaimer of a fiduciary relationship does not change the nature of the parties' relationship.   Although the Paying Agent Agreement states that Wells Fargo's duties "shall be deemed purely ministerial in nature, and [Wells Fargo] shall under no circumstances be deemed a fiduciary for any of the parties to the [Paying Agent] Agreement," a party may not "disclaim" an agency relationship where one otherwise exists.  For example, in *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 452 (S.D.N.Y. 2015), the court held that "where a writing erects the essential structure of an agency relationship, even an explicit disclaimer cannot undo it."  Courts will look past the labels used by the parties to the overall purpose of the agreement, including the level of direction and control by the principal over the agent.  *Id.*; *Pine River Master Fund Ltd. v. Amur Fin. Co.*, 2017 WL 4023099, at *7 (Del. Ch. Sep. 13, 2007) ("While Amur noted at oral argument that the Credit Agreement disclaims any 'fiduciary relationship' between the Administrative Agent and the Lender, this does not negate that the Credit Agreement still provides for an agency relationship between the Administrative Agent and the Lender.").   Thus, the Paying Agent Agreement's disclaimer language does not change the essential agency nature of the relationship between Wells Fargo and the parties.

Finally, although Plaintiff objects that Bankruptcy Code § 546(e) does not apply to state law claims, that statement is clearly wrong.  On its face, Bankruptcy Code § 546(e) bars state law claims brought pursuant to Bankruptcy Code § 544.  *See* 11 U.S.C. § 546(e) ("Notwithstanding sections ***544***, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer….") (emphasis added).  What Plaintiff apparently means is that Bankruptcy Code § 546(e) does not apply to assigned state law claims.  But that too is a live issue that has been raised in the pretrial order for review by this Court.  Contrary to Plaintiff's statement, this Court

has not ruled on the question; rather, this Court denied interlocutory review.  For the reasons expressed in the pretrial order, this Court should conclude that Bankruptcy Code § 546(e) protects against assigned fraudulent transfer claims.  *See Noteholders v. Large Private Beneficial Owners (In re Tribune Co. Fraudulent Conveyance Litig.)*, 818 F.3d 98 (2d Cir. 2016) (holding that Bankruptcy Code § 546(e) preempts state law fraudulent transfer claims).

For these reasons, Defendants' instructions are consistent with the plain language of Bankruptcy Code § 101(22)(A) and with post-*Merit Management* case law interpreting that statute.  *Tribune*, 2019 WL 1771786 at *9–12.

### 3.12.   Release Defense [DISPUTED]

#### DEFENDANTS' PROPOSAL

Defendants assert that on or about December 26, 2012, Physiotherapy and Court Square's "Buyer" subsidiary released Defendants from the claims asserted in this case, and did so not only on their own behalf, but on behalf of their "successors" and "assigns," including Plaintiff, which has agreed to give half of any recovery in this case to Court Square.  Plaintiff disputes that its claims in this case are within the scope of that Release.  Defendants bear the burden to prove this defense by the preponderance of the evidence.  If you find that the Release applies to any of Plaintiff's claims, you must find in favor of Defendants on such claims.

#### AUTHORITY

*In re Physiotherapy Holdings, Inc.*, 2017 WL 6524524, at *12 (D. Del. Dec. 21, 2017) (Stark, J.) ("the scope of the Release may present a disputed issue of fact").

#### PLAINTIFF'S OBJECTION

The Court should not instruct the jury on Defendants' purported release defense because its legal validity has already been adjudicated and determined to be inapplicable against the Trust in this case as a matter of law.  At the outset of this case, Defendants moved to dismiss the Trust's complaint based on a release between the parties to the Merger Agreement (*i.e.,* Physiotherapy and an entity associated with Court Square).  Adv. D.I. 107 at 22, 53-59.  The Bankruptcy Court denied that motion, ruling as a matter of law that "because the Trustee was not a party to the Release *he is not bound by the terms of the agreement*."  Adv. D.I. 250 at 30 (emphasis added).  As the Court explained, given that a pre-petition debtor cannot pursue fraudulent transfer claims in bankruptcy, "[i]t follows that the pre-petition debtor may not waive such claims either.  The avoidance powers under the Code are within the unique purview of the

trustee, and courts have noted that 'prior to bankruptcy a debtor may not waive bankruptcy rights that inure to the benefit of unsecured creditors not a party to that waiver.'" *Id.* at 30-31 (citation omitted); *see also Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153-55 (3d Cir. 1989) (trustee not bound on avoidance claims by pre-petition contract of the debtor). The Trust's claims in this case are brought on behalf of the bankruptcy estate and its creditors, neither of which was a party to the release.

Defendants requested interlocutory review of the Bankruptcy Court's ruling that the release does not apply to the Trust's claims, and this Court denied review on the grounds that Defendants had not "identified an issue on which there exists substantial grounds for disagreement." 1:16-mc-00201-LPS, D.I. 22 at 24. Ignoring this ruling, Defendants selectively quote this Court's separate statement that "the scope of the Release may present a disputed issue of fact." *Id.* That statement does not imply that enforceability of the release is a jury issue. To the contrary, the Court explained that Defendants' arguments for interlocutory review were erroneous for multiple reasons—not only because there were no "substantial grounds for disagreement" with the Bankruptcy Court's ruling that the release does not apply as a matter of law, but also because there would be factual disputes regarding the release's scope even if it did apply. This alternative ground for denying review does not support Defendants' assertion that enforceability of the release is a jury issue.

The Courts' ruling that the pre-petition release does not create a defense as a matter of law is the law of the case. Defendants do not identify any basis for reconsideration of this ruling, and there is none. *See N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (reconsideration may be appropriate only if there is "(1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; [or] (3) the need

to correct clear error [of law] or prevent manifest injustice") (quotations and citations omitted; alterations in original).  Accordingly, the Court should not instruct the jury on this inapplicable defense.

**DEFENDANTS' RESPONSE**

Plaintiff argues that Defendants no longer have a release defense because the Bankruptcy Court denied Defendants' motion to dismiss and this Court denied interlocutory review.  But neither court dismissed this defense.  On the contrary, this Court stated that "***the scope of the Release may present a disputed issue of fact***."  *Physiotherapy*, 2017 WL 6524524, at *12 (Dec. 21, 2017) (emphasis added).  Since then, facts relating to the Release have been adduced, and Plaintiff has not moved for or been granted summary judgment on Defendants' Release defense.  Accordingly, Defendants' Release Defense remains an issue for the jury to decide, and they should be properly instructed on it.  *See Drippe v. Gototweski*, 434 F. App'x 79, 81 (3d Cir. 2011) (holding that where defendant "raised [an] affirmative defense in his responsive pleading . . . he was, therefore, entitled to pursue th[e] defense at trial.").

Furthermore, Plaintiff asserts, above, that it seeks to recover "losses by Court Square, which is part of the bankruptcy estate."  Pl.'s Resp. & Obj. re Instr. 3.13, *supra*.  Yet in the Merger Agreement and the Release (which Plaintiff itself describes as an amendment to the Merger Agreement) Court Square promised not only to release its own claims, but to cause its successors and assigns—*i.e.*, Plaintiff—to release its claims as well.  Plaintiff may contend that it is not Court Square's successor or assign, or that the Release does not otherwise apply to Plaintiff, but it cannot also simultaneously contend that it is allowed to recover the losses that Court Square released.  In any event, these are disputed issues of fact for the jury to resolve.  *See Physiotherapy*, 2017 WL 6524524, at *12.

156

### 3.13.   Damages [DISPUTED]

**PLAINTIFF'S PROPOSAL**

The Court has already decided on the amount of damages to be awarded for the Trust's federal law claims.  Your role is to decide if Defendants are liable to the Trust on these claims.

**AUTHORITY**

Adv. D.I. 624.  As set forth elsewhere (D.I. 47 at 1-2, 11-13; D.I. 84 at 1-8; PTO 60-66 & Exh. 6), the Bankruptcy Court determined the measure of damages in this case on summary judgment.  *See* Adv. D.I. 624.  Defendants' argument that the Summary Judgment Order may be ignored fails for the reasons set forth in these submissions—including because Defendants did not seek *de novo* review of the Summary Judgment Order, which accordingly is binding.  *See, e.g.*, *Leonard v. Dorsey & Whitney LLP*, 553 F.3d 609, 620 (8th Cir. 2009) (a party's "failure to file objections eliminates not only the need for de novo review, but *any* review by the district court") (emphasis in original); *Continental Cas. Co. v. Dominick D'Andrea, Inc.*, 150 F.3d 245, 250 (3d Cir. 1998) (with respect to magistrate judge ruling, "the district judge need take no time reviewing the matter unless a party objects").  Neither the Seventh Amendment nor Article III creates a unilateral right to disregard summary judgment rulings at trial.  *See, e.g.*, *Peretz v. United States*, 501 U.S. 923, 939 (1991) (where "'de novo review is required to satisfy Article III concerns, it need not be exercised unless requested by the parties'"); *Kontrick v. Ryan*, 540 U.S. 443, 453 (2004) (Congress "confine[d] review to 'matters to which any party has timely and specifically objected'") (quoting 28 U.S.C. § 157(c)(1)).

Under the Bankruptcy Court's ruling, the only facts that are relevant are the amounts of the transfers and prior settlements.  *See id.* at 16-20 & n.7.  The amount of settlements is subject to a stipulation of fact, PTO at 6, and Defendants agree that "[t]here is no dispute . . . as to the

158

amount Defendants received." D.I. 42 at 8. Thus, in light of the Bankruptcy Court's rulings as to the measure of damages, there are no contested facts for the jury to resolve with respect to damages.

### DEFENDANTS' OBJECTION

This Court has ***not*** "already decided on the amount of damages." Nor did the bankruptcy court—indeed, it expressly stated ***exactly the opposite***, both in its order and its accompanying opinion. *See* Adv. D.I. 625 ("[T]he amount of damages [is still] to be determined pending the liability phase of the litigation."); Adv. D.I. 624 at 16 (opining "***not on the amount***, which remains at issue, but on the ***concept***" of damages) (emphases added). Moreover, as Defendants explained in their opposition to Plaintiff's *Daubert* motion, *see* D.I. 63 at 7-15, and in their pretrial conference statement, the bankruptcy court's advisory opinion about damages is not binding on this Court or the jury. On the contrary, the Court should leave the determination of damages to the jury—the bankruptcy court's advisory opinion "on the concept" of damages notwithstanding—as required by the Seventh Amendment and Article III of the Constitution.

### DEFENDANTS' COUNTERPROPOSAL

If, but only if, you found in favor of the Plaintiff on either its actual fraudulent transfer claim or its constructive fraudulent transfer claim, then you must decide the amount of damages, if any, to award. Both claims provide for the same remedy: a reversal or partial reversal of the transfer. Therefore, you should only award damages for one claim, even if you found for the Plaintiff on both of its claims. Plaintiff may not recover once for its actual fraudulent transfer claim and then separately for its constructive fraudulent transfer claim.

Plaintiff must prove the amount of damages by a preponderance of the evidence. Damages cannot be speculative or punitive. You may not award Plaintiff a windfall—in other

words, damages, if any, cannot exceed the amount of the Noteholders' original $210 million loan amount, minus any recoveries the Noteholders have already recovered or received.

As I have explained before, Court Square's legal claims are not at issue in this case because Court Square has previously released its claims. Accordingly, losses suffered by Court Square are not recoverable are not recoverable and you should not consider them when awarding damages.

The parties have offered conflicting evidence, including expert testimony, on these issues and now the amount of damages, if any, is for you to decide. The fact that I am instructing you about damages does not mean that the Court believes that one party or the other should win in this case. My instructions about damages are for your guidance only in the event you find in Plaintiff's favor.

## AUTHORITY

*In re Cybergenics Corp.*, 226 F.3d 237, 244 (3d Cir. 2000) ("courts have limited a debtor's exercise of avoidance powers to circumstances in which such actions would in fact benefit the creditors, not the debtors themselves"); *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 524 (3d Cir. 1999) ("the rights of an assignee can rise no higher than those of the assignor," so the assignee "may recover only those damages to which [the assignor] was entitled"); *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 797-98 (7th Cir. 2009) (Posner, J.) ("If and when [the creditors] are paid in full, the wrong committed by the shareholders will have been righted and there will no reason to deny their claims to whatever money is left over. . . . Since the sale is to be ignored, any money received from the sale of the company's assets that is not owed to a creditor belongs to the original shareholders."); *In re Allonhill, LLC*, No. 14-10663 (KG), 2019 WL 1868610, at *52 (Bankr. D. Del. Apr. 25, 2019)

("[E]ven if a plaintiff prevails on its avoidance claims, it cannot recover in excess of outstanding creditor claims.  To hold otherwise would result in a windfall to equity . . . that Section 550 and Third Circuit law precludes.") (citing *In re Majestic Star Casino, LLC*, 716 F.3d 736, 761 n.26 (3d Cir. 2013)); *Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 482 (W.D. Tex. 2013) (damages should be limited to outstanding creditor claims because otherwise, "[n]ot only will the banks (and their successors) walk away with ownership of [the company] and several hundred million dollars in loan payments, they will recoup the bulk of the loan they made with full knowledge of the risk.  In essence, the lenders will have stolen" the company); *In re Tronox Inc.*, 464 B.R. 606, 618 (Bankr. S.D.N.Y. 2012) ("Bankruptcy courts have used their equitable powers in appropriate cases to reduce the estate's recovery by the value of consideration paid by a transferee, even in cases of actual fraud."); *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80, 94 (S.D.N.Y. 2008) ("[T]he Bankruptcy Code's avoidance provisions can only be asserted to benefit a creditor of the debtor in question.  '[A] transaction can be avoided under section 544(b) only to the extent the avoidance benefits unsecured creditors.'") (citation omitted); *In re Grove-Merritt*, 406 B.R. 778, 811 (Bankr. S.D. Ohio 2009) ("The entire transfer need not be undone. A fraudulent transfer should be avoided only to the extent creditors were harmed.") (citation omitted); *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("Fraudulent transfer laws are intended to promote payment to creditors; that is, the statutes are remedial, rather than punitive," avoidance is "only for the benefit of creditors," and "when the fraudulent transfer is avoided, the parties are restored to their previous positions."); *In re Murphy*, 331 B.R. 107, 121–26 (Bankr. S.D.N.Y. 2005) (alleged fraudulent transfer would be avoided "only to the extent necessary to satisfy allowed . . . creditor claims"; "The purpose of fraudulent conveyance law, whether state or federal, and of Section 548 is to

prevent harm to creditors by a transfer of property from the debtor….  Fraudulent transfer laws were not designed to alter the legal relationship between the transferor and transferee.") (citation omitted); Robert B. Bruner and Gerard G. Pecht, *The Unexplored Limits of* Moore v. Bay*: Statutory and Equitable Basis for Limiting Money Damage Awards on Fraudulent Transfers Claims*, 26 No. 3 J. Bankr. L. & Prac. 253, 253, 264 (June 2017) ("if the purpose of fraudulent transfer law is to remedy harm to creditors, then what purpose is served by permitting a money judgment in an amount greater than what is actually necessary to satisfy the claims of creditors who would have standing to bring a fraudulent transfer claim under state law? . . . [P]ermitting a recovery beyond what is necessary to satisfy the claims of innocent creditors necessarily penalizes the fraudulent transfer defendant and grants a windfall to parties in interest that could not assert a fraudulent transfer claim on their own behalf outside of bankruptcy.") (footnote omitted).

## PLAINTIFF'S RESPONSE AND OBJECTIONS TO COUNTERPROPOSAL

The Court should not instruct the jury on damages because the Summary Judgment Order is binding and there are no contested issues of fact for the jury to determine with regard to damages.  If the Court does instruct the jury on damages, it should not give Defendants' proposed instruction, which contains numerous legal errors.

1. Defendant's proposed instruction that "damages, if any, cannot exceed the amount of the Noteholders' original $210 million loan amount" is wrong on the law.  As the Bankruptcy Court correctly held, "[n]umerous cases stand for the proposition that a recovery under Section 550(a) is not capped by the amount of the creditor claims."  Adv. D.I. 624 at 16 (citing *Stalnaker v. DLC, Ltd.*, 376 F. 3d 819 (8th Cir. 2004); *In re Leonard*, 125 F. 3d 543, 545 (7th Cir. 1997); *In re Tronox Inc.*, 464 B.R. 606, 613-14 (Bankr. S.D.N.Y. 2012); and *MC Asset Recovery, LLC v.*

*S. Co.,* 2006 WL 5112612, *6-7 (N.D. Ga. Dec. 11, 2006)); *see also, e.g.*, *In re Coleman*, 426 F.3d 719, 723, 725 (4th Cir. 2005); *In re Acequia, Inc.*, 34 F.3d 800, 810-12 (9th Cir. 1994). This holding is compelled by the language of the statute, which allows a trustee to recover "the property transferred" for "the benefit of the estate," without reference to the amount of creditor claims. 11 U.S.C. § 550(a); *see also, e.g.*, *5-550 Collier on Bankruptcy* ¶ 550.02 (4th ed. 2017) (explaining that section 550(a) "does not impose a limit on recovery of the avoided transfer" and "the full payment of creditors does not *per se* cap the recovery on avoidance actions under section 550(a)"); *cf. Moore v. Bay*, 284 U.S. 4, 5 (1931) (pre-§ 550 case holding that a trustee may avoid a fraudulent transfer without regard to the size of the claim of the credit whose rights and powers the trustee was asserting); *Tronox*, 464 B.R. at 616 ("Congress intended to incorporate *Moore*'s rule of complete avoidance into § 550.").  The cases on which Defendants rely support only the inapplicable principle that a "*debtor* is not entitled to benefit from any avoidance," which the same Bankruptcy Court judge that decided *In re Allonhill,* 2019 WL 1868610, *52 (Bankr. D. Del. Apr. 25, 2019), recognized did *not* apply in this case, where the Trust is the Plaintiff and the Debtor will not benefit from a recovery.  *See In re Majestic Star Casino, LLC*, 716 F.3d 736, 761 n.26 (3d Cir. 2013) ("A *debtor* is not entitled to benefit from any avoidance") (emphasis added); *In re Cybergenics Corp.*, 226 F.3d 237, 244 (3d Cir. 2000) ("courts have limited a *debtor's* exercise of avoidance powers to circumstances in which such actions would in fact benefit the creditors, not the *debtors* themselves") (emphasis added).

2. Defendants' proposed instruction not to award a "windfall" is not only wrong on the law, as discussed above, but also biased and improper.

3. Defendants' proposal that the jury be instructed to subtract "any recoveries the Noteholders have already recovered or received" is erroneous.  Damages on the Trust's federal-

law claims are measured by the size of Defendants' fraudulent transfer, not the creditors' claims. Even if such facts were proper considerations for the jury (they are not), Defendants' vague language regarding "recoveries" invites error, particularly in light of Defendants' plans to attempt to put the "irrelevant" Select Medical sale before the jury.  Adv. D.I. 624 at 19 ("The cases make it clear that the appreciation of equity from the Select Medical sale is irrelevant.") (citing authorities).

4.      The Court should not instruct the jury that Court Square's claims were released. The release is inadmissible.  *See* PTO Ex. 6 (MIL No. 3).  Even if admissible, Defendants provide no basis for instructing the jury that Court Square's claims were released.  Nor should the Court instruct the jury to disregard losses by Court Square, which is part of the bankruptcy estate, as the Bankruptcy Court found.  Adv. D.I. 624 at 17-18 (citing *Mellon Bank, N.A. v. Dick Corp.*, 351 F. 3d 290, 293 (7th Cir. 2003); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 972 (Bankr. D. Del. 1994)); *see also Kipperman v. Onex Corp.*, 411 B.R. 805, 876 (N.D. Ga. 2009) ("The 'estate' comprises all interests, including all creditors and equity."); *In re Bayou Group, LLC*, 372 B.R. 661, 664 n.2 (Bankr. S.D.N.Y. 2007) (permitting "trustee to assert fraudulent conveyance claims *for the benefit of innocent equity investors*, as well as creditors"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 972 (Bankr. D. Del. 1994) ("Section 550(a) requires a benefit to the 'estate,' not to creditors.  'Estate' is a broader term than 'creditors.'"); *Tronox*, 464 B.R. at 613-15 (the "plain words of the statute" disprove attempts to limit recovery to unpaid creditors' claims because "[t]he concept of the estate is not limited to the interest of creditors," but instead is "comprised of, among other things, 'all legal *or equitable* interests of the debtor in property as of the commencement of the case'") (quoting 11 U.S.C. § 541).  Nor can Defendants collaterally attack the confirmed Bankruptcy Plan, under which Court Square is entitled to share in Litigation

Trust recoveries, in this proceeding.  Adv. D.I. 624 at 20.

5.      For these reasons, the Trust objects to instructing the jury that it must decide damages.   Nevertheless, if the Court decides to do so, then without waiving the Trust's objections, the Court should instruct the jury consistently with the Summary Judgment Order, as follows:

### PLAINTIFF'S COUNTER-PROPOSAL

If you find in favor of the Plaintiff on either its actual or constructive fraudulent transfer claim under federal law, then you must decide the amount of damages to award.  The measure of damages for these claims is the amount of the fraudulent transfer received by Defendants.  You must award the full amount of the fraudulent transfer, and should not reduce that award for any reason.  If appropriate, the Court may further adjust the award after the trial.

### DEFENDANTS' RESPONSE

The damages issue has been addressed in the briefing on Plaintiff's *Daubert* motion and its Motion in Limine No. 1.  Plaintiff's last-minute additional briefing is improper.  In any case, Plaintiff is wrong.  Damages have not been decided, and the bankruptcy court's refusal to cap them ***as a matter of law*** does not mean the jury cannot decide what to award, if anything, based on the ***facts***.  That is what the jury ***must*** decide.  Indeed, the court in *In re Tronox*, 464 B.R. 606, on which Plaintiff relies, held that a plaintiff "overstates its case when it implies that there is no cap on plaintiffs' potential recovery other than the value of the property fraudulently transferred."  *Id.* at 617.  Fraudulent conveyance law is "remedial rather than punitive," and the facts may require reduction of any recovery "by the value of consideration paid by a transferee, even in cases of actual fraud."  *Id.* at 618.  The bankruptcy court here did not factor that into its analysis, apparently because it concluded, as in *Tronox*, that "trial was necessary to determine

165

what, if anything, would reduce damages."  Adv. D.I. 624 at 15.  At trial, the jury can and should consider the totality of the circumstances to reduce or offset the alleged damages.  *See id.*; *Tronox*, 464 B.R. at 618 (reduction not given as a matter of law on summary judgment might be given "based on the facts proved at trial").  Plaintiff also fails to recognize that "the power to avoid is not the same as the power to recover."  *Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 481 (W.D. Tex. 2013).   In other words, even where the entire amount of a transfer is "avoidable," it is not necessarily ***recoverable***.  That depends on the facts, and the "one consistent vein traveling through all of these cases"—including the cases Plaintiff cites—"is the fact-specific nature of the inquiry."  *Id.* at 481.  Plaintiff's proposed instruction asks the jury to ignore the facts and has no basis in the law.  The Court should reject it.

### 3.14.   Good Faith For Value Defense [DISPUTED]

### DEFENDANTS' PROPOSAL

Defendants have raised the defense that they are entitled to offset any damages award by the value of their shares in Physiotherapy that they gave up as part of the transaction. In order to establish this defense, Defendants must prove by a preponderance of the evidence that (1) Defendants acted in good faith in selling their shares in Physiotherapy to Court Square; and (2) the shares they sold had a positive value at the time of the transfer.  To evaluate this defense, you will be required to determine both (1) whether the Defendants acted in good faith; and (2) whether the shares had positive value at the time of the transfer, and if so, what that value was.  I will use your determinations, if appropriate, to subtract the value of the shares from the Plaintiff's damages award for certain of its legal claims.

### AUTHORITY

11 U.S.C. § 548(c); *In re Hannover Corp.*, 310 F.3d 796, 802 (5th Cir. 2002) (§ 548(c) "looks at value from the perspective of the transferee: How much did the transferee 'give'? The concern here, quite properly, is for the transferee's side of the exchange, not the transferor's gain."); *Brown v. Gen. Elec. Capital Corp. (In re Foxmeyer Corp.)*, 286 B.R. 546, 581 (Bankr. D. Del. 2002) ("[A] determination regarding 'good faith' under 11 U.S.C. § 548(c) can thus be made by simply ascertaining whether a transferee was free from either fraudulent intent itself or knowledge as to the fraudulent intent of its transferor."). *Peltz v. Hatten*, 279 B.R. 710, 735-36 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003) ("To the extent the Liquidating Trustee proves that the reasonably equivalent value of CT Tel was less than $68 million, he may recover the difference between $68 million and this 'reasonably equivalent value.' . . . The 'value' transferred by the Hatten Sellers at Closing was all issued and

167

outstanding stock of HCHC, whose sole assets, were, in turn, all the issued and outstanding stock of CT Tel.").

## **PLAINTIFF'S OBJECTION**

The Court should not instruct the jury on Defendants' "good faith for value" defense because the defense is not viable as a matter of law.  The statute on which Defendants rely provides that, in certain circumstances, "a transferee . . . that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee . . . gave value *to the debtor* in exchange for such transfer . . . ."  11 U.S.C. § 548(c) (emphasis added); *see also* 6 Del. Code § 1308(d) ("a good-faith transferee . . . is entitled, to the extent of the value *given the debtor* for the transfer, . . . to . . . a reduction in the amount of the liability on the judgment") (emphasis added).  As this statutory language makes clear, even if all other statutory requirements are satisfied, this defense *only* applies where a transferee gives value to the debtor in exchange for a transfer.  *See, e.g., In re Positive Health Mgmt.*, 769 F.3d 899, 908 (5th Cir. 2014) ("Courts have thus netted the amounts received in a fraudulent transfer against *the value given to the debtor*.") (emphasis added); *Adler, Coleman Clearing Corp.*, 263 B.R. 406, 471 (S.D.N.Y. 2001) (a transferee is entitled to a setoff "only to the extent the transferee gave value *to the debtor* in exchange") (emphasis added); *In re Brooke Corp.*, 568 B.R. 378, 416–17 (Bankr. D. Kan. 2017) (transferee had no defense under Section 548(c) because it "did not transfer any value *directly to [the debtor]*") (emphasis added); *In re Lockwood Auto Grp., Inc.*, 370 B.R. 652, 657 (Bankr. W.D. Pa. 2007) (transferee had no defense under § 548(c) because the value transferee provided did not "flow[] to the Debtor"; rather, it flowed to a third party); *In re Energy Sav. Ctr., Inc.*, 61 B.R. 732, 736 (E.D. Pa. 1986) (similar).

Because the cancellation of Defendants' stock did not confer value on the Debtor, the

good faith for value defense does not apply as a matter of law.  *In re Oxford Homes, Inc.* is illustrative.  180 B.R. 1 (Bankr. D. Me. 1995).  The seller transferred the outstanding stock of the debtor to the buyer in exchange for a payment made by the debtor and financed with debt.  *Id.* at 4-6.  Because the seller "transferred its 100% holdings in [the debtor] to [the buyer] (not to the debtor)," the debtor "received nothing."  *Id.* at 6.  And because the debtor "received no value" from the seller in exchange for the transfer, the good faith defense did not apply as a matter of law.  *Id.* at 11.

Similarly, in *In re Structurelite Plastics Corp.*, the court explained that "Defendants gave nothing of value to the Debtor" when they sold their ownership interest in the debtor in an LBO. 193 B.R. 451, 461-62 (Bankr. S.D. Ohio 1995), *rev'd in part on other grounds*, 224 B.R. 27 (B.A.P. 6th Cir. 1998).  And in *In re Bay Plastics, Inc.*, the court reached the same conclusion as to the good faith defense under UFTA:

> In this case the selling shareholders gave up their shares of stock in the debtor in exchange for their payment of $3.5 million.  However, this provision is not applicable in this case, because the shareholders did not transfer their shares or give any other value to the debtor.  The shares went to BPI, the new parent corporation of Bay Plastics, and from there to Milhous.  The debtor itself received neither shares nor money.  This did not constitute 'value given the debtor,' within the meaning of UFTA § 8(d) or California Civil Code § 3439.08(d).  Thus the good faith defense fails.

187 B.R. 315, 336 (Bankr. C.D. Cal. 1995).  As discussed in connection with Instruction 3.6, the cancellation of Defendants' stock did not give value to the Debtor as a matter of law.  This defense fails as a matter of law, and no instruction should be given.

In addition, if the Court gives an instruction on this defense, it should modify Defendants' proposed instruction by clarifying that (1) only value given to the Debtor may be considered, and (2) this defense does not apply if the Debtor was insolvent.  The value of consideration given in exchange for a transfer is "determined at the time the transfer is made."

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2018 WL 1442312, at *5 (Bankr. S.D.N.Y. Mar. 22, 2018). At the time the transfer was made, Physiotherapy had taken on $310 million in debt, and as the Trust intends to show at trial, Physiotherapy's assets were worth no more than $243 million. If the jury accepts the Trust's evidence on this issue, then the Debtor was insolvent. And if the jury finds that the Debtor was insolvent, then the stock of its former equity holders was worthless—and cannot have provided any value for purposes of this defense. Accordingly, if the jury finds that the Debtor was insolvent, this defense does not apply as a matter of law.

Finally, Defendants' proposed instruction is misleading because it fails to explain the requirements for a finding of good faith. The good faith defense necessitates "a factual determination that requires that the transferee acted without fraudulent intent and did not collude with the debtor or otherwise actively participate in the fraudulent transfer scheme." *In re Incare, LLC*, 2018 WL 2121799, at *14 (Bankr. E.D. Pa. May 7, 2018).

"First, good faith is determined according to an objective or 'reasonable person' standard, and not based on the subjective knowledge or belief of the transferee. Courts thus look to what the transferee objectively knew or should have known concerning the nature of the underlying circumstances involved with the transfer." *In re Lockwood Auto Grp., Inc.*, 428 B.R. 629, 636 (Bankr. W.D. Pa. 2010); *Ameriserv Fin. Bank v. Commercebank, N.A.*, 2009 WL 890583, at *5 (W.D. Pa. Mar. 26, 2009) (citing authorities showing that "federal courts have reached a consensus that 'good faith' under the Bankruptcy Code provisions is determined according to an 'objective' or 'reasonable person' standard and not on the subjective knowledge or belief of the transferee, and that under this standard the courts look to what the transferee objectively knew or should have known") (quotations and citations omitted).

170

"Second, once a transferee is on notice of suspicious circumstances regarding a transfer, it is obliged to conduct a diligent investigation which must 'ameliorate' the issues that placed it on inquiry notice in the first place.  The failure to do so can be fatal to a good faith defense." *Lockwood*, 428 B.R. at 636; *Ameriserv* 2009 WL 890583, at *5 (similar).

"Third, among the non-exhaustive circumstances that may preclude a finding of good faith are notice of the transferor's fraudulent purpose, an underlying fraud, the transferor's unfavorable financial condition or insolvency, the improper nature of a transaction, and, the voidability of the transfer."  *Lockwood*, 428 B.R. at 636; *Ameriserv* 2009 WL 890583, at *6 (same).

For these reasons, the Trust objects to giving the jury any instruction on this defense.  Nevertheless, if the Court decides to do so, then without waiving the Trust's objections, the Trust proposes the following alternative instruction:

## PLAINTIFF'S COUNTERPROPOSAL

Defendants assert a "good faith for value" defense.  In order to establish this defense, Defendants must prove by a preponderance of the evidence that (1) they received the transfer of $248.6 million in good faith; (2) they received the transfer in exchange for value; and (3) they are seeking a setoff only to the extent that they gave value to Physiotherapy in exchange for the transfer.

For the first element—whether Defendants received the transfer in good faith—you must consider what Defendants knew or should have known concerning the underlying circumstances relating to the transfer.  If Defendants were on notice of suspicious circumstances but failed to conduct a diligent investigation into those circumstances, or if their investigation did not ameliorate those concerns, you should find against Defendants on their good faith defense.  For

example, if Defendants had notice of Physiotherapy's allegedly unfavorable financial condition or insolvency, the improper nature of a transaction, or of misconduct by Physiotherapy, this defense does not apply.  To show good faith, Defendants must prove that they acted without fraudulent intent and did not collude with Physiotherapy or otherwise actively participate in the fraudulent transfer scheme.

For the second element—whether Defendants gave value in exchange for the transfer— you must consider Physiotherapy's financial condition.  If you determine that the transfer rendered Physiotherapy insolvent, then Defendants did not provide any value in exchange for the transfer because shares of stock in an insolvent company have no value.

For the third element—whether Defendants gave value specifically to Physiotherapy— you must consider who received any value given by Defendants.  If you determine that Defendants' shares had value, but that value was not given to Physiotherapy, then this element is not satisfied because value given to a third party, such as Court Square, is not the same as value given to Physiotherapy.

If you find that Defendants did not act in good faith, that the transfer rendered Physiotherapy insolvent, or that Defendants did not give value specifically to Physiotherapy, then you must find against Defendants on their good faith defense.

If you determine that Defendants' shares had value, that Defendants gave that value to Physiotherapy, and that they did so in good faith in exchange for the transfer, then you must determine the value of Defendants' shares at the time of the transfer.

## DEFENDANTS' RESPONSE

Here, again—and perhaps most egregiously—Plaintiff is improperly attempting to use the jury-instruction process to obtain summary judgment on a defense on which it never moved

for summary judgment. The Court should reject Plaintiff's procedurally improper argument out of hand. In any case, Plaintiff's argument is wrong, as discussed above in connection with proposed instruction 3.6. Contrary to Plaintiff's assertions, Defendants gave value in the transaction—specifically, "[t]he 'value' transferred by the [shareholders] at Closing was all issued and outstanding stock." *Peltz*, 279 B.R. at 736. Plaintiff's counterproposal, moreover, misstates the law. For example, Plaintiff contends that Defendants cannot have provided any value if Physiotherapy was insolvent. But that is not the law—if it were, the defense would be meaningless in the context of a constructive fraudulent transfer claim, which separately requires proof of insolvency. Because Plaintiff failed to offer its counterproposal with sufficient time for Defendants to consider whether there might be an acceptable compromise between the two proposals, Defendants reserve the right to continue to meet and confer, and to respond further to Plaintiff's erroneous legal arguments and inapposite authorities as necessary.

### 3.15.   Equitable Adjustment [DISPUTED]

**DEFENDANTS' PROPOSAL**

Certain of Plaintiff's legal claims are not subject to the Good Faith For Value defense, and are instead subject to an equitable adjustment. For these claims, you may determine an amount to reduce your damages award as the equities, or fairness, may require. When deciding the amount of reduction that the equities may require, you may consider the value of the stock that Defendants gave up as part of the transaction, the value the Noteholders have already recovered, the good faith of any party, or any other factor relating to the fairness of the damages award to the parties. An equitable adjustment is different from the good faith value defense described in the prior instruction because an equitable adjustment does not necessarily require that the Defendants acted in good faith, nor does it necessarily require that the reduction reflect the pre-transaction value of the Defendants' shares in Physiotherapy. If you decide that an equitable adjustment is warranted, then you must determine the amount of the reduction, which I will use to subtract from the Plaintiff's damages award for certain of its legal claims.

**AUTHORITY**

6 Del. Code § 1308(c).  *Sauer v. Publisher Servs., Inc.*, 2016 WL 4409209, at *7 (N.D. Ga. Aug. 19, 2016) ("Plaintiff contends that, under the UFTA, the value of Plaintiff's claim is the value of the assets transferred— $139,984.80.  Subsection (c), however, provides that the value of the assets transferred is 'subject to adjustment as the equities may require.'  Those equities may be considered by the jury at trial."); *Meoli v. Huntington Nat'l Bank (In re Teleservs. Group, Inc.)*, 469 B.R. 713, 762 n.152 (Bankr. W.D. Mich. 2012) ("[T]he discretion given to the court under Section 550(a) to award value offers the same opportunity for adjustment [as state law] when only a money judgment is sought.  Indeed, it is likely as not that Congress was

174

attempting to mimic the equitable adjustment provisions of comparable state fraudulent transfer laws when it left awards of value under Section 550(a) to the court's discretion."); *Crescent Res. Litig. Trust v. Duke Energy Corp.*, 500 B.R. 464, 481 (W.D. Tex. 2013) ("[T]here are numerous examples of cases where courts have denied or limited recovery based on the equitable principles underlying the Bankruptcy Code and Section 550(a) in particular").

## **PLAINTIFF'S OBJECTION**

Defendants' proposed instruction is an invitation to error, and should not be given.

1.      At the outset, the Bankruptcy Court has already considered and rejected Defendants' contention that the Trust's damages are subject to further equitable adjustment beyond the limitations identified in the Summary Judgment Order.  Defendants pursued these same arguments on summary judgment, both as a basis to grant their motion, *see* Adv. D.I. 559 at 41, 48 (Defendants' equitable adjustment arguments on summary judgment), and as a basis to deny the Trust's cross-motion, Adv. D.I. 572 at 36 (Defendants' equitable adjustment argument in opposition to the Trust's cross-motion).  The Summary Judgment Order denied Defendants' motion, granted the Trust's, and ruled that "[a]mounts received in excess of the sale consideration *will not be a windfall*," explaining that even a recovery of the entirety of Defendants' fraudulent transfer would not make the Noteholders whole because they "would have received with interest $470,332,509 at maturity" if not for the bankruptcy.  Adv. D.I. 624 at 19-21 (emphasis added).  This issue, like the other damages issues in this case, has already been litigated and resolved.  Defendants failed to object to the Bankruptcy Court's summary judgment ruling, which is a jurisdictional defect that eliminates any basis for review.  *See* Instruction No. 3.13.

2.      Even if this issue were open to reassessment (it is not), Defendants' proposed

instruction is wrong on the merits in multiple ways.  First, under federal law, Defendants may only pursue defenses that are enumerated in the Bankruptcy Code.  *See, e.g., Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 487 (Bankr. S.D.N.Y. 2017) (ruling that "the Trustee's recovery of a cash transfer" cannot be limited "for equitable reasons" under federal fraudulent avoidance claims); *In re Tronox Inc.*, 503 B.R. 239, 332 n.121 (Bankr. S.D.N.Y. 2013) ("Damages cannot be limited in this case solely on the ground that it is 'equitable' to do so"); *In re Auto. Professionals, Inc.,* 398 B.R. 256, 261 (Bankr. N.D. Ill. 2008) ("When a trustee asserts a cause of action created under the Bankruptcy Code. . .  the defenses available are a matter of federal law."); *In re Equip. Acquisition Res., Inc.*, 2012 WL 4754949, *4 (Bankr. N.D. Ill. Sept. 28, 2012) (same); *In re Teleservices Grp., Inc.*, 444 B.R. 767, 842 (Bankr. W.D. Mich. 2011) ("This court is not empowered to create other equitable defenses.").  Indeed, Defendants' own cited authority recognizes that their proposed defense is not applicable to the Trust's federal claims:  "Section 550(a), *not state law*, dictates what the trustee may recover with respect to an avoided Section 544(b) transfer."  *In re Teleservices Grp., Inc.*, 469 B.R. 713, 762 n.152 (Bankr. W.D. Mich. 2012) (emphasis added) (rejecting argument that state-law equitable adjustment provision applies to federal claims).

3.     Nor does this defense apply under state law to the transfer of cash received by Defendants.  Under Section 1308 of the DUFTA, a fraudulent transfer plaintiff may recover either "the value of the asset transferred, as adjusted under subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less."  If and only if an award is measured by "the value of the asset transferred," subsection (c) provides that the judgment may be "subject to adjustment as the equities may require."  But Section 1308(c) is not a freewheeling invitation to award *any* amount of damages, without regard for the amount of the transfer.  It is

instead a means of recognizing that a *transferred asset's value* can change after a transfer, and when it does, the transferee may be able to claim a reduction *based on the change in value of that asset*.

As the UFTA explains, "[t]he premise of [subsection (c)] is that changes in value of the asset transferred that occur after the transfer should ordinarily not affect the amount of the creditor's recovery." UFTA § 8 cmt. 3; *see United States v. Verduchi*, 434 F.3d 17, 23 (1st Cir. 2006) ("The law sought to avoid giving creditors the windfall of the costs incurred by an innocent transferee to improve the property."). The equitable adjustment provision thus permits the Court to adjust the value of transferred property *where a transferee adds value to that property*, such as by making improvements to a transferred house or car, or where the value of the transferred property otherwise changes following a transfer. This is why a Section 1308(c) reduction can apply, if at all, *only* in connection with fraudulent transfer awards based on the value of the asset transferred, and is statutorily barred from consideration when the award is based on the size of creditors' claims, *see* 6 Del. Code § 1308(c)—the adjustment is necessarily limited to changes in the value of the transferred asset.

Here, the transferred asset was $248.6 million in cash. No authority supports "equitable adjustment" of the "value" of this cash, which has only gone up over the past seven years. None of Defendants' authorities is analogous. For example, in *Sauer v. Publisher Servs., Inc.*, 2016 WL 4409209, *7 (N.D. Ga. Aug. 19, 2016), the transferee was contractually bound to sell the transferred inventory at wholesale prices after it had been valued at retail upon transfer, thus (unlike here) decreasing the value of the transferred property following the transfer. *See* 14-cv-00698-WSD (N.D. Ga.) D.I. 58 & 65 (underlying motion *in limine* briefing). Accordingly, this defense does not apply to either the Trust's federal or state law claims.

177

4.      Even if the Bankruptcy Court had not already decided these issues against Defendants (it has), and even if the transfer of cash to Defendants were subject to "equitable" adjustment (it is not), any such adjustments would be for the Court to determine after trial, not for the jury to decide.  *See GlaxoSmithKline LLC v. Glenmark Pharm. Inc.*, 2017 WL 8948975, at *7 (D. Del. May 30, 2017) (under federal law, "equitable defenses . . . are exclusively for the District Court to decide"), report and recommendation adopted, 2017 WL 2536468 (D. Del. June 9, 2017) (Stark, J.); *Schering Corp. v. Amgen Inc.*, 969 F. Supp. 258, 269 (D. Del. 1997 (under state law, equitable defenses "would be heard by the Court, not a jury").  Defendants' own authorities make this clear.  *See Teleservs.,*469 B.R. at 762 n.152 (Bankr. W.D. Mich. 2012) (referring to "the discretion *given to the court* under Section 550(a)") (emphasis added); *Crescent Res. Litig. Trust ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 483 (W.D. Tex. 2013) ("*this Court* would limit any recovery") (emphasis added).  While Defendants claim that a single out-of-Circuit decision (*Sauer*) authorizes juries to decide equitable defenses, the plaintiff there did not object to submission of equitable defenses to the jury, and that issue was not considered.  *Sauer*, 2016 WL 4409209, at *7 (stating without analysis that equitable defense was for the jury); 14-cv-00698-WSD (N.D. Ga.) D.I. 58, 65, 70 (motion in limine briefing contained no discussion or objection to jury's consideration of equitable defense).  The Trust does object to the submission of an equitable defense to the jury, and the law of this Circuit is clear that such defenses are for the Court.  Like any other equitable defense, Defendants' "equitable adjustment" defense should be heard, if at all, by this Court after trial.  *See Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc.*, 2017 WL 2840352, at *2-3 (E.D. Pa. June 30, 2017) (addressing potential equitable adjustments under UFTA statute after trial).

5.      Even putting all of this to the side, there are numerous defects in the proposed

instruction.   The instruction (1) does not specify what claims it pertains to, (2) is vastly overbroad, and gives the jury unguided discretion to make any award it wishes, which is contrary to law, (3) wrongly instructs the jury to consider "the value the Noteholders have already recovered," which is an issue for a *different* portion of the statute (pertaining to the amount of creditor claims) to which this "adjustment" defense could not possibly apply, (4) wrongly instructs the jury to consider Defendants' purported "good faith" and "the value of the stock that Defendants gave up as part of the transaction," which is again the subject of a *different* statute relating to the purported "good faith for value" defense, and (5) in general, is biased and unfairly suggests that the jury should reduce the Trust's award.  Defendants' proposal that the jury be given a free-floating and limitless invitation to reduce the Trust's award has no basis in law.

## DEFENDANTS' RESPONSE

1.     Again, Plaintiff's erroneous assertion that damages have already been resolved is refuted by the bankruptcy court's order itself, which says the opposite, and further refuted in Defendants' pretrial conference submissions and in their oppositions to Plaintiff's *Daubert* motion and motion *in limine* regarding damages.  Plaintiff's last-minute additional briefing is procedurally improper and substantively wrong.  *See also*, *e.g.*, Defendants' Objection and Response re Instr. 3.13, *supra*.

2.     Defendants can seek equitable adjustment of any bankruptcy award—be it under state or federal law, based on the court's inherent equitable powers, and as set out in both 11 U.S.C. § 105(a) and § 550.  *See In re Sawran*, 359 B.R. 348, 353 (Bankr. S.D. Fla. 2007) (providing Defendants credit for payments to debtor under its "equitable powers under 11 U.S.C. § 105(a)"); *see also In re Cybridge Corp.,* 312 B.R. 262, 271 (D.N.J. 2004) ("We hold, therefore, that Section 550(d) of the Code empowers courts to prohibit a trustee from recovering under

Section 550(a) from a transferee that has already returned to the estate.").  In *Sawran*, the court explained that "Courts have often used section 105(a) to mitigate the harsh results from a literal application of section 550."  359 B.R. at 353.  In *In re Incare*, LLC, No. AP 14-0248, 2018 WL 2121799, at *14 (Bankr. E.D. Pa. May 7, 2018), to take another example, the court barred the trust's recovery entirely based on an equitable adjustment under § 550.  *Id.* ("I conclude that the facts in this case warrant the application the "diminution of the estate" limitation on the § 544(b) avoidance remedy. . . Specifically, I conclude that an equitable adjustment under 11 U.S.C. § 550 precludes the Trustee's recovery.") There is no restriction on applying equitable principles to bankruptcy claims rooted in federal law.  Contrary to Plaintiff's characterization, Defendants are not creating a new equitable defense, but one that already exists under the Bankruptcy Code.  *See In re Pearlman*, 515 B.R. 887, 901 (Bankr. M.D. Fla. 2014) (deferring ruling on equitable adjustment on claims, including both federal and state-law based claims, until after trial, noting "[T]he cornerstone of the bankruptcy courts has always been the doing of equity.") (citations omitted).

Plaintiff misunderstands Defendants' cited authority, *In re Teleservices Grp., Inc.*, 469 B.R. 713, 762 (Bankr. W.D. Mich. 2012), which explains that be it through Section 550(a) or otherwise, the Court always retains discretion to adjust damages award in bankruptcy actions as the equities may require.  *See id.* (explaining that whether an award under Section 550(a) or under state law, the Court's discretionary power is the same, noting "it is likely as not that Congress was attempting to mimic the equitable adjustment provisions of comparable state fraudulent transfer laws when it left awards of value under Section 550(a) to the court's discretion.").

3.      Contrary to Plaintiff's argument, none of Plaintiff's cited cases actually prohibit

equitable adjustments to damages awards for state law cases where underlying transactions included cash transfers.  The statute also does not impose any such bar. Moreover, Defendants' equitable adjustment defense is not based solely on cash transfers, but on the value of the equity conveyed and any increase in value to that equity that occurred, the value the Noteholders have already recovered, and other factors relating to fairness.   The jury should be able to consider these facts and adjust their damages award based on it.

4.      Plaintiff's argument that equitable adjustment can only be decided by the judge, not the jury is belied by *Sauer v. Publisher Servs., Inc.*, No. 1:14-CV-698-WSD, 2016 WL 4409209, at \*7 (N.D. Ga. Aug. 19, 2016).  Ruling on a motion *in limine* there, the court ruled that Plaintiff's recovery on its UFTA claim could be reduced based on the equities, and that the jury could consider "those equities . . . at trial."  Accordingly, Defendants maintain that the jury is empowered to make equitable adjustments, and that power is not limited to just the court. Moreover, to the extent factual determinations are inherent to making any equitable adjustments, the jury—as the arbiter of the facts—should make those determinations.

5.      Plaintiff claims there are numerous defects with Defendants' proposed instruction, but fails to offer any counter-proposal.  Defendants' proposal is not overbroad, it explains what the "equities" means, and provides concrete examples of factors the jury can consider.  Plaintiff's other claimed defects have no basis in law—there is no restriction that equitable principles apply to only certain bankruptcy claims and not others (as has already been discussed above), or that jurors can only consider certain facts not others (Plaintiff offers no authority to support this position).

4.      **Fraudulent Transfer – State Law Claims [DISPUTED]**

**DEFENDANTS' OBJECTION**

Because, as Plaintiff recognizes (see below), the same instructions should apply to the federal and state claims, the Court should simply provide one set of instructions for each.  In any event, the same objections and counterproposals Defendants provided above apply equally to Plaintiff's proposed instructions regarding state law, so Defendants will not repeat them.

**PLAINTIFF'S RESPONSE**

While many of the legal principles and factual determinations at issue in federal fraudulent conveyance claims overlap with those at issue in state-law fraudulent conveyance claims, the claims are not identical.  Different measures of damages apply, and to the extent the Court allows any instruction on defenses, there are differences in applicable defenses.  Plaintiff has claims under both state and federal law, and the jury will be required to return separate verdicts on each set of claims given the different measures of damages that apply.  Accordingly, the jury should be instructed on all of the elements of all of the claims that they will be asked to evaluate in their deliberations.

**DEFENDANTS' RESPONSE**

Plaintiff's argument that the jury should be given two sets of instructions filled with cross-references because "[d]ifferent measures of damages apply" makes no sense, especially because Plaintiff failed until the last minute to propose any substantive instructions about damages, and thus waived not only those proposed instructions, but any reliance on the distinctions between them as purported reason to give the jury two sets of otherwise nearly identical instructions.  In any case, if the Court instructs the jury separately on the state-law claims, it should refer to and use Defendants' proposed instructions for the reasons set forth above.  **PLAINTIFF'S**

**PROPOSAL**

The Trust also has two claims under state law, for (1) actual fraudulent transfer and (2) constructive fraudulent transfer.

### 4.1.    Actual Fraudulent Transfer [DISPUTED (see above)]

As with the Trust's actual fraudulent transfer claim under federal law, to prove actual fraudulent transfer under state law, the Trust must establish by a preponderance of the evidence that Physiotherapy made the transfers to Defendants with the actual intent to hinder, delay or defraud creditors.

The same instructions that I provided earlier regarding Plaintiff's actual fraudulent transfer claim under federal law (Instruction Nos. 3.1 through 3.5) apply equally to the Trust's actual fraudulent transfer claim under state law.

If you find that Physiotherapy made the transfers with the actual intent to hinder, delay or defraud creditors, you must find for Plaintiff on its claim for actual fraudulent transfer under state law.

**AUTHORITY**

6 Del. C. § 1304(a)(1), (b); *In re PennySaver USA Publ'g, LLC*, -- B.R. --, 2019 WL 2193320, *9 (Bankr. D. Del. May 21, 2019) ("Delaware's Section 1304(a)(1) hold[s] the same requirements as § 548(a)(1)(A)."); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 365 (S.D. Tex. 2008) ("§ 548 of the Bankruptcy Code is substantially the same as Delaware's actual fraudulent transfer provision."); 6 Del. C. § 1304(b) (listing badges of fraud, "among other factors" to consider in determining actual intent: "(1) The transfer or obligation was to an insider; … (5) The transfer was of substantially all the debtor's assets; … (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably

equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred"); *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 551 (D. Del. 2005) (listing badges of fraud); *Fringer v. Kersey Homes, Inc.*, 2018 WL 3107961, *8 (Del. Ch. June 25, 2018) ("It is not necessary that all of the factors support a finding of actual intent.   Rather, the confluence of several factors in one transaction generally provides conclusive evidence of an actual intent to defraud.") (quoting *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *14 (Del. Ch. Oct. 10, 2014)); *In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150, 172 (Bankr. D. Del. 2019) (""It is undisputed that the Delaware Fraudulent Transfer Acts track section 548 of the Bankruptcy Code (or vice versa).") (quoting *Autobacs Strauss, Inc. v. Autobacs Seven Co.*, 473 B.R. 525, 567 (Bankr. D. Del. 2012)); *Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A.*, 879 F.3d 79, 86 (3d Cir. 2018) ("The relevant DUFTA and Bankruptcy Code provisions are nearly identical, and Delaware courts have interpreted and applied them uniformly."); *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) ("The proper inquiry is whether the badges of fraud are present, not whether some factors are absent.").

### 4.2.    Constructive Fraudulent Transfer [DISPUTED (see above)]

To prove constructive fraud under state law, the Trust must establish by a preponderance of the evidence that (1) Physiotherapy received less than reasonably equivalent value in exchange for the transfers, and (2) any one of the following:

- Physiotherapy became insolvent as a result of the transfers, or

- Physiotherapy was about to engage in a business for which its remaining assets were unreasonably small, or

- Physiotherapy intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

The same instructions that I provided earlier regarding Plaintiff's claim for constructive fraudulent transfer under federal law (Instruction Nos. 3.6-3.9), apply equally to the Plaintiff's claim for constructive fraudulent transfer under state law.  As with Plaintiff's claim under federal law, you are instructed that Physiotherapy did not receive reasonably equivalent value in exchange for the transfers, and thus the first element is satisfied.  It is for you to decide whether the second element is satisfied pursuant to this instruction and Instruction Nos. 3.6 through 3.9.

If you find either that (1) the transfers rendered Physiotherapy insolvent, (2) the transfers left Physiotherapy with remaining assets that were unreasonably small, or (3) Physiotherapy intended to or believed or reasonably should have believed that it would incur debts beyond its ability to pay, you must find for Plaintiff on its claim for constructive fraudulent transfer under state law.

### AUTHORITY

6 Del. C. §§ 1304(a)(2), 1305; *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 335 (S.D. Tex. 2008) (setting forth elements of constructive fraudulent transfer under DUFTA);

*Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 252 (3d Cir. 2000) ("there is ordinarily no value to the corporation in such an exchange" of cash for stock); *In re SemCrude L.P.*, 648 F. App'x 205, 209 (3d Cir. 2016) ("The Bankruptcy Court found, and it is undisputed, that the Trustee satisfied [the requirement of proving that the debtor received less than a reasonably equivalent value] because 'no reasonably equivalent value was provided' for the equity distributions."); *Boyer v. Crown Stock Distrib.*, 587 F.3d 787, 796 (7th Cir. 2009) (stockholder distributions were not an exchange for value because they "were made, not in return for some exchange of property or services, or the payment of an antecedent debt, but solely on account of their status as shareholders"); *Hayes v. Palm Seedlings Partners*, 916 F.2d 528, 540 (9th Cir. 1990) (same); *Primex Plastics Corp. v. Zamec*, 675 F. App'x 629, 631 (7th Cir. 2017) ("[C]hanging a firm's ownership structure is not a source of value to the firm itself.  A payment to repurchase membership interests is in the nature of a dividend, which distributes profits to investors (and changes proportional ownership interests) but does not add to the firm's financial health."); *In re Joy Recovery Tech Corp.*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2012) ("stock redemptions are treated as dividends to shareholders which return no value to the company"); *In re Fid. Bond & Mortg. Co.*, 340 B.R. 266, 286-87 (Bankr. E.D. Pa. 2006) (same); Rutter Practice Guide on Bankruptcy, ¶ 21:1096.1 ("When the 'debt' paid is actually equity, the transfer is not for reasonably equivalent value and may be avoided as constructively fraudulent[.]") (citing *Matter of Fitness Holdings, Int'l Inc.*, 714 F.3d 1141, 1147 (9th Cir. 2013)); *Feinberg v. RM Acq., LLC*, 629 F.3d 671, 674 (7th Cir. 2011) ("[A] dividend is not an exchange of reasonably equivalent value.").

### 4.3.    Damages  [DISPUTED]

### PLAINTIFF'S PROPOSAL

The Court has already decided the amount of damages under the Trust's state law claims. The only issue for you to decide is whether Defendants are liable to the Trust on these claims.

### AUTHORITY

As set forth in connection with Instruction No. 3.13 and in other briefing (D.I. 47 at 1-2, 11-13; D.I. 84 at 1-8; PTO 60-66 & Exh. 6), the Bankruptcy Court determined the measure of damages in this case on summary judgment. *See* Adv. D.I. 624 at 20 n.7.

### DEFENDANTS' OBJECTION

For reasons already discussed, this instruction is entirely improper. *See* Objection to Plaintiff's Proposed Instruction 3.13, *supra*. Furthermore, having more than one damages instruction is unnecessary, confusing and potentially prejudicial. Plaintiff cannot recover double damages for the same alleged transfer, and damages—if any—under federal and state law should be the same. The Bankruptcy Code merely codified existing law and did not create a new fraudulent transfer cause of action, or "remedies therefor, unknown to the common law." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 60–61 (1989) (citation omitted). On the contrary, the fraudulent transfer provisions of the Bankruptcy code are modeled on state law, "and uniform interpretation of the two" is "essential to promote commerce nationally." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1068 (3d Cir. 1992) (citation omitted); *see also*, *e.g.*, *Crystallex Int'l Corp. v. Petróleos de Venezuela, S.A.*, 879 F.3d 79, 86 (3d Cir. 2018) ("Delaware courts generally recognize that our state and the federal fraudulent transfer statutes' principles are substantially the same."). Thus, the Court should only give one damages instruction, and it should be Defendants' Counterproposal to Instruction No. 3.13, *supra*.

## **PLAINTIFF'S RESPONSE**

The Court need not instruct the jury to determine damages, but if it does so, should not give Defendants' erroneous instruction.  The Bankruptcy Court has already determined that damages for the Trust's state-law claims are measured by the amount necessary to satisfy outstanding creditor claims, which "will occur only when (or if) the Litigation Trust recovers $250.8 million ($125.4 million x 2), or $228.7 million above the $22.05 million the Trust received in settlement."  Adv. D.I. 624 at 20.  Defendants have no right to relitigate these decided issues, *see supra* Instruction No. 3.13, and they do not deny that the facts necessary to determine the amount of damages under the Summary Judgment Order are undisputed.  There is thus no need to submit state-law damages to the jury.

If the Court does submit state-law damages to the jury, Defendants' suggestion that damages "should be the same" under federal and state law is erroneous.  As the Bankruptcy Court explained, the Trust's state-law remedy is limited to the amount necessary to satisfy outstanding creditor claims, while federal law includes no such limitation.  Adv. D.I. 624 at 17, 20.  Indeed, these differences are apparent on the face of the statutes.  *Compare* 11 U.S.C. § 550(a) ("the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property"), *with* 6 Del. C. § 1308(b) ("the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less").  Numerous authorities recognize the obvious material differences between these statutes, holding that a federal-law remedy is not limited to the amount of creditor claims.  *See supra* Instruction No. 3.13.

For these reasons, the Trust objects to instructing the jury that it must decide damages.  Nevertheless, if the Court decides to do so, then without waiving the Trust's objections, the

Court should instruct the jury consistently with the Summary Judgment Order, as follows:

## PLAINTIFF'S COUNTERPROPOSAL

If you find in favor of the Plaintiff on either its actual or constructive fraudulent transfer claim under state law, then you must decide the amount of damages to award. The measure of damages for these claims is the amount necessary to satisfy the Noteholders' claims.

To determine this amount, you must first consider the amount of the Noteholders' claims. The Bankruptcy Plan for Physiotherapy determined that this amount is $210 million, and that determination is binding.

Next you must deduct amounts received by the Noteholders at the time of the Bankruptcy Plan. The Plan determined that this amount is $84.63 million, and that determination is binding.

This leaves a total of $125.37 million. Next you must multiply this amount times two because, under the Bankruptcy Plan, Court Square is entitled to 50% of Plaintiff's recoveries.

This leaves a total amount necessary to satisfy Noteholders claims of $250.74 million. To determine the Trust's total award under state law, you must deduct the amount of settlements received by the Trust in other cases (that is, $22.05 million) from $250.74 million.

You must award the full amount necessary to satisfy the Noteholders' claims, and you should not reduce that award for any reason. If appropriate, the Court may further adjust the award after the trial.

## DEFENDANTS' RESPONSE

Plaintiff's counterproposal—which it should have offered in the first place if it wanted to preserve a substantive proposal—contradicts the law. On its state-law claims, Plaintiff may only avoid the transfer "to the extent necessary to satisfy the creditor's claim," 6 Del. C. § 1307(a)(1), and may only "recover judgment for the value of the asset transferred, as adjusted under

subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, ***whichever is less***," *id.* § 1308(b) (emphasis added).  Subsection (c) states that judgment based upon the value of the asset is "***subject to adjustment as the equities may require***," *id.* 1308(c) (emphasis added).

Based on the plain language of the statute, in no event may Plaintiff recover more than is "necessary to satisfy the creditor's claim." *Id.* §§ 1307(a)(1), 1308(b).  Yet Plaintiff misreads the bankruptcy court's advisory opinion on summary judgment to allow the jury to award $250.74 million, which is far more than the entire $210 million in allowed claims, based on the notion that Plaintiff may double its recovery simply because the Noteholders and Court Square agreed to share it.  The law prohibits such "double recovery."  *In re Majestic Star Casino, LLC*, 716 F.3d 736, 761 n.26 (3d Cir. 2013).  Plaintiff's instruction invites the jury to violate the governing statutes, which limit recovery to the amount necessary to satisfy the Noteholders' claims.  *See* 6 Del. C. §§ 1307(a)(1), 1308(b).

Here, the maximum claim allowed is $210 million.  Plaintiff's suggestion that the jury might award $250.74 million plainly contravenes the statutes.  The $210 absolute maximum, moreover, must be reduced by ***at least*** the projected value of the Noteholders' equity in Physiotherapy, $84.63 million, and should be reduced by the actual value of that equity, as determined by the "actual price a willing buyer"—Select Medical—"agree[d] to pay." *Allonhill*, 2019 WL 1868610, at *40.  And Plaintiff received $22.05 million in settlement, which the bankruptcy court agreed must be subtracted.  MSJ Op. at 20 & n.7.  Taking account of all that the Noteholders have already received to satisfy their claim, the amount remaining is $21,047,609.  Renjillian Rep. ¶¶ 281-84.  If the jury is to be given amounts, they should be told that the maximum they may award is $21,047,609.

Furthermore, because the bankruptcy court did not and could not (on summary judgment) consider the disputed facts or equities, *see* Adv. D.I. 624 at 3 n.2, it did not consider the extent to which "the equities may require" reduction of the alleged $248.6 million transfer as the other possible measure of recovery—the lesser of which must apply.  6 Del. C. § 1308(b)-(c).  Such reductions "are not limited solely to post-transfer improvements.  Instead, equity guards against windfalls in general."  *In re Jackson*, 318 B.R. 5, 27 (Bankr. D.N.H. 2004) (citation omitted).  Plaintiff's proposal improperly instructs the jury to unlawfully award what the Third Circuit in *Majestic Star* called "a double recovery and then some," 716 F.3d at 761 n.26, and what the court in *Crescent Resources*—on similar facts—called a "massive windfall," 500 B.R. at 482.

5.      **Deliberations and Verdict**

    **5.1.     Introduction**

I have completed my instructions on the law.  I will end by explaining how you will conduct your deliberations in the jury room and about your possible verdicts.

When you start deliberating, do not talk to the jury officer, to me, or to anyone but each other about the case.  If you have any questions or messages, you must write them on a piece of paper, sign them and give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.  I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.  Any questions or messages normally should be sent through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages.  Never write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be.  Your votes should stay secret until you are finished.

### AUTHORITY

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 10.1; Third Circuit Model Civil Jury Instruction 3.1 (as modified).

### 5.2.    Unanimous Verdict

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that every juror agree to the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to re-examine your own views and change your opinions, if convinced they are erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.

Remember at all times that you are not partisans.  You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you.  I will review it with you in a moment.  You will take the form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form.  You will then return to the Courtroom and my deputy will read aloud your verdict.  Place the completed verdict sheet in the envelope we will give you.  Do not show the completed verdict form to anyone or share it with anyone until you are in the Courtroom.

It is proper to add the caution that nothing said in these instructions, and nothing in the form of a verdict, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find.  Determining what the verdict shall be is your sole and exclusive duty and responsibility.

193

## **AUTHORITY**

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark,

J.) Jury Instruction No. 10.2; Third Circuit Model Civil Jury Instruction 3.1 (as modified).

### 5.3.    Duty to Deliberate

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.  Try your best to work out your differences.  Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that—your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say.  So you should all feel free to speak your minds.  Listen carefully to what the other jurors have to say, and then decide for yourself.

### <u>AUTHORITY</u>

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 10.3; Third Circuit Model Civil Jury Instruction 3.1 (as modified).

**5.4.    Social Media**

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a smartphone, tablet or computer, the Internet, any Internet service, any text or instant messages service, any Internet chatroom, blog or website such as Facebook, LinkedIn, YouTube, Twitter, or Instagram to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case.  You can only discuss the case in the jury room with your fellow jurors during deliberations.

**<u>AUTHORITY</u>**

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 10.4 (as modified); Third Circuit Model Civil Jury Instruction 3.1 (as modified).

### 5.5.    Court Has No Opinion

Let me finish by repeating something I have said to you earlier.  Nothing that I have said or done during this trial was meant to influence your decision in any way.  You must decide the case yourself based on the evidence presented.

## **AUTHORITY**

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284 (Stark, J.) Jury Instruction No. 10.5; Third Circuit Model Civil Jury Instruction 3.1 (as modified).[16]

---

[16]    The parties continue to meet and confer regarding these proposed instructions and reserve the right to amend their proposed instructions as necessary to address issues that may arise after service, including the Court's rulings, pending objections, other disclosures and filings, and developments before or at trial.

**Defendants' position**: Defendants further note that they provided Plaintiff with a responsive draft of the final instructions on June 13, the date agreed upon by the parties. Defendants' legal positions were previously disclosed both during the litigation and in Defendants' responsive draft of the pretrial order, which was provided on May 30.  But instead of offering compromise positions, Plaintiff served voluminous revised objections, counter-proposals and objections to Defendants' counter-proposals less than 48 hours before the parties' joint filing deadline; then Plaintiff served another round of lengthy objections and briefing roughly 24 hours before the deadline; and yet another round less than 16 hours before the deadline.  Defendants have attempted to respond to Plaintiff's objections and responses to the extent possible within the Court's deadlines, but reserve the right to supplement with additional responses as necessary.

**Plaintiff's Position**: Defendants have disclosed a number of new theories, arguments and proposed instructions, including many that disregard key legal rulings previously made by the Bankruptcy Court.  These tactics required Plaintiff to respond on a compressed schedule to legal and factual issues that required extensive analysis.  Plaintiff attempted to address the issues as quickly as possible, and provided their responses on a piecemeal basis to Defendants in order to expedite the process.  Defendants then provided very extensive and significant edits to their arguments and positions only one hour before the filing deadline.  Plaintiff has not had the opportunity to meaningfully review, much less respond to Defendants' last minute revisions and additions, and reserves all rights to amend or supplement its responses and counterproposals based on Defendants' evolving arguments.