**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>PHYSIOTHERAPY HOLDINGS, INC., *et al.,*<br><br>          Debtors. | Chapter 11 Case<br>Case No. 13-12965 (KG)<br>(Jointly Administered) |
| PAH LITIGATION TRUST,<br><br>          Plaintiff,<br><br>    v.<br><br>WATER STREET HEALTHCARE PARTNERS,<br>L.P. *et al.,*<br><br>          Defendants. | Adversary Proceeding<br>Case No. 15-51238 (KG) |
| PAH LITIGATION TRUST,<br><br>          Plaintiff,<br><br>    v.<br><br>WATER STREET HEALTHCARE PARTNERS,<br>L.P. *et al.,*<br><br>          Defendants. | Case No. 18-01734 (LPS)<br><br>**JURY TRIAL**<br><br>PUBLIC VERSION OF D.I. 101<br>FILED JULY 1, 2019 |

## PROPOSED JOINT FINAL PRETRIAL ORDER

This matter comes before the Court at a final pretrial conference held pursuant to Rule 16 of the Federal Rules of Civil Procedure.  Plaintiff is the PAH Litigation Trust ("Plaintiff" or the "Trust").  Defendants are WS Associate Co-Invest Partners, LLC, Water Street Healthcare Management, L.P., Water Street Healthcare Partners, L.P., Wind Point Associates IV, LLC, Wind Point IV Executive Advisor Partners, L.P., Wind Point Investors IV, L.P., and Wind Point Partners IV, L.P. (collectively, "Defendants").

1

**Plaintiff's Counsel**:

Michael A. Barlow (#3928)
April M. Kirby (#6152)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
(302) 778-1000
barlow@abramsbayliss.com
akirby@abramsbayliss.com

OF COUNSEL:
Richard I. Werder, Jr.
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
rickwerder@quinnemanuel.com

William C. Price
R. Brian Timmons
Johanna Y. Ong
B. Dylan Proctor
Terry Wit
Stephen Broome
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3112
williamprice@quinnemanuel.com
briantimmons@quinnemanuel.com
johannaong@quinnemanuel.com
dylanproctor@quinnemanuel.com
terrywit@quinnemanuel.com
stephenbroom@quinnemanuel.com

**Defendants' Counsel:**

John W. Shaw (#3362)
David M. Fry (#5486)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 298-0700
jshaw@shawkeller.com
dfry@shawkeller.com

Robert J. Stearn, Jr. (#2915)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
stearn@rlf.com

OF COUNSEL:

Robert A. Van Nest
David J. Silbert
Steven K. Taylor
Ajay S. Krishnan
Erin E. Meyer
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, California 94111
(415) 391-5400
rvannest@keker.com
dsilbert@keker.com
staylor@keker.com
akrishnan@keker.com
emeyer@keker.com

Richard W. Reinthaler
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700
rreinthaler@winston.com

Brian D. Roche
REED SMITH LLP
10 S. Wacker Drive
Chicago, Illinois 60606-7507
(312) 207-6490
broche@reedsmith.com

3

## I.  NATURE OF THE CASE

**Plaintiff's Proposal**

The Plaintiff in this case is the PAH Litigation Trust (the "Trust"), a special entity that was created by the federal bankruptcy court here in Delaware in connection with the bankruptcy of a company called Physiotherapy Associate Holdings ("Physiotherapy").   The Defendants are investment funds managed by two private equity firms:  Water Street and Wind Point.

Between 2007 and 2012, Water Street and Wind Point owned nearly 90% of the shares of Physiotherapy, which was a nationwide provider of outpatient physical therapy services based in Exton, Pennsylvania.  On April 30, 2012, Water Street and Wind Point sold Physiotherapy to Court Square Capital Partners ("Court Square") for $510 million (the "Transaction").   Court Square put down $213.3 million in cash, and the remainder was funded with debt assumed by Physiotherapy.  As part of the Transaction, Physiotherapy transferred $248.6 million to Defendants.

The Trust claims that the transfers of $248.6 million to Water Street and Wind Point were actually and constructively fraudulent under federal and state law.  The Trust alleges that, prior to the Transaction, Physiotherapy overstated its net revenues in order to inflate its valuation for purposes of the sale.  The Trust claims that Physiotherapy was actually worth less than half of its $510 million purchase price, that its actual net revenues were not sufficient to pay the debt that it took on in the Transaction, and that the Transaction rendered Physiotherapy insolvent.

Defendants deny that Physiotherapy's revenues were overstated and deny that the $248.6 million they received for their shares was a "fraudulent transfer."

The Bankruptcy Court has already determined the amount of damages.  The trial will therefore focus on whether Defendants are liable to the Trust on its claims.

**Defendants' Proposal**

4

From 2007 to 2012, Defendants Water Street and Wind Point were shareholders and indirect investors of a company called Physiotherapy Associates Holdings, Inc. ("Physiotherapy" or the "Company"). Physiotherapy was purchased by Court Square Capital Partners ("Court Square") in 2012 (the "Transaction").

The Trust claims that the alleged transfers of $248.6 million to Water Street and Wind Point in connection with the Transaction were actually and constructively fraudulent under federal and state law. Defendants contend that there was no fraud, either actual or constructive, and that there was no avoidable transfer by the debtor (Physiotherapy) to Defendants. Defendants also assert various defenses under state and federal law. Finally, the parties disagree about damages, as set forth herein.

## II.   JURISDICTION

This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising under or relating to the bankruptcy petitions filed by Physiotherapy under Chapter 11 of the United States Bankruptcy Code.

The jurisdiction of the Court is not disputed.

## III.   FACTS

### A.   Uncontested Facts

The parties have stipulated to the following facts that require no proof at trial:

1.      Daniel Connors was Physiotherapy's Chief Executive Officer ("CEO") from February 2009 to June 2011, and then Chairman of the Board from June 2011 to April 30, 2012.

2.      Andrew DeVoe served as Physiotherapy's Chief Financial Officer ("CFO") from January 2011 to June 2011, and as CEO from June 2011 until the Transaction closed. After the Transaction, Mr. DeVoe served as CEO until July 2013.

5

3.      Edwin Bode served as Physiotherapy's CFO from August 2011 until the Transaction closed.  After the Transaction, Mr. Bode served as CFO until September 2012.

4.      Plaintiff filed this lawsuit on September 1, 2015.

5.      Plaintiff has informed Defendants that it has received settlement payments in other matters arising out of claims assigned to Plaintiff under the bankruptcy plan in the amount of $22,050,010.[1]

### B.      Contested Facts

The Parties have set forth their respective sections regarding contested facts in **Appendix A**, attached hereto.

## IV.     ISSUES OF LAW

The Parties have set forth their respective sections on issues of law in **Appendix B**, attached hereto.

## V.      WITNESSES

The parties' anticipated witnesses are set forth below.  Any witness not listed will be precluded from testifying absent leave of the Court after a showing of good cause or agreement of the parties.

The listing of a witness by any party in this pretrial order does not establish that it is necessary or required that the party call that witness to testify.  Similarly, it does not establish that the witness has relevant or admissible testimony.  In an abundance of caution, both parties identified witnesses on subjects that are addressed in pending motions, and the parties do not waive any of their arguments on such motions.

---

[1] Defendants object to this fact being introduced in front of the jury, but do not object to its inclusion in this uncontested facts section because it may be relevant to issues to be decided by the Court at a later date.

[**Plaintiffs' Proposal:**  Consistent with section VI (A) below, the parties shall provide notice of witnesses to be called, the final order of those witnesses and exhibits to be used in the direct examination at 9:00 a.m. two (2) calendar days before those witnesses will be called.  The parties will also exchange disclosures listing the cross-examination exhibits (including any impeachment exhibits) to be used with the witnesses at 9:00 a.m. one (1) calendar day before the witness will be called.]

[**Defendants' Proposal**: Consistent with section VI (A) below, the parties shall provide notice of witnesses to be called,  the final order of those witnesses, and all exhibits to be used with those witnesses, at 9:00 a.m. two (2) calendar days before those witnesses will be called.]

All disclosures will identify any previously-served objections to each exhibit.  The parties will meet and confer at 6:00 p.m. the day before a witness is to be called to narrow their disputes and identify any remaining objections to be presented to the Court.

Witnesses will only be called to testify one time.  If a witness is called during the other party's case, the scope of examination by the non-calling party will not be limited to the scope of the examination by the party that called the witness.

[**Plaintiff's Proposal:**  In the event a witness identified by the opposing party will be examined outside the scope of the direct examination during the opposing party's case-in-chief, the party intending to conduct such an examination shall provide notice of that by 6:00 pm two (2) calendar days before the witness is called and the parties shall identify all exhibits that will be used in the expanded examination (including all previously-served objections to each exhibit).  Any cross-examination exhibits relating to the expanded examination will be provided by 4:00 p.m. one (1) calendar day before the witness is called.  All objections to documents so identified will be resolved with objections to exhibits identified to be used on direct examination.]

**[Defendants' Proposal:**  In the event a witness identified by the opposing party will be examined outside the scope of the direct examination during the opposing party's case-in-chief, the party intending to conduct such an examination shall provide notice of that by 9 a.m. one (1) calendar day before the witness is called and the parties shall identify all exhibits that will be used in the expanded examination of that witness.  All objections to documents so identified will be resolved with objections to exhibits identified to be used on direct examination.] .

A party may only present a witness out of order with either approval of the Court after a showing of good cause or agreement of the parties.

The parties' identification of the witnesses is not a commitment that any of the witnesses listed are in fact available, will appear for trial, or will be called in a party's case.  If any witness whom a party identifies as coming live becomes unavailable or fails to appear for trial, the party shall promptly notify the other party, and the parties may present the witness by deposition designations made pursuant to this Order, to the extent permitted by the Federal Rules of Civil Procedure and the Federal Rules of Evidence.  The parties may call any witness called by the other party or found on the other party's list of trial witnesses.

Pursuant to Fed. R. Evid. 615, the parties request that the Court prevent fact witnesses from hearing the testimony of other witnesses, except to the extent the witness is the sole designated table representative for the trial.

**A.     Plaintiff's Witnesses**

Plaintiff identifies the following fact and expert witnesses it expects to testify live and by deposition, subject to the reservations set forth below:

Plaintiff reserves the right to call additional witnesses based on a showing of good cause, including: (1) to provide foundation testimony should Defendants contest the authenticity or

admissibility of any evidence proffered at trial; (2) to obtain testimony from any witness identified

by Defendants on their witness list; (3) to respond to issues raised by the Court's pretrial or trial

rulings or to issues raised after the deadline for Plaintiff to disclose their list of witnesses, including

but not limited to Defendants' pre-trial or trial disclosures or filings, (3) to address any changes of

positions or theories by Defendants, their witnesses or their experts; (4) for a different purpose

than as identified below, (5) to account for any discovery that occurs between the time of this

submission and trial and (6) for impeachment purposes, whether listed or not, live or by deposition.

    1.      **<u>Fact Witnesses – Case in Chief</u>**

        a.      Richard Agabs (deposition)

        b.      Keller Arnold (live)

        c.      Edwin Bode (live)

        d.      John Broderick (live)

        e.      Daniel Connors (deposition)

        f.      Andrew DeVoe (live)

        g.      Susan Hoeflich (live)

        h.      Michael Hone (live)

        i.      Marianne Kilroy (live)

        j.      Richard Kracum (deposition)

        k.      Keith Lockwood (deposition)

        l.      Randall Notes (deposition)

        m.      James Porter (deposition)

        n.      Surender Raman (live)

        o.      Andrew Shannahan (live)

        p.      Kenneth Saitow (deposition)

        q.      Christina Sisco (deposition)

r.    Omar Vaishnavi (live)

s.    Michael Walden (deposition)

t.    John Weber (live)

u.    Robert Womsley (deposition)

v.    Kimberly Zeoli (deposition)

2.    **<u>Fact Witnesses – Foundational and/or Rebuttal</u>**

a.    Kevin Brown (deposition)

b.    James Connelly (deposition)

c.    Edward Chiosso (live)

d.    Thaddeus Davis (deposition)

e.    David Dietzel (deposition)

f.    Tim Dugan (deposition)

g.    Mark Falcone (live)

h.    Merrill Bryant Huber III (deposition)

i.    Thad Kresho (deposition)

j.    Michael Kuczborski (live)

k.    Joseph Lawler (deposition)

l.    Robert Mulcare (deposition)

m.    David Nguyen (deposition)

n.    Phil Norris (deposition)

o.    Michael Powell (deposition)

p.    Tannus Quatre (deposition)

q.    Sandy Sloyer (live)

r.    Scott Strickland (deposition)

s.    Derek Strum (deposition)

3.     **Expert Witnesses**

    a.     Bala Dharan (live)

    b.     Chip Hurley (live)

    c.     Yvette Austin Smith (live)

    d.     Sanjay Unni (live)[2]

4.     **Defendants' Objection to Plaintiff's Witnesses**

Defendants believe that objections to witnesses can be addressed at the time the witnesses are identified by the terms of this Order.  Defendants object to the designation of any witnesses by deposition who are available to testify live or who are in Plaintiff's control.  Defendants object to Plaintiff's witness list as overbroad, as it contains 46 witnesses for a trial of limited time. Defendants object to any witness whose testimony is subject Defendants' pending Daubert motions or Motions in Limine, and dispute the characterization of Mr. Unni's inadmissible anticipated testimony, in footnote 1 below, as being on the issues of "damages."

B.     **Defendants' Witnesses**

Defendants identify the following fact and expert witnesses they expect to testify live and by deposition.  Defendants object to Plaintiff's further "reservation of rights" regarding witnesses to the extent that it conflicts with the Federal Rules of Evidence and Federal Rules of Civil Procedure and further is not warranted or necessary.  Any witness not listed on a party's trial witness list should not be permitted to be called for any reason absent good cause shown and approval by the Court.  To the extent that the Court agrees with Plaintiff's "reservations" Defendants ask that they be applied equally to both parties.

---

[2] Plaintiff does not believe either side should be allowed to introduce an expert on damages at trial, but Plaintiff is disclosing Mr. Unni as a potential trial witness in the abundance of caution, subject to the Court's pre-trial rulings on the issue of damages and the sale of Physiotherapy to Select Medical.

1.      **Fact Witnesses**

        a.   Edwin Bode (live)

        b.   Jim Connelly (live)

        c.   Daniel Connors (live)

        d.   Ernst & Young LLP (live)

        e.   Andrew DeVoe (live)

        f.   Thaddeus Davis (deposition)

        g.   Douglas Dieter (deposition)

        h.   David Dietzel (deposition)

        i.   Tim Dugan (live)

        j.   Mark Falcone (live)

        k.   Merrill Bryant Huber III (deposition)

        l.   Christopher Jacobs (deposition)

        m.   Janna King (live)

        n.   Rich Kracum (live)

        o.   Thad Kresho (deposition)

        p.   Michael Kuczborski (live)

        q.   Joseph Lawler (live)

        r.   Keith Lockwood (deposition)

        s.   Robert Mulcare (deposition)

        t.   David Nguyen (deposition)

        u.   Phillip Norris (deposition)

        v.   Randall Notes (deposition)

w.   James Porter (deposition)

x.   Tannus Quatre (deposition)

y.   Surender Raman (deposition)

z.   Kenneth Saitow (deposition)

aa.  Andrew Shannahan (deposition)

bb.  Christina Sisco (deposition)

cc.  Sandy Sloyer (live)

dd.  Scott Strickland (deposition)

ee.  Derek Strum (deposition)

ff.   John Weber (deposition)

gg.  Robert Womsley (live)

hh.  Kimberly Zeoli (deposition)

**2.    Expert Witnesses**

a.   Professor Richard Puntillo (live)

b.   M. Tim Renjilian, CPA (live)

c.   Professor Daniel R. Fischel (live)

d.   Rajiv Gokhale (live)

**3.    Plaintiff's Objections to Defendants' Witnesses Which Plaintiff Requests Be Resolved Prior to Trial**

Plaintiff has lodged a number of substantive objections to Defendants' Witness List, but two of the objections are time sensitive and require resolution in advance of trial, so Plaintiff respectfully requests the Court's assistance at the pre-trial conference.  *See* Ex. 1 (Plaintiff's Objections to Defendants' Witness List).

13

First, Defendants included a witness on their witness list, Janna King, former General Counsel for Physiotherapy, who was not disclosed in their initial disclosures and who was not deposed in the case.  Given that Ms. King lives outside the subpoena power of the Court, Plaintiff asked Defendants to confirm they had a good faith basis for listing Ms. King and that she had agreed to travel to Delaware and testify at trial.  Defendants did not respond.  Plaintiff does not believe it is appropriate to depose Ms. King if she has not agreed to travel to trial.  Otherwise, by listing her Defendants' would get a do-over on the decision not to properly disclose and depose Ms. King during discovery and would be allowed to subpoena her deposition and present it at trial.  It would also prejudice Plaintiff by requiring Plaintiff to divert resources from trial preparation to prepare for the deposition and would potentially require the parties to amend key pre-trial submissions, like their exhibit lists and deposition designations days before trial.  Under those circumstances, Ms. King should be precluded from testifying. *See, e.g.*, *DCK TTEC, LLC v. Postel Indus., Inc.*, 602 Fed. Appx. 895, 898 (3d Cir. 2015) (upholding district court's exclusion of witness who was not properly disclosed under Rule 26 and not deposed before trial); Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").  Accordingly, Plaintiff respectfully requests that the Court preclude Ms. King from testifying due to Defendants' failure to properly disclose her.

Second, Defendants also disclosed Ernst & Young, the entity, on their witness list, without identifying the witness or the subjects of his or her anticipated testimony.[3]  Given that Defendants already deposed the Ernst & Young partner who managed the engagement day-to-day (James Porter), and had the option of deposing an Ernst & Young 30(b)(6) witness but chose not to, there is no basis for adding an additional Ernst & Young witness for trial.  Doing so, would consume pre-trial resources and also require the parties to amend key pre-trial submissions, like their exhibit lists and deposition designations, days before trial is set to begin. *See id.*  Accordingly, Plaintiff respectfully requests that the Court preclude Defendants from calling an additional, undisclosed and undeposed Ernst & Young witness in advance of trial.

### 4.    Defendants' Response to Plaintiff's Objections

Defendants have properly and adequately disclosed witnesses that may be testified to trial. Regarding Ms. King, Defendants can and will update Plaintiff regarding efforts to secure her testimony for trial.  Regarding Plaintiff's objection to trial testimony from Ernst & Young LLP (E&Y), Defendants issued a subpoena to Ernst & Young LLP (E&Y).  In their initial disclosures, Defendants disclosed that (i) E&Y may have discoverable information and (ii) John "Chip" Clark, in particular, may possess discoverable information.  Defendants anticipate that E&Y will produce Mr. John "Chip" Clark as a trial witness.  Defendants will update Plaintiff with any additional information Defendants receive regarding the testimony of a witness from E&Y.

### D.    Testimony by Deposition

Federal Rule of Civil Procedure 32 shall control the presentation of deposition testimony.

---

[3]    Defendants did not provide Plaintiff with notice of a trial subpoena to Ernst & Young. Plaintiff believes that Defendants' response below may be referring to a deposition subpoena served in August 2016, which Defendants abandoned and are apparently trying to enforce nearly three years later.

This pretrial order contains the maximum universe of deposition designations, counter-designations, and objections to admission of deposition testimony; none of the foregoing shall be supplemented without leave of the Court on good cause shown or agreement of the parties.

The parties have exchanged designations of testimony which is expected to be offered by deposition, and have met and conferred in an effort to resolve their objections.  If there are objections that remain to be resolved, the party calling the witness by deposition shall, not later than 9:00 a.m. two (2) calendar days before the witness is to be called at trial, serve a chart of the deposition testimony it expects to play and the exhibits it expects to introduce with the designations, with a listing of all previously served objections and counter-designations.  The parties will then meet and confer at 6:00 p.m. two (2) calendar days before the deposition testimony is expected to be played to narrow any issues that may be raised with the Court.  The party calling the witness by deposition will then submit one calendar day before the deposition testimony is expected to be played: (i) a copy of the entire deposition testimony of the witness at issue, clearly highlighting the designations, counter-designations, exhibits and any remaining objections as well as a brief indication (i.e., no more than one sentence per objection) of the basis for the objection and the offering party's response to it.  Failure to comply with these procedures, absent an agreement by the parties and approval by the Court, will result in waiver of the use of the deposition testimony or exhibit or waiver of objection to the use of the deposition testimony or exhibit.  If an exhibit is testified to in a deposition designation, it will be admitted into evidence if it is included on the offering party's trial exhibit list and is not subject to an objection.  All exhibits included in admitted deposition designations for a given witness and agreed to by the parties or ruled admissible by the Court will be admitted before the designations are played and can be displayed to the jury while the designations on each exhibit are played.

All irrelevant and redundant material, including colloquy between counsel and objections, will be eliminated when the deposition is read or played at trial. When the witness is called to testify by deposition at trial, the party calling the witness shall provide the Court with two copies of the transcript of the designations and counter-designations that will be read or played. Subject to the Court's approval, the party calling the witness may provide a brief neutral introduction of the witness, including their name and their job title, employer and employment period during the relevant events. The parties will be charged for all time that elapses from the time the witness is called (including any introductions of the witness) until the next witness is called, according to the designations of that party. Testimony offered by deposition will be presented and played in the order taken at the deposition.

For those depositions that have been recorded by video, a party may elect to present the deposition excerpt by video instead of or in addition to by transcript, including for impeachment. If a party elects to introduce deposition testimony by video, any counter-designations from that same witness's deposition testimony must also be submitted by video. If the deposition testimony will be presented by video, the party offering the deposition testimony in its case-in-chief shall provide a copy of the video to be played to the opposing party by 8:00 p.m. the night before the testimony is to be played. Unless otherwise instructed by the Court, the parties shall submit a copy of such DVD to the Court at the time the designated testimony is offered.

### 1.      Plaintiff

Plaintiff's deposition designations, Defendants' objections and counter-designations, and Plaintiff's objections to the counter-designations are set forth in Exhibit 2. Plaintiff reserves the right to utilize other deposition excerpts for impeachment purposes. Plaintiff also reserves the right to utilize any deposition excerpt identified by Defendants, and to use its counter-designations

17

as designations or vice versa.

Further, Plaintiff reserves the right to modify or supplement its designations to address: (1) any rulings or pre-trial motions or disclosures made after the submission of these designations, (2) any changes in positions or theories by Defendants, their witnesses or their experts, (3) any typographical errors later identified in the submissions, (4) any corrections made by Defendants to their designations, including designations that are incomplete, and (5) any discovery that occurs between the time of this submission and trial.

In an abundance of caution, Plaintiff has counter-designated testimony it believes is inadmissible and/or the subject of pending motions; Plaintiff reserves the right to withdraw or amend such designations to comply with the Court's rulings.

Plaintiff objects to any designations by Defendants that fail to account for corrections by the deponent and reserves the right to modify any impacted designations and counters.  Plaintiff has identified certain impacted testimony with an asterisk, which signifies testimony that has been amended by the deponent's errata.

Pursuant to Fed. R. Civ. Proc. 32(a)(4)(B), Plaintiff also objects to Defendants' designations of the testimony of Surender Raman, a witness who is within the subpoena power of the Court and who has been served with a trial subpoena to ensure his appearance at trial.  Plaintiff reserves the right to amend its objections and counter-designations, and serve its own designations, in the event Mr. Raman becomes unavailable for trial.

Plaintiff further objects to any Rule 30(b)(6) testimony designated by Defendants to the extent the deponent has no personal knowledge regarding the topic in question.  *See Digene Corp. v. Ventana Med. Sys. Inc.*, 316 F. Supp. 174, 181 n.10 (D. Del. 2004) (J. Jordan); *TIG Ins. Co. v. Tyco Intern. Ltd.*, 919 F. Supp. 2d 439, 454-55 (M.D. Pa. 2013).  Plaintiff reserves its rights to

18

supplement its objections and counter-designations to such testimony in the event it is deemed admissible.

### 2.    Defendants

Defendants' deposition designations, Plaintiff's objections and counter-designations, and Defendants' objections to the counter-designations are set forth in Exhibit 3.  Defendants object to Plaintiff's further "reservation of rights" regarding witnesses to the extent that it is inconsistent with the Federal Rules of Evidence and Federal Rules of Civil Procedure and further is not warranted or necessary.  To the extent that the Court agrees with Plaintiff's "reservations" Defendants ask that they be applied equally to both parties.  Any and all objections to specific deposition designations can and should be addressed on a per witness basis unless otherwise provided by the terms of this Order.

## VI.    EXHIBITS

### A.    Exhibits

On or before the first day of trial, counsel will deliver to the Courtroom Deputy a completed AO Form 187 exhibit list for each party.

This pretrial order contains the maximum universe of exhibits to be used by each side, as well as all objections to the admission of such exhibits, excluding impeachment evidence or demonstratives.  Neither the exhibits nor objections shall be supplemented without leave of the Court following a showing of good cause or the agreement of the parties, except for those exhibits disclosed by either party after the parties' agreed upon exchange of exhibit lists.  For those exhibits, the parties agree that the parties retain the right to timely object and/or to timely designate additional responsive exhibits.

No exhibit will be admitted unless offered into evidence through a witness, who must at

least be shown the exhibit.  In the case of exhibits referenced in deposition testimony presented at trial, the deposition witness must have been shown the exhibit.  Before the completion of the witness's testimony, any party that has used an exhibit with the witness and wishes that exhibit to be admitted into evidence must formally move the exhibit into evidence, by exhibit number. Exhibits may not be published, displayed, or otherwise shown to the jury until after they have been admitted into evidence.  Once admitted, counsel may publish exhibits to the jury without requesting to do so.

The parties will exchange a chart of exhibits to be used in connection with their direct or adverse direct examinations of the witness (excluding impeachment) by 9:00 a.m. two (2) calendar days before their intended use, with a list of all previously served objections.  [**Plaintiff's Proposal**:  The parties will also exchange disclosures listing the cross-examination exhibits (excluding any impeachment exhibits) to be used with the witnesses at 9:00 a.m. one (1) calendar day before the witnesses will be called.]  The parties are to meet and confer regarding all such objections by 6:30 p.m. the night before their intended use.  If good faith efforts to resolve the objections fail, the party objecting to the exhibits shall bring its objections to the Court's attention prior to the witness being called to the witness stand.  Failure to comply with these procedures, absent an agreement by the parties and approval by the Court, will result in waiver of the use of an exhibit or waiver of an objection to the exhibit.

Exhibits not objected to will be received into evidence by operation of the Final Pretrial Order without the need for additional foundation testimony, provided they are shown to a witness.

Nothing herein shall be construed as a stipulation or admission that the document is entitled to any weight in deciding the merits of this case.  The parties agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission

or otherwise as evidence regarding the listed document or any other listed document.

Any document that on its face appears to have been authored or prepared by an employee, officer, director, or principal of a party or pre-Bankruptcy Physiotherapy, Court Square, or the Noteholders or was produced from the files of a party or Physiotherapy, Court Square, or the Noteholders shall be deemed *prima facie* to be authentic under Fed. R. Evid. 901, except that a party with a good faith basis to contest the authenticity of a document so authored, prepared or produced may do so in accordance with the schedule set for objections to exhibit lists.

Legible photocopies of documents may be offered and received in evidence in lieu of originals thereof, subject to all objections that might be made to the admissibility of the originals. Each such document shall be deemed *prima facie* to have been created on the date it bears, if any, subject to the right of the party against whom it is offered to present evidence to the contrary.

The parties agree to meet and confer in good faith to resolve objections to trial exhibits prior to their introduction at trial.

Any party may use an exhibit that is listed on the other party's exhibit list, to the same effect as though it were on its own exhibit list, subject to all evidentiary objections.  Any exhibit, once admitted at trial, may be used equally by each party for any proper purpose in accordance with the Federal Rules of Evidence and any limiting instructions.  The listing of a document on a party's exhibit list is not an admission that such document is relevant or admissible if offered by the opposing party for the purpose that the opposing party wishes to enter the document into evidence.  The fact that an exhibit is listed on a party's exhibit list does not mean that party believes the exhibit would be admissible if offered by the other party.  If a party attempts to introduce an exhibit listed only on the other party's exhibit list, the listing party reserves the right to object to such introduction, and need not list objections to its own exhibits as part of the Pretrial Order.

Any document not offered into evidence may still be used at trial for the purpose of cross-examination, impeachment, refreshing recollection, rehabilitation, or other purpose, if otherwise competent for such purposes.

### 1.      Plaintiff

Plaintiff's list of exhibits that it intends to offer at trial, except demonstrative exhibits and exhibits to be used solely for impeachment, and Defendants' objections to Plaintiff's exhibits, are attached as Exhibit 4.  Plaintiff reserves the right to offer documents identified in any tab of its list for any purpose.  Plaintiff reserves the right to utilize for impeachment purposes documents not listed on Exhibit 4.  Plaintiff reserves the right to amend or supplement Exhibit 4 for good cause, including to address (1) the context and presentation of a document at trial, including as set forth in the two-day witness disclosures or as disclosed through Defendants' use of exhibits or questioning of the sponsoring witness, (2) any forthcoming rulings from the Court, including on *Daubert* and evidentiary motions; (3) Defendants' pre-trial disclosures or filings, including any amendments thereto; (4) any objections to evidence and/or counter-designations made by Defendants, (5) any changes in positions or theories by Defendants, their witnesses or their experts, and (6) any discovery that occurs between the time of this submission and trial.  Plaintiff further objects to any document disclosed after the agreed-upon time for exhibit disclosure, and reserve the right to object to those exhibits and/or to designate additional responsive exhibits.

The inclusion of a document on Plaintiff's exhibit list is not intended as and shall not be construed as an admission that the document is authentic or admissible if the document were introduced by Defendants.  In an abundance of caution, Plaintiff has included exhibits to address arguments or evidence that are the subject of pending or to-be-filed motions.  By including these exhibits, Plaintiff does not waive any of the arguments in its pending or to-be-filed motions.

Likewise, Plaintiff's objections to an exhibit on Defendants' exhibit list does not mean that the exhibit is inadmissible if sought to be admitted by Plaintiff.  To preserve its rights, Plaintiff has objected to certain exhibits on Defendants' list, as it is presently unclear how Defendants intend to use the exhibit, and certain uses may be relevant and permissible while others not.

Plaintiff's exhibits will be identified with PTX numbers.

### 2.   Defendants

Defendants list of exhibits that it intends to offer at trial, except demonstrative exhibits and exhibits to be used solely for impeachment, and Plaintiff's objections to Defendants' exhibits, are attached as Exhibit 5.

Defendants' exhibits will be identified with DTX numbers. Defendants object to Plaintiff's further "reservation of rights" to amend or supplement its Exhibit List to the extent that that reservation of rights is inconsistent with the Federal Rules of Evidence and Federal Rules of Civil Procedure and further is not warranted or necessary.  To the extent that the Court agrees with Plaintiff's "reservations" Defendants ask that they be applied equally to both parties. Defendants' further object to any document disclosed after the agreed-upon time for exhibit disclosure, and reserve the right to object to those exhibits and/or to designate additional responsive exhibits.

### B.   Demonstrative Exhibits

The parties agree that demonstrative exhibits (including Fed. R. Evid. 1006 summaries) that the parties intend to use at trial do not need to be included on their respective lists of trial exhibits.   Plaintiff's demonstratives will be identified with PDX numbers.   Defendants' demonstratives will be identified with DDX numbers.

The parties will exchange demonstratives to be used in opening statements by [**Plaintiff's Proposal:** 9:00 a.m.], [**Defendants' Proposal:** 12:00 p.m.]. on Saturday, July 20, 2019.  The parties will exchange any objections to the demonstratives by 4:00 p.m. that same day and meet and confer about the objections by 6:00 p.m. that same day.

A party will provide demonstrative exhibits to be used in connection with their direct or adverse direct examination by 9:00 a.m. two (2) calendar days before their intended use; objections will be provided no later than 9:00 a.m. on the following day, and the parties will meet and confer at 6:00 p.m. that evening to narrow any issues to be raised with the Court.  **[Plaintiff's Proposal:** Demonstrative exhibits intended for use during cross examination will be provided in advance of the cross examination at 9:00 a.m. one (1) calendar day before their intended use, and the parties will meet and confer on any objections by 6:00 p.m. that same evening to narrow any issues to be raised with the Court.]

The party seeking to use a demonstrative will provide a color representation of the demonstrative to the other side in PDF form.  However, for video or animations, the party seeking to use the demonstrative will provide it in native form to the other side via FTP or thumb drive. For irregularly sized physical exhibits, the party seeking to use the demonstrative will provide a color representation as a PDF of 8.5 x 11 copies of the exhibits.

This provision does not apply to demonstratives created during testimony which need not be provided to the other side in advance of their use.  In addition, blow-ups or highlights of exhibits or parts of exhibits or testimony are not required to be provided to the other side in advance of their use.

If good faith efforts to resolve objections to demonstrative exhibits fail, the objecting party shall bring its objections to the Court's attention prior to the opening statements or prior to the applicable witness being called to the witness stand.

## VII.    DAMAGES

### A.    Plaintiff

As explained in the Issues of Law section in the Appendix, the Bankruptcy Court granted summary judgment in favor of Plaintiff on the measure of damages.  On its federal claims, Plaintiff may recover the full amount ($248.6 million) of the transfers.  Adv. D.I. 624 at 16-19.  On its state law claims, Plaintiff may recover approximately $228.7 million.  *Id*. at 19, n.7.  Because there are no disputed issues of material fact relating to damages, the trial should be limited to liability.

In addition to the damages set forth in the summary judgment Order, Plaintiff is also entitled to an award of prejudgment interest, which Plaintiff intends to seek through post-trial briefing if it prevails at trial.

### B.    Defendants

Contrary to Plaintiff's claim, the bankruptcy court held that "the amount of damages [is still] to be determined pending the liability phase of the litigation." *See* Adv. D.I. 625.  As set forth at length in Appendix B below, Plaintiff's claim for damages is both legally and factually flawed. Defendants intend to prove at trial that the equity they transferred in exchange for the allegedly fraudulent transfer had substantial value, and that had the Transaction never occurred, Physiotherapy would have had substantial residual value.  Defendants also will prove at trial that the Noteholders have recovered all but approximately $21 million of their allowed $210 million claim, and many of these Noteholders recovered ***more*** than their portion of the total claim, by selling Physiotherapy to Select Medical in January 2016.

25

## VIII.   MOTIONS *IN LIMINE*

Plaintiff's motions *in limine*, Defendants' responses, and Plaintiff's replies are submitted as Exhibit 6.  They include:

  1.  Plaintiff's Motion *in Limine* No. 1 to Exclude Evidence Contradicting the Damages Ruling

  2.  Plaintiff's Motion *in Limine* No. 2 to Exclude Evidence Relating to the Noteholders

  3.  Plaintiff's Motion *in Limine* No. 3 to Exclude Evidence of Agreements Not Binding on the Trust

Defendants' motions *in limine*, Plaintiff's responses, and Defendants' replies are submitted as Exhibit 7.  They include:

  1. Defendants' Motion *in Limine* No. 1 to Preclude Use of Settlement Agreements

  2. Defendants' Motion *in Limine* No. 2 to Exclude References to Bankruptcy Proceedings for Purposes of Establishing Liability

  3. Defendants' Motion *in Limine* No. 3 to Exclude Evidence of Corporate Officers' and Employees' Purported Intent Generally, and Their Actions and Intent After the Sale in Particular

## IX.   DISCOVERY

Each party has completed discovery.

## X.   NUMBER OF JURORS

There shall be eight jurors.  The Court will conduct jury selection through the "struck juror" method, beginning with the Court reading voir dire to the jury panel in the courtroom, meeting with jurors individually in chambers to address issues relating to any challenges for cause, and concluding back in the courtroom with peremptory strikes.

XI.     **NON-JURY TRIAL**

Not applicable.

XII.    **LENGTH OF TRIAL**

Pursuant to the Court's Oral Order dated March 11, 2019 (D.I. 30), trial is to begin on July 22, 2019 and should be completed no later than July 31, 2019, and each side will be allocated a maximum of fifteen (15) hours for its trial presentation (not including the time required for jury selection, instruction and deliberation).

As the Court has now scheduled jury selection for Friday, July 19, 2019, which adds an extra half day to the projected trial length (D.I. 90), the parties jointly request that opening statements (limited to [**Plaintiff's Proposal:** 60 minutes each per side**] [Defendants' Proposal:** 45 minutes per side]) and closing arguments (also limited to 75 minutes each per side) be excluded from the 15-hour per side trial time limitation.

Defendants additionally respectfully request that the Court reconsider its prior order and allow each side a maximum of twenty hours (20) for presentation of witnesses and evidence, exclusive of opening and closing arguments, given (a) the complexity of the issues presented by this case (as set forth in Appendices A and B to this statement); (b) the number of witnesses identified by the parties; and (c) the scope of designations for testimony by deposition.

Time will be charged to a party for its direct and redirect examinations of witnesses it calls, and its cross-examination of witnesses called by any other party including any counter-designations of testimony).  The Courtroom Deputy will keep a running total of trial time used by counsel.

Time will be charged to a party for its opening statement, direct and redirect examinations of witnesses it calls, cross-examination of witnesses called by any other party including any

27

counter-designations of testimony), and closing argument.  The Courtroom Deputy will keep a running total of trial time used by counsel.

## XIII.   AMENDMENTS OF THE PLEADINGS

Except as discussed herein, the parties do not anticipate any further amendments to the pleadings.

## XIV.   ADDITIONAL MATTERS

The parties agree that all exhibits and other information which are [**Plaintiff's Proposal**: used] [**Defendants' Proposal**: admitted] at trial or whose contents have been displayed in open Court shall be treated as public materials notwithstanding any confidentiality designations for such exhibits or information unless otherwise ordered by the Court.  [**Plaintiffs' Proposal**: The courtroom should not be closed to the public during any portion of the trial unless otherwise ordered by the Court.]

## XV.   COURTROOM ACCESS

The parties respectfully request that the Court grant access to the Courtroom on Thursday, July 18, 2019, the day before jury selection begins, for purposes of setting up electronic and computer devices.

## XVI.  SETTLEMENT

The parties certify that they have made good faith efforts to resolve this case.  On June 17, 2017 and July 30, 2018, the parties participated in mediations before Judge Daniel Weinstein (Ret.).  On May 15, 2019, the parties participated in a mediation with Judge Thynge.  The parties were unable to reach a settlement during the mediations.

**IT IS HEREBY ORDERED** that this Final Pretrial Order shall control the subsequent course of the action, unless modified by the Court to prevent manifest injustice.

DATED: _____

_____
UNITED STATES DISTRICT JUDGE

APPROVED AS TO FORM AND SUBSTANCE:

_/s/ Michael A. Barlow_____
Michael A. Barlow (#3928)
April M. Kirby (#6152)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
barlow@abramsbayliss.com
akirby@abramsbayliss.com

*Attorneys for Plaintiff PAH Litigation Trust*

OF COUNSEL:
Richard I. Werder, Jr.
Susheel Kirpalani
Benjamin Finestone
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

R. Brian Timmons
Johanna Y. Ong
B. Dylan Proctor
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3112

_/s/ David M. Fry_____
John W. Shaw (#3362)
David M. Fry (#5486)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 298-0700
jshaw@shawkeller.com
dfry@shawkeller.com

*Attorney for Defendants WS Associate Co-Invest Partners, LLC, Water Street Healthcare Management, L.P., Water Street Healthcare Partners, L.P., Wind Point Associates IV, LLC, Wind Point IV Executive Advisor Partners, L.P., Wind Point Investors IV, L.P., and Wind Point Partners IV, L.P.*

OF COUNSEL:
Robert A. Van Nest
David J. Silbert
Steven K. Taylor
Ajay S. Krishnan
Erin E. Meyer
Abraham Fine
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, California 94111
(415) 391-5400

## APPENDIX A – CONTESTED FACTS

Below, the Parties provide their respective statement of contested facts.

### I.   Plaintiff's Contested Facts

1.     Plaintiff intends to prove at trial that the transfer of $248.6 million from Physiotherapy to Defendants on April 30, 2012 must be avoided—i.e., clawed back—as an actual and constructive fraudulent transfer, based on the following summary of relevant facts.

2.     Prior to April 30, 2012, Physiotherapy was headquartered in Exton, Pennsylvania and provided, among other things, physical therapy services to patients through hundreds of outpatient clinics.  Water Street and Wind Point were the controlling shareholders of Physiotherapy, owning nearly 90% of it.  In a transaction that closed on April 30, 2012 (the "Transaction"), Water Street and Wind Point sold Physiotherapy to a third party, Court Square Capital Partners.

3.     Water Street and Wind Point controlled Physiotherapy's board of directors at the time of the Transaction, having appointed Water Street partners James G. Connelly III, Robert Womsley, and Kurt M. Selquist, Wind Point partner Richard Kracum, and Daniel Connors (an executive associated with Water Street) to the board.

4.     As of 2009, Physiotherapy was struggling financially.  Wind Point had been invested in Benchmark (which was later merged into Physiotherapy) for nine years without a return to its own investors, and Water Street was two years into its ownership of Physiotherapy.  Water Street and Wind Point wanted to "pump" Physiotherapy's earnings before interest, taxes, depreciation, and amortization ("EBITDA") to make Physiotherapy attractive for a sale within the next three years.  Physiotherapy and the Defendants knew that the Company would be valued by potential buyers based on a multiple of EBITDA.  They knew that the higher its EBITDA, the

30

higher its sale price would be.  They also knew that the primary driver of EBITDA was the Company's net revenues from its outpatient rehabilitation services.  Physiotherapy's board appointed Mr. Connors as CEO in 2009 in order to "pop" Physiotherapy's EBITDA.

5.     Prior to April 2010, Physiotherapy used an industry standard "look back" method of recording revenue.  This method based current revenue estimates on the Company's actual, recent historical cash collections for closed invoices, also known as closed claims.

6.     Between April 2010 and April 2012, Physiotherapy's senior management ceased use of the "look back" method and implemented a new revenue recognition approach, called the "rate bridge."  The rate bridge approach estimated Physiotherapy's net revenues without validation or verification against actual historical collections.  This approach allowed Physiotherapy to manipulate its reported net revenues and accounts receivable.

7.     Under the rate bridge, Physiotherapy's senior management estimated how much revenue it could collect on average per visit—a net rate per visit.  But Physiotherapy's management knew that their estimate was higher than what Physiotherapy could actually collect (or had ever previously collected) on average per visit.   Physiotherapy calculated its net revenues by multiplying that inflated rate by the number of patient visits each month, which resulted in reported net revenues that were highly inflated.  In 2011, the rate bridge approach caused Physiotherapy's net revenues to be inflated by at least $22.4 million.  Each dollar of Physiotherapy's overstated net revenues resulted in a dollar-for-dollar overstatement of Physiotherapy's EBITDA, the key metric potential buyers would consider in bidding for the Company.

8.     Physiotherapy's revenue recognition practices between April 2010 and April 2012 were unreasonable and did not comply with Generally Accepted Accounting Principles ("GAAP"), including accounting principles and guidelines specifically applicable to healthcare organizations.

Physiotherapy's board and senior management knew that the rate bridge was an unreliable means to estimate net revenues.

9.    Physiotherapy and Defendants knew that the Company's net revenues and EBITDA were overstated, including because:

    a.    Physiotherapy's board knew that Physiotherapy's net rate per visit and net revenues did not reasonably reflect Physiotherapy's actual financial performance and were not supported by its actual  collection history;

    b.    Physiotherapy management knew that Physiotherapy's net rate per visit and net revenues did not reasonably reflect Physiotherapy's actual financial performance and were not supported by its actual cash collections per visit;

    c.    Employees observed that the net rate per visit that Physiotherapy was using to calculate its net revenue was too high and warned management;

    d.    Employees observed that Physiotherapy's financial reporting was being manipulated and did not reflect reality, and warned management;

    e.    Closed claims data reflecting actual average amounts collected per visit, and known by management to be reliable, indicated that Physiotherapy was not collecting the amount per visit that management was using to  estimate net revenue under their rate bridge approach;

    f.    Cash collections reports reviewed by management and Physiotherapy's Board indicated that Physiotherapy never fully collected the amounts it was reporting under the rate bridge for any given month;

    g.    Beginning in November 2011, Physiotherapy developed a different method for estimating net revenue based on actual, recent historical collections,

which indicated to management that it was overstating net revenues under
its then-current rate bridge approach;

h.   Two bidders interested in purchasing Physiotherapy, Clayton, Dublier, and
Rice, and New Mountain Capital, had questions they could not resolve
regarding Physiotherapy's reported financial performance, the results of
which were shared with Physiotherapy's management and board members;
and

i.   Ernst & Young ("EY") told Physiotherapy management and Defendants
before the Merger Agreement was signed that Physiotherapy's revenues for
portions of 2011 were overstated;

10.   Physiotherapy knew that it was overstating  its net accounts receivable balances, a
byproduct of the inflated net revenue estimates under the rate bridge.  As of October 2011,
Physiotherapy was reporting $9.8 million more for its net accounts receivable on its general ledger
under its rate bridge estimates than what was recorded in Physiotherapy's internal, transaction
level subledger under its billing and collection system called "NextGen." Net accounts receivable
balances in the general ledger resulted from the net revenue estimates using the rate bridge, which
Physiotherapy knew was not producing reasonable estimates of what was actually collectable.  At
the direction of management, Physiotherapy concealed the discrepancy between its general ledger
and subledger by instructing its collections vendor, Inventurus Knowledge Solutions, Inc. ("IKS"),
to manually adjust the NextGen aged trial balance so that it would match the  net accounts
receivable amount Physiotherapy wanted to report, and did report, on the general ledger and in its
financial statements.  Physiotherapy's practice of force matching its net accounts receivable
balance in the subledger with  the balance reflected in the general ledger did not comply with

GAAP.

11.     Physiotherapy knew that if it continued to show a material discrepancy between its general ledger and its subledger balances, it would be required to adjust  its EBITDA downward in the sales process.   Physiotherapy concealed its practice of force matching the material discrepancy in its books from its auditor, KPMG, as well as from EY, Huron Consulting Group, Inc. ("Huron"), potential buyers and their advisors, including Court Square and PwC, and potential debt investors.

12.     In late 2011, Defendants, Physiotherapy's board members, and Physiotherapy's management prepared a Confidential Information Memorandum to market Physiotherapy. Physiotherapy approved the Confidential Information Memorandum.  After Physiotherapy issued the Confidential Information Memorandum in October 2011, it did not issue any amended versions of that document or corrections to the historical information in the document.  Physiotherapy's board members and management also prepared and approved a Cash Collection Presentation dated January 2012 that was provided to Court Square.

13.     Physiotherapy intentionally overstated its financial condition in the Confidential Information Memorandum, management presentation, Cash Collection Presentation, 2012 budget, financial statements, and other financial data and documents used to induce Court Square to purchase Physiotherapy.  Physiotherapy intentionally misled Court Square that Huron and EY had vouched for the accuracy of Physiotherapy's net revenue and accounts receivable, and that its net revenues were supported by historical cash collections.   Physiotherapy also manipulated projections provided to bidders in the CIM and a subsequent model and falsely represented that these projections were "management's projections" and were based on a "bottoms up" approach, which was not true.  In reality, Physiotherapy's directors dictated the EBITDA to use in projections

for 2012 EBITDA, which was millions higher than the number calculated by Physiotherapy managers.

14.     Defendants and Physiotherapy strategized with Jefferies & Company, Inc. ("Jefferies") to focus Court Square's attention on the goal of submitting a winning bid, and away from the process of conducting financial due diligence.  Defendants' and Physiotherapy's goal was to mislead Court Square into believing that there other competitive bids on the table, to get  Court Square to "focus on the winning rather than diligence" so that Court Square would not "dig as hard on financials."  They thus strategized about delivering a message to Court Square that they described as "B/S" (or bullshit).  After Court Square agreed to buy Physiotherapy, but before the transaction closed, Defendants celebrated that they had "dodged a bullet," i.e., because Court Square had not detected the revenue overstatements.  Defendants' and Physiotherapy's agent, Jefferies, similarly celebrated that a bidder which dropped out of the process had not "spilled their guts" to Court Square about the issues they identified, and had the bidder done so, they "wouldn't have a deal."

15.     Physiotherapy and Defendants knew that the Company was not worth the $510 million purchase price reflected in the Merger Agreement.  They also knew that closing on the transaction was contingent on securing $310 million in debt financing which, in turn, depended on lenders falsely believing that Physiotherapy was worth $510 million and had sufficient free cash flow (reflected in EBITDA) to service the debt that it was about to incur.  Physiotherapy intentionally overstated its EBITDA and financial condition for 2011 and the first quarter of 2012 in the Offering Memorandum and communications with potential lenders.  From the beginning, Defendants knew that Physiotherapy would be sold through a leveraged transaction.

16.     In April 2012, Physiotherapy issued an Offering Memorandum to solicit $210

million in Senior Notes from potential creditor investors.  The Offering Memorandum made numerous material misrepresentations and omissions, including, without limitation, (i) that Physiotherapy continuously monitored collections estimates and assumptions to ensure any business or economic changes impacting the estimates are reflected in financial statements; (ii) that the allowance for estimated contractual adjustments were based on historical collection and write-off experience; (iii) that management regularly compared cash collections to net revenues; and (iv) that the provision for bad debt was regularly reviewed for accuracy.  After Physiotherapy issued the Offering Memorandum, it did not issue any amended versions of that document or corrections to the historical information in the document.

17.     The Noteholders had access to a limited set of materials and information in connection with their review of the Senior Notes offering, such as the Offering Memorandum, financial statements, and the roadshow presentation delivered by Physiotherapy management.  The Noteholders did not have access to the data room that was made available to potential equity buyers, and only had a limited time period in which to make their respective investment decision.

18.     The Transaction closed on April 30, 2012 (the "Closing Date").  On the Closing Date, pursuant to the terms of the Merger Agreement,

(i)     Court Square paid $213.3 million in equity into Physiotherapy Holdings, Inc.;

(ii)     creditors loaned Physiotherapy $210 million, in exchange for Senior Notes issued by Physiotherapy (the "Noteholders");

(iii)     other creditors loaned Physiotherapy $100 million;

19.     Under the Transaction, Physiotherapy took on new loans in a total amount of $310 million plus interest.  Under the Senior Notes, Physiotherapy was required to make principal and

interest payments totaling $470,332,509 at maturity.

20.     On the Closing Date, Physiotherapy transferred $140,921,571 to Water Street and $107,693,627 to Wind Point, for a total of $248,615,198 in transfers to Defendants.  This cash was Physiotherapy's property, and transferred at Physiotherapy's direction.  These transfers consisted of the following:

(i)     $140,873,007 transferred by Physiotherapy to Water Street Healthcare Partners L.P.  Water Street Healthcare Partners L.P. distributed $5,532,824 of this amount to Water Street Healthcare Management L.P.

(ii)    $48,564 transferred by Physiotherapy to WS Associates Co-Invest Partners LLC.

(iii)   $106,498,945 transferred by Physiotherapy to Wind Point Partners IV L.P.

(iv)    $394,440 transferred by Physiotherapy to Wind Point Associates IV LLC,

(v)     $800,241 transferred by Physiotherapy to Wind Point IV Executive Advisor Partners L.P.

21.     Water Street and Wind Point received these distributions in their capacities as shareholders of Physiotherapy.  The $248.6 million in transfers to Defendants were made to redeem their shares in Physiotherapy, which were cancelled upon the closing.  The transfers were made with funds borrowed by the Debtor.

22.     Mr. Connors, Physiotherapy's Chairman and a member of its board of directors, received cash payments of ▮▮▮▮▮▮▮ as a result of the Transaction.  Mr. Kracum, a Wind Point partner and a member of Physiotherapy's board of directors, received cash payments of ▮▮▮▮▮▮▮ as a result of the Transaction.  Other Water Street and Wind Point partners, and Physiotherapy's directors and senior officers Physiotherapy, received substantial benefits from the sale.

23.     On the day the transaction closed, Physiotherapy's valuation was at most ▇▇▇ ▇▇▇▇  Because its debts exceeded ▇▇▇▇▇▇ the $248.6 million transfers to Defendants rendered Physiotherapy insolvent under a balance sheet test, left Physiotherapy with unreasonably small capital, and left Physiotherapy unable to pay its debts as they became due.

24.     Physiotherapy made the transfers of $248.6 million to Defendants intending to hinder, delay, and defraud Physiotherapy's creditors, including the Noteholders.  The $248.6 million transfer represented substantially all of Physiotherapy's assets.  The cancellation of Defendants' shares in Physiotherapy did not confer any value to Physiotherapy, much less reasonably equivalent value.

25.     Following the Transaction, Physiotherapy's senior management, who stayed with the Company, concealed the fraud.  After the sale closed, management switched the Company back to the "look back" method of recording revenue, without informing Court Square of the change.  They also started implementing other rate manipulations designed to conceal the fraud. These ongoing post-sale manipulations delayed Court Square's discovery of the fraud.

26.     Physiotherapy made its first interest payment due under the Senior Notes on November 1, 2012, but defaulted on the next payment due on May 1, 2013, and did not make any further payments under the Senior Notes.  As of 2013, the Company still had not collected a large number of receivables reported years earlier.  The Company's auditor, KPMG, identified discrepancies between the receivables the Company had recorded and its cash collections, and declined to approve Physiotherapy's financial statements.

27.     Court Square retained an outside accounting firm, Deloitte & Touche, to investigate.  Deloitte concluded that Physiotherapy had overstated its net revenues for 2011 by over ▇▇▇▇▇▇  Based on Deloitte's findings, Keller Arnold, Physiotherapy's new CFO,

concluded that Physio's prior management had "reasonably knowable and readily accessible information" showing that revenues for 2011 were overstated.

28.     On November 12, 2013, Physiotherapy Holdings Inc., Physiotherapy Associates Holdings, Inc. and their affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On December 23, 2013, the Court entered an order confirming the Debtors' Chapter 11 plan of reorganization (the "Plan"), and the Plan became effective on December 31, 2013.  As a result of the Plan, Court Square's equity interest in Physiotherapy was eliminated.

29.     The Plan allowed the claims of the Noteholders in the amount of $210 million— the principal amount of the Senior Notes.  Pursuant to the Plan, the Noteholders were granted stock in the reorganized debtor, Physiotherapy, valued at $84.63 million.  Plaintiff, the PAH Litigation Trust, was formed, and the claims of Court Square and the Noteholders were assigned to the PAH Litigation Trust.   The consenting Noteholders were granted a right to 50% of any litigation recoveries obtained by the Trust.   Court Square was granted a right to 50% of any litigation recoveries obtained by the Trust.

30.     The transfers to Defendants identified above were made within two years of the date on which Physiotherapy filed for bankruptcy.   The fraudulent transfer claims of Physiotherapy's creditors and the estate were assigned to the Trust  pursuant to the Plan.  Plaintiff filed its lawsuit seeking to avoid the transfers to Defendants on September 1, 2015.

Plaintiff reserves the right to assert additional facts at trial that are not set forth in the foregoing summary.  To the extent that Defendants raise new issues of fact for the first time at trial, Plaintiff reserves the right to object, seek to preclude and/or respond.  Should the Court determine that any of the foregoing is more properly considered an issue of law (rather than one of fact), it should be so considered

## II.   Defendants' Contested Facts

1.      Plaintiff will be unable to meet its burden at trial to establish facts necessary to prove any of its federal or state law claims.   Instead, the evidence at trial will establish the following facts, which in fact disprove Plaintiff's claims:

2.      In 2007, Water Street Healthcare Partners, L.P. ("Water Street") purchased an entity named Physiotherapy Associates, Inc.  Beginning in 2000, Wind Point Partners IV, L.P. ("Wind Point") acquired twenty-three companies that ultimately became Benchmark Medical, Inc. The combined total amount spent by Water Street and Wind Point for these various companies was ██████████

3.      In 2007, Physiotherapy Associates, Inc. merged with Benchmark Medical, Inc. to form Physiotherapy Associates Holdings, Inc., which would become one of the largest providers of outpatient physical-therapy services in the country, with approximately 650 clinics in 33 states.

4.      In 2010, Physiotherapy transitioned to a billing system called NextGen to replace four legacy billing systems that pre-dated the merger between Physiotherapy and Benchmark Medical.  Also in 2010, Physiotherapy outsourced significant portions of the process of "revenue-cycle management"—*e.g.*, generating invoices, issuing them to payors, tracking receipts, and pursuing outstanding balances—to an Indian company called IKS.  Physiotherapy experienced significant problems with both the transition to NextGen and with IKS's performance, including inaccurate and unreliable data and estimates.

5.      In 2010 and 2011, Physiotherapy had difficulty obtaining reliable information from IKS and NextGen relating to billings and collections.

6.      In 2011, Physiotherapy retained Huron Healthcare as a consultant on issues related to revenue cycle management.  Notes Dep. Tr. 8:1-9:15.

7.      As part of this engagement, Huron dedicated 12-15 full-time employees working over eight months in the United States and India to improve Physiotherapy's billing and collections practices.

8.      Before 2010, Physiotherapy estimated its revenues using a retrospective, or "look-back," method that relied on recent collections data as an indicator of future collections.  Due to a number of considerations, including the disruption to Physiotherapy's operations caused by its transition to NextGen and IKS, Physiotherapy's management determined that continued use of the "look back" method for estimating revenues would be problematic.

9.      In April 2010, Physiotherapy adopted the "rate bridge" method of estimating net revenues.  "Rate bridge" relies upon historical collection information among many other factors, and complies with Generally Accepted Accounting Principles ("GAAP").

10.      While Plaintiff devotes significant attention to alleged complaints by certain employees about the process of booking revenue, for a variety of reasons, those complaints are not reflective of fraud or improper accounting practices on behalf of Defendants, the debtor, or their agents and will be refuted by the evidence.  For instance: some of the alleged accounting practices—which Plaintiff describes as improper—reduced rather than increased booked revenues; a difference of opinion as to appropriate accounting treatment is not probative of fraud; often, individuals lacked foundation for their complaints; Plaintiff ignores management's efforts to correct accounting records in a manner that reduced stated revenues; some of the alleged accounting practices continued long after the Transaction, when Court Square controlled Physiotherapy; and some inferences that Plaintiff seeks to draw from Physiotherapy's pre-sale statements and documents are unsupported or unreasonable.

11.      Physiotherapy's financials improved in the second half of 2011, prior to the

41

beginning of any sale process. For example, without limitation, Physiotherapy demonstrated improvements in billing and collections results in the second half of 2011.

12. Court Square approached Water Street and Wind Point in 2011, prior to any auction process, to express interest in purchasing Physiotherapy. Court Square ultimately participated in the auction process and submitted a successful bid.

13. In the middle of 2011, Water Street and Wind Point began to explore a sale of Physiotherapy. Physiotherapy retained Jefferies as an investment banker, and with its help conducted a six-month auction process. All actors on the seller side—including Water Street, Wind Point, Physiotherapy's management, and its board—engaged in a proper, transparent, customary auction process and had no intent to defraud, hinder, or delay any potential or actual bidder or any creditor. For instance, Physiotherapy disclosed its use of the "rate bridge" method and its actual cash collections information to all bidders, including Court Square, as well as to the third-party advisors assisting bidders in analyzing the Company.

14. In connection with or during the sale process, several third-party advisors (*e.g.*, Ernst & Young, Huron Healthcare, KPMG, etc.) examined and approved of various aspects of Physiotherapy's financial condition.

15. In connection with the sale process, Water Street and Wind Point (along with Physiotherapy) appropriately and legitimately highlighted the Company's positive trends. In addition to highlighting the positives, the Company (along with Water Street and Wind Point) disclosed the Company's challenges and weak points. Defendants never gave inaccurate or fabricated collections numbers or provided potential bidders with estimates known to be false. Indeed, Defendants disclosed significant information in connection with the auction process.

16. Court Square, along with its outside advisors and experts, was allowed to consider

whatever information they wanted and had access to an extensive data room as well as Physiotherapy management. Court Square hired a bevy of industry experts, accountants, and lawyers to advise it in connection with the auction process, including without limitation, PwC, Vantage, Avalere Healthcare, and Dechert LLP.  To the extent Court Square, the Noteholders, or any other person disagreed with Physiotherapy's revenue estimates or projections, they were free to develop their own estimates and projections—and indeed, various bidders, including Court Square, did so by relying on Physiotherapy's cash collections data (among other things).  Their valuations of Physiotherapy were higher than those proffered by Plaintiff's expert, Yvette Austin Smith.

17.     In connection with this standard auction sale process, Defendants were under no obligation to provide information about one bidder's conclusions or analysis to another bidder. Indeed, each bidder participating in the auction process signed a strict Non-Disclosure Agreement that precluded such disclosure.

18.     After forming its independent judgment about Physiotherapy's value and future performance, informed by multiple outside advisors and experts, Court Square agreed to purchase Physiotherapy for $510 million.  Court Square, through its wholly owned subsidiaries, made various assurances to Water Street and Wind Point in the Merger Agreement and thereafter, including that it took "full responsibility for making its own evaluation of the adequacy and accuracy" of the inherently uncertain "estimates, projections, and other forecasts and plans" that Physiotherapy had furnished, and accordingly that it would "have no claim against [Water Street or Wind Point] relating thereto"; that no Seller Party "will have or be subject to any liability to Buyer" in connection with any information or projections provided to Buyer; that the Company would be solvent; and that there was no intent to hinder, delay, or defraud either present of future

43

creditors.

19.     The Transaction did not involve a transfer by Physiotherapy to the Defendants. Rather the merger consideration came from a Court Square-controlled entity, Physiotherapy Holdings, Inc., which was also known in the transaction documents as the "Buyer" (or, in the alternative, from Buyer and Physiotherapy Merger Sub, Inc., which was known in the transaction documents as "Merger Sub"). These entities then transferred funds to Wells Fargo as paying agent, which then paid Defendants for their shares.   Physiotherapy was not the transferor of Court Square's cash, nor was it the original borrower.  Indeed, there was no transfer of an asset of debtor Physiotherapy.  Other relevant facts about the Transaction include that:

a.   Court Square chose the financing structure for the Transaction, including how much of its own equity to supply and how much debt to incur.  The Noteholders were fully aware of all relevant aspects of the Transaction.

b.   The Transaction was an acquisition by Court Square; for numerous reasons, it was not structured as a typical leveraged buyout ("LBO").

c.   Nor was the Transaction a stock redemption transaction. Rather, it was the sale of a company to Court Square. The value of Defendants' equity that they provided in exchange for the challenged transfer was as high as ████ ████ and even Plaintiff's expert acknowledges that it was as high as ██ ████

d.   The alleged transfer that the Litigation Trust seeks to avoid is a settlement payment made in connection with a securities contract; it was also made by, to, or for the benefit of a financial participant and/or a financial institution. It is beyond dispute that Wells Fargo is a commercial bank and therefore a

financial institution.  Buyer and Defendants were customers of Wells Fargo and were therefore themselves financial institutions.

20.     Court Square alone determined how much debt to take on in connection with its purchase of Physiotherapy.  It procured $310 million of financing for the Transaction, including a $100 million term loan, and $210 million in Senior Notes at an interest rate of 11.875%. The Offering Memorandum that Court Square prepared and provided to investors—which featured Court Square's projections—prominently disclosed the risks to Physiotherapy's business, including the problems it had experienced with billing and cash collections.

21.     In connection with its purchase of Physiotherapy, Court Square (through its subsidiary) represented and warranted to Water Street and Wind Point that Physiotherapy would remain solvent after the Transaction closed, even accounting for the debt that Court Square would cause Physiotherapy to assume, and that no assets would be transferred with the intent to hinder, delay, or defraud Physiotherapy's creditors.  Professor Daniel Fischel, an independent solvency expert, has determined that Physiotherapy was in fact solvent both before and after Court Square's purchase of the Company, using the three tests traditionally used for solvency (i.e., the balance sheet test, the ability to pay debts test, and the adequacy of capital test).

22.     The Defendants' pre-Transaction equity had a value that was reasonably equivalent to or greater than $248.6 million.

23.     No one involved in the Transaction on the seller's side—whether Defendants, Physiotherapy, or its Officers—had an intent to hinder, delay, or defraud creditors or Court Square.

    a.  None of the badges of fraud, as properly construed, are present here; to the extent they are found to be present, they are not probative of fraud.  For instance, while Defendants had a relationship with the Company, by virtue

of being shareholders, their status as shareholders is not probative of fraud.

b.  To the extent any corporate officers are found to have fraudulent intent, they were not acting within the scope of their agency, and that intent therefore should not be attributed to the debtor or Defendants.  Moreover, several Physiotherapy employees, including Chief Executive Officer Andrew DeVoe and Chief Financial Officer Edwin Bode, made substantial personal investments in the Company at the acquisition valuation, as did a number of other employees, which is inconsistent with an intent to defraud.

c.  Physiotherapy's Board, and not the Defendants, controlled Physiotherapy with respect to the sale transaction.

24.     After Court Square purchased Physiotherapy, it did not maintain the Company in the same way that Water Street and Wind Point did.  For example, and without limitation, Court Square did not continue Physiotherapy's consulting engagement with Huron Healthcare regarding the Company's billing and collections practices.   Court Square also significantly increased Physiotherapy's debt.

25.     Court Square also faced difficult business conditions that did not exist previously, for example and without limitation, changes to Medicare reimbursement policies negatively affected revenues.   Court Square also identified several other factors contributing to Physiotherapy's poor performance, including lack of pricing growth as Court Square projected, unexpected payor mix changes, inability to sustain same store visit performance, and poor performance by new clinics opened under Court Square's ownership and supervision.

26.     Far from blaming Water Street or Wind Point for the performance issues faced by the Company, in December 2012, Court Square released $25 million from escrow early and

released (and caused Physiotherapy to release) Water Street and Wind Point from any potential liability in connection with the Transaction.  Moreover, in 2013, Keller Arnold, the new Chief Financial Officer selected by Court Square, informed investors that she had not seen any indication of fraud.

27.     In 2013, Physiotherapy technically defaulted on its debt covenants with the Noteholders.  Rather than work to save the Company, Court Square ceded Physiotherapy to the Noteholders in a voluntary, "pre-packaged" bankruptcy. Several large Noteholders purchased more Physiotherapy debt on the open market before the bankruptcy was filed, sensing an opportunity to "get rich!"

28.     The Noteholders blamed Court Square for Physiotherapy's performance issues, and Noteholder representatives indicated that they would not do a deal with Court Square again.

29.     After obtaining control of the Company, the Noteholders did not significantly improve the Company's performance.   Nonetheless, in January 2016, the Noteholders sold Physiotherapy to Select Medical—a target that they had identified before the bankruptcy—for ████████ recouping their entire investment and earning a substantial profit. At the time of the sale, Physiotherapy's EBITDA was nearly identical to what it was when it declared bankruptcy. When selling the Company, the Noteholders relied on the $510M purchase price of Physiotherapy at the time of the Transaction as a relevant data point about the value of the Company.

30.     Plaintiff claims that the bankruptcy plan "placed a value on the Equity Interest in the reorganized Debtors which the Noteholders received" in the amount of $84.63 million, based on an analysis performed by Rothschild, Inc.  This is incorrect.  That number does not purport to be a valuation, it was not part of the bankruptcy plan, and it was generated at the request of entities with an interest in understating the value of the Company.

Defendant reserves the right to assert additional facts at trial that are not set forth herein. To the extent that Plaintiff raises new issues of fact for the first time at trial, Defendants reserve the right to object, seek to preclude and/or respond.  Should the Court determine that any of the foregoing is more properly considered an issue of law (rather than one of fact), it should be so considered.

## APPENDIX B – ISSUES OF LAW

**A.     Plaintiff's Issues of Law**

In addition to the issues set forth elsewhere in this Pretrial Order, Plaintiff sets forth the following issues of law that remain to be litigated.

## ACTUAL FRAUDULENT TRANSFER (11 U.S.C. §§ 548(a)(1)(A) AND 550)

1.      Plaintiff intends to prove at trial that it is entitled to avoid the $248.6 million transfers to Defendants as actual fraudulent transfers under federal law, 11 U.S.C. §§ 548(a)(1)(A) and 550.  To prevail on that claim, Plaintiff must prove three elements: (1) the debtor transferred an interest in property; (2) the transfer was within two years from the filing of the debtor's bankruptcy petition; and (3) the transfer was made with the actual intent to hinder, delay, or defraud creditors.  11 U.S.C. §§ 548(a)(1)(A) and 550.  These elements must be proven by a preponderance of the evidence.  *See In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir. 2006) ("The party 'bringing the fraudulent conveyance action' bears the burden of proving each of these elements by a preponderance of the evidence."); *In re Green Field Energy Servs., Inc.*, 594 B.R. 239, 289 (Bankr. D. Del. 2018) (same).

2.      Proof of the debtor's intent to hinder, delay or defraud a creditor is sufficient to satisfy the intent element of an actual fraudulent transfer claim.  *See In re Syntax-Brillian*, 573 F. App'x 154, 161 (3d Cir. Aug. 11, 2014).  In addition, "when a transferee is in a position to dominate or control the debtor's disposition of . . . property, the transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor," such that proof of the transferee's intent is also sufficient to satisfy the intent element.  *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns., Inc.*, 817 F. Supp. 2d 934, 941 (N.D. Tex. 2011); *see In re Elrod Holdings Corp.*, 421 B.R. 700, 709 (Bankr. D. Del. 2010) (adopting test for intent imputation); *In re Adler, Coleman Clearing Corp.*, 263 B.R.

406, 445 (S.D.N.Y. 2001) (the requisite intent can be that of "a *transferee* who is in the position to dominate or control the debtor's disposition of his property") (emphasis in original).  To prevail based on the intent of the transferee, a plaintiff must prove that (1) the controlling transferee possessed the requisite intent to hinder, delay, or defraud the debtor's creditors; (2) the transferee was in a position to dominate or control; and (3) the domination and control related to the debtor's disposition of the property.  *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 369 (S.D. Tex. 2008).  In their portions of this Pretrial Order, Defendants assert that their intent as transferees cannot be imputed to Physiotherapy, but do not address this widely accepted three-part test.

3. An officer's or director's knowledge of wrongdoing is imputed to the debtor.  *See In re The Personal and Bus. Ins. Agency*, 334 F.3d 239, 242-43 (3d Cir. 2003) (for a § 548(a)(1)(A) claim, "the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation.") (citing *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 884 (3d Cir. 1975)); *In re Lyondell Chem. Co.*, 554 B.R. 635, 647-50 (S.D.N.Y. 2016) (knowledge of debtor's CEO and chairman of inflations to financial projections could be imputed to corporation even though those individuals did not control board of directors); *In re James River Coal Co.*, 360 B.R. 139, 161 (Bankr. E.D. Va. 2007) (in Section 548 action, "the intent of the officers and directors may be imputed to the corporation"); *see also Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271, 302–03 (Del. Ch. 2015) ("[A] basic tenet of [Delaware] corporate law, derived from principles of agency law, is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself."); Restatement (Third) Of Agency § 5.03 cmt. d (2006) (agent's "knowledge of the falsity is imputed" to principal).

4. Defendants advocate a different rule, primarily based on *In re Tribune Co.*

*Fraudulent Conveyance Litigation*, 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017), but that decision is contrary to both controlling Third Circuit law and the prevailing view in the Second Circuit. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 560 B.R. 208, 228 (Bankr. S.D.N.Y. 2016) (in Section 548 case, "the knowledge of a corporate officer will be imputed to the corporation"). Defendants also cite *In re Vaso Active Pharm., Inc.*, 2012 WL 4793241 (Bankr. D. Del. Oc. 9, 2012) and *In re Elrod Holdings Corp.*, 421 B.R. 700 (Bankr. D. Del. 2010), but those cases address whether to impute the intent of the *transferees* to a debtor—not the intent of the debtor's own officers. *Vaso*, 2012 WL 4793241, at *10; *Elrod*, 421 B.R. at 709-12. These cases support the Trust's position on imputation. *See, e.g.*, *Vaso*, 2012 WL 4793241, at *10 ("How does a legal fiction such as a corporation have an intent to do anything? Of course, corporations act through people and, ultimately, their officers and directors."). The Bankruptcy Court correctly rejected Defendants' imputation argument below, *see* Adv. D.I. 250 at 33, and Defendants did not challenge that ruling in seeking leave to appeal.

5.      A debtor's scheme does not have to be undertaken for nefarious or malicious purposes but merely with the purpose of hindering or delaying creditors. *See, e.g.*, *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932) ("A conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them."); *In re Spearing Tool & Mfg. Co., Inc.*, 171 B.R. 578, 583 (Bankr. E.D. Mich. 1994) ("An intent to delay or hinder creditors, standing alone, is sufficient to constitute a fraudulent conveyance[.]"); *U.S. v. Spencer*, 2012 WL 4577927, at *8 (N.D. Okla. Oct. 2, 2012) (intent element satisfied where defendant sought to delay his creditor in order to buy time to earn sufficient funds to pay the debt).

6.      In addition, "[i]ntent need not be proven by direct evidence; it is most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor."

51

*eSpeed, Inc. v. Brokertec USA, L.L.C.*, 417 F. Supp. 2d 580, 592 (D. Del. 2006) (quotations and citation omitted); *see United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1305 (3d Cir. 1986) ("a party is deemed to have intended the natural consequences of his acts."); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1075 (3d Cir. 1992) (same); *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019) ("[i]f the natural consequence of a debtor's action is to hinder, delay or defraud creditors, a court may infer an intentional fraudulent conveyance") (quotations and citations omitted); *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *6 (Bankr. D. Del. Feb. 8, 2016) ("The Debtors are presumed to intend the natural consequences of their acts."); *In re Am. Bus. Fin. Servs., Inc.*, 384 B.R. 66, 75 (Bankr. D. Del. 2008) (trustee stated claim for intentional fraudulent transfer where "[t]he natural consequence of [defendant's] actions was to defraud the Debtor's creditors").

7.     Where the requisite intent is established, a transfer to shareholders pursuant to a leveraged buyout is avoidable as a fraudulent transfer even if the buyer elected to finance the purchase with debt. *Tabor*, 803 F.2d at 1296-97 (transfers to shareholders made pursuant to leveraged buyouts may be avoided as fraudulent transfers).

8.     The requisite intent to hinder, delay or defraud creditors can also be shown by proving the badges of fraud. Relevant badges of fraud include "(i) the relationship between the transferor and transferee; (ii) the consideration for the transfer; (iii) the insolvency of the transferor; and (iv) concealment or secrecy of the transaction." *In re Charys Holding Co., Inc.,*  2010 WL 2774852, *5 (Bankr. D. Del. July 14, 2010). Courts also consider whether (v) "the transfer was of substantially all the debtor's assets" and (vi) "the transfer occurred shortly before or shortly after a substantial debt was incurred." *In re Covenant Partners, L.P.,* 531 B.R. 84, 91 (Bankr. E.D. Pa. 2015) (identifying badges of fraud under federal law); *In re PennySaver USA Publ'g, LLC*, 587

B.R. 445, 460 (Bankr. D. Del. 2018) (same).

9.      Each badge of fraud that is present in a particular transaction "may cast suspicion on the transferor's intent," and "the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." *PennySaver*, 587 B.R. at 460; *see also In re Sharp Int'l. Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (describing badges of fraud as "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent"); *In re Glencoe Acquisition, Inc.*, 2015 WL 3777972, *5 (Bankr. D. Del. June 16, 2015) (presence of multiple badges "generally provides conclusive evidence of actual intent to defraud"); *Charys Holding*, 2010 WL 2774852 at *5 (same); *In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006) (same).

10.     In contrast, the *absence* of a particular badge of fraud that is not connected to the facts of the case is not countervailing evidence:  "The proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *PennySaver*, 587 B.R. at 460; *see In re B.L. Jennings, Inc.*, 373 B.R. 742, 767 (M.D. Fla. 2007) ("the Court turns to analysis of the badges of fraud under CA-UFTA, *discussing only those which are relevant*") (emphasis added).   The factfinder's task is to assess whether the badges relevant to a particular transaction are met, not whether badges that do not apply to the circumstances of the case are missing.  *See, e.g.*, *In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, *10-15 (Bankr. D. Del. Oct. 9, 2012) (evaluating only a subset of the badges set forth in 6 Del. C. § 1304(b) based on facts of the dispute).

11.     If the Trust proves the existence of multiple badges of fraud, "the burden shifts to the transferee to prove some legitimate supervening purpose for the transfers at issue," which requires "significantly clear evidence." *In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994) (quotation marks omitted); *see also In re Bachman*, 2007 WL 4355620, *15 (Bankr. D. Idaho Dec.

10, 2007) (same); *In re The Heritage Org., L.L.C.*, 413 B.R. 438, 465 (Bankr. N.D. Tex. 2009) (same).

12.     Defendants err in arguing below that the jury need not be instructed on the badges of fraud or the weight properly given to a finding that multiple badges are present.  *See, e.g., Kelly v. Armstrong*, 141 F.3d 799, 803 (8th Cir. 1998) (reversing based on jury instruction providing "that badges of fraud, if found, could be given whatever weight the jury thought they warranted" because such instruction may "have resulted in the jury's improper allocation of the burden of proof" by suggesting it "was free to return a verdict in favor of the defendants, despite finding the existence of multiple badges of fraud and disbelieving the defendants' explanations for the transfers").

## FEDERAL CONSTRUCTIVE FRAUDULENT TRANSFER
## (11 U.S.C. §§ 548(a)(1)(B) AND 550)

13.     Plaintiff intends to prove at trial that it is entitled to avoid the $248.6 million transfers to Defendants as constructive fraudulent transfers under federal law, 11 U.S.C. §§ 548(a)(1)(B) and 550.  To prevail on that claim, Plaintiff must prove that (1) the debtor received less than a reasonably equivalent value in exchange for a transfer; and (2) any of: (a) the debtor was insolvent at the time of, or was rendered insolvent by, the transaction; or (b) the debtor was engaged in business or a transaction, or was about to, for which any remaining property it possessed was unreasonably small capital; or (c) the debtor intended to incur, or believed that it would incur, debts beyond its ability to pay as they matured.  11 U.S.C. §§ 548(a)(1)(B).  "A trustee must show a constructive fraudulent transfer by a preponderance of the evidence."  *In re Zambrano Corp.*, 478 B.R. 670, 690 (Bankr. W.D. Pa. 2012).

14.     Reasonably equivalent value is determined by a two-part analysis:  first, whether

the debtor received any value, and second, whether such value was "reasonably equivalent" to what the debtor transferred.  *See* 5 Collier on Bankruptcy ¶ 548.05[2][a] (16th ed. 2012).  As a matter of law, a payment to a shareholder on account of its equity ownership is not a transfer for reasonably equivalent value.  For example, in *Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. P'ship IV*, the debtor transferred $3.5 million to defendants in exchange for their equity interests in the debtor.  229 F.3d 245, 252 (3d Cir. 2000).  The Third Circuit held that defendants' equity interests did not provide reasonably equivalent value because "a transaction in which the corporation receives nothing but outstanding stock amounts simply to a reduction in capitalization," and "[f]rom the perspective of the creditors, there is ordinarily no value to the corporation in such an exchange." *Id.*; *see also Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 796 (7th Cir. 2009) (stockholder distributions were not an exchange for value because they "were made, not in return for some exchange of property or services, or the payment of an antecedent debt, but solely on account of their status as shareholders"); *In re Agric. Research & Tech. Grp., Inc.*,, 916 F.2d 528, 540 (9th Cir. 1990) (similar); *In re Joy Recovery Tech Corp.*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002) ("stock redemptions are treated as dividends to shareholders which return no value to the company"); *In re Fid. Bond & Mortg. Co.*, 340 B.R. 266, 286-87 (Bankr. E.D. Pa. 2006) (same); *Rutter Practice Guide on Bankruptcy*, ¶ 21:1095.1.

15.     In their Section below, Defendants say these authorities do not apply because Defendants' stock was "cancelled" rather than "redeemed," and "a conversion of shares to cash" is "legally distinct from a redemption of shares by a corporation."  But Defendants' stock was cancelled in exchange for a cash payment purporting to correspond to the value of that stock in order to effectuate a sale of the company.  For purposes of reasonably equivalent value, the difference between a "cancellation" of stock and a "redemption" of stock is meaningless—and the

authorities on which Defendants rely, which relate to issues of shareholder rights, do not find this distinction material to reasonably equivalent value.[4]  Whether characterized as a "redemption" or "cancellation" of stock, Physiotherapy received *no* value from Defendants in exchange for the $248.6 million it transferred to them.  Nor did anyone else receive value, because the stock was worthless in light of Physiotherapy's insolvency.  Viewing this exchange "[f]rom the perspective of the creditors," there was not an exchange for reasonably equivalent value. *Buncher*, 229 F.3d at 252; *see Boyer*, 587 F.3d at 793, 796 (no reasonably equivalent value where debtor "distributed the money it received in the sale forthwith to its shareholders" on "account of their status as shareholders of the company").

16.     The test for solvency for fraudulent conveyance purposes is a "balance sheet test," examining whether debts in the aggregate are greater than assets in the aggregate. *In re R.M.L., Inc.,* 92 F.3d 139, 154-55 (3d Cir. 1996); *Peltz v. Hatten*, 279 B.R. 710, 743 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.,* 60 F. App'x 401 (3d Cir. 2003); *see also Rutter Practice Guide on Bankruptcy* at ¶¶ 21:635, 21:113-21:1120.

17.     Alternatively, Plaintiff may show that the transfers left Physiotherapy with unreasonably small capital.  Unreasonably small capital means an inability to generate enough capital to sustain operations.  This encompasses financial difficulties short of insolvency. *See Rutter Practice Guide on Bankruptcy* at ¶¶ 21:1125-21:1126; *Collier on Bankruptcy* ¶ 548.05[3][b]; *see also In re Jevic Holding Corp.*, 2011 WL 4345204 at *9 (D. Del. 2011) ("An overly leveraged buyout that leaves the target company with unreasonably small capital — where

---

[4]  Indeed, Defendants themselves previously asserted that their stock *was* redeemed in the sale. *See, e.g.*, Adv. D.I. 163 at 16 (Defendants:  "the transfer of Merger Consideration to 'redeem' the Certificates involved a 'security'"); *id.* at 37 (Defendants:  the Noteholders "made loans the proceeds of which were required to be used to redeem the shares of the selling shareholders").

it is reasonably foreseeable that the target will soon thereafter become insolvent — may provide the requisite factual predicate for an avoidance action grounded in fraudulent transfer law.").

18.     Alternatively, Plaintiff may show that the debtor intended to incur debts beyond its ability to pay as they become due.  *Rutter Practice Guide on Bankruptcy* at ¶ 21:1130-21:1131. The intent requirement may be inferred where the facts and circumstances surrounding the transaction show that the debtor could not reasonably believe that it would be able to pay its debts as they matured.  *Collier on Bankruptcy*, *Fraudulent Transfers and Obligations* ¶548.05[3][c].

## STATE LAW INTENTIONAL FRAUDULENT TRANSFER

## (6 DEL. C. § 1304(a)(1))

19.     Plaintiff intends to prove at trial that it is entitled to avoid the transfers to Defendants, in the amount necessary to satisfy the Noteholders' outstanding claims, as actual fraudulent transfers under state UFTA law, *see* 6 Del. C. § 1304(a)(1).[5]  To prevail on a claim of intentional fraudulent transfer under state law, Plaintiff must prove two elements: (1) the debtor made a transfer, and (2) the transfer was made with the actual intent to hinder, delay, or defraud creditors.  6 Del. C. § 1304(a)(1).  The standard of proof is preponderance of the evidence.  *See ASARCO*, 396 B.R. at 368-69 (applying Delaware law).  The elements of a state law and federal claim for intentional fraudulent transfer are "identical," and the factfinder "need only evaluate the elements of § 548 as the elements for the state transfer claims are substantially the same." *PennySaver*, 587 B.R. at 459 (addressing actual fraudulent transfer claims under Delaware law and federal law).

20.     State law fraudulent transfer claims also rely on "badges of fraud."  *Id.*  Thus, the

_____

[5] The Trust pleaded its state-law claims under Pennsylvania law, but the Bankruptcy Court previously ruled in the context of a motion for leave to amend that Delaware law applies.  Adv. D.I. 630.

requisite intent may be determined by considering whether:  "(1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6)  The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."  6 Del. C. § 1304(b).  "Although the presence of a single factor, i.e. badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud."  *In re Nat'l Serv. Indus., Inc.*, 2015 WL 3827003, at *4 (Bankr. D. Del. June 19, 2015) (quoting *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009)) (applying same standard to fraudulent transfer claims under federal law and Delaware law) (internal citation omitted).

## STATE LAW CONSTRUCTIVE FRAUDULENT TRANSFER

## 6 DEL. C. § 1304(a)(2))

21.     Plaintiff intends to prove at trial that it is entitled to avoid the transfers to Defendants, in the amount necessary to satisfy the Noteholders' outstanding claims, as constructive fraudulent transfers under state law, *see* 6 Del. C. § 1304(a)(2).  To prevail on a claim of constructive fraudulent transfer, Plaintiff must prove that (1) the debtor received less than a reasonably equivalent value in exchange for a transfer; and (2) any of: (a) the debtor was engaged

in business or a transaction, or was about to, for which any remaining assets it possessed were unreasonably small; or (b) the debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they matured.  6 Del. C. § 1304(a)(2). The elements must be proven by a preponderance of evidence.  *In re MDIP Inc*., 332 B.R. 129, 132 (Bankr. D. Del. 2005); *ASARCO*, 396 B.R. at 335 n.45.

## GENERAL PARTNER LIABILITY UNDER 6 DEL. C. §§ 15-306, 17-403

22.     If the jury finds that the subject transfers to Water Street Healthcare Partners, L.P., Wind Point Partners IV, L.P., and Wind Point IV Executive Advisor Partners, L.P. were fraudulent, the Court should also enter judgments in the same amounts against the general partners of those entities under Delaware partnership law.  Water Street has admitted that Water Street Healthcare Management, L.P. is the general partner of Water Street Healthcare Partners, L.P., a limited partnership formed under Delaware law.  Adv. D.I. 867 (Water Street's Answer) ¶ 15.  Wind Point has admitted that Wind Point Investors IV, L.P. is the general partner of Wind Point Partners IV, L.P. and Wind Point IV Executive Advisor Partners, L.P., limited partnerships formed under Delaware law.  Adv. D.I 866 (Wind Point's Answer) ¶ 17.  Under Delaware law, general partners are *automatically* liable for their limited partnerships' debts.  *See* 6 Del. C. § 15-306(a) ("all partners are liable jointly and severally for all obligations of the partnership"), § 17-403(b) ("a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law."); *New England Interconnect Sys., Inc. v. AEES, Inc.*, 2011 WL 2118853, *3 (W.D. Pa. May 27, 2011) (under Delaware law, "all partners are liable jointly and severally for all obligations of the partnership"); *Sandvik AB v. Advent Int'l Corp.,* 83 F. Supp. 2d 442, 448 (D. Del. 1999), *aff'd*, 220 F.3d 99 (3d Cir. 2000) ("In Delaware limited partnerships, a general partner is liable for the debts of the limited partnership.").

23.     Defendants' response below that the general partners discussed in this paragraph are not parties to the case is odd, because they were named in the Trust's original complaint, and were not dismissed.  Adv. D.I. 1 (Complaint) ¶¶ 15, 17, 116-17, 125-26, 139-41, 148-50, 163-65.

## DAMAGES

24.     The measure of damages in this case has already been decided as a matter of law, on summary judgment, and the facts necessary to calculate an award of damages are undisputed. Accordingly, if the jury renders a verdict in Plaintiff's favor on liability, the Court should fix damages and enter a judgment in the amount required by law.

25.     Two years ago, Wind Point's counsel submitted a letter to the Bankruptcy Court, on behalf of all parties, requesting approval for the "[t]he parties [to] file simultaneous cross-motions for partial summary judgment on the scope of allowable damages."  Adv. D.I. 544 at 2. Wind Point explained that the parties' disputes regarding the proper measure of damages had been an impediment to settlement, and the parties sought resolution of those disputes by the Court.  *Id.* at 1-2.  Most notably, the parties disagreed about the relevance of a sale that had occurred while this lawsuit was pending, in 2016.  As part of the Bankruptcy Plan confirmed in 2013, the Noteholders had agreed to exchange their claims under the Notes for stock in the reorganized Debtor, valued at $84 million, and an interest in litigation recoveries.  Defendants asserted that the Trust's recovery in this action should be reduced by the proceeds that the Noteholders received when they sold their stock in 2016—years later, long after the Bankruptcy Plan had been negotiated, agreed to, and confirmed.  The Bankruptcy Court agreed to resolve the parties' disputes on these issues, authorizing the filing of cross-motions for partial summary judgment on damages. The parties then filed 127 pages of briefing in support of such motions, as well as voluminous exhibits, and participated in a half-day hearing on damages before the Bankruptcy Court.

26.     On November 1, 2017, the Bankruptcy Court issued a 21-page decision granting Plaintiff's motion and denying Defendant's motion.  Adv. D.I. 624, 625 (the "Summary Judgment Order").  The Summary Judgment Order made several key legal determinations:

27.     *First*, the Court held that if the Trust prevails on a claim under federal law, it may avoid the *full* amount of the transfers to Defendants ($248.6 million) without regard for the amount of creditor claims.  Adv. D.I. 624 at 16-19.  The Court canvassed the authorities and explained that "[n]umerous cases stand for the proposition that a recovery under Section 550(a) [of the Bankruptcy Code] is not capped by the amount of the creditor claims."  *Id.* at 16-18 (discussing authorities so holding); *see also id.* at 10-12 (discussing additional authorities).  The Court explained that the supposedly contrary authorities cited by Defendants were "inapposite."  *Id.* at 18.  The Court thus held that the Trust's remedy under federal law is not limited by the amount of creditor claims, and instead the Trust is entitled to avoid the full amount of the fraudulent transfers if it prevails under federal law.

28.     *Second*, the Court held that although the Trust's remedy under state law is limited to the amount of creditor claims, the amount received by the Noteholders from the sale to Select Medical in 2016 is not relevant in determining that amount.  *Id.* at 19.  Rather, the amount of creditor claims was conclusively determined under the Plan, which:

(a)     "provided that the 'Senior Notes Claims shall be Allowed in the aggregate principal amount of $210,000,000,'" *id.* at 4 (quoting Bankr. D.I. 18 at 17);

(b)     "proposed to distribute to each Noteholder who chose to participate in the Plan, 'in exchange for full and final satisfaction, settlement, release, and discharge of the Allowed Senior Notes Claims,' (i) a pro rata share of new common stock issued by the reorganized Debtor (the 'Equity Interest'), and

(ii) a pro rata share of 50% of Litigation Trust recoveries (the 'Litigation Interest')," *id.* at 4-5 (quoting Bankr. D.I. 18 at 28); and

(c)  "placed a value on the Equity Interest in the reorganized Debtors which the Noteholders received" in the amount of $84.63 million, based on a contemporaneous valuation performed by the Debtor's investment banker, Rothschild, Inc., *id.* at 5 (citing Bankr. D.I. 19 at 38).

29.   The Court held that the Plan's valuation of the Noteholders' Equity Interest at $84.63 million is "binding" on the parties to this case.  *Id.* at 20-21.  Moreover, contrary to Defendants' argument that the Equity Interest must be revalued based on the sale to Select Medical in 2016, "[t]he cases make it clear that the appreciation of equity from the Select Medical sale is irrelevant" in determining the amount of outstanding creditor claims.  *Id.* at 19 (citing authorities); *see id.* at 12 (same).  Nor will the Noteholders "receive a windfall if successful in the litigation," as "the Noteholders would have received with interest $470,332,509 at maturity" under the Senior Notes, which is more than the amount they will receive from avoidance of the fraudulent transfers. *Id.* at 19; *see id.* at 12-13, 21 ("Amounts received in excess of the sale consideration will not be a windfall.").

30.   *Third*, considering these rulings and the Plan's terms governing the distribution of Trust recoveries, as well as the amount of settlements which the Trust has obtained to date ███████ ██████, the Court held that a recovery of $228.7 million would be necessary to satisfy outstanding creditor claims.  *Id.* at 20 & n.7.  Thus, this is the amount that the Trust is entitled to recover under its state law creditor claims if it prevails on liability.  *Id.*

31.   On November 16, 2017, Defendants requested interlocutory review of these rulings by this Court, noting that the key underlying facts were not in dispute.  Case No. 17-00319-LPS,

D.I. 1.  On March 3, 2018, following briefing and a hearing, this Court denied review.  *Id.*, D.I. 20.

32.     The Summary Judgment Order is now the governing law of the case.  "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.  This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues."  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (internal quotations and citations omitted); *see In re Continental Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002) (law of the case doctrine "limits relitigation of an issue once it has been decided"); *In re Continental Airlines, Inc.*, 145 B.R. 404, 408 (D. Del. 1992) (Bankruptcy Court Order as to which litigant failed to seek further review "stands as a final order and as the law of the case").[6]

33.     In light of the Summary Judgment Order, there are no disputed issues of fact for the jury to decide on damages.  The Trust is entitled to recover the full amount of the fraudulent transfers under its federal claims.  Adv. D.I. 624 at 16-20.  The amount of the transfers that

---

[6] *See also In re Radnor Holdings Corp.*, 564 B.R. 467, 483 (D. Del. 2017) (bankruptcy court correctly adhered to prior legal rulings, as law of the case "doctrine bars re-litigation 'of matters once decided during the course of a single continuing lawsuit'"); *Chase Bank USA N.A. v. Hess*, 2011 WL 45132, *5 (D. Del. Jan. 6, 2011) (legal rulings of prior judicial officer at an earlier stage of the case were law of the case); *In re Winstar Commc'ns, Inc.*, 435 B.R. 33, 39 (Bankr. D. Del. 2010) (district court's legal ruling prior to transfer to bankruptcy court was law of the case and could not be relitigated before bankruptcy court absent "extraordinary circumstances" warranting reconsideration, as "[f]ederal courts routinely apply law of the case principles to transfer decisions of coordinate courts"); *In re Vaso Active Pharms., Inc.,* 500 B.R. 384, 398-99 (Bankr. D. Del. 2013) (legal rulings from earlier summary judgment motion applied as law of the case to subsequent summary judgment motion); *In re W. Elecs., Inc.*, 1992 WL 184340, *8 (D. N.J. Jan. 9, 1992) (following withdrawal of the reference, district court holding that bankruptcy court's prior determination that defendant had not waived jury right was binding law of the case); *In re DuFrayne*, 194 B.R. 354, 358 (Bankr. E.D. Pa. 1996) (holding that "the factual findings made in the [bankruptcy court opinion denying plan confirmation] are the law of the case and are therefore binding on the parties in this [adversary] proceeding").

Defendants received is not in dispute.  *See, e.g.,* D.I. 42 at 8 (Defendants agreeing that "[t]here is

no dispute . . . as to the amount Defendants received").  No other facts are relevant to the Trust's

damages under federal law.

34.     Nor are there any material disputes of fact as to state-law damages.  Under the

Summary Judgment Order, the amount of outstanding creditor claims is $125.37 million, which is

the amount of allowed creditor claims ($210 million) minus the value of the Equity Interest under

the Plan ($84.63 million).    Adv. D.I. 624 at 20 n.7.  In light of the Plan's terms regarding

distribution of recoveries, the Trust must recover $250.74 million before creditors will be made

whole.  *Id.*  Because the Trust has already recovered ███████ in settlements, the outstanding

amount of creditor claims is ██████ .  *Id.*  Here as well, there are no disputed issues of fact

for the jury to decide.  The amount of the settlements is undisputed, and the Summary Judgment

Order establishes that the terms of the Plan are binding.

35.     Contrary to Defendants' arguments below, the fact that the Summary Judgment

Order was decided by a Bankruptcy Court does not render it non-binding.  The Bankruptcy Code

requires litigants who seek *de novo* review of a Bankruptcy Court ruling to file timely and specific

objections under 28 U.S.C. § 157(c)(1) and Fed. R. Bankr. P. 9033.  Congress "confine[d] review

to 'matters to which any party has timely and specifically objected,'" *Kontrick v. Ryan*, 540 U.S.

443, 453 (2004) (quoting 28 U.S.C. § 157(c)(1)), and this limitation is jurisdictional, *see In re

Wilkins*, 587 B.R. 97, 106 (B.A.P. 9th Cir. 2018).  A party's "failure to file objections eliminates

not only the need for de novo review, but *any* review by the district court."  *Leonard v. Dorsey &

Whitney LLP*, 553 F.3d 609, 620 (8th Cir. 2009) (emphasis in original); *see In re Monge*, 826 F.3d

250, 255 (5th Cir. 2016) ("By failing to file objections or to respond to the Monges' objections,

Rojas and Jayme have waived their right to appeal the proposed findings and to present any legal

issues in opposition to them."); *In re Ultimate Escapes Holdings, LLC*, 551 B.R. 749, 760 n.3 (D. Del. 2016) ("[A]ny unspecified objections are waived."); *In re Synergy Acceptance Corp.* (*Synergy II*), 2015 WL 6085304, *2 (N.D. Cal. Oct. 16, 2015) (same); *see also Continental Cas. Co. v. Dominick D'Andrea, Inc.*, 150 F.3d 245, 250 (3d Cir. 1998) (with respect to magistrate judge ruling, "the district judge need take no time reviewing the matter unless a party objects"). Defendants do not argue that they filed objections to the Summary Judgment Order, and the time for objections has passed. *See Synergy II*, 2015 WL 6085304, at *2-3; *In re Synergy Acceptance Corp.* (*Synergy I*), 2015 WL 3958155, *4 (N.D. Cal. June 29, 2015).[7]

36.     Defendants also are not entitled to *de novo* review of the Summary Judgment Order on the grounds that it was not labeled "proposed findings of fact and conclusions of law."  This Court's Standing Order of Reference re: Title 11 permits the Court to "treat *any order* of the bankruptcy court as proposed findings of fact and conclusions of law."  *Standing Order of Reference re: Title 11* (D. Del. Feb. 29, 2012) (emphasis added); *see also Synergy II*, 2015 WL 6085304 at *2-3 (treating bankruptcy court's summary judgment ruling as "proposed findings of fact and conclusions of law"); *Cole v. Strauss*, 2014 WL 4055787, *4 (W.D. Mo. Aug. 15, 2014) (same); *In re W. Elecs., Inc.*, 1992 WL 184340, *10 (D.N.J. Jan. 9, 1992) (same).  Further, if the Summary Judgment Order were merely interlocutory, Defendants still would have no right to *de novo* review.  *See In re Anderson News, LLC*, 2018 WL 2337132, *3 (D. Del. May 23, 2018) (rejecting argument that refusing to hear objections to interlocutory orders "deprived Defendants of their Constitutional right to proceed before an Article III Judge"); *In re Anderson News, LLC*,

---

[7] To the extent the Constitution limits the authority of non-Article III judges to issue certain final orders, it does not render their rulings nullities, but instead only requires that parties have the *opportunity* to seek further review before the entry of final judgment.  *Peretz v. United States*, 501 U.S. 923, 939 (1991) (where "de novo review is required to satisfy Article III concerns, it need not be exercised unless requested by the parties") (internal quotation marks omitted).

2015 WL 4966236, *2 (D. Del. Aug. 19, 2015) ("Even if the Bankruptcy Court lacks constitutional authority to enter a *final* judgment on Count XVI of Plaintiffs' claim, there is no constitutional constraint preventing it from entering interlocutory orders . . . regarding that same claim."); *Synergy I*, 2015 WL 3958155, *2-3 (denying objections to interlocutory orders without considering merits because "the Bankruptcy Judge, while lacking authority to enter a final judgment on the Trustee's fraudulent conveyance claims, had the power to enter interlocutory orders in connection therewith").

37.     Accordingly, the disagreements with the Summary Judgment Order that Defendants discuss in their portions of this Pretrial Order are not properly before the Court. For the reasons explained during the summary judgment proceedings, they are also erroneous. *See* Adv. D.I. 563, 575; Case No. 17-00319-LPS, D.I. 8.[8]

---

[8] Defendants err in arguing below that the jury can deviate from the measure of damages determined on summary judgment by applying "equitable" reductions. The Summary Judgment Order conclusively determined the measure of damages, finding that such awards would not yield a "windfall" notwithstanding the "equities" arguments that Defendants seek to reassert at trial. *Compare* Adv. D.I. 559 at 41 (Defendants arguing on summary judgment that principles of equity limit recovery under Section 550 to prevent windfalls), 48 (same, regarding UFTA) ; Adv. D.I. 572 at 36 ("[T]he Court should deny Plaintiff's cross-motion based upon the factual nature of the Court's ability to equitably adjust any recovery under section 550(a) of the Bankruptcy Code . . . or UFTA §8(c) . . . and hold that relevant factual considerations may be taken into account in determining the proper measure of recovery"), *with* Adv. D.I. 624 at 19 ("[T]he Court does not see a windfall from recovery in the fraudulent transfer action."). The Bankruptcy Court considered and rejected Defendants' arguments for "equitable" reductions.

In any event, "the Trustee's recovery of a cash transfer" cannot be limited "for equitable reasons." *Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 487 (Bankr. S.D.N.Y. 2017); *see In re Tronox Inc.*, 503 B.R. 239, 332 n.121 (Bankr. S.D.N.Y. 2013) ("Damages cannot be limited in this case solely on the ground that it is 'equitable' to do so"). Even if it could be so limited, any equitable reductions would be for the Court to determine after trial. *See GlaxoSmithKline LLC v. Glenmark Pharm. Inc.*, 2017 WL 8948975, at *7 (D. Del. May 30, 2017) ("equitable defenses . . . are exclusively for the District Court to decide"), report and recommendation adopted, 2017 WL 2536468 (D. Del. June 9, 2017) (Stark, J.); *Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc.*, 2017 WL 2840352, at *2-3 (E.D. Pa. June

## PREJUDGMENT INTEREST

38.     The Parties agree that prejudgment interest is a matter to be decided by the Court after trial if the jury renders a verdict on liability for Plaintiff.  *See* D.I. 42 at 8 (Defendants' argument that prejudgment interest is an issue for determination by the Court); *see, e.g.*, *Ambromovage v. United Mine Workers of Am.*, 726 F.2d 972, 981-82 (3d Cir. 1984) ("[T]he awarding of prejudgment interest under federal law is committed to the trial court's discretion[.]"); *Am. Home Assurance Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 329 (3d Cir. 1985).  "The question of whether to award prejudgment interest is often addressed through post-trial motions." *Hoggard v. Allstate Ins. Co.*, 2005 WL 6786727, at *2 (3d Cir. Dec. 21, 2005); *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2010 WL 815466, at *2 (M.D. Pa. Mar. 3, 2010) ("postjudgment motions for prejudgment interest are commonly pursued under Rule 59(e)").  Thus, post-trial briefing is the appropriate procedure for the determination of prejudgment interest (if any) in this case, if the jury returns a verdict in favor of Plaintiff.  The parties reserve their rights to present their respective positions on the availability and amount of prejudgment interest at that time.

## DEFENDANTS' AFFIRMATIVE DEFENSES AND OTHER NEW ARGUMENTS

39.     In the Section that follows, Defendants present lengthy arguments regarding the purported merits of their defenses.  Because Plaintiff does not believe such arguments (which Defendants elected not to make on summary judgment) should be briefed in a Pretrial Order, the Trust does not respond to each argument at length.  The Trust does, however, show below that most of Defendants' purported defenses are not issues for the jury trial.

---

30, 2017) (addressing potential equitable adjustments under UFTA after trial).  In *Sauer v. Publisher Servs., Inc.*, 2016 WL 4409209 (N.D. Ga. Aug. 19, 2016), on which Defendants rely, the court had not determined the measure of damages prior to trial, and the plaintiff did not object to the submission of equitable defenses to the jury, as the Trust does here.

40.     **Release.**  Defendants argue that the Trust is bound by a release executed by the parties to the Merger Agreement, but the Bankruptcy Court and this Court have already rejected that defense.  Defendants moved to dismiss the Trust's complaint based on the release.  Adv. D.I. 107 at 22, 53-59.  The Bankruptcy Court denied that motion, ruling as a matter of law that "because the Trustee was not a party to the Release he is not bound by the terms of the agreement."  Adv. D.I. 250 at 30.  As the Bankruptcy Court explained, given that a pre-petition debtor cannot pursue fraudulent transfer claims in bankruptcy, "[i]t follows that the pre-petition debtor may not waive such claims either.  The avoidance powers under the Code are within the unique purview of the trustee, and courts have noted that 'prior to bankruptcy a debtor may not waive bankruptcy rights that inure to the benefit of unsecured creditors not a party to that waiver.'"  *Id.* at 30-31 (citation omitted); *see also Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153-55 (3d Cir. 1989) (trustee not bound on avoidance claims by pre-petition contract of the debtor).  Defendants requested interlocutory review of this ruling, which this Court denied on the grounds (*inter alia*) that Defendants had not "identified an issue on which there exists substantial grounds for disagreement."  1:16-mc-00201-LPS, D.I. 22 at 24.  These rulings are now the law of the case, and Defendants have not identified any basis for reconsideration.  *See N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (reconsideration may be appropriate only if there is "(1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; [or] (3) the need to correct clear error [of law] or prevent manifest injustice.") (quotations and citations omitted; alterations in original).

41.     Defendants suggest below that the release should apply because the Trust's cause of action may be recharacterized as a claim for fraudulent inducement on behalf of Court Square, rather than fraudulent transfer on behalf of the estate.  This odd argument is unavailing.  The Trust

filed fraudulent transfer claims, which belonged in the first instance to the bankruptcy estate and the Debtor's creditors (not Court Square), and has not pled a claim for fraudulent inducement. Defendants cannot change the nature of the Trust's claims to make an inapposite defense apply.

42.    **Ratification.**    Nor can Defendants pursue a "participation," "ratification," or "estoppel" defense at trial, for several reasons.  *First,* defenses to the Trust's federal law claims are limited to those set forth in the Bankruptcy Code, which does not include such a defense.  *See In re Teleservices Grp., Inc.,* 444 B.R. 767, 842 (Bankr. W.D. Mich. 2011) (limiting defendant to statutory defenses under Section 548 because "[t]his court is not empowered to create other equitable defenses"); *In re Equip. Acquisition Res., Inc.*, 2012 WL 4754949, at *4 (Bankr. N.D. Ill. Sept. 28, 2012) (same); *Auto. Professionals, Inc.,* 398 B.R. 256, 261 (Bankr. N.D. Ill. 2008) (similar).

43.    *Second,* this defense does not apply under state law either.  The Bankruptcy Court ruled that this defense could apply *only if* Defendants show that the Noteholders "intended to extend credit to an insolvent company."  Adv. D.I. 250 at 28; *see id.* at 27 ("Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding.") (citing 57 N.Y. Jur. 2d Estoppel, Ratification, and Waiver § 87.6 at 692).  This Court found no "substantial grounds for difference of opinion" with this ruling as well, Case No. 16-00201-LPS, D.I. 22 at 20, and it is the law of the case.  Defendants have not identify any basis for reconsideration.  *See N. River Ins.*, 52 F.3d at 1218.  Below, Defendants advocate a different *legal* standard, but do not claim they can meet the established legal standard.  Because they cannot—no evidence suggests that any (let alone all) of the Noteholders knew at the time of the Transaction

that it was fraudulent or that Physiotherapy was insolvent—this defense is not applicable.[9]

44.     *Third,* this equitable defense would be for the Court, not the jury, even if it were

viable.  "[R]atification is an equitable defense," *Genger v. TR Inv'rs, LLC,* 26 A.3d 180, 195 (Del.

2011), as is "estoppel," *Schering Corp. v. Amgen Inc.*, 969 F. Supp. 258, 269 (D. Del. 1997).  If

this or any other equitable defense *could* apply, it would be for the Court to decide after trial, not

for the jury.  *See GlaxoSmithKline LLC v. Glenmark* Pharm. Inc., 2017 WL 8948975, at *7 (D.

Del. May 30, 2017) ("equitable defenses . . . are exclusively for the District Court to decide and

therefore (absent some further ruling by the District Court) would not be relevant for the jury

trial."), report and recommendation adopted, 2017 WL 2536468 (D. Del. June 9, 2017) (Stark, J.);

*Schering*, 969 F. Supp. at 269 (same).

45.     **Offset Under Section 502(h).**  Defendants assert a right to an "offset" under 11

U.S.C. § 502(h).  That statute provides:  "A claim arising from the recovery of property under

section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection

(a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as

if such claim had arisen before the date of the filing of the petition."  This statute does not provide

---

[9] The Bankruptcy Court's ruling is consistent with established law.  *See, e.g., In re Tronox Inc.*, 503 B.R. 239, 276 (Bankr. S.D.N.Y. 2013) (explaining that ratification defense could apply only if "the bondholders knowingly gave sanction to the fraudulent conveyances complained of in this case"); Case No. 16-00201-LPS, D.I. 13 at 9-13 (collecting authorities).  As the Bankruptcy Court explained, the cases on which Defendants now rely for a different legal standard are inapplicable.  Defendants' primary authority, *Weisfelner v. Fund I (In re Lyondell Cehm. Co.)*, 503 B.R. 348 (Bankr. S.D.N.Y. 2014), is "highly distinguishable because . . . there were no allegations that the *Lyondell* lenders relied on false financial statements."  Adv. D.I. 250 at 28.  And in *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc*., 479 B.R. 405, 411 (N.D. Tex. 2012), the court did consider the established standard for ratification.  That missing analysis is key, as *Tronox* explained:  "If the decision to become a creditor of an entity constitutes a ratification sufficient to bar that creditor from filing a fraudulent conveyance complaint . . . few such actions could be brought, even though it is well accepted that they may have claims under the fraudulent conveyance laws."  503 B.R. at 276.

a defense for trial, for several reasons.

46.     *First*, Section 502(h) is not an issue for this proceeding.  Under this statute, a "claim arising from the recovery of property" from a transferee will be "allowed" or "disallowed" in certain circumstances.  But where a claim arises from the recovery of property under Section 550, it is disallowed under Section 502(d) "*unless such . . .  transferee has paid* the amount . . . for which such entity or transferee is liable under section . . . 550."  (Emphasis added.)  Accordingly, as numerous authorities recognize, a transferee does not have a Section 502(h) claim unless and until it "satisf[ies] the judgment arising out of the fraudulent transfer action."  *In re Best Prod. Co., Inc.*, 168 B.R. 35, 58 (Bankr. S.D.N.Y. 1994); *In re Tronox Inc.*, 503 B.R. 239, 330 (Bankr. S.D.N.Y. 2013) (a claim under Section 502(h) only arises "after" a fraudulent transfer is returned, unless the plan provides otherwise); *Tronox*, 464 B.R. at 611 & n.8, 618 (same).  That cannot happen in this proceeding.  Moreover, under the confirmed Bankruptcy Plan, any post-judgment "claim" arising under Section 502(h) would be for the Bankruptcy Court to adjudicate in a separate, post-trial proceeding.  *See* Bankr. D.I. 197 at ¶ 81 ("This Court shall have exclusive jurisdiction" over "any claim . . . by a Defendant" under Section 502).  Defendants cite no authority that Section 502(h) provides a defense for trial in a fraudulent transfer action.

47.     *Second,* Section 502(h) is not applicable to transfers to equity holders.  This statute permits reinstatement of a claim where a *creditor* that has a *pre-existing claim* against the Debtor is required to return a preference or transfer.  *See In re Redf Marketing, LLC*, 536 B.R. 646, 655 (W.D.N.C. 2015) ("As pled, the majority of [fraudulent transfer] defendants were not creditors of the debtor, the payments were not made on debts owed by the debtor, and defendants would therefore never have viable claims under 11 U.S.C. § 502(h)."); *In re Toy King Distribs., Inc.,* 256 B.R. 1, 204 (Bankr. M.D. Fla. 2000) ("[Transferees] were never creditors of the debtor with respect

71

to the TKA and M & D obligations. . . . Because [transferees] are not creditors of the debtor, they may not assert a claim on that basis."). "Congress enacted § 502(h) and its predecessor to protect *creditors* whose pre-petition claims were paid by pre-petition transfers that were later avoided or recovered by the Trustee or Debtor in Possession." *In re Gurley*, 311 B.R. 910, 918-19 (Bankr. M.D. Fla. 2001) (emphasis added); *see id.* ("The mere reversal of a pre-petition transfer does not automatically cause a claim to 'arise' in favor of the disappointed transferee."). As former equity holders, Defendants cannot rely on Section 502(h). *See id.* at 919; *Southmark Corp. v. Schulte, Roth & Zabel, L.L.P.*, 242 B.R. 330, 342 (N.D. Tex. 1999) (rejecting Section 502(h) defense because, "[a]t the time of the transfer, [transferee] was not a creditor of [debtor]").

48.     *Third,* the statute is not applicable where, as here, a transferee did not give value *to the Debtor* in exchange for a transfer. *See In re Duplication Mgmt. Inc.*, 510 B.R. 446, 453 (Bankr. D. Mass. 2014) ("The Bank defendants simply were not, and cannot be by virtue of § 502(h), creditors of the Debtor's bankruptcy estate where they provided no consideration to the Debtor for the mortgage or the payments."); *In re Dreier LLP*, 2012 WL 4867376, at *3-4 (Bankr. S.D.N.Y. 2012) (similarly rejecting Section 502(h) claim:  "PHH does not allege that it gave any consideration to Dreier LLP in exchange for the payment that Dreier LLP made at the closing. Because it gave no consideration to Dreier LLP, the return of fraudulently transferred funds would not reinstate a valid claim"). As shown earlier, Defendants' redemption of their equity interest in the Debtor conferred no value on the Debtor.

49.     **Offset Under Section 548(c).**  Defendants' claim to an offset under Section 548(c) is not an issue for trial either.  This statute provides that, in certain circumstances, "a transferee . . . that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee . . . gave value *to the debtor* in exchange for such transfer . . . ."  11

U.S.C. § 548(c) (emphasis added).  As this statutory language makes clear, a transferee seeking to invoke the good faith defense must demonstrate not only that it received the transfer in exchange "(1) for value *and* (2) in good faith," but also that it "(3) claim[s] the applicable right to the interest only to the extent the transferee gave value *to the debtor* in exchange."  *Adler*, 263 B.R. at 471 (second emphasis added); *see In re Positive Health Mgmt.*, 769 F.3d 899, 908 (5th Cir. 2014) ("Courts have thus netted the amounts received in a fraudulent transfer against *the value given to the debtor*.") (emphasis added); *In re Brooke Corp.*, 568 B.R. 378, 416–17 (Bankr. D. Kan. 2017) (transferee had no defense under Section 548(c) because it "did not transfer any value *directly to [the debtor]*") (emphasis added); *In re Lockwood Auto Grp., Inc.*, 370 B.R. 652, 657 (Bankr. W.D. Pa. 2007) (same); *In re Energy Sav. Ctr., Inc.*, 61 B.R. 732, 736 (E.D. Pa. 1986) (similar).  As discussed above, the cancellation of Defendants' stock did not confer value on the Debtor.  The Section 548(c) defense thus does not apply as a matter of law.  *See, e.g.*, *In re Oxford Homes, Inc*., 180 B.R. 1, 11 (Bankr. D. Me. 1995) (Section 548(c) did not apply because seller provided value only to purchaser, not debtor); *In re Structurelite Plastics Corp.*, 193 B.R. 451, 461-62 (S.D. Ohio 1995) (same), *rev'd in part on other grounds*, 224 B.R. 27 (B.A.P. 6th Cir. 1998); *In re Bay Plastics, Inc.*, 187 B.R. 315, 336 (Bankr. C.D. Cal. 1995) (same, under analogous provision of UFTA).

50.     Moreover, because the Transaction rendered the Debtor insolvent, Defendants' stock had no value.  The value of consideration given in exchange for a transfer is "determined at the time the transfer is made."  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2018 WL 1442312, at *5 (Bankr. S.D.N.Y. Mar. 22, 2018).  At the time the transfer was made, Physiotherapy had taken on $310 million in debt, and as the Trust will show at trial, its assets were worth no more than ███████████  The Company was thus insolvent, and the stock of its former

equity holders was worthless.

51.     **Safe Harbor.**  Defendants misstate the law regarding their safe harbor defense under 11 U.S.C. § 546(e).  *First,* both the Bankruptcy Court and this Court have already ruled that this defense does not apply to the Trust's state-law claims.   The Bankruptcy Court denied Defendants' motion to dismiss those claims based on the same preemption arguments they make here.  *See* Adv. D.I. 250 at 20 (ruling "that the safe harbor does not preempt [the Trust's] state law fraudulent transfer claims").  This Court denied leave to appeal, finding that Defendants failed to establish "that a substantial ground for difference of opinion exists, as the Bankruptcy Court's preemption analysis followed well-established Third Circuit and Supreme Court law."  16-mc-00201-LPS, D.I. 22 at 15.  These rulings are the law of the case, and Defendants again do not identify any changed circumstances that warrant further review.

52.     *Second,* the safe harbor does not apply to the Trust's federal-law constructive fraudulent transfer claim either.[10]  The Bankruptcy Court initially dismissed this claim based on Third Circuit precedent holding that the presence of a bank as an intermediary in a transaction was sufficient to trigger the safe harbor.  Adv. D.I. 250 at 25.  Subsequently, the Supreme Court held in *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 892-93 (2018), that the involvement of a bank as an intermediary is *not* sufficient to trigger the safe harbor, and the Bankruptcy Court reinstated the Trust's claim, Adv. D.I. 851 at 2.  Defendants now argue that the presence of a bank as an intermediary *is* sufficient to trigger the safe harbor if the parties to the transaction *hired* the bank, as that turns the parties into the bank's "customers," thereby turning *the parties themselves* into "financial institutions" entitled to the protections of the safe harbor.

---

[10] Defendants do not argue that the safe harbor applies to the Trust's actual fraudulent transfer claim under federal law.

53.     This counterintuitive argument is wrong.   If accepted, this exception would completely swallow the rule, recognized by the Supreme Court just last year, that the presence of a bank as an intermediary in a transaction is not sufficient for application of the safe harbor.   Banks are hired to act as intermediaries in almost every financial transaction.   An ordinary party's hiring of a bank does not turn that party into a "financial institution."   As the Trust will show more fully elsewhere, the single district court decision on which Defendants rely for their position, rendered by a court outside the Third Circuit, was decided in error and did not fully consider the operative text or structure of the governing statute.   *See In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786, *6 (S.D.N.Y. Apr. 23, 2019) (ruling that undue prejudice was a "sufficient" basis on which to deny leave to amend, and addressing meaning of "financial institution" in *dicta*).

54.     In any case, there is no issue for the jury to decide with respect to the safe harbor. Defendants argue that they, Court Square, and Physiotherapy are all financial institutions entitled to the benefit of the safe harbor.   The Trust will show that they are not.   Whether these entities constitute "financial institutions" is a pure issue of statutory interpretation that should be decided by the Court.   *See, e.g.*, *Marin v. King*, 720 F. App'x 923, 938 (10th Cir. 2018) (whether an individual meets a statutory definition is "a matter of statutory interpretation; thus a question of law for a court to decide rather than a question of fact for a jury to decide").   The Trust intends to address this issue further via the parties' submission of competing jury instructions, and will show that this defense has no application to this case.

55.     **Transfer By Debtor.**   Finally, for the first time in this case and one the eve of trial, Defendants make a new argument below that the $248.6 million transfer may not be avoided because it was not made by the Debtor.   This last minute assertion—made for the first time in this Pretrial Order—flies in the face of well-settled principles of fraudulent conveyance law, and is not

an issue for trial.

56.      *First,* Defendants' new argument is wrong—it is an elevation of form over substance that has long been rejected by courts and commentators.  The Transaction encumbered the Debtor with $310 million in new debt.  As Defendants acknowledge, that debt was used to pay the Defendants:  "The Offering Memorandum provided to prospective Noteholders made clear that the proceeds of the Senior Notes would be used to purchase PTA stock from the shareholders, including Water Street and Wind Point."  Adv. D.I. 107 at 33.  Defendants' assertion that Physiotherapy lacked any rights to the money that it borrowed, merely because that money did not enter a Physiotherapy bank account, is nonsense.[11]

57.      The Bankruptcy Code defines a transfer to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . property or . . . an interest in property."  11 U.S.C. § 101(54); *see* 6 Del. C. §1301(12) (same under DUFTA).  In light of this broad language, "a transfer does not have to be made directly by a debtor in order to fall within the ambit of the [fraudulent transfer] statute."  *In re Arbogast*, 466 B.R. 287, 310–11 (Bankr. W.D. Pa.), *aff'd*, 533 F. App'x 150 (3d Cir. 2013) (internal citation omitted).  Courts routinely hold that a transfer may be avoided even if the debtor did not transfer the property itself.  *See, e.g., In re Wettach*, 811 F.3d 99, 115 (3d Cir. 2016) (transfer that debtor caused to be paid by a third party to another third party was avoidable because "[a] person may not do by indirection what he is forbidden to do directly"); *In re Marshall*, 550 F.3d 1251, 1256 (10th Cir. 2008) (where

---

[11] Whether the Debtor had a property interest is a question of law for the Court.  *In re Cascade Ag Servs., Inc.*, 2017 WL 5017405, at *7 (B.A.P. 9th Cir. Nov. 2, 2017) ("[W]hich entity owned the [property] is a legal conclusion for the court to determine"); *Tarabishi v. McAlester Reg'l Hosp.*, 827 F.2d 648, 652 (10th Cir. 1987) ("Whether the facts establish a property interest is a question of law.").

debtors directed lender to pay loan proceeds to a third party, reversing ruling that transfer could not be avoided); *In re Craig*, 144 F.3d 587, 592 (8th Cir. 1998) (same).[12]

58.     These principles apply in the context of leveraged transactions.  In *In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289 (D. Del. 2012), for example, the defendants argued there was no transfer by the debtor because the "the Lenders wired funds directly to [Defendants]" and the debtor "never took possession of the funds." *Id.* at 298.  This Court rejected that assertion, explaining that "although Defendants received the dividend directly from the Lenders," it "truly defies logic" and "would be paradoxical to allow the Parties to offer Debtors' property as collateral, abscond with the proceeds of the loan in the form of a dividend, and yet declare that the Debtors had no interest in property." *Id.* at 299.  Similarly, the court in *Lyondell* rejected an argument that plaintiff could not avoid transfers that "came from the LBO lenders through their paying agent to Lyondell stockholders" as "puzzling, to say the least," because the debtor's "pre-existing assets were pledged as collateral for the LBO Lenders' loans." *In re Lyondell Chem. Co.*, 503 B.R. 348, 381 (Bankr. S.D.N.Y. 2014), abrogated on other grounds by In re Tribune Co. Fraudulent Conveyance Litig., 818 F.3d 98 (2d Cir. 2016).

59.     Here, the Debtor took on $310 million in debt in order to fund the transfers to Defendants.  Although a shell entity was the initial issuer of the debt, that shell entity had no assets, no income, and no ability to borrow without the backing of the Debtor.  Indeed, the relevant contracts "provided that immediately following the Acquisition and the Merger, the [Debtor] shall

---

[12] *See also, e.g., In re Scheffler*, 471 B.R. 464, 485 (Bankr. E.D. Pa. 2012) (debtor who guaranteed mortgages had property interest in transferred house even though he lacked title); *In re Khan*, 2014 WL 10474969, at *12 (E.D.N.Y. Dec. 24, 2014) (debtor that owned 25% of real property had property interest in proceeds of mortgage paid to third party); *In re FBN Food Servs., Inc.*, 185 B.R. 265, 272–73 (N.D. Ill. 1995) (the "fact that [the debtor] did not actually cut the check … does not undermine the bankruptcy court's conclusion that the debtor actually had an interest in the property").

become the borrower."  PTX 906 (WATERST000177 at 396, 417) (Debt Commitment Letter).

Before the Transaction closed, the Debtor agreed to assume the $310 million in debt "at Closing."

PTX 870, 841 (Joinder and Assumption Agreement for Senior Notes, Assumption Agreement for

Term Loan).  After the closing, *Physiotherapy*—not Court Square, as Defendants state—instructed

the intermediary that held the funds (Wells Fargo) to make the transfers of $248.6 million to

Defendants.  PTX 837 (WATERST089881) (Instructions to Paying Agent).  The Debtor was thus

the ultimate entity that (1) borrowed the money and (2) instructed the paying agent to pay it to

Defendants.

   60. This is a classic LBO transaction, which has been subject to fraudulent transfer laws

for decades.  *See, e.g., United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1297 (3d Cir.

1986).  Under the collapsing doctrine, courts have long recognized the risk that LBO sponsors may

try to immunize themselves from fraudulent transfer liability by structuring a transaction with

intermediate shell companies.  *See, e.g., In re Syntax-Brillian Corp.*, 573 F. App'x 154, 160 (3d

Cir. 2014) (collapsing doctrine is "equitable tool by which a court may 'collapse' multiple

apparently innocuous transactions for purposes of a fraudulent transfer analysis and consider the

economic reality of the integrated whole"); *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787,

793 (7th Cir. 2009) (Posner, J.) (the "fraudulent conveyance doctrine … is a flexible principle that

looks to substance, rather than form, and protects creditors from any transactions the debtor

engages in that have the effect of impairing their rights"); *Orr v. Kinderhill Corp.*, 991 F.2d 31,

35 (2d Cir. 1993) ("Where a transfer is only a step in a general plan, the plan 'must be viewed as

a whole with all its composite implications.'"); *In re Pinto*, 89 B.R. 486, 497 (Bankr. E.D. Pa.

1988) (rejecting argument seeking "to irrationally break down the present transaction into minute

detail to support . . . contention that no transfer occurred").  Here, the $310 million debt that

Physiotherapy took on cannot be separated from the $248 million transfer to Defendants—both were required to close the transaction, and without the debt there would have been no funds to transfer.   Defendants' argument that the "collapsing" doctrine does not permit avoidance of a transfer of property that does not belong to a debtor misses the point, because the property here did belong to the Debtor.   The only authority Defendants invoke, *Crystallex Int'l Corp. v. Petroleos de Venezuela, S.A.*, 213 F. Supp. 3d 683, 693 (D. Del. 2016), is factually distinguishable.[13]

61.    *Second,* this new, last ditch theory of the case is waived.   After four years of litigation, Defendants cannot now argue for the first time in a Pretrial Order that the Debtor never made a transfer.   Such trial by ambush is improper.   Early in this case, the Trust asked Defendants to "[s]tate all bases for [their] contention that the transfer of funds to [Defendants] in connection with the Transaction was not a fraudulent conveyance."   Trust's Interrogatories (Set 2), No. 6.   In their response, Defendants did not (1) disclose their theory that the Debtor did not make a transfer, or (2) assert, as they do now, that the Debtor lacked "property rights in the $248.6 million" transferred to Defendants.

62.    To the contrary, Defendants acknowledged that the transfer *was* made by the Debtor.   For example, Water Street answered an interrogatory asking Defendants to "[d]escribe the flow of funds received by You in connection with the Transaction," Trust's Interrogatories (Set 1) No. 3, by referring to a chart that identified the "TRANSFERS FROM PHYSIOTHERAPY ASSOCIATES HOLDINGS, INC"—that is, *from the Debtor*—to Defendants.   PTX 895 (Water

---

[13]    In *Crystallex*, a creditor of Venezuela sued an alter ego of Venezuela and its subsidiaries in the United States, seeking to avoid dividends issued by those subsidiaries up the corporate chain and out of the country to Venezuela.   As this Court explained, the only debtor was Venezuela, the only transferors were its subsidiaries, and Venezuela did not have a property interest in its subsidiaries' assets before they were transferred.   *Id.* at 686, 690-693.   The debtor was thus a foreign *transferee* that did not have a property interest in the transferred funds.   *Id.* at 690-691. Here, the Debtor was a transferor which took out loans to pay dividends to its owners.

Street's Resp. to Trust's Interrogatories (Set 1), No. 3: "Water Street refers the Litigation Trust to documents previously produced by Water Street bearing bates numbers WATERST003085-88."), PTX 377 (WATERST003085).   In their motion to dismiss, Defendants challenged the Trust's claims on the grounds that the Trust could not show the requisite fraudulent intent *on the part of Physiotherapy*, the transferor.   *See* Adv. D.I. 107 at 68 ("the relevant intent in this case is that of … PTA's Board of Directors").   And on summary judgment, the Bankruptcy Court noted based on undisputed facts that, "[a]s a result of the LBO, *Physiotherapy* transferred $248.6 million of the proceeds to Defendants."   Adv. D.I. 624 at 3 (emphasis added).

63.   Defendants never before raised their theory that the $248.6 million did not belong to Physiotherapy.   They should not be permitted to raise this new argument now.   *Fed. R. Civ. P.* 37(c)(1) ("If a party fails to provide information … as required by Rule 26(a) or (e), the party is not allowed to use that information … at a trial, unless the failure was substantially justified or is harmless."); *see, e.g., CPC Int'l, Inc. v. Archer Daniels Midland Co.*, 831 F. Supp. 1091, 1102-03 (D. Del. 1993) (defendant waived theory not disclosed in interrogatory response); *AstraZeneca AB v. Mut. Pharm. Co.*, 278 F. Supp. 2d 491, 508 (E.D. Pa. Aug. 21, 2003) (same); *see also, e.g., ING Bank, FSB v. Am. Reporting Co., LLC*, 859 F. Supp. 2d 700, 704 (D. Del. 2012) (plaintiff could not "alter its theory of the case" shortly before trial, as doing so would "unduly prejudice the defendant by forcing it to prepare to defend against a new theory of the case").   Had Defendants disclosed their new theory in a timely manner, the Trust could have easily sought documents from Defendants and deposition testimony from witnesses that would have further laid bare Defendants' attempt to elevate form over substance and inability to break down this LBO transaction into multiple unrelated parts.   The Trust would have also moved for summary judgment on Defendants' spurious theory.   Having been deprived of these opportunities, the Trust should not be required to

tackle this theory for the first time at trial.

### B.     Defendants' Issues of Law

### <u>PLAINTIFF FAILED TO PROPERLY IDENTIFY AN AVOIDABLE TRANSFER</u>

As an initial matter, this Court must decide whether the transfer Plaintiff seeks to avoid "meets the characteristics set out under the substantive avoidance provisions." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 894 (2018).  Plaintiff "is not free to define the transfer that it seeks to avoid in any way it chooses.  Instead, that transfer is necessarily defined by the carefully set out criteria in the Code."  *Id.*  Plaintiff's claims fail at the outset because Plaintiff "failed to properly identify an avoidable transfer under the Code."  *Id.*

Both federal and state fraudulent transfer law require a transfer by a "debtor."  *See* 11 U.S.C. § 548(a)(1) (trustee may avoid a "transfer of an interest of the debtor in property"); 6 Del. C. §§ 1304(a), 1305(a) (a plaintiff may avoid a "transfer made . . . by a debtor"); 6 Del. C. § 1306(4) ("A transfer is not made until the debtor has acquired rights in the asset transferred.").[14]

Plaintiff identifies the transfer it seeks to set aside as "approximately $248.6 million" allegedly transferred to Defendants "on account of their former membership interests in the Debtor (the 'Stock Distributions')."  D.I. 1 ¶ 111.  Plaintiff identifies the "Debtor" as Physiotherapy

---

[14] *See also*, *e.g.*, *Crystallex Int'l Corp. v. Petroleos de Venezuela, S.A.*, 213 F. Supp. 3d 683, 693 (D. Del. 2016) ("*Crystallex I*") (Stark, J.) ("a transfer is not made until the debtor has acquired rights in the asset transferred") (quoting 6 Del. C. § 1306(4)), *rev'd on other grounds that strengthen the point made here*, 879 F.3d 79, 81 (3d Cir. 2018) ("*Crystallex II*") ("a transfer by a non-debtor cannot be a 'fraudulent transfer'"); *In re Plassein Int'l Corp.*, 366 B.R. 318, 326 (Bankr. D. Del. 2007) ("Since no Debtor made a transfer, there is no legal basis for any fraudulent conveyance claim."); *In re Robert L. Dawson Farms, LLC*, No. 18-00127-5-DMW, 2019 Bankr. LEXIS 1567, *16 (Bankr. E.D.N.C. May 20, 2019) ("logic and equity dictate that a debtor should not be able to claim a retroactive interest in property transferred by a non-debtor").

Associates Holdings, Inc. ("Physiotherapy").  *Id.* ¶ 2.[15]  **But Physiotherapy never transferred $248.6 million to Defendants; neither directly nor through intermediaries**.

On the contrary, the gravamen of Plaintiff's complaint is that **Court Square** allegedly was fraudulently induced to pay Defendants more than they deserved for their shares in Physiotherapy, which Court Square purchased by means of a reverse triangular merger.  To consummate that merger, Court Square contributed $213 million in cash to its subsidiary, Physiotherapy Holdings, Inc. ("Buyer").  Buyer's subsidiary, Physiotherapy Merger Sub., Inc. ("Merger Sub") borrowed $310 million, $210 million of which came from the Noteholders.  Buyer—**not Physiotherapy**— then transferred the $248.6 million that Plaintiff identifies as the transfer it seeks to avoid to Wells Fargo, the Paying Agent.  Wells Fargo, in turn, distributed the funds to Defendants in exchange for the surrender of their shares in Pre-Sale Physiotherapy, which then merged with Merger Sub to become the Surviving Corporation, *i.e.*, Court Square Physiotherapy.  There was **no** transfer from Physiotherapy to Defendants, anywhere in the chain, and no amount of "collapsing" can create such a counterfactual transfer.  *See Crystallex I*, 213 F. Supp. 3d at 692-93.

In fact, the fatal flaws in Plaintiff's theory of this case are similar to those this Court identified in *Crystallex I*.  There, CITGO Holding issued $2.8 billion in debt, the proceeds of which were paid to its parent company, PDVH, and then to PDVH's parent, Petróleos, as a dividend.  *See id.* at 687.  The plaintiff asked this Court to "collapse" those transactions in order to hold CITGO Holding liable, but this Court refused.  *See id.* at 692-93.  As the Court noted, the "collapsing doctrine is often used to analyze the motivations for a transfer as opposed to whether (and when) a transfer of debtor property occurred in the first place." *Id.* at 692.  But where, as here, the issue is

---

[15] It is often important to distinguish between Physiotherapy as it existed before and after Court Square bought it.  The former is sometimes referred to here as "Pre-Sale Physiotherapy"; the latter as "Court Square Physiotherapy."

"whether and when 'property of a debtor' was 'transferred' and, if so, who the parties to that transfer were," the "collapsing doctrine does not cleanly fit," and should not be applied. *Id.* at 692-93. In particular, the Court refused to apply the collapsing doctrine where doing so would have the effect of "turning CITGO Holding into a substantive transferor, which would impermissibly imply Petróleos held property rights in Transaction funds prior to the final dividend declaration," and "would also be inconsistent with the condition that 'a transfer is not made until the debtor has acquired rights in the asset transferred.'" *Id.* (quoting 6 Del. C. § 1306(4)). That ruling was not challenged on appeal. *See Crystallex II*, 879 F.3d at 82 n.2. Moreover, the Third Circuit held that, in addition to dismissing CITGO Holding, this Court also should have dismissed PDVH because it was also not a debtor, and "a transfer by a non-debtor cannot be a 'fraudulent transfer.'" *Id.* at 81; *see also id.* at 85-86 (explaining that this is true under both the Bankruptcy Code and the Delaware Uniform Fraudulent Transfer Act (DUFTA)).

Similarly, Plaintiff's theory of this case impermissibly implies that Physiotherapy held property rights in the $248.6 million when the transfer occurred, prior to the consummation of the merger. *Cf. Crystallex I*, 213 F. Supp. 3d at 693. But the transfer came from ***Buyer***, Court Square's subsidiary, both of which (along with Merger Sub) were on the opposite side of the Transaction from Physiotherapy at the time of the transfer. And even after the transfer, Physiotherapy had no rights to the $248.6 million, because those funds were never intended for Physiotherapy, but for its former shareholders. Moreover, at the time of the transfer, ***Physiotherapy was not a debtor to the Noteholders in this case***. After the transfer and merger, Court Square Physiotherapy took on Merger Sub's debts to the Noteholders. But that was the result of ***an entirely different transaction***

83

between Court Square and the Noteholders,[16] which Court Square was responsible for, and

Buyer and Merger Sub promised would not harm creditors,[17] and even if it did, would not be

blamed on Defendants.[18]

These facts, among others, also defeat Plaintiff's misleading effort to leverage the case law

involving leveraged buyouts (LBOs).  The Transaction here does not fit the mold of Plaintiff's

cases for many reasons, starting with the fact that nobody contends that the allegedly "leveraged"

aspect of the Transaction (i.e., the existence of debt financing) was part of an "overall scheme to

defraud creditors."  In re Bachrach Clothing, Inc., 480 B.R. 820, 855 (Bankr. N.D. Ill. 2012)

(citations omitted).  On the contrary, Court Square—through its subsidiaries Buyer and Merger

Sub—explicitly represented and warranted that the Transaction was nothing of the kind.  See

Merger Agr. § 8J.  Neither Plaintiff nor the Noteholders can claim otherwise because the

Noteholders knew "that they were lending for the purposes of [a purported] LBO, and that the

proceeds of their loans were going to stockholders."  In re Lyondell Chem. Co., 503 B.R. 348, 385

---

[16] See Merger Agr. § 9B(iv) ("[E]ach of Buyer and Merger Sub affirms that it is not a condition to the Closing or to any of their other obligations under this Agreement that Buyer and/or Merger Sub (or the Surviving Corporation) obtain financing for or related to any of the transactions contemplated by this Agreement (including the Financing).").

[17] See id. § 8J ("Solvency. As of the Closing and immediately after giving effect to the transactions contemplated hereby (including the incurrence of the Debt Financing), Buyer and each of its Subsidiaries (including the Surviving Corporation and its Subsidiaries) shall be able to pay their respective debts as they become due and shall own property which has a fair saleable value greater than the amounts required to pay their respective debts when due (including all contingent liabilities). As of the Closing and immediately after giving effect to the transactions contemplated hereby, Buyer and each of its Subsidiaries (including the Surviving Corporation and its Subsidiaries) shall have adequate capital to carry on their respective businesses. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Buyer and its Subsidiaries (including the Surviving Corporation and its Subsidiaries).").

[18] See id. § 11B (agreeing to indemnify Defendants and hold them harmless for any failure of the foregoing representation and warranty as to solvency).

(Bankr. S.D.N.Y. 2014), *abrogated on other grounds by In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016) ; *see also*, *e.g.*, *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 479 B.R. 405, 411 (N.D. Tex. 2012) (creditors who knew money would be used to pay transferee could not avoid transfer).   Court Square's agreement to purchase Physiotherapy "***without any financing contingency***" further refutes Plaintiff's effort to collapse the two independent transactions.  *Bachrach*, 480 B.R. at 856 (emphasis in original); *see* Merger Agr. § 9B(iv); *see also In re Tribune Co.*, 464 B.R. 126, 165-67 (Bankr. D. Del. 2011) (no collapsing because "step 2" of multi-step transaction was not contingent on "step 1").   And approximately 42% of the purchase price was financed with ***cash***, not debt, unlike a "typical leveraged buyout," in which "the purchaser usually invests only a modest, if any, amount of its own capital as new equity." *Official Comm. Unsecured Creditors of Grand Eagle Companies, Inc. v. ASEA Brown Boverie, Inc.*, 313 B.R. 219, 230 (N.D. Ohio 2004).  Because here, as in *Grand Eagle*, "a substantial amount of new money [was] infused into the company," there is "no reason to collapse the transactions."  *Id.*

Indeed, to the extent this case bears any similarity to *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), on which Plaintiff relies, the similarity is that, like the LBO lender in *Tabor*, the Noteholders here knew or should have known that the money they lent was used to finance Court Square's acquisition of Physiotherapy.  *Id.* at 1295.  But in *Tabor*, the LBO lenders (or their assignees) were ***defendants*** in the fraudulent-transfer action, not the plaintiffs. Indeed, Defendants are not aware of any case where lenders who, like the Noteholders here, knowingly participated in an LBO were allowed to assert (or assign) claims casting them as the victims of the LBO.  On the contrary, such lenders are typically on the defense side of such cases. As the Third Circuit explained in *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991), LBO lenders are beneficiaries, not victims, of the LBO because they receive "higher

interest rates and fees." *Id.* at 646.  Here, moreover, the Noteholders seek to obtain an even greater windfall by falsely casting themselves in the role of victims after already recouping their full investment and more, and as discussed below with respect to damages, by seeking to recover far more than the amount of their (already recovered) investment.  As in *Crescent Resources Litigation Tr. ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464 (Bankr. W.D. Tex. 2013), the Noteholders, having already "recoup[ed] the bulk of the loan," hope to also "walk away with ownership" of Physiotherapy without paying ***anything*** for it.  *Id.* at 482.  "In essence, the lenders will have ***stolen***" Physiotherapy, which this Court cannot allow.  *Id.* (emphasis added).

For all of these reasons, Plaintiff "failed to properly identify an avoidable transfer under the Code," *Merit*, 138 S. Ct. at 894, and all of its claims fail.

### ACTUAL FRAUDULENT TRANSFER (11 U.S.C. §§ 548(A)(I)(A) AND 550)

Plaintiff's discussion of its claim for actual fraudulent transfer misstates the law.  For the reasons already discussed above, and more discussed below in response to Plaintiff's misstatements, Plaintiff's claim for actual fraudulent transfer must fail.

The "central focus of § 548(a)(1)(A) is the ***debtor's*** intent: the statute allows the trustee to avoid a transfer 'if the debtor voluntarily or involuntarily made such transfer . . . with actual intent to hinder, delay, or defraud.'"  *In re Elrod Holdings Corp.*, 421 B.R. 700, 709 (Bankr. D. Del. 2010) (emphasis added) (quoting 11 U.S.C. § 548(a)(1)(A)).  As already discussed, the Debtor here, according to Plaintiff, is Physiotherapy.  D.I. 1 ¶ 2.  Physiotherapy, however, did not make the transfer that Plaintiff seeks to avoid.  Thus, at a minimum, the relevant intent would be Court Square's or its subsidiaries' (or Wells Fargo's), not Physiotherapy's, and the jury instructions must so reflect.

But even if Physiotherapy is somehow deemed to have made the transfer Plaintiff seeks to

avoid, Plaintiff cannot carry its burden to prove that Physiotherapy "made such transfer" with "actual intent" to defraud creditors.  11 U.S.C. § 548(a)(1)(A).  Physiotherapy's existing creditors at the time of the transfer were paid off; the Noteholders only became creditors after the merger, by Court Square's choice, and Plaintiff does not contend that Court Square or Court Square Physiotherapy had fraudulent intent.

Plaintiff attempts to shirk its burden to prove *Physiotherapy's* fraudulent intent by arguing that *Defendants'* alleged fraudulent intent, as transferees, may be "imputed" to Physiotherapy, the alleged Debtor and purported (but not actual) transferor.  Plaintiff cites *Elrod* for this proposition, but the *Elrod* court *refused* to impute the transferee's intent to the transferor.  As the court noted, "the cases are careful to point out that vicarious intent is an *extreme* situation that is dependent upon nearly total control of a debtor by a transferee."  *Elrod*, 421 B.R. at 711 (emphasis added) (quoting *In re Bob's Sea Ray Boats, Inc.*, 144 B.R. 451, 459 (Bankr. N.D. 1992)).  Moreover, "the pertinent domination and control relates to the debtor's disposition of its property."  *Id.* at 712.  The transfer at issue in *Elrod*, as here, was approved by the parties on the opposite side of the transaction from the transferees, "and each side was represented by counsel."  *Id.*  Although those parties claimed they were "defrauded and tricked," *id.* at 707, that is different from being *controlled*.  On the contrary, "as a matter of law," the transferees did not control the debtor.  *Id.* at 712.  "Imputation of their intent to [the debtor] would be improper."  *Id.*  Similarly, Plaintiff cites *In re Adler, Coleman Clearing Corporation*, 263 B.R. 406, 445 (S.D.N.Y. 2001), but the court there also refused to impute the transferee's intent to the debtor because, as here, it was "central to the Trustee's theory" that the transferee was guilty of "deceiving" the debtor, and the transferee "could not simultaneously have acted as [the debtor's] principal directing [the debtor] knowingly to defraud itself."  *Id.* at 449.

Here, the transfer was part of an arm's-length transaction negotiated between sophisticated parties represented by sophisticated lawyers and Big Four accounting advisors following an extensive auction process.  This was not an "insider" transaction.  Moreover, the evidence at trial will reveal that Defendants, as private equity sponsors, did not control Physiotherapy's day-to-day operations; did not dictate its accounting practices; and did not prepare its financial statements.  Physiotherapy was run by management, under the supervision and oversight of the Board—the approval of which was required for the merger.  *See* 8 Del. C. § 251(b); *see also*, *e.g.*, *In re Tribune Co. Fraudulent Conveyance Litig.*, No. 11-MD-2296 (RJS), 2017 WL 82391, at *6-10 (S.D.N.Y. Jan. 6, 2017) (refusing to impute officers' intent to corporation for allegedly creating misleading projections underlying LBO, because plaintiff could not allege the board was passive or that the officers controlled the board's decision).

Most importantly, even assuming (counterfactually) that the transfer at issue was made by Physiotherapy, it was also "approved by" Buyer and Court Square, the "counterparties in these transactions," who were, again, "represented by counsel."  *Elrod*, 421 B.R. at 712.  Plaintiff claims that those approvals were obtained by fraud, but that is irrelevant to the question at hand: whether Defendants had "formal, legal control" over the transfer.  *Id.*  Because the transfer could not have happened without Court Square's approval, as a matter of law, Defendants ***cannot*** have controlled Physiotherapy "with respect to the transfers at issue.  Imputation of their intent to [Physiotherapy] would be improper."  *Id.*

A separate defect in Plaintiff's analysis of intent is its incorrect assumption that the irrelevant intent of certain corporate officers can be imputed to the debtor.  Numerous courts, including the Delaware Bankruptcy Court, have allowed imputation of a corporate officer's intent to the debtor ***only*** where the officer exerts actual control over the transfer at issue.  *See, e.g.*, *Burtch*

*v. Masiz (In re Vaso Active Pharm., Inc.)*, 2012 WL 4793241, at \*16-17 (Bankr. D. Del. Oc. 9, 2012) (denying summary judgment on imputing intent of officer transferee because genuine issue of fact existed where transaction was approved by board of directors); *In re Elrod Holdings Corp.*, 421 B.R. at 712 (although defendant-officers had high degree of functional control, they did not have "formal, legal control" over decision and therefore their intent would not be imputed); *In re Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at \*6–10 (refusing to impute officers' intent to corporation for allegedly creating misleading projections underlying LBO, because plaintiff could not allege the board was passive or that the officers controlled the board's decision). The *Tribune* decision (in which the Court looked to Delaware state law for guidance) contains the most detailed summary of the applicable legal standard Defendants submit this Court should follow. *In re Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at \*6–10.  Judge Gross, in denying in part Defendants' motion to dismiss, adopted a more lenient standard arising out of state law general agency principles, under which the actions and knowledge of a corporation's officer, acting within the scope of his/her employment, may be imputed to the corporation.  This decision is subject to de novo review in this Court.  28 U.S.C. § 157(c)(1); 28 U.S.C. § 158(a)(1); *Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 242 F. Supp. 2d 322, 336 (D. Del. 2017) ("When reviewing a case on appeal, the Court reviews the Bankruptcy Court's legal determinations de novo.").

Even if Plaintiff could prove that Physiotherapy had the requisite intent, which Plaintiff cannot prove, Plaintiff's burden is much heavier than it contends.  A "claim for actual fraud requires that there be conscious wrong-doing." *In re Network Access Sols., Corp.*, 330 B.R. 67, 77 (Bankr. D. Del. 2005).  As the Supreme Court explained in *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016), the term "actual fraud" has "two parts: actual and fraud," the first of which denotes "moral

turpitude or intentional wrong," and stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality."  *Id.* at 1586 (citation omitted).  An alleged fraud is not an "actual fraud," therefore, unless it is "done with wrongful intent."  *Id.*[19]

As for the "badges of fraud," most do not apply—unsurprisingly, because the Transaction at issue was not a fraudulent transfer, and if it was, it breaks the mold.  The jury cannot find wrongful intent without examining "the totality of circumstances."  *In re Bernier*, 282 B.R. 773, 781 (Bankr. D. Del. 2002).  Asking them to consider Plaintiff's cherry-picked "badges" is a recipe for confusion and injustice.  Defendants will address how the jury should be instructed—and whether those instructions should include the "badges"—at the appropriate time.[20]  At this point, suffice it to say that none of the "badges" is "dispositive, and the court may consider other factors," *In re DBSI, Inc.*, 476 B.R. 413, 420 (Bankr. D. Del. 2012), including "whether the transaction is conducted at arm's length," *Bernier*, 282 B.R. at 781; *see also Dev. Specialists, Inc. v. Kaplan (In re Irving Tanning Co.)*, 555 B.R. 70, 81 (Bankr. D. Me. 2016) ("[T]he court should take a holistic view and take into account all evidence that supports or undermines a finding of fraud.").  Certainly

---

[19] Plaintiff contends that a transfer also may be avoided if it was made with intent to "hinder" or "delay" creditors, but Plaintiff does not claim "hindrance" or "delay"; it claims *fraud* and must prove it.  In any event, as the Supreme Court has explained, it is not only the word "fraud," but the word "actual" that denotes wrongful intent, *Husky*, 136 S. Ct. at 1586, and plaintiff cannot shirk its burden to prove wrongful intent by reading "actual" out of the statute.

[20] The "badges" have no applicability to the facts of this case.  But even if they did, contrary to Plaintiff's statement of the law on this issue, supra at __, the presence of one or more badges of fraud does not "provide[] conclusive evidence" of actual intent to defraud.  Rather, the law is clear that a factfinder should not apply the badges mechanically.  *In re Syntax-Brillian Corp.)*, 2016 WL 1165634, at *5 ("The badges-of-fraud analysis is not a check-the-box-inquiry, and a court may consider other factors relevant to the alleged fraudulent transaction."); UFTA § 4(b) comment 5 ("Proof of the existence of any one or more of the factors enumerated in subsection (b) [of UFTA § 4] may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer or incurred a fraudulent obligation.").

the "insolvency" and "lack of reasonably equivalent value" badges are insufficient to establish wrongful intent, because otherwise all constructively fraudulent transfers would also be actually fraudulent, making the distinct statutory provisions for the two types of claims "superfluous." *In re Commercial Loan Corp.*, 396 B.R. 730, 747 (Bankr. N.D. Ill. 2008).  And in any event, as discussed below, "insolvency" and "lack of reasonably equivalent value" are absent here. Similarly, if the Defendants' shareholder and Board status satisfied the first badge of fraud—which asks whether the transfer was to an "insider"—then every sale of a company would involve a potential fraud because every sale involves shareholder and/or Board approval and a payment to shareholders.  Nor was there any "concealment" or "secrecy" in the Transaction: Court Square and the Noteholders knew exactly how and where their money was being spent—indeed, Court Square structured the Transaction—and Plaintiff does not contend otherwise.

**FEDERAL CONSTRUCTIVE FRAUDULENT TRANSFER**
**(11 U.S.C. §§ 548(A)(1)(B) AND 550)**

The crux of Plaintiff's constructive fraudulent transfer claim is its assertion that, as a purported "matter of law, a payment to a shareholder on account of its equity ownership is not a transfer for reasonably equivalent value." *Supra*.  That is incorrect.  The cases on which Plaintiff relies involved stock redemptions, but it is "clear that under the Delaware General Corporation Law, a conversion of shares to cash that is carried out in order to accomplish a merger is legally distinct from a redemption of shares by a corporation." *Rauch v. RCA Corp.*, 861 F.2d 29, 30 (2d Cir. 1988).  This follows from "Delaware's doctrine of independent legal significance," under which "the various provisions of the Delaware General Corporation Law are of equal dignity, and a corporation may resort to one section thereof without having to answer for the consequences that would have arisen from invocation of a different section." *Id.* at 31 (citing, *e.g.*, *Rothschild Int'l Corp. v. Liggett Grp.*, 474 A.2d 133, 136 (Del. 1984); and *Hariton v. Arco Elecs., Inc.*, 188 A.2d

91

123, 125 (Del. 1963)).  "Plaintiff's contention that the transaction was essentially a redemption rather than a merger must therefore fail."  *Id.*; *see also*, *e.g.*, *In re Appraisal of Metromedia Int'l Grp., Inc.*, 971 A.2d 893, 906 (Del. Ch. 2009) ("[T]he merger did not operate as an effective redemption of the preferred shares"); R. Franklin Balotti & Jesse A. Finkelstein, DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS, § 9.4 (3d ed. 2017) ("Under the 'doctrine of independent legal significance,' the Delaware courts have held that . . . a conversion of shares to cash through a merger does not constitute a redemption.  The doctrine has become a keystone of Delaware corporate law. . . .").[21]

Furthermore, Plaintiff's federal constructive fraudulent transfer claim, along with its state-law claims for actual and constructively fraudulent transfer, are barred by Bankruptcy Code § 546(e).  That provision bars all fraudulent transfer claims (state law claims asserted under Bankruptcy Code § 544 and federal law claims asserted under Bankruptcy Code § 548), other than a claim for actual fraudulent transfer under the Bankruptcy Code, if the transfer is either: (1) "a settlement payment . . . made by or to (or for the benefit of) a . . .  financial institution" or (2) "made by or to (or for the benefit of) . . . a financial participant . . . in connection with a securities contract." The Bankruptcy Court has already held, and it is not subject to any legitimate dispute, that the alleged transfers of funds here to Defendants were "settlement payments" and/or "transfers . . . in connection with a securities contract."  Motion to Dismiss Op., 2016 WL 3611831, at *11 (Bankr. D. Del. June 20, 2016).  Thus, the question for this Court is whether the transfers were "by or to (or for the benefit of)" either a "financial institution" or "financial participant," as defined in the statute.

---

[21] Plaintiff's false characterization of the Transaction as a stock redemption also fails for the independent reason that, as discussed above, Physiotherapy did not make the transfer that Plaintiff seeks to avoid.

Bankruptcy Code § 101(22)(A) defines "financial institution" broadly to include not only a "commercial or savings bank," but also any "customer" of the bank if the bank was "acting as agent or custodian for [the] customer" in connection with a securities transaction.  So even entities that are not themselves traditional financial institutions may qualify as one under the statutory definition if they are customers of a bank that acts as their agent in a securities transaction.  *See In re Tribune Company Fraudulent Conveyance Litig.*, 2019 WL 1771786, at *7-12 (S.D.N.Y. Apr. 23, 2019) (finding that Tribune (the transferor) was a "financial institution" by virtue of being a "customer of a bank that acted as its agent in connection with a securities transaction").

The transfers here were both "by" and "to" "financial institutions," because both the transferor and transferees were "customers" of a "commercial bank" that was acting as their "agent."  Buyer (the Court Square subsidiary that purchased Defendants' equity interest) and Water Street as the representative of the sellers jointly retained Wells Fargo, N.A. to act as their "paying agent" in the Transaction.  *See* Paying Agent Agreement.  As paying agent, Wells Fargo collected the merger consideration and then distributed it to the Defendants upon receiving their stock certificates and letters of transmittal.  *See* Paying Agent Agreement § 4.  In return for this service, the parties jointly paid Wells Fargo a fee (50% paid by the sellers and 50% by the Buyer).  *Id.* § 11.

This arrangement qualifies the parties as "financial institutions" under § 101(22)(A)'s definition because they are "customers" of a "commercial bank" acting as their "agent."  First, it is indisputable that Wells Fargo is a "commercial bank."  *See* Office of the Comptroller of Currency list of National Banks, available at https://occ.gov/topics/licensing/national-banks-fed-savings-assoc-lists/index-active-bank-lists.html.  Second, the parties were Wells Fargo's "customers."  Section 101(22)(A) does not define the term "customer," so the Court should apply the term's

93

ordinary meaning.  *See In re Tribune*, 2019 WL 1771786 at *9 (applying dictionary definition of "customer").  A "customer" is a person who purchases goods or services, and includes a person who purchases paying agent services from a bank.  *Tribune*, 2019 WL 1771786 at *10 ("Tribune engaged the CTC's services as depository in exchange for a fee…. It was a 'purchaser' of CTC's 'services.'").  Third, a bank acting as a "paying agent" in a securities transaction is an "agent" under the well-settled meaning of that term.  *Tribune*, 2019 WL 1771786 at *11 ("CTC was entrusted with billions of dollars of Tribune cash and was tasked with making payments on Tribune's behalf to Shareholders upon the tender of their stock certificates to CTC.  This is the paradigmatic principal-agent relationship.").  Thus, both the Buyer and Water Street as the representative of the sellers are "financial institutions" by virtue of being Wells Fargo's customers.  The transfer was both "by" and "to" a financial institution.

In *Merit*, the Supreme Court held that the application of the § 546(e) safe harbor turns on whether the transferor or transferee of the transfer that the plaintiff is seeking to avoid is a protected entity, and not on whether any "intermediaries" through which the transfer passed would be protected by section 546(e).  138 S. Ct. at 888, 892-93.  The Court made clear, however, that the safe harbor would continue to apply where the transferor or transferee was itself a protected entity—an issue the parties did not address in *Merit*.  *Id.* at 890 n.2 ("The parties here do not contend that either the debtor or petitioner in this case qualified as a 'financial institution' by virtue of its status as a 'customer' under § 101(22)(A).").

Moreover, *In re Tribune Company Fraudulent Conveyance Litig.*, 2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019), held that a company engaged in a leveraged buyout was a "financial institution" under Bankruptcy Code § 101(22)(A) because it was a customer of a bank that was acting as a depository agent in the transaction.  *Id.* at *7-12.  The reasoning of the *Tribune* court is

equally applicable and persuasive here.[22]

## STATE LAW INTENTIONAL FRAUDULENT TRANSFER
## (6 DEL. C. § 1304(A)(1))

Plaintiff's state-law claim for intentional fraudulent transfer suffers from all of the fatal

defects of its federal claim for intentional fraudulent transfer—including that there was no

avoidable transfer, the claim is barred by the releases, Plaintiff cannot prove intent, and

underestimates its burden in any event.

Moreover, Plaintiff's state-law claims are preempted by 11 U.S.C. § 546(e).[23]  As numerous

courts have observed, § 546(e) would be rendered a nullity if a transfer that it protects from

avoidance can nevertheless be avoided under state law.  *See, e.g., In re Hechinger Inv. Co. of Del.*,

274 B.R. 71, 96 (D. Del. 2002) (finding that "the exemption set forth in section 546(e) would be

rendered useless" if an otherwise barred transfer could be recovered under state law).[24]  Thus,

where a state law avoidance claim is premised on the same facts as those needed to state a claim

for fraudulent transfer under Bankruptcy Code §§ 544 or 548, the claim is barred.  *Hechinger*, 274

---

[22]  Because the definition of "financial institution" clearly applies here, it will be unnecessary for the Court to determine whether the transferor or transferees here also meet the definition of "financial participant."

[23]  Defendants moved to dismiss on these grounds, but that motion was denied, and this Court denied leave to appeal.  This Court should now decide the issue *de novo*.

[24]  *See also*, *e.g.*, *Whyte v. Barclays Bank PLC*, 494 B.R. 196, 199 (S.D.N.Y. 2013) (allowing plaintiff to assert state law claim to avoid a transfer protected by § 546(g) (§ 546(e)'s counterpart for swap agreements) would create an "absurd result" and "render § 546(g) a nullity"); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009) ("Through its state law claims, [the creditors' committee] seeks to recover the same payments we have already held are unavoidable under § 546(e).  Allowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section."); *Deutsche Bank Trust Co. Ams. v. Large Private Beneficial Owners (In re Tribune Co. Fraudulent Conveyance Litig.)*, 818 F.3d 98, 119 (2d Cir. 2016) ("[T]he idea of preventing a trustee from unwinding specified transactions while allowing creditors to do so, but only later, is a policy in a fruitless search of a logical rationale.").

B.R. at 96–98.  Indeed, resolving a § 544 state law fraudulent transfer claim will *extinguish* any corresponding individual state law claim belonging to creditors.  *In re PWS Holding Corp.*, 303 F.3d 308, 315 (3d Cir. 2002) ("Because [the debtor] validly and effectively extinguished all potential fraudulent transfer claims arising from the leveraged recapitalization, Haskell is precluded from now prosecuting those claims in Alabama state court.").  It follows that barring a § 544 state law fraudulent transfer claim—a complete extinguishment and resolution of that claim—likewise bars any corresponding state law claim belonging to creditors.

The Second Circuit's decision in *Tribune* is the most recent and authoritative opinion on whether § 546(e) preempts state law avoidance claims, and should be followed here.  Consistent with the result reached by this Court in *Hechinger*, *Tribune* held that § 546(e) impliedly preempts creditor state law constructive fraudulent transfer claims.  818 F.3d at 109–24; *see also Hechinger*, 274 B.R. at 96 ("[T]he court finds that the rationales that underlie both conflict and field preemption support a finding of preemption here.").  Under the implied preemption doctrine, "state laws are 'preempted to the extent of any conflict with a federal statute,'" which occurs where state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Tribune*, 818 F.3d at 110 (citation omitted).  Although a presumption against preemption exists where a particular regulatory area is traditionally within the domain of state law alone, "the regulation of creditors' rights has 'a history of significant federal presence,'" particularly as it "relate[s] to securities markets, which are subject to extensive federal regulation," so no presumption again preemption applies.  *Id.* at 110, 112.

A conflict exists between § 546(e)'s protection of covered transfers, one the one hand, and state law avoidance of those same transfers, on the other.  Allowing creditors to avoid transfers that § 546(e) protects from avoidance conflicts with § 546(e)'s purpose because it "would implicate the

same concerns regarding the unraveling of settled securities transactions … which is precisely the result that section 546(e) precludes." *Hechinger*, 274 B.R. at 96; *see also Tribune*, 818 F.3d at 119 ("Even the narrowest purpose of Section 546(e) is … at risk" if a creditor could pursue avoidance of a protected transfer under state law).

Relying primarily on a decision that *Tribune* abrogated, the Bankruptcy Court fashioned a rule that preemption does not apply where "(1) the transaction sought to be avoided poses no threat of 'ripple effects' in the relevant securities markets; (2) the transferees received payment for non-public securities, and (3) the transferees were corporate insiders that allegedly acted in bad faith." Motion to Dismiss Op., 2016 WL 3611831, at *10 (Bankr. D. Del. June 20, 2016). This rule has no basis in the language of § 546(e). The Third Circuit has held that § 546(e) protects transfers of non-public securities, regardless of whether there is any "ripple effect" in the market. *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 516 (3d Cir. 1999), *abrogated in part on other grounds*, *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 183 (2018) ("A payment for shares during an LBO is obviously a common securities transaction, and we therefore hold that it is also a settlement payment for the purposes of section 546(e)."); *Brandt v. BA Capital Co. (In re Plassein Int'l Corp.)*, 590 F.3d 252, 258 (3d Cir. 2009) ("Resorts expressly rejected the argument that 'settlement payments' must travel through the settlement system."); *see also Tribune*, 818 F.3d at 120 (rejecting argument that because there is no "ripple effect," § 546(e) does not implicate transfers "when monetary damages are sought only from shareholders, or an LBO is involved."). Likewise, introducing a "good faith" exception is inconsistent with § 546(e), because § 546(e) already exempts from protection intentional fraudulent transfer under Bankruptcy Code § 548(a)(1)(A), and so already contains a congressional judgment about what types of "bad faith" transfers should remain unprotected.

The Bankruptcy Court also relied on § 546(e)'s reference to the "trustee," which the Bankruptcy Court concluded meant that § 546(e) does not apply to non-trustees like individual creditors.  But by operation of law, a bankruptcy filing vests all individual state law fraudulent transfer claims in the trustee, by virtue of Bankruptcy Code § 544.  *In re PWS Holding Corp.*, 303 F.3d 308, 314 (3d Cir. 2002) ("§ 544(b) places the debtor in possession in the shoes of its creditors, giving it the right to prosecute individual creditors' fraudulent transfer claims for the benefit of the bankruptcy estate").  Bankruptcy Code § 546(e)'s lack of reference to non-trustees and non-Section 544 state law claims thus is no surprise, as once a bankruptcy case is filed, those creditors no longer have claims to assert.  *See also Tribune*, 818 F.3d at 120 (noting that the Plaintiff's argument "us[es] the oil and water mixture of applying a narrow literalness to the word 'trustee' and disregarding the rest of the Section's language.").

Plaintiff's attempt to circumvent § 546(e) by asserting a direct "assigned" claim from the Noteholders fails for a second reason: by virtue of the bankruptcy filing, the Noteholders were divested of standing over any of their "direct" fraudulent transfer claims and therefore had nothing to assign.  Under section 544 of the Bankruptcy Code, once a petition is filed, the trustee/debtor in possession becomes by statute the only party that can assert a fraudulent transfer claim.  *See Deutsche Bank Trust Co. Ams. v. Large Private Beneficial Owners (In re Tribune Co. Fraudulent Conveyance Litig.)*, 818 F.3d 98, 111 (2d Cir. 2016) ("Once Tribune entered bankruptcy, the creditors' avoidance claims were vested in the federally appointed trustee [under] 11 U.S.C. § 544(b)(1)"); *In re PWS Holding Corp.*, 303 F.3d 308, 314 (3d Cir. 2002) ("§ 544(b) places the debtor in possession in the shoes of its creditors, giving it the right to prosecute individual creditors' fraudulent transfer claims for the benefit of the bankruptcy estate").  Creditors are divested of standing to sue under state law, and if the debtor's estate chooses to pursue a fraudulent transfer

claim under sections 544 or 548(b), as it did here via the Litigation Trust's original complaint, then

creditors lose (1) the ability to assert such claims themselves and, consequently, (2) the ability to

assign such claims to a litigation trust to assert on their behalf.   Although the Third Circuit has not

directly addressed the issue, courts in the Second Circuit have held, consistent with the position

espoused by Defendants in this case, that upon the filing of a bankruptcy petition, and absent at the

very least an abandonment by the estate of such claims (which did not occur here), creditors (such

as the Noteholders) lose the right to pursue, and thus may not assign, state law fraudulent transfer

claims to a litigation trust.  *See Whyte v. Barclays Bank PLC*, 494 B.R. 196, 199 (S.D.N.Y. 2013)

(rejecting argument that "avoidance claims remain property of creditors during bankruptcy,"

notwithstanding Bankruptcy Code § 544, because "it would, in effect, render section 546(g) a

nullity" and create "an absurd result").[25]  And whether the Bankruptcy Code even permits a debtor

to "abandon" fraudulent transfer claims such that they revert to creditors is far from clear, as "the

inference that fraudulent conveyance claims [can] revert to creditors . . . has no basis in the Code's

language."  *In re Tribune Fraudulent Conveyance Litig.*, 818 F.3d at 114.  In any event, no attempt

at abandonment occurred here.  Since the Noteholders did not possess the right to assert state law

fraudulent transfer claims when they purported to assign their claims to the Litigation Trust, the

Trust lacks standing to assert avoidance claims under Delaware law on their behalf, and is relegated

instead to pursing claims exclusively under Sections 544 and 548(b) of the Bankruptcy Code—

---

[25] Further, both of the cases that the Plaintiff primarily relied on below involved an affirmative abandonment of claims by the debtor, unlike here where the Plaintiff has continued to assert fraudulent transfer claims under Bankruptcy Codes §§ 544 and 548.  *In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310, 314 (S.D.N.Y. 2013); *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 356 (Bankr. S.D.N.Y. 2014).  Plaintiff's cases have been abrogated, moreover, to the extent they are inconsistent with the Second Circuit's *Tribune* decision, which holds that § 546(e) preempts state law constructive fraudulent transfer claims.  *In re Tribune Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016).

claims that are barred by Bankruptcy § 546(e).

Thus, Plaintiff's state-law claim for intentional fraudulent transfer must fail.

## STATE LAW CONSTRUCTIVE FRAUDULENT TRANSFER 6 DEL. C. § 1304(A)(2))

Plaintiff's state-law claim for constructive fraudulent transfer suffers from the same fatal defects as its federal constructive fraudulent transfer claim, and is also preempted and fails for lack of standing for the reasons discussed in the preceding section.

## GENERAL PARTNER LIABILITY UNDER 6 DEL. C. §§ 15-306, 17-403

The Litigation Trust requests a broad statement that any judgment entered against Defendants Water Street Healthcare Partners, L.P., Wind Point Partners IV, L.P., and Wind Point IV Executive Advisor Partners, L.P. also be entered against the general partners of those entities. Any entity, general partner or otherwise, not a party to this litigation, cannot be included in the Court's judgment. As a threshold matter, the Court lacks jurisdiction to enter judgment against a non-party. *Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 798 (1996) (a "judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings"). More importantly, the Litigation Trust already sought leave to amend its complaint to name general partners as defendants—and the Bankruptcy Court denied that motion, holding that the Litigation Trust lacked "good cause" to add parties after the pleadings were closed. Adv. D.I. 630 at 4-5. Long ago, the Litigation Trust "concede[d] that it can wait until it obtains judgment against Defendants to pursue claims against" their general partners, *id.* at 5 n.2, and there is no reason to reopen that issue on the eve of trial, or to seek a broad ruling applying a judgment to "general partners."

## DAMAGES

Plaintiff contends that the bankruptcy court already decided the measure of damages, and

asks that the trial be limited to liability.  Plaintiff is wrong as a matter of law and fact, and the Court should decline Plaintiff's efforts.

The bankruptcy court did not decide "the amount required by law" for damages.  The bankruptcy court's order says nothing of the kind—indeed, it says the opposite.  *See* Adv. D.I. 625 ("[T]he amount of damages [is still] to be determined pending the liability phase of the litigation."); Adv. D.I. 624 at 16 (opining "***not on the amount***, which remains at issue, but on the ***concept***" of damages) (emphases added).  Moreover, the bankruptcy court itself later reached the ***opposite*** conclusion from the one Plaintiff attempts to impose on this Court, holding that "even if a plaintiff prevails on its avoidance claims, ***it cannot recover in excess of outstanding creditor claims***.  To hold otherwise would result in a windfall to equity . . . that Section 550 and Third Circuit law precludes."  *Allonhill*, 2019 WL 1868610, at *52 (emphasis added) (citing *In re Majestic Star Casino, LLC*, 716 F.3d 736, 761 n.26 (3d Cir. 2013)).  The bankruptcy court acknowledged that it had concluded otherwise in this case, but stated that "in retrospect," its opinion in this case "was advisory in nature" and "was decided under unique circumstances," *id.*—namely, an expedited timeframe in an effort to assist with mediation, *see* Adv. D.I. 624 at 2.

The bankruptcy court's interlocutory advisory opinion is not binding on this Court, nor is it law of the case.  *See, e.g.*, Defendants' Opposition to Plaintiff's Motion in Limine No. 1; *see also Philip Servs. Corp. v. Luntz (In re Philip Servs. (Del.), Inc.)*, 267 B.R. 62, 66 (Bankr. D. Del. 2001) ("[T]he law of the case doctrine does not act as an absolute bar on relitigation…Rather the law of the case doctrine merely directs the court's discretion not to rehear matters *ad nauseum*.") (citations omitted).  On the contrary, at oral argument on Defendants' motion for leave to appeal the bankruptcy court's advisory ruling, even Plaintiff's counsel conceded that this Court would "have the opportunity to address this before the trial occurs and after a complete factual record has been

established." Mar. 2, 2018 Tr. at 60:1-4.  This Court agreed, ruling that "it will be better to make decisions on what the trial should look like on these very issues, if need be, that have been argued today, based on a full factual record, once we know that a trial really is necessary." *Id.* at 76:4-7. Now that a trial is necessary, the issue is ripe for review.  Moreover, as explained in Defendants' opposition to Plaintiff's *Daubert* motion, this Court's review is required under Article III of the Constitution.  *See* Adv. D.I. 63 at 8-10; *see also*, *e.g.*, *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 558-66 (9th Cir. 2012), *aff'd sub nom. Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014).  In any case, the Court should do what both Plaintiff and the Court suggested at the hearing on Defendants' motion for leave to appeal: decide "these very issues" *de novo* "based on a full factual record."  Mar. 2, 2018 Tr. at 76:4-7; *see also id.* at 60:1-4.

The bankruptcy court reached the wrong conclusion below, but the right one in *Allonhill*: a plaintiff cannot recover in excess of outstanding creditor claims.  2019 WL 1868610, at *52; *see also In re Cybergenics Corp.*, 226 F.3d 237, 244 (3d Cir. 2000) ("courts have limited a debtor's exercise of avoidance powers to circumstances in which such actions would in fact benefit the creditors, not the debtors themselves"); *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80, 94 (S.D.N.Y. 2008) ("[T]he Bankruptcy Code's avoidance provisions can only be asserted to benefit a creditor of the debtor in question.  '[A] transaction can be avoided under section 544(b) only to the extent the avoidance benefits unsecured creditors.'") (citation omitted); *In re Grove-Merritt*, 406 B.R. 778, 811 (Bankr. S.D. Ohio 2009) ("The entire transfer need not be undone. A fraudulent transfer should be avoided only to the extent creditors were harmed.") (citation omitted); *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("even were an obligation avoided as in fraud of creditors, pursuant to … section 550 … that avoidance would be only for the benefit of creditors and the obligation would still stand ahead of equity"); *In re Murphy*, 331 B.R. 107,

121–26 (Bankr. S.D.N.Y. 2005) (alleged fraudulent transfer would be avoided "only to the extent necessary to satisfy allowed . . . creditor claims"; "The purpose of fraudulent conveyance law, whether state or federal, and of Section 548 is to prevent harm to creditors by a transfer of property from the debtor…. Fraudulent transfer laws were not designed to alter the legal relationship between the transferor and transferee.") (citation omitted); Robert B. Bruner and Gerard G. Pecht, *The Unexplored Limits of* Moore v. Bay*: Statutory and Equitable Basis for Limiting Money Damage Awards on Fraudulent Transfers Claims*, 26 No. 3 J. Bankr. L. & Prac. 253, 253, 264 (June 2017) ("if the purpose of fraudulent transfer law is to remedy harm to creditors, then what purpose is served by permitting a money judgment in an amount greater than what is actually necessary to satisfy the claims of creditors who would have standing to bring a fraudulent transfer claim under state law? . . . [P]ermitting a recovery beyond what is necessary to satisfy the claims of innocent creditors necessarily penalizes the fraudulent transfer defendant and grants a windfall to parties in interest that could not assert a fraudulent transfer claim on their own behalf outside of bankruptcy.") (footnote omitted). As a result, the Plaintiff's federal law fraudulent transfer claim should be limited to the amount of unpaid creditor claims.

Moreover, the bankruptcy court's erroneous advisory opinion creates a conflict between state and federal law contrary to Supreme Court and Third Circuit precedent. It is undisputed and indisputable that, under state law, a fraudulent transfer recovery may not exceed the amount of unpaid claims. *See* Summary Judgment Op., 2017 WL 5054308, at *8 (Bankr. D. Del. Nov. 1, 2017). The same result should follow under federal law. The Bankruptcy Code merely codified existing law and did not create a new fraudulent transfer cause of action, or "remedies therefor, unknown to the common law." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 60–61 (1989) (citation omitted). On the contrary, the fraudulent transfer provisions of the Bankruptcy code are

103

modeled on state law, "and uniform interpretation of the two" is "essential to promote commerce nationally." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1068 (3d Cir. 1992) (citation omitted); *see also*, *e.g.*, *Crystallex Int'l Corp. v. Petróleos de Venezuela, S.A.*, 879 F.3d 79, 86 (3d Cir. 2018) ("Delaware courts generally recognize that our state and the federal fraudulent transfer statutes' principles are substantially the same.").

As for Plaintiff's state law claims, the Bankruptcy Court advised that any amounts the Noteholders have received in satisfaction of their claims should be deducted from the Noteholders' recovery. 2017 WL 5054308 at *8. The Noteholders received all of Physiotherapy's stock as a bankruptcy distribution, and have since received amounts from settlements of other claims. *Id.* at *8 & n.7. The Bankruptcy Court bound Defendants to the Disclosure Statement's $84.63 million "valuation" of the Noteholders' distribution (a disputed issue of law raised below), and concluded that the Noteholders' $210 million claim was unpaid in the amount of $125.37 million ($210 million - $84.63 million). But the Bankruptcy Court then held that because the Noteholders agreed to share 50% of any recovery on their claims with Court Square (former equity), the Plaintiff could recover *twice* the amount of unpaid claims, as it would need that much for the Noteholders to receive $125.37 million. *Id.* at *8 n.7.[26]

In addition to being illogical and inconsistent with DUFTA, this ruling violates the fundamental principle that an assignee can recover no greater damages than its assignor. As the assignee of a creditor claim, the Plaintiff cannot recover more damages than its assignor could have recovered. *See*, *e.g.*, *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 524 (3d Cir. 1999) ("[T]he rights of an assignee can rise no higher than those of the assignor.... [Assignee]

---

[26] The Bankruptcy Court correctly recognized that the settlements that the Plaintiff has received from other unrelated cases also must reduce any fraudulent transfer recovery. *Id.*

104

may recover only those damages to which [assignor] was entitled."). Assuming for the sake of argument that the Noteholders as assignors held a claim in a maximum of $125.37 million, the Plaintiff as assignee took no greater claim. The Plaintiff does not receive the right to double the amount of the *claim* just because the Noteholders agreed to share some of their *recovery* on that claim with someone else. Yet that is precisely what the Bankruptcy Court ruled. Under the Bankruptcy Court's logic, had the parties agreed to a 90/10 split between Court Square and the Noteholders, the Plaintiff could recover *ten times* more on the claim than its assignor could have. The Bankruptcy Court conflated satisfaction of the Noteholders' underlying *claim*, which has been assigned to the Litigation Trust, with satisfaction of the *Noteholders themselves*, who agreed to accept only 50% of any recovery—faulty logic that has no basis in law.

Furthermore, the Rothschild "valuation" contained in the Disclosure Statement sets a floor on the value of the common stock of the reorganized debtor that the Noteholders received when Physiotherapy emerged from bankruptcy. Defendants are not bound by the $84.3 million "valuation" placed on the stock by Rothschild, and thus should be free at trial to introduce evidence supporting a higher valuation. The Bankruptcy Court held in its decision on partial summary judgment that *res judicata* principles precluded Defendants from challenging that "valuation." The Bankruptcy Court relied on the *res judicata* effect of the bankruptcy *plan*, although the Rothschild valuation was in the Disclosure Statement, not the plan. Summary Judgment Op., 2017 WL 5054308, at *9 (Bankr. D. Del. Nov. 1, 2017); *see also* Disclosure Statement Ex. J (MSJ Exs. at FD381–83). This ruling was incorrect for several reasons.

First, Rothschild's "valuation" was not prepared in connection with a real-world sale or for the purpose of being relied upon in the market. Rather, its purpose was to provide a basis to ensure that the plan satisfied minimum Bankruptcy Code requirements. MSJ Exs. at FD381 ("In

conjunction with formulating the Plan and satisfying their obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Debtors."). Indeed, on its face Rothschild's purported "valuation" was not a valuation at all. Physiotherapy's Disclosure Statement characterizes Rothschild's "valuation" of Physiotherapy as both an "estimate" and "hypothetical." MSJ Exs. at FD381. The Disclosure Statement also states that "[t]he estimated enterprise value … does not purport to constitute an appraisal or to necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors, … which may be significantly higher or lower than the estimated enterprise value range herein." *Id.*; *see also id.* at FD383 (Rothschild's "estimated enterprise value … is not necessarily indicative of actual value, which may be significantly higher or lower"). As Physiotherapy admitted, "at the direction of the Debtors, Rothschild did not make any independent evaluation or appraisal of any of the assets or liabilities … of the Reorganized Debtors"). *Id.* at FD382. This was not a true valuation.

Second, the Bankruptcy Court erred in ruling that Defendants are bound by the Rothschild "valuation." There is ample authority supporting Defendants' position that information included in disclosure statements is not binding and has no preclusive effect. *See, e.g., In re Bridgepoint Nurseries, Inc.*, 190 B.R. 215, 222 (Bankr. D.N.J. 1996) ("[T]his court finds that a disclosure statement is not a binding contract and has no *res judicata* or collateral estoppel effect on the court and cannot bind the parties . . . ."); *In re Flutter Lumber Corp.*, 2011 WL 5417094, at *5-6 (Bankr. E.D.N.Y. Nov. 8, 2011) ("The Disclosure Statement is not necessary to effectuate the terms of the Plan. The Disclosure Statement cannot be deemed to be 'confirmed' pursuant to the Confirmation Order or to have the same binding effect as the Plan.").

Moreover, not only were the terms of the Disclosure Statement not binding generally, they

were not binding on Defendants specifically.  Physiotherapy's chapter 11 plan expressly *preserved* avoidance claims the Litigation Trust may in the future bring against Defendants.  Doing so rendered *res judicata* inapplicable, as a matter of law, to such claims.

> "A judgment that expressly leaves open the opportunity to bring a second action on specified parts of the claim or cause of action that was advanced in the first action should be effective to forestall preclusion." "Res judicata does not apply where a claim is expressly reserved by the litigant in the earlier bankruptcy proceeding." The confirmation order here provided that TWD retained the right to "demand, enforce, and litigate Estate Actions [which include the Avoidance Actions]."  As the bankruptcy court held, "where, as here, an intent to pursue a claim post-confirmation has been manifested in both the confirmed plan and its associated disclosure statement, the res judicata effect of confirmation would not ... preclude pursuit of those claims."  The confirmation order specifically left open the opportunity for TWD to bring the claims in a second action, and the claims should not be precluded.

The Fifth Circuit recently summarized the law on this issue:

*Spicer v. Laguna Madre Oil & Gas II, L.L.C. (In re Texas Wyoming Drilling, Inc.)*, 647 F.3d 547, 553 (5th Cir. 2011) (citations omitted); *see also Peltz v. Worldnet Corp. (In re USN Commc'ns, Inc.)*, 280 B.R. 573, 587 (Bankr. D. Del. 2002) (plan had no *res judicata* effect on avoidance action because "[a]lthough both actions may share some facts in common, … both the 'factual underpinnings' and 'theory of' an avoidance action are completely different than a determination on the allowability and proper treatment of a creditor's claim under a plan of reorganization").

Relatedly, the Third Circuit has observed that "[a] number of our sister courts of appeals have concluded, based on … due process principles, that, despite any statutory prescription of finality or any knowledge that the creditor may have, a confirmed plan has no preclusive effect on issues that must be raised in an adversary proceeding, if no such proceeding has been brought." *In re Mansaray-Ruffin*, 530 F.3d 230, 240 (3d Cir. 2008) (citing cases).

Because bankruptcy plans touch upon so many issues, *res judicata* applies only to claims that are "so close to a claim actually litigated in the bankruptcy that it would be unreasonable not

107

to have brought them at the same time in the bankruptcy forum." *Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 337–38 (3d Cir. 2000).  Valuation was not "actually litigated" in the bankruptcy case, and it would have been unreasonable to expect Defendants to litigate valuation at the time because they had not been sued, and so they had no defense to raise at the time (and the plan preserved any claims against them for future lawsuit).  *See Philip Servs. Corp. v. Luntz (In re Philip Servs. (Del.), Inc.)*, 267 B.R. 62, 68–69 (Bankr. D. Del. 2001) (cash collateral order finding debts to be valid did not bar avoidance defendants from later raising validity of those debts as defense, because at time order was entered defendants had not yet been sued).

In short, because the debtors' chapter 11 plan expressly left open the ability to bring an avoidance action against Defendants, the plan can have no *res judicata* impact on their defenses to such action.  Indeed, "[t]o apply res judicata so broadly would bring bankruptcy cases to a halt." *Philips Servs. Corp.*, 267 B.R. at 68.  This stands to reason: any holding that a potential future defendant to an unfiled lawsuit must anticipate its future defenses to yet-to-be-brought claims, and litigate those defenses at the confirmation stage, would create serious due process concerns and unduly complicate and delay plan confirmation proceedings for many chapter 11 debtors.

Plaintiff's discussion of damages is also erroneous because, as already noted above, it implies that the Noteholders will not only "recoup the bulk of the loan"—which they have already done—but also "walk away with ownership" of Physiotherapy without paying anything for it. *Crescent*, 500 B.R. at 482.  "In essence, the lenders will have ***stolen***" Physiotherapy. *Id.* (emphasis added).  The law does not allow such an inequitable windfall.

On the contrary, Bankruptcy Code § 502(h) provides that "a claim arising from the recovery of property under section . . . 550 . . . of this title shall be determined, and shall be allowed . . . or disallowed . . . the same as if such claim had arisen before the date of the filing of the petition."  11

U.S.C. § 502(h).   The section is based on the principle that "the return of the [fraudulent] transfer entitles the transferee to the return of the consideration it paid," thus "restor[ing] the parties to the status quo."  *Gowan v. HSBC Mortgage Corp. (In re Dreier LLP)*, 2012 WL 4867376, at *3 (Bankr. S.D.N.Y. Oct. 12, 2012).  Under § 502(h), a transferee of an avoided transfer receives an unsecured claim in the amount of whatever value the transferee may have held if the fraudulent transfer had never occurred, including but not limited to the consideration it provided in exchange for the avoided transfer.  *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 331–32 (Bankr. S.D.N.Y. 2013).  For example, *Tronox* held that the defendant equity holders should receive a claim for any amounts exceeding unpaid creditor claims.  The court so held because § 502(h) aims to restore the parties to the positions they would have occupied had the transaction never occurred, and "if the parties are to be restored to the positions they held before the transfers, Defendants would be entitled to the residual value of the E&P assets after their debts, including the legacy liabilities, were paid in full."  *Id.* at 333.

So too here.  Defendants intend to prove at trial that the equity they transferred in exchange for the allegedly fraudulent transfer had substantial value, and that had the Transaction never occurred, Physiotherapy would have had substantial residual value.  For example, even the Plaintiff's solvency expert concedes that Physiotherapy was solvent prior to the Transaction—and that is in spite of her valuing the Company based on after-the-fact projections that she created for purposes of this litigation, applying far more severe assumptions than any of the contemporaneous third-party valuations.  Defendants will be entitled to a substantial § 502(h) claim offsetting any damages.

Similar to § 502(h), Bankruptcy Code § 548(c) provides that "[e]xcept to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this

title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c). The two elements that a defendant must establish to raise the defense are (1) good faith and (2) value. Defendants will prove at trial that they acted in good faith and provided substantial value in the form of the shares they sold.

Defendants also will prove at trial that the Noteholders recovered almost the entirety of their allowed claims by selling Physiotherapy to Select Medical in January 2016—*a transaction they were already planning before they manipulated Physiotherapy into bankruptcy*, in a scheme to exchange their debt for equity and "get rich!" MSJ Ex. 7 at FD596. Defendants should be free at trial to introduce evidence demonstrating that most of the Noteholders already have recovered their claims in full. As already discussed, fraudulent transfer law limits recovery to the amount of unpaid creditor claims, and does not allow windfalls. Thus, the recovery that the Noteholders already have received—actually received—on their claims is relevant evidence, as it will establish the unpaid portion of Noteholder claims and set the upper limit of recovery.

The parties briefed this issue in connection with their motions for partial summary judgment, and the Bankruptcy Court advised in its interlocutory summary judgment ruling that, in that context, it deemed the Select Medical sale to be irrelevant. Summary Judgment Op., 2017 WL5054308 at *8 (Bankr. D. Del. Nov. 1, 2017). But the jury should be allowed to hear about the Select Medical sale in considering "the totality of circumstances," *Bernier*, 282 B.R. at 781, and all of the equities, *Sauer v. Publisher Servs., Inc.*, No. 1:14-CV-698-WSD, 2016 WL 4409209, at *7 (N.D. Ga. Aug. 19, 2016). To ignore the Select Medical sale and allow the Plaintiff to recover in excess of the unpaid portion of allowed creditor claims would ignore the basic tenet of law that

"double recoveries" are forbidden.  *See, e.g.*, *Lovejoy v. Murray*, 70 U.S. 1, 17 (1865) ("when the plaintiff has accepted satisfaction in full for the injury done to him, from *whatever source it may come*, he is so far affected in equity and good conscience, that the law will not permit him to recover again for the same damages") (emphasis added); *In re Complaint of Weeks Marine, Inc.*, 270 F. App'x 97, 98 (3d Cir. Mar. 27, 2008) (affirming summary judgment for defendant where further recovery "would constitute impermissible double recovery" because plaintiff was claiming $6.3 million in damages but already recovered $7.3 million from third parties); *In re Majestic Star Casino*, 716 F.3d 736, 761 n.26 (3d Cir. 2013) (questioning relief on the basis that it represented a "double recovery and then some").  It also would ignore the fundamental premise that fraudulent transfer law is meant to make creditors whole and no more.  Indeed, the Bankruptcy Court recognized that Plaintiff's recovery should be reduced by any amounts that the Plaintiff has since received from settlement of other, unrelated claims, thus recognizing that subsequent amounts received are relevant.  Summary Judgment Op., 2017 WL 5054308 at *8, n.7 (Bankr. D. Del. Nov. 1, 2017).

Here, the Noteholders have recovered all but approximately $21 million of their allowed $210 million claim, and many have recovered ***more*** than their portion of the total claim.  In accordance with the remedial purpose of fraudulent transfer law, as well as the equities of this case, the jury can and should properly consider the fact that the Noteholders have fully recouped their losses, and offset any liability of Defendants by that amount.  *See In re Best Prods. Co.*, 168 B.R. 35, 37 (Bankr. S.D.N.Y. 1994) ("Fraudulent transfer laws are intended to promote payment to creditors; that is, the statutes are remedial, rather than punitive."), *aff'd* 68 F.3d 26 (2d Cir. 1995); *Allonhill*, 2019 WL 1868610, at *52 ("even if a plaintiff prevails on its avoidance claims, it cannot recover in excess of outstanding creditor claims.  To hold otherwise would result in a windfall to

equity . . . that Section 550 and Third Circuit law precludes."); 6 Del. C. § 1308(c) (fraudulent transfer recovery is "subject to adjustment as the equities may require.").

### DEFENDANTS' PARTICIPATION, RATIFICATION, AND ESTOPPEL DEFENSES

Plaintiff's state law fraudulent transfer claims—which Plaintiff asserts as assignee of the Noteholders—are barred by the doctrines of "participation," "ratification," or "estoppel." The Noteholders participated in, and thus approved or ratified, the Transaction, and therefore cannot attack it. On a motion to dismiss, the Bankruptcy Court adopted Plaintiff's incorrect statement of the legal standard for "ratification," holding that the defense applies only if the Noteholders intended to extend credit with adequate knowledge of Physiotherapy's alleged financial condition. Motion to Dismiss Op., 2016 WL 3611831, at *12. The Bankruptcy Court went on to hold that "there is a material dispute as to whether the Senior Noteholders had knowledge of the material facts surrounding the transaction . . . ." Accordingly, even under the Bankruptcy Court's formulation, the ratification/estoppel defense remains an open issue for trial.

Upon *de novo* review, however, this Court should adopt the better reasoned line of cases, which require only that the creditor participate in, or know about, the transaction at issue. *See, e.g.*, *Weisfelner v. Fund I (In re Lyondell Cehm. Co.)*, 503 B.R. 348, 383-85 (Bankr. S.D.N.Y. 2014) ("Creditors who authorized and sanctioned the transaction, or indeed, participated in it themselves, can hardly claim to have been defrauded by it, or otherwise be victims of it. . . . The Court has difficulty seeing how the Creditor Trust could plausibly be alleging that any LBO Lender was ignorant of the fact that it was lending for the purpose of financing an LBO, and that the LBO proceeds would go to stockholders."); *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc*., 479 B.R. 405, 411 (N.D. Tex. 2012) (finding no support for allegations that creditors were "duped" or "tricked," and also finding allegations to be irrelevant because "[t]he plaintiff's claims are for fraudulent transfers, not for fraud").

Here, the evidence at trial will establish that the Noteholders knew that (1) some portion of their loan proceeds ultimately could flow to the Defendants, (2) Court Square would be increasing Physiotherapy's debt load from $190 million to $310 million, and (3) there was substantial risk associated with the Transaction given the difficulties Physiotherapy had been experiencing, and was continuing to experience, with its revenue cycle management, which is why the Noteholders demanded that the coupon rate on the bonds be set at an exorbitantly high rate (11.875%), qualifying them as "junk" bonds.  Regardless of the standard applied by the Court, Defendants believe the evidence will support their ratification and estoppel defenses.

## PREJUDGMENT INTEREST

Defendants agree with the Plaintiff that the Court should take up the issue of prejudgment interest post-trial, if needed, and that the parties reserve the right to raise all arguments about the availability and extent of prejudgment interest at that time.

## PLAINTIFF'S CLAIMS ARE BARRED BY THE RELEASES

Another fatal flaw in Plaintiff's theory of this case is that the underlying cause of action, if there ever was one, is for fraudulent ***inducement***, not fraudulent ***transfer***.  There was no avoidable transfer, as shown above.  Instead, the gravamen of Plaintiff's claims is that Court Square, Buyer, Merger Sub, and/or Physiotherapy were fraudulently induced to pay Defendants more for their shares than they were worth.  Plaintiff should not be allowed to pursue such claims in the guise of fraudulent transfer law, which does not apply.  But if Plaintiff is allowed to, in effect, step into Court Square's shoes to assert a claim for fraudulent inducement, Plaintiff must be bound by the releases in the Merger Agreement and the Global Settlement of Claims.  Indeed, especially given that Plaintiff has agreed to share half its recovery in this case with Court Square, it would be inequitable to allow Court Square to evade its representations, warranties, and releases by laundering its claims through the Litigation Trust.

Under Delaware law,[27] it is well-settled that a release bars recovery on the claims released. *See, e.g.*, *Hicks v. Soroka,* 188 A.2d 133, 138 (Del. Super. 1963) (citing *Hob Team Room v. Miller*, 89 A.2d 851, 856 (Del. 1952)); *Seve Invs., LLC v. AD Capital LLC,* 32 A.3d 391, 395 (Del Ch. 2011) (enforcing general release extinguishing all claims, known or unknown, arising out of or in any way related to transaction).

Here, Buyer (and Merger Sub) represented and agreed in the Merger Agreement that (a) no Seller Party "will have or be subject to any liability to Buyer" in connection with any information or projections provided to Buyer; (b) Buyer was not relying on any statements or representations made by Defendants; (c) Buyer would be performing its own investigations of the Company and was taking "full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans" furnished to it, and "would have no claim against any Seller Party" with respect thereto; and (d) after the Closing, and giving effect to the financing incurred by Merger Sub, the Company would be solvent, and no property was being transferred nor obligation incurred "with the intent to hinder, delay or defraud either present *or future* creditors of Buyer . . . ."  Merger Agr. §§ 13I and 8J (emphasis added).

In December 2012, eight months after the Transaction closed, Court Square, on behalf of Buyer and Physiotherapy, offered and agreed to settle certain post-closing disputes on terms that included the granting of a release by Buyer and Physiotherapy of any claims they had or in the future may have against Defendants, "whether in law, equity, contract, tort, or otherwise, whether or not known now, heretofore or hereafter, whether anticipated or unanticipated, suspected, unsuspected or claimed, fixed or contingent, whether accrued or not and whether damage has yet

---

[27] Delaware law governs both the Merger Agreement and Release.  *See* Merger Agreement § 13G and Release at p. 2.

resulted from such or not, which such Person had, has or may ever have."  Release at 2.  The Release thus broadly and unambiguously extinguished all claims Buyer and Physiotherapy had, or may in the future have, whether accrued or not, arising out of or relating to the Transaction.